# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**RECEIVED**

## INFORMAL BRIEF OF APPELLANT

AUG 29 2024

**Case Number:** 24-2256

United States Court of Appeals
For the Federal Circuit

**Short Case Caption:** Golden v. US

**Name of Appellant:** Larry Golden

---

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 30 pages.

Attach a copy of the trial court's opinion, order, and/or judgment. You may also attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

---

1. Have you ever had another case before this court? ☑ Yes ☐ No
   If yes, state the name and number of each case.

   > Larry Golden v. Google LLC; Case No. 22-1267
   > Larry Golden v. Google LLC; Case No. 24-2024

2. Did the trial court incorrectly decide or fail to take into account any facts?
   ☑ Yes ☐ No
   If yes, what facts?

   > 28 U. S. C. § 455(a), which requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." It was developed under § 144, which requires disqualification for "personal bias or prejudice." the pejorative connotation of the words "bias or prejudice," which indicate a judicial predisposition that is wrongful or inappropriate. Even if the 10-day requirement could justify reading the extrajudicial source rule into § 144, it would not suffice as to § 455(a) or § 455(b)(1), which have no analogous requirement.

3. Did the trial court apply the wrong law? ☑ Yes ☐ No
   If yes, what law should be applied?

> Plaintiff cited the provision for disqualification under 28 U.S.C. § 455(a) in his "Motion for Disqualification" in at Dkt. 12 filed 7/19/23: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limitedto instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; Plaintiff is asking the Judge to disqualify himself ... Plaintiff is requesting the Judge disqualify himself because of a personal bias or prejudice the Judge has against Plaintiff." Although many disciplinary actions under these rules punish lies like fraud or perjury that violate other legal constraints, some hold lawyers and judges to higher standards of truthfulness by punishing lies that would likely not be punishable if uttered by nonattorneys. See In re Pautler, 47 P.3d 1175 (Colo. 2002); In re Carpenter, 95 P.3d 203 (Or. 2004). Plaintiff substantiate his historical experience with Judge Bruggink's personal bias and/or prejudice in three related cases of Plaintiff whereby Judge Bruggink is the presiding Judge.

4. Did the trial court fail to consider important grounds for relief?
   ☑ Yes ☐ No
   If yes, what grounds?

> Plaintiff cited the provision for disqualification under 28 U.S.C. § 455(a) in his "Reply in Support of Motion for Disqualification" in at Dkt. 19 filed 8/4/23: "Section 28 U.S.C. § 455 provides in relevant part: (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. (b) He shall also disqualify himself in the following circumstances: (1) [W]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding ... 28 U.S.C. § 455."[A]judge must recuse [himself] if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality."United States v. Hartsel, 199 F.3d 812, 820 (6th Cir. 1999) (quoting Hughes v. United States, 899 F.2d 1495, 1501 (6th Cir. 1990)) (modifications in original).
>
> The Judge instead lied and said Plaintiff cites 28 U.S.C. § 144 and used the statute as a valid reason for not addressing Plaintiff "motion for disqualification" for nine months and not before issuing an opinion on "preclusion."

5. Are there other reasons why the trial court's decision was wrong?
   ☑ Yes ☐ No
   If yes, what reasons?

> Plaintiff cited the provision for 'Judicial Misconduct' in his "Reply in Support of Motion for Disqualification" in at Dkt. 19 filed 8/4/23: "Judicial misconduct occurs when a Judge acts in ways that are considered unethical or otherwise violate the Judge's obligations of impartial conduct. It is Plaintiff's argument that Judge Bruggink is being intimidated by the DOJ to act under duress." "Otherwise, the Judge Bruggink's actions can be classified as judicial misconduct, which include: conduct prejudicial to the effective and expeditious administration of the business of the Court (as an example: "falsification of facts"or complicit with the"falsification of facts" at summary judgment or final judgement)."
>
> Plaintiff complaint for "Judicial Misconduct" against Judge Bruggink is attached and is assigned Case No: CL 24-90404 filed on May 24, 2024. This complaint was filed a month after the Reported Order but two months before the Judge denied Plaintiffs "Motion for Reconsideration".

6. What action do you want this court to take in this case?

A Fraud upon the Court by the Court occurred when Judge Bruggink made numerous false statements to support his personal bias or prejudice, which the U.S. Court of Federal Claims Judge was aware and yet did not correct in his final decision. Because fraud on the Court by the Court has occured, the entire case is voided or cancelled. This means that any ruling or judgment that the Court has issued will be rendered void. Fraud invalidates everything it touches. The major difference between fraud on the court, and other claims and remedies in law, is that there is no time bar for asserting fraud on the court. If Judge Bruggink is found to be biased or prejudiced, even prior to when the fraud occurred, he is required to excuse themself. The Fraud on the Court by the Court in Golden v. US case no. 13-307C, that is carried over to this current case Golden v. US case no. 23-811C, and relied upon for a"issue preclusion" dismissal, is "fraught with violations": The "fraught with violations" are described throughout the remainder of this informal brief.

Date: 08/26/2024

Signature:

Name: Larry Golden

## MEMORANDUM OF LAW GOVERNING THE UNITED STATES COURT OF FEDERAL CLAIMS JURISDICTION

The COFC Judge Bruggink violated Golden's right created by Congress to bring an action against the United States government for allegedly infringing Golden's patents under 28 U.S.C. § 1498(a), that provides in pertinent part: "[w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

In this current case *Golden v. United States* no. 23-811C; and, the previous case *Golden v. United States* no. 13-307C for which the COFC Judge Bruggink relied upon, was adjudicated by Judge Bruggink outside United States Court of Federal Claims' jurisdiction.

Golden spent years trying to explain to Judge Bruggink that *Golden v. United States* no. 23-811C is an alleged patent infringement action brought against the Department of Defense; Defense Threat Reduction Agency [the "United States"], and in the previous case *Golden v. United States* no. 13-307C it is an alleged patent infringement action brought against the Department of Homeland Security [the "United States"]. 28 U.S.C. § 1498(a).

In the previous case *Golden v. United States* no. 13-307C Judge Bruggink made the case a dispute against two private parties (Golden v. Apple); and demanded Golden prove Apple's direct infringement under 35 U.S.C. § 271(a) as a necessary predicate to proving the United States direct infringement under 28 U.S.C. § 1498(a). *Zoltek III*, 442 F.3d 1345, 1350 (Fed. Cir. 2006), abrogated by *Zoltek V*, 672 F.3d 1309, 1322–23 (Fed. Cir. 2012) (en banc).

> "[h]e goes on to include pictures of examples, which show the additional sensors added or affixed to the phones. They are not native to the devices as manufactured by Apple or Samsung. More fundamentally, however, they illustrate the painfully obvious problem with plaintiff's case: he has not, and at this point in the litigation we must presume cannot, credibly allege what component of the accused Apple, or Samsung for that matter, devices infringe literally, or is even equivalent to, hazard detectors or sensors claimed in his patents. The same language is used in plaintiff's contentions regarding Samsung, and for that matter, LG. *See, e.g.*, Samsung Claim Chart at 9, 16 *et seq*." Case 1:13-cv-00307-EGB Document 249 Filed 11/10/21 Pages 7 & 8 of 13

Likewise, in the current case *Golden v. United States* no. 23-811C, COFC Judge Bruggink again violated Golden's right created by Congress and overstepped the United States Court of Federal Claims jurisdictional boundaries to adjudicate this case as a dispute between two private parties (Golden v. Google), and dismissed Golden's case under the *Kessler* doctrine and "issue preclusion".

COFC Judge Bruggink forced Golden to defend against one third-party contractor—Apple for DHS *Cell-All* and Google for DoD DTRA ATAK. Senior Judge Bruggink forced a dispute between two private parties, which is outside the Court of Federal Claims jurisdiction. Golden's claim of alleged infringement and complaint is against the Government [DHS & DoD] for infringing Golden's patented invention(s) combinations.

| THE GOVERNMENT'S REQUEST FOR GOLDEN'S PATENTED INVENTION(S) COMBINATIONS | | | |
|---|---|---|---|
| **Agency**<br>Authorization and Consent | **Software**<br>CPU / Chipset / SoC [Operating System] | **Consumer Device**<br>Smartphones, PCs, Laptops, Tablets | **Detection Device**<br>Placed In, On, Upon, Adjacent, Plugins |
| **DHS**<br>*(Cell-All)* | Qualcomm<br>Apple<br>Google | Apple<br>Samsung<br>LG<br>Qualcomm | SeaCoast<br>Rhevision<br>NASA<br>Synkera<br>Qualcomm |
| **DoD / DTRA**<br>*(TAK)* | Samsung-ATAK<br>Qualcomm-ATAK<br>Apple-iTAK<br>Google-ATAK<br>Intel-WinTAK<br>Microsoft-WinTAK | Google<br>Intel<br>Apple<br>Samsung<br>LG<br>Qualcomm | Draper |

The Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson,* 26 Cl. Ct. at 370 (citing

*Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901).

As indicated in the above chart, it was the intention of the DHS in *Golden v. United States* case no. 13-307C and the intention of the DoD DTRA in *Golden v. United States* case no. 23-811C to expressly contract work to meet the specifications of Golden's patents; with specifications that cannot be met without infringing Golden's patent(s); and, with multiple government contractors to manufacture Golden's patented invention(s) combinations.

Therefore, COFC Judge Bruggink intentional and deliberate omission of the sensors and detectors the DHS & DTRA contracted for [expressed or implied] violates how the United States Court of Federal Claims adjudicate alleged patent infringement claims against the United States.

Addressing for the first time the meaning of "manufactured" for the purposes of 28 USC § 1498, the US Court of Appeals for the Federal Circuit affirmed the US Court of Federal Claims' interpretation of "manufactured" as being in a state "suitable for use." *FastShip, LLC v. United States*, Case Nos. 17-2248; -2249 (Fed. Cir., June 5, 2018) (Wallach, J).

The bulk of the Federal Circuit's analysis centered on the definition of the term "manufactured." The Court analyzed the plain meaning, context and legislative history of the term, ultimately finding that "manufactured" requires "each limitation of the claims" to be "suitable for use."

The Federal Circuit noted that its definition of "manufactured" is consistent with the Supreme Court of the United States' 2012 decision in *Samsung Elecs v. Apple* (IP Update, Vol. 15, No. 12), where it interpreted "manufacture" the same way in the context of 35 USC § 289. Thus, while the *FastShip* decision is only applicable to § 1498, broadly interpreted, the Court's definition of "manufactured" may have precedent throughout Title 35.

Judge Bruggink tactically eliminated the contributions of eight of the third-party contractors for the DHS S&T *Cell-All* initiative: Apple, Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Samsung, and LG; and, tactically eliminated the contributions of two of the third-party contractors for the DoD DTRA initiative: Google and Draper Laboratories, Inc.

Judge Bruggink also eliminated the contributions of third-party contractors who performed work under an "implied" authorization: Samsung, Qualcomm, LG, and Google's development of ATAK software; Apple's development of iTAK software; and Microsoft and Intel's development of WinTAK software.

Thereby, unlawfully narrowing the cases to disputes between the private parties in *Golden v. United States* case no. 13-307C to that of [Golden v. Apple] and *Golden v. United States* case no. 23-811C to that of [Golden v. Google], which falls outside the United States Court of Federal Claims jurisdiction.

When Judge Bruggink stated "the accused products are the 'private property' of the private entity Apple [Google], and the private entity(s) Apple did not have authorization from the Government to manufacture the accused products; nor did Apple have the consent to infringe Golden's patents for the furtherance of a benefit to the Government", Judge Bruggink, with knowledge and intent, literally made the case(s), a case between two private entities [Golden and Apple] and [Golden and Google], which is outside the Court of Federal Claims' jurisdiction.

When Judge Bruggink ordered Golden to identify in the Apple products certain sensors [for detecting CBRNE] that are only "*native*" to the manufacture of the Apple products, the Judge had just ordered Golden to prove direct infringement by a single private entity. "When a single actor performs all the steps necessary to infringe a patent, that actor is liable for direct infringement under 35 USC §271(a)."

The concept known as jurisdiction, consists of two main parts. The Court of Federal Claims must have power over the United States ("Government"), that Golden is suing for reasonable royalties, which is known as personal jurisdiction; and the Court of Federal Claims must have the power to resolve the legal issues under 28 U.S.C. § 1498(a), not 35 U.S.C. § 271(a), in the case(s), which is known as subject matter jurisdiction.

Consequently, the decisions made by Judge Bruggink are considered ***moot*** and cannot be a decision based on the merits of the previous case, nor can they be applied to this current case because the case was ordered by Judge Bruggink to be adjudicated as a dispute between private entities, which is outside the United States Court of Federal Claims' jurisdiction.

Because Judge Bruggink made both cases "a dispute between private entities" the Court of Federal Claims lack jurisdiction to adjudicate the cases. The United States Court of Federal Claims is barred from deciding Golden's suits.

Judge Bruggink's opinion in *Golden v. United States* case no. 13-307C was wrongfully entered because the Judge himself arranged that Golden prove direct infringement by Apple, [a private entity] as a necessary predicate to proving direct infringement under 28 U.S.C. § 1498(a). *Zoltek III*, 442 F.3d 1345, 1350 (Fed. Cir. 2006), abrogated by *Zoltek V*, 672 F.3d 1309, 1322–23

7

(Fed. Cir. 2012) (en banc). The opinion falls outside the Claims Court's jurisdiction, and is barred as precedence for "issue preclusion" in this current case. The opinions are moot.

"[T]he Supreme Court's doctrine on mootness imposes [a] limitation on justiciability derived from Article III's case-or-controversy requirement. *See* U.S. Const. art. III, § 2 on the federal courts' jurisdiction to resolve disputes. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)

"It has long been settled that a federal court has no authority 'to give opinions upon moot questions;'" *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). *See* also, e.g., *Calderon v. Moore*, 518 U.S. 149, 150 (1966) (same), that is, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 498 (1969)). *See* also, e.g., *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (same); *City of Erie v. Paps* A.M., 529 U.S. 277, 287 (2000) (same).

"[A]n actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1975 (2016) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013)). *See* also, e.g., *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013). *See* also, e.g., *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) ("It is a basic principle of Article III that a justiciable case or controversy must remain extant at all stages of review, not merely at the time the complaint is filed.") (quoting *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (per curiam)); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990) ("To sustain our jurisdiction . . . it is not enough that a dispute was very much alive when suit was filed, or when review was obtained in the Court of Appeals."); *Honig v. Doe*, 484 U.S. 305, 317 (1988) ("That the dispute between parties was very much alive when suit was filed ... cannot substitute for the actual case or controversy that an exercise of this Court's jurisdiction requires."); *Burke v. Barnes*, 479 U.S. 361, 363 (1987) ("Article III of the Constitution requires that there be a live case or controversy at the time that a federal court decides the case; it is not enough that there may have been a live case or controversy when the case was decided by the court whose judgment we are reviewing").

Thus, "if an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit []' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (quoting

Genesis *Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)). The Supreme Court has justified the mootness doctrine on the ground that it "ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *Genesis Healthcare*, 569 U.S. at 71.

## STANDARD OF REVIEW GOVERNING SUITS AGAINST THE UNITED STATES FOR THE UNLAWFUL USE OR MANUFACTURE OF PATENTED ARTICLES

This section covering the principles established under 28 U.S.C. § 1498(a) for "[w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same", was retrieved 'word-per-word' from the United States Court of Federal Claims website for what establishes the principles of 28 U.S.C. § 1498(a); and, what distinguishes the principles under 28 U.S.C. § 1498(a) from those of principles established under 35 U.S.C. § 271(a). Retrieved from: Intellectual Property Suits in the United States Court of Federal Claims: Posted on: 2017-10-04; Vol. 10 No. 1: By Judge Mary Ellen Coster Williams and Diane E. Ghrist. Published on the American Bar Association's website. https://uscfc.uscourts.gov/node/2927#:~:text=

Known as "the People's Court," the US Court of Federal Claims (USCFC) was created by Congress as a forum for suits against the government for monetary damages. Appeals from the USCFC are resolved by the US Court of Appeals for the Federal Circuit. The USCFC is unique in the federal trial court system in that it has nationwide jurisdiction, and hears a variety of claims against the US government for money damages, including patent infringement. The government has expressly waived its sovereign immunity and consented to be sued for patent infringement under 28 U.S.C. § 1498(a).

Section 1498(a) took its present form in 1949, and retains the bedrock principles established in 1910 and 1918 of (1) defining the government's unlawful use or manufacture of patented articles as a Fifth Amendment taking of a license to use a patented invention, (2) providing government contractor immunity from patent infringement litigation, and (3) limiting available remedies to monetary damages. Act of May 24, 1949, Pub. L. No. 81-72, § 87, 63 Stat. 89, 102. Section 1498(a) provides in pertinent part:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States. [28 U.S.C. § 1498(a)].

As § 1498(a) infringement actions are grounded in eminent domain ... the Patent Act— the statutory basis that governs the processes for issuing and enforcing patents before the United States Patent and Trademark Office (USPTO) and the district courts—defines patent infringement as a statutory tort in 35 U.S.C. § 271. [35 U.S.C. § 271(a)–(c), (e)–(g); see also *Decca*, 640 F.2d at 1166 ("Because section 1498 authorizes the Government to take a license in any United States patent, the Government is never 'guilty' of 'direct infringement' of a patent insofar as 'direct infringement' connotes tortious or wrongful conduct.").

Section 271(a) of the Patent Act provides: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." In contrast, § 1498(a) only references patented inventions "used or manufactured by or for the United States" as potentially infringing acts.

In *Decca Ltd. v. United States*, the Court of Claims interpreted § 1498 to mean that the government consented to be sued for damages stemming from direct infringement by consenting to suits for its "taking of a patent license," because § 1498(a) does not give rise to government liability for activities "which fall short of direct infringement," including induced and contributory infringement []. In *Zoltek III*, the Federal Circuit further narrowed § 1498 by holding that direct infringement under § 1498(a) with respect to the United States' use or manufacture of a patented invention was predicated on § 271(a) of the Patent Act. *See Zoltek Corp. v. United States* (*Zoltek III*), 442 F.3d 1345, 1350 (Fed. Cir. 2006), abrogated by *Zoltek V*, 672 F.3d 1309, 1322–23 (Fed. Cir. 2012) (en banc).

However, in the 2012 *en banc* decision *Zoltek V*, the Federal Circuit abrogated *Zoltek III*, holding that establishing conduct falling within the definition of direct infringement codified in 35 U.S.C. § 271(a) is not a predicate to finding infringement under § 1498(a). Instead, the court concluded that the scope of § 1498(a) is "linked to the scope of the patent holder's rights as granted by the patent grant in title 35 U.S.C. section 154(a)(1)." *Zoltek V*, 672 F.3d at 1323. In contrast to the statutory definitions of infringement in § 271, § 154(a)(1) defines the patent grant issued by the USPTO as:

> the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, . . . the right to exclude others from using, offering for sale or selling throughout the United States, products made by that process, referring to the specification for the particulars thereof. 35 U.S.C. § 154(a)(1). [1][2][3]

In *Zoltek V*, the appellate court emphasized that § 1498(a) is "its own independent cause of action" with three elements to trigger government liability: (1) the invention must be claimed in a patent; (2) it must be "used or manufactured by or for the United States," meaning each limitation of the claims must be present in the accused product or process; and (3) the "use or manufacture" of the patented invention must be done without license or lawful right—i.e., "use of an invention that, if done by a private party, would directly infringe the patent." 672 F.3d at 1321, 1323.

---

[1] 35 U.S.C. § 154(a)(1): Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

[2] Products made by an invention process: consists of the steps to create, develop, produce, and market a unique idea: and licensing or manufacturing and selling the invention. https://www.upcounsel.com/invention-process

[3] Utility patents [] cover processes, materials, and devices … A patent specification is a legal document that describes an invention and its various aspects. It is the most critical part of the patent application process, as it defines what the inventor claims to have invented and how they intend to protect their intellectual property. https://www.cypris.ai/insights/understanding-patent-specification-a-guide-for-innovators

The government's authorization of or consent to a contractor's infringing activity may be express or implied. *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976). Federal Acquisition Regulation (FAR) 52.227-1 contains an express grant of "authorization and consent" for contractors and subcontractors for the use and manufacture of any patented invention (1) embodied in the structure or composition of any article delivered to and accepted by the government related to a government contract; or (2) used in machinery, tools, or methods necessary for a contractor to comply with the specifications of a contract, or if such use is directed by a contracting officer's specific written instructions.48 C.F.R. § 52.227-1; see also *Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1367 (Fed. Cir. 2007); *TDM Am., LLC v. United States*, 83 Fed. Cl. 780, 784–86 (2008).

To succeed on an implied authorization theory there must be some explicit government action, such as a contracting officer's instruction, or evidence extrinsic to the contract language showing the government's intention to assume liability. *Va. Panel*, 133 F.3d at 870; Larson, 26 Cl. Ct. at 370.

In *Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370 (citing *Bereslavsky v. Esso Standard Oil Co.*, 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v. United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901.

The purpose behind permitting the government's authorization or consent to be implied is tied to the government's need to procure items without disruption, *TVI Energy*, 806 F.2d at 1060; *Blais v. United States*, 31 Fed. Cl. 422, 427 (1994) so as not to disturb the procurement process, a subcontractor's use of the subcontractor's own patents in performing a contract creates an implied license for the government to use the patented invention. Retrieved from:

Intellectual Property Suits in the United States Court of Federal Claims: Posted on: 2017-10-04; Vol. 10 No. 1: By Judge Mary Ellen Coster Williams and Diane E. Ghrist. Published on the American Bar Association's website. https://uscfc.uscourts.gov/node/2927#:~:text=

**THE PRINCIPLES ESTABLISHED UNDER 28 U.S.C. § 1498(a) FOR GOVERNMENT INFRINGEMENT; WAS CONFIRMED BY THE CLAIMS COURT IN THE PREVIOUS RELATED CASE GOLDEN v. US 13-307C, FOR THE *CELL-ALL* INITIATIVE**

Judge Braden describes how at least thirty devices asserted in the complaint by Golden was developed as a result of the specifications outlined in the Government solicitations. **Dkt. No. 94:** Filed 11/30/2016 in the previous case of *Larry Golden v. United States* Case No. 13-307C. REPORTED MEMORANDUM OPINION and ORDER denying 88 Motion to Dismiss - Rule 12(b)(1) and (6) … Signed by Judge Susan G. Braden. Judge Braden complies with the principles established under 28 U.S.C. § 1498(a):

> The February 12, 2016 Amended complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts or National Science Foundation ("NSF") grants. 2/12/16 Am. compl. at ¶¶ 68-127. These devices allegedly infringe claims in Plaintiff's '497, '752, '891, '990, and '189 Patents. 2/12/16 Am. Compl. at ¶¶ 68-127.

> The relevant devices. are: M-Lock; High-power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; Smartphone Biosensor cradle; iPhone Biodetector smartphone; Pathtracker; the center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded sensors; Smartphone-Based Rapid Diagnostic Tests; Lockheed Martin K-Max Unmanned Self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; SIN-Vapor I Smartphone system; Samsung Galaxy s6 Microscope Smartphone; VOCket System; Nett warrior Smartphone System; Northrop Grumman x-47B UCAS | x-478 control Display unit; GammaPix; NFC Samsung Galaxy s6 smartphone Sensor; *Cell-All Synkera MikroKera ultra*: Biotouch System; iPhone Biodetector Smartphone; Navy Marine Corps Intranet; FLIR identiFINDER R300; AOptix stratus MX Peripheral; MultiRae Pro wireless portable Multi Threat Radiation and chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX; 1"x2" Detection Device Samsung Galaxy s6 smartphone; 2"x2" Detection Device Samsung Galaxy s6 smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the passport systems Base control unit; Oshkosh Defense Autonomous Unmanned Ground vehicle TerraMax; and the *Variable NODE+Oxa*. 2/72/76 Am. Compl. at, ¶¶ 68-127.

> Infringing activity is "for the Government" under section 1498(a) if it is "for the benefit of the Government.' *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir.2009); see also *Madey Duke University,* 413 F. Supp. 2d, 601, 607 (M.D.N.C. 2006) ("A use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" (quoting *Riles v. Amerada Hess, Corp.*, 999 F. Supp. 938,940 (S.D. Tex. 1998)). *In Hughes Aircraft Co. v. United States*, 534 F.2d 889 (197 6), for example, the court held that a satellite program

to advance the military defense and security of the United States was "for the Government." Id. at898.

Moreover, "authorization or consent of the Government," does not need to be expressly stated. *See TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) ("[a]uthorization or consent by the Government can be express [or] [i]n proper circumstances, Government authorization can be implied."). Indeed, "authorization or consent . . . may be given in many ways other than by ... direct form of communication —e.g., by contracting officer instructions, [or] by specifications . . . which impliedly sanction and necessitate infringement[.]" *Hughes Aircraft Co*, 534 F.2d at 901.

"[U]nder the Tucker Act, the United States Court of Federal Claims has jurisdiction to adjudicate a claim if the statute, regulation, or constitutional provision that is the basis for that claim "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained," *United States v. Mitchell*, 463 U.S. 206,217 (1983), and the plaintiff is "within the class of plaintiffs entitled to recover under the statute if the elements of [the] cause of action are established," *Greenlee County, Arizona v. United States*, 487 F.3d 871,876 (Fed. Cir. 2007). "There is no further jurisdictional requirement that plaintiff makes [] additional nonfrivolous allegation[s] that [he] is entitled to relief under the relevant money-mandating source." *Jan's Helicopter Serv., Inc. v. Federal Aviation Agency*. 525 F.3d 1299,1307 (Fed. Cir. 2008).

Judge Bruggink describes how "the specifications and capabilities of the CMDC devices that were developed for, manufactured and commercialized by third-party government contractors, Apple, Samsung, and LG, are significantly the same as the Plaintiff's CMDC devices." Sixth Am. Compl. ¶¶ 6, 12. **Dkt. No. 215:** Filed 02/06/2021 in *Larry Golden v. United States* Case No. 13-307C. Order ... Signed by Senior Judge Eric G. Bruggink:

> Plaintiff also alleges his "communicating, monitoring, detecting, and controlling ("CMDC") device is commercialized in the form of an improved cell phone, smartphone, smartwatch, laptop, or tablet. The specifications and capabilities of the CMDC devices that were developed for, manufactured and commercialized by third-party government contractors, Apple, Samsung, and LG, are significantly the same as the Plaintiff's CMDC devices." Sixth Am. Compl. ¶¶ 6, 12. Attached to the sixth amended complaint is a claim chart that purports to identify features of devices alleged to be part of the DHS Cell-All initiative that infringe claims of the patents asserted in the current complaint. Id. Ex. 7.

> Further, we read the complaint as asserting infringement from the 2011 demonstration forward. It appears that Mr. Golden asserts that the Cell-All initiative resulted in the manufacture of a variety of devices that infringe his patents. We can reasonably infer that he is pointing the finger at the federal government for the inclusion of his technology in

these third-party devices. Thus, whether ultimately true or not, the complaint has put at issue events that may have happened after the patent priority dates. We therefore find no basis to dismiss on either of those grounds.

As to defendant's argument that plaintiff's current infringement allegations are too "vague as to the nature of the Cell-All project and exactly how plaintiff alleges the Cell-All Project infringed the '497 Patent," we disagree. Def. Mot. to Dismiss at 12. In alleging infringement of his patented CMDC technology, plaintiff attached a lengthy series of "claim charts" illustrating allegations of how the government, and third parties at the government's behest, are infringing certain of his patents' claims. Sixth Am. Compl. Ex. 7 at 100-108. Defendant's motion has not attempted to wrestle with that chart or otherwise explain with any detail why those claims fail as a matter of law.

In exhibit 7 to his present complaint, plaintiff's claim chart illustrates instances of alleged infringement of the '189 patent, '287 patent, '439 patent, '497 patent, and the '752 patent. E.g., id. at 100-108. He includes separate charts for a device manufactured by LG, one by Apple, and Samsung. The next chart in exhibit 7 explains why he believes that the *Cell-All* initiative resulted in the manufacture of these devices for DHS. More detail is appended regarding each of the accused devices in charts and diagrams that follow. In short, we cannot conclude on the face of these documents without more detailed briefing and examination that no valid patent claim has been presented. Read together with the sixth amended complaint, it is clear that Mr. Golden is alleging that the government caused the manufacture of all of these devices or caused these devices to use his technology.

The rest is history, Judge Bruggink flipped and narrowed the case to one between two private parties [Golden and Apple]. The Judge dropped the seven other third-party contractors, [Seacoast, Synkera, NASA, Rhevision, Qualcomm, Samsung, and LG]; but, most of all, the Judge never decided whether the Government infringed the patented combinations of Golden that was developed and assembled by the eight third-party contractors.

The Judge stated the sensors cannot be considered in the combination because they were not "*native*" to the manufacture of the Apple device. The Judge stated Golden enlarged the case when Golden identified Golden's patented CPU. The Judge himself approved claim 4, 5, & 6 of Golden's '287 patent. The three patent claims are Golden's patented CPU claims.

Judge Bruggink lied when he said Golden was unable to find the sensing component in the accused devices. When Judge Bruggink ordered Golden to find the sensing component in the private parties' devices as a predicate to proving the government directly infringed under 28 U.S.C. § 1498(a), Golden presented the private parties' camera sensors and the private parties' smartwatch, both are native to the manufacture of the private parties' devices and both are capable of sensing for CBR. "Unable to find a sensing component in the accused devices, Mr.

Golden did as he has done for many years now, simply brought in another party and device. Unexplained is how they relate either to the products ostensibly accused by the complaint or the overarching mystery present in all of plaintiff's pleadings—how the government is on the hook for the private parties' products." *Golden v. US* Case No. 1:13-cv-00307-EGB Document 249 Filed 11/10/21 Page 8 of 13



The camera captures the image from the array of nanopores that uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the resolution phone camera. The resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time*. Source: https:// www.under standingnano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of

Judge Bruggink extended the goal post when he ordered Golden to find sensing components that was both 'native' to the manufacture of the accused devices and 'internal' the private entities devices. When Golden complied, Judge Bruggink said "Golden was unable to identify a sensing component in the accused devices". Thereby dismissing the case on a lie.

According to the principles established under 28 U.S.C. § 1498(a), "In contrast, [to section 271(a)] § 1498(a) only references patented inventions "used or manufactured by or for the United States" as potentially infringing acts" … "The government's authorization of or consent to a contractor's infringing activity may be express or implied" … "To succeed on an implied authorization theory there must be some explicit government action, such as a contracting officer's instruction, or evidence extrinsic to the contract language showing the government's intention to assume liability" … "the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without

16

infringing on a patent; and (3) the government had some knowledge of the infringement" … "the government's authorization or consent to be implied is tied to the government's need to procure [] without disruption, 427 (1994) so as not to disturb the procurement process, a subcontractor's use of the subcontractor's own patents in performing a contract creates an implied license for the government to use the patented invention."



The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. *Credits: Variable Inc.*

Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color references, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.

In Judge Bruggink's opinion, he expressly infers he is against the principles established under § 1498(a) for an implied subcontractor's authorization to perform work for the government or that the work performed creates an implied license with the government. If the Judge believed in the principles established under 28 U.S.C. § 1498(a), he would not have written the following:

"General Systems Inc. and the NODE+ device [is] new to the suit" … " the NODE+ and the "off-the-shelf sensor" are both separate from and extraneous to the accused devices" … "they are an improper expansion of the case" … "they illustrate the painfully obvious problem with plaintiff's case: he has not, and at this point in the litigation we must presume cannot, credibly allege what component of the accused Apple, or Samsung for that matter, devices infringe literally, or is even equivalent to, hazard detectors or sensors claimed in his patents" … "NODE+ and the additional sensor needed to make it work are not components of the phones and smart watches accused by plaintiff" … "[t]hey are not

native to the devices as manufactured by Apple or Samsung." *Golden v. US* Case No.
1:13-cv-00307-EGB Document 249 Filed 11/10/21 Page 7 of 13

In *Larson v. United States*, the Claims Court recognized that implied authorization "may
be found under the following conditions: (1) the government expressly contracted for work to
meet certain specifications; (2) the specifications cannot be met without infringing on a patent;
and (3) the government had some knowledge of the infringement." *Larson*, 26 Cl. Ct. at 370
(citing *Bereslavsky v. Esso Standard Oil Co*., 175 F.2d 148, 150 (4th Cir. 1949); *Carrier Corp. v.
United States*, 534 F.2d 244, 247–50 (Ct. Cl. 1976); *Hughes*, 534 F.2d at 897–901.

In the previous case *Golden v. United States* no. 13-307C [discussed above], and in the
current case *Golden v. United States* no. 23-811C, COFC Judge Bruggink fail to recognize that
implied authorization is present when the government expressly contracted for work to meet
certain specifications under the *Cell-All* initiative and the DoD DTRA ATAK initiative; when the
*Cell-All* and the DoD DTRA ATAK initiatives specifications cannot be met without infringing on
Golden's patent(s); and, the government was made aware of Golden's patented inventions on
multiple occasions, beginning in year 2006.

Qualcomm, Inc. was designated the "prime contractor" in the DHS S&T *Cell-All*
initiative. The prime contractor work directly with the government. They manage any
subcontractors and are responsible for ensuring that the work is completed as defined in the
contract.

In 2007, the DHS S&T called upon the private sector to develop concepts of operations.
"[T]hree teams from Qualcomm, the National Aeronautics and Space Administration (NASA),
and Rhevision Technology were selected to perfect their specific area of expertise. Qualcomm
engineers specialize in miniaturization and know how to shepherd a product to market" …
"S&T is pursuing what's known as cooperative research and development agreements with four
cell phone manufacturers: Qualcomm, LG, Apple, and Samsung."
https://www.dhs.gov/archive/cell-all-super-smartphones-sniff-out-suspicious-substances

"Qualcomm's role has been to develop a smartphone app [chipset that combines the CPU
and cellular modem] and the associated network software [Qualcomm's software for cellular
connectivity] for processing data [CPU for carrying out the operational and functional
instructions for the smartphone]. Smartphone users can download the app(s) from Google Play

18

and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iPhone operating systems.



Qualcomm first introduced a "built-in, embedded"
chemical sensor for the *Cell-All* smartphone

"The major milestone in the development of the Google Android system occurred on November 5th, 2007. On this day, Google unveiled the Open Handset Alliance (OHA), a consortium of technology manufacturers that would work together to create open mobile device standards. At the outset, 34 companies were involved in the consortium. The companies included in the collection at that point included wireless telecommunications providers (T-Mobil), mobile handset makers (Motorola, HTC) and chipset makers (Texas Instruments, and Qualcomm). https://ipwatchdog.com/2014/11/26/a-brief-history-of-googles-android-operating-system/id=52285/

Qualcomm is the prime contractor responsible for ensuring that the work is completed as defined in the *Cell-All* contract. Qualcomm was personally responsible for providing three major components for the assembly of the *Cell-All* cell phone detection device that infringes Golden's patents: the new, improved upon, and useful cell phone [Golden's CMDC Device]; the sensing component [Golden's Multi-Sensor Detection Device]; and, the processor for carrying out functional and operational instructions [Golden's Central Processing Unit (CPU)].

The question is why select Apple, the private contractor who's only responsibility was to assemble and commercialize, under a cooperative agreement the components developed under the *Cell-All* contract, over Qualcomm, the prime contractor responsible for providing three major components named in the above paragraph and a cellular modem for wireless connectivity.

19

Judge Bruggink knew that if the Appellate Court overturned its inaccurate interpretation of the law governing the Government's patent infringement liability under 28 U.S.C. § 1498(a), and rule that beyond the fact the case was litigated outside the United States Court of Federal Claims' jurisdiction, Golden has successfully proven the Apple products literally or under the doctrine of equivalents infringes Golden's patent; when the case returns back to the Claims Court Golden would have to start all over again providing the Government infringed, because Apple is immune from infringement liability because of its immunity under § 1498(a).

In a lawsuit between private parties, § 1498(a) operates as an affirmative defense, and where a private party's use of a patented invention is "for the Government" and with the "authorization and consent of the Government," that private party cannot be held liable for patent infringement. See *Madey v. Duke Univ.*, 307 F.3d 1351, 1359 (Fed. Cir. 2002).

If Judge Bruggink believed the case(s) are disputes between private parties, Judge Bruggink should have dismissed the case eight years ago. "[N]otably, when a suit arising under § 1498 is brought against a private party, the claims must be dismissed in favor of a suit against the United States. See *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F.Supp.3d 963 (2019) (granting motion for summary judgement because of defendant's immunity under § 1498); see also *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1382 (Fed. Cir. 2002).

In the previous case *Golden v. United States*, the only comment Judge Bruggink made about Qualcomm in his "opinion to dismiss" Case no. 1:13-cv-00307-EGB Document 249 Filed 11/10/21 Page 6 of 13 is: "He [Golden] also discusses documents from Qualcomm, a mobile phone chip producer, apparently submitted to DHS in response to the Cell-All solicitation".

Judge Bruggink knew that by blocking the contribution of the sensors and the CPU the product could never be "suitable for use". The Judge proceeded to get sarcastic in saying: "[U]nexplained is how they relate either to the products ostensibly accused by the complaint or the overarching mystery present in all of plaintiff's pleadings—how the government is on the hook for the private parties' products."

"[E]ven though device has other hardware and embedded software module that cannot be used to infringe—distinguishing *Hodosh* (Fed. Cir. 11/25/87) and relying on *Grokster* (U.S. 06/27/2005) ("one who distributes a device with the object of promoting its use to infringe [], as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.") *Ricoh* (Fed. Cir. 12/23/08).

Judge Bruggink was completely out of line when he allowed the modification of the DHS S&T Cell-All contract, without having the official modification made at the DHS and agreed upon by the prime contractor Qualcomm:

> Contract modification is a generic term meaning any written change in the terms and scope of the contract. When using FAR Part 12 procedures for the acquisition of commercial items, the Government does not have authority to unilaterally require changes. The commercial item clause at FAR 52.212-4, Contract Terms and Conditions -- Commercial Items, requires that both parties agree to changes in the terms and conditions of a contract. When this occurs, a supplemental agreement has been created. https://www.dau.edu/acquipedia-article/contract-modifications-and-changes.

Further, the modification to the DHS S&T Cell-All contract to include in specifications a requirement for a lock disabling mechanism would have been insignificant for the purpose of developing and assembling a mobile device capable of CBRNE sensing. Judge Bruggink is quoted as saying: "Defendant also argues that the claim charts fail to identify in the accused devices any locking mechanism or function as claimed by the five patents" … "his claim charts do not identify any biometric fingerprint sensors or functions in the accused devices as the claimed locking features" … "[t]his same problem betrayed plaintiff's first attempt at infringement contentions, and it does so again" … "Mr. Golden's claim charts are deficient because they do not identify the locking mechanisms in the accused devices."

Judge Bruggink lies when he states, "Golden's claim charts are deficient because they do not identify the locking mechanisms in the accused devices." Judge Bruggink admits himself he is lying: "Claims 4, 5, and 6 of the '287 patent each teach "at least one" locking mechanism that communicates with "at least one" CPU for locking or disabling the device. E.g., Apple Claim Chart at 197, 206, 216 (quoting claims 4, 5, and 6 of the '287 patent). Case no. 1:13-cv-00307-EGB Document 249 Filed 11/10/21 Page 11 of 13.

Judge Bruggink again admits he is lying when he states Golden failed to identify in the private party Apple smartphones where the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock is found: "To be fair, the patents also separately claim a locking and unlocking mechanism which responds to unauthorized attempts to access the device by locking it. For these limitations, the claim charts recite the patents' specifications and apparently quote an explanation from Apple regarding its Apple ID locking functions." The following chart and information are supported by twelve independent patent claims asserted against at least six Apple smartphone devices:

21



**Apple ID Disabled or Locked?** **Let's Fix it!**

"If your Apple ID is locked or disabled; if you or someone else enters your password or other account information incorrectly too many times; if your account has been disabled for security reasons; or, if you see one of the following messages, your Apple ID automatically locked to protect your security and you can't sign in to any Apple services: "this Apple ID has been disabled for security reasons"; "you can't sign in because your account was disabled for security reasons"; "this Apple ID has been locked for security reasons", you need to reset your password to regain access. Reset your password or fingerprint: "Use the steps below to reset your password from any trusted iPhone, iPad, iPod touch, or Mac. You can also use a friend or family member's iPhone, iPad, or iPod touch. If that doesn't work, you may not be signed into iCloud on an eligible device or have two-factor authentication enabled for your Apple ID. https://support.apple.com/en-us/HT201487 Apple's iPhone 11 & iPhone 12 Series Security feature:

The function of the phones lock disabling mechanism can be verified by simply entering the wrong code; the wrong fingerprint; or the wrong facial to many times and the phone will lock you out as an unauthorized person.

**Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"

Judge Bruggink improperly modified the Cell-All initiative to include a locking component that is insignificant to the development and assembly of a cell phone capable of sensing for CBRNE; lied that Golden never identified the locking component; and, used the insignificant locking component to dismiss Golden's case against the Government in *Golden v. US* case no. 13-307C.

In claim 5 of Golden's '287 patent Golden describes "a monitoring device". Judge Bruggink is complicit with this phase "a monitoring device" to describe Golden's patented invention as a Communicating, Monitoring, Detecting, and Controlling (CMDC) device: "Plaintiff describes his invention as a Communicating, Monitoring, Detecting, and Controlling, known as a 'CMDC'."

In claim 5 of Golden's '287 patent Golden describes "a monitoring device", "**Apple iPhone 11 & iPhone 12 Series** are believed to be communicating, monitoring, detecting, and

controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU)" ... "**Apple iPhone 11 Chipset**: Apple A13 Bionic (7 nm+). **Apple iPhone 11 CPU**: Hexa-core (2x2.65 GHz Lightning + 4x1.8 GHz Thunder). **Apple iPhone 12 Chipset**: Apple A14 Bionic (5 nm). **Apple iPhone 12 CPU**: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). **Apple Watch Series 5 Chipset**: Apple S5. **Apple Watch Series 5 CPU**: Dual-core. **Apple Watch Series 6 Chipset**: Apple S6. **Apple Watch Series 6 CPU**: Dual-core".

Golden identified where in the Apple devices the CPU is found alone with the make and model of each CPU per each alleged infringing device.

In claim 5 of Golden's '287 patent, the first element that is comprised by the "monitoring device" is "at least one central processing unit". The next 'nine' elements of Golden's "monitoring device" are described as being "in communication with the at least one CPU for monitoring temperature".

The functionality of the **Apple iPhone 11 & iPhone 12 Series** CPU element is described as carrying out instructions in substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)).

---

**Plaintiff believes the Defendant and third-party vendor; Apple Inc. is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854))**

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.

All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices.

---

Judge Bruggink lied when he said the following: "plaintiff's argument that a CPU is the infringing component" ... "plaintiff's response to the motion to strike that he asserts that the CPUs themselves satisfy the sensor limitation" ... "plaintiff asserts that the phone's brain, its

CPU, ought to count as the sensor" ... "the CPU cannot be both the thing that responds to the inputs—the brain—and the extremities that deliver the inputs" ... " Plaintiff's August 23 submission improperly attempts to expand the scope of the case" ... "This appears in tune with plaintiff's argument that a CPU is the infringing component" ... "the inclusion of these new chips as independent infringing devices is an improper attempt to again enlarge and materially change the infringement pled" ... "In any event, these contentions are not supported by a claim chart and thus violate RCFC Patent Rule 4(c). Accordingly, plaintiff's August 23 submission is struck for failure to conform to the court's rules and failure to follow a court order".

Golden has patent claims that covers his patented CPUs but they were not asserted in this case *Golden v. US* Case No. 1:13-cv-00307-EGB. Judge Bruggink ordered Golden to locate where in the accused devices the CPU is found and when Golden did, Golden's documentation was stricken from the record, and Golden was accused of not complying with a Court order and complying with the requirements of Local Patent Rule 4. This too, is another lie.

In the current case *Golden v. US* Case No. 1:23-cv-00811-EGB, Golden was very sure to indicate that the camera sensor was native to manufacture of the Google smartphone(s) but also functions as a sensing device. See the chart below for an element-by-element analysis:

| The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone ||
|---|---|
| **Patent No. 10,163,287 (Patent Claim 5 of Golden's '287 patent)** | **Google "megapixel" Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween** |
| *A monitoring device, comprising*: | [Golden has identified the Google smartphone(s) as "a monitoring device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| at least one central processing unit (CPU); | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | [Golden has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+ 2x2 MIMO of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | [Golden has identified the Bluetooth® v5.3 with dual antennas for enhanced quality of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; | [Golden has identified the Google Pixel smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | The Google Pixel smartphone is equipped with the ability to check a "human" heart rate i.e. the number of beats per minute with the smartphone camera, and the working camera flash unit that is in communication with the Google "Tensor" CPU/Chipset] |
| one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | [Golden is identifying the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is in communication with the Google Pixel smartphone "Tensor" CPU/Chipset] |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor ... or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | [Golden is identifying the Google Pixel smartphone(s), that is in communication with the Google "Tensor" CPU/Chipset, as "a monitoring device" or "communication device", interconnected to the Google "megapixel" Camera as the cell phone detection device capable of receiving signals or sending signals] |

## NINE FEDERAL JUDGES WHO HAS REVIEWED GOLDEN'S PATENTED COMBINATIONS ALL AGREE THE GOVERNMENT IS THE "SINGLE ENTITY' FOR DIRECT INFRINGEMENT UNDER 28 U.S.C. § 1498(a).

Under 28 USC § 1498, the patentee's "exclusive remedy for an alleged infringement by or for the Government, which means the Government is the 'single entity' for the purpose of direct infringement, is a suit against the United States in the Court of Federal Claims."

The statue serves two purposes: (i) it waives sovereign immunity to permit a patent owner to recover damages for direct infringement [] and (ii) it protects contractors [Draper and Google, LLC] from liability for patent infringement committed on behalf of the United States.

Therefore, nine judges, six from the Federal Circuit and three from the Northern District of California, acknowledged the "U.S. Government", the single entity under 28 USC § 1498 for

direct infringement, is more likely than not, the direct infringer because the element-by-element requirement is only satisfied under 28 USC § 1498 when Golden's entire patented invention combination is made and is "suitable for use".

**The United States Court of Appeals for the Federal Circuit Judges in _Golden v. Google, LLC,_ Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

The Federal Circuit in _Larry Golden v. Google LLC_; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. _Golden v. Google_) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., _Southwall_ (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. _Becton Dickinson_ (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); _Cobalt Boats_ (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." |

The Federal Circuit in _Golden v. Google LLC_ Case No. 22-1267 disclosed in "Discussion" that [] "under the pleading standards set forth in _Bell Atlantic Corp. v. Twombly_, 550 U.S. 544 (2007), and _Ashcroft v. Iqbal_, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." _Twombly_, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." _Iqbal_, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "[] and it does so in a relatively straightforward manner. ... [t]he district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart."

The Circuit did not specifically say "Google's smartphones that include the ATAK software and CBRN plugin sensors literally or under the doctrine of equivalents, infringing Golden's patents", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not is directly infringing Golden's patents asserted in the case.

**The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's [] patents if a user were to add [] ATAK application and CBRN plugins.

"Google argues that "Mr. Golden alleges that some Google Pixel devices could infringe his asserted patents if a user were to add an additional application, ATAK ... Google contends that "Mr. Golden thus alleges not that Google sells infringing Pixel devices ..." *Id.* (emphasis in original). Google argues that these allegations are not sufficient to support an infringement claim. *Id. The Court agrees*."

"Plaintiff's claims, as pled, only allege that Google's devices infringe the patents in issue if the end user downloads a particular application. Plaintiff includes a claim chart purporting to

27

describe the components of the Google Pixel 5 (which Plaintiff asserts is "representative of all the alleged infringing products of Google asserted in this complaint") that allegedly map onto the elements of an independent claim for each of the asserted patents. See Compl. ¶ 53."

Golden is the first admit, the ATAK software is not necessarily the problem. The mere existence of the ATAK software does not infringe Golden's patents. But once a third-party embodies the ATAK software with Golden's patented CPUs to carry out operational and functional instructions; embodies the ATAK software with Golden's patented smartphone to enable the hardware and software to communicate with each other; and embodies the ATAK software to make Golden's patented CBRNE devices detect; then we do have a serious problem.

"Even affording Plaintiff the benefit of the doubt, his own claim chart makes it clear that Defendant's products purportedly infringe because of the characteristics of the ATAK application. But Plaintiff's complaint alleges that ATAK is not made by Google, and he does not allege that ATAK comes pre-loaded on Google phones:" *Judge Haywood S. Gilliam, Jr.*

> "*ATAK is a digital application* available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — *on an end-user device such as a smartphone or a tablet*. With DTRA's contribution, ATAK now *includes chemical, biological, radiological, and nuclear (CBRN) plug-ins*. See Compl. ¶ 18 at 13 (emphasis in original)."

**The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU, and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

"The complaint's allegations made clear that whether Google's smartphones (Google Pixel 3, 3 XL, 3a, 3a XL, 4a, 4a (5G), and 5) allegedly infringed on the patents-in-suit depended on the end user's download of the Android Team Awareness Kit ("ATAK"), which is a third-party application not made by Google. (Id. at 5–6.)

"ATAK application. Golden's first claim of direct infringement (see FAC, Ex. G ("Ex. G") at 2–9) fails for the same reason as the original complaint: it requires the use of ATAK, a

28

third-party application that the user must install on the accused product, for at least two elements of each asserted claim. (See id. at 6.) See *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without modification—the modification of installing the required software")."

Both Northern District of California Court Judges Haywood S. Gilliam Jr. and Rita F. Lin determined the combined ATAK software, smartphone, and CBRN plugin sensors, describes a method, system, or apparatus that is covered in Golden's patents. The Judges also described how the DoD authorized or consented to the DTRA, Draper, and Google infringing Golden's patented combination.

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality."

"The district court agreed and dismissed Mr. Golden's complaint [] concluding, in part, that "[t]he allegations [] are wholly unsupported []" Golden, 2023 WL 3919466, at *2."

## CONCLUSION – FRAUD ON THE COURT

The history of *Golden v. US* case no. 13-307C, that is carried over to this current case *Golden v. US* case no. 233-811C, and relied upon for a claim of "issue preclusion", will show that it was fraught with violations of "Fraud upon the Court by the Court", i.e. United States Court of Federal Claims. A Fraud upon the Court by the Court occurred when Judge Bruggink made numerous false statements, which the U.S. Court of Federal Claims Judge was aware and yet did not correct in his Final Decision.

Fraud on the Court by the Court is considered to be one of the most serious violations that can occur within a court of law. If fraud on the Court by the Court occurs, the entire case is voided or cancelled. This means that any ruling or judgment that the Court has issued will be rendered void. Fraud invalidates everything it touches.

Fraud on the Court by the Court occurred when: the intentional fraud was committed; the intentional fraud was committed by Judge Bruggink of the Claims Court; the intentional fraud was directed at the Claims Court itself; and the intentional fraud deceived the Claims Court.

The Fraud on the Court by the Court in *Golden v. US* case no. 13-307C, that is carried over to this current case *Golden v. US* case no. 23-811C, and relied upon for a "issue preclusion" dismissal is fraught with violations "Fraud upon the Court by Judge Bruggink", i.e. United States Court of Federal Claims in the following: changing the cause of action from a claim against the government to a claim between private parties; adjudicating outside the Claims Court's jurisdiction; changing the requirements of the contract specifications; misrepresenting the requirements of local rule 4; failure to follow the decision of the higher Court of Appeals for the Federal Circuit within the same jurisdiction; failure to recognize implied authorization under 28 U.S.C. § 1498; requiring direct infringement is proven under 35 U.S.C. § 271(a) as a necessary predicate to proving direct infringement under 28 U.S.C. § 1498(a); bias in favor of the government; bias in favor of the third-party contractors to include Qualcomm; and, refusal to disqualify. The violations above are described throughout this informal brief.

The major difference between fraud on the court, and other claims and remedies in law, is that ***there is no time bar for asserting fraud on the court***. If Judge Bruggink is found to be biased or prejudiced, even prior to when the fraud occurred, he is required to excuse themself.

Signature: _Larry Golden_     Date: _8/26/24_

**CORRECTED**

# In the United States Court of Federal Claims

No. 23-811C
(Filed: April 23, 2024)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

LARRY GOLDEN,

        *Plaintiff,*

v.

THE UNITED STATES,

        *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Larry Golden*, pro se.

    *Grant Johnson*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Scott Bolden*, Director, for defendant.

<u>ORDER</u>

BRUGGINK, *Judge*

    Plaintiff Larry Golden, appearing *pro se*, filed his most recent, fourth complaint in this court on May 31, 2023. In it, Mr. Golden alleges the United States, through the Defense Threat Reduction Agency "authorized or consented" to the use of Google phones that infringed on the same patents[1] as those previously asserted in his first case, filed in 2013 ("*Golden I*"). Compl. ¶ 21 (the present case is "*Golden IV*"). Except for the manufacturer of the accused devices and the agency alleged to have authorized the

---

[1] Those are U.S. Patents No. 10,163,287, 9,589,439, and 9,096,189. A fourth patent, not asserted in this case, was also alleged to have been infringed in *Golden I*.

infringing use, the present case is otherwise virtually identical to plaintiff's first patent complaint.

In *Golden I* (Case No. 13-307), plaintiff alleged that the government infringed the claims of five related patents through a Department of Homeland Security ("DHS") initiative known as "CELL-ALL." Eventually, he identified virtually all cell phones manufactured by Apple and Samsung after the 2011 DHS initiative as infringing. After plaintiff amended his complaint six times, *Golden I* was dismissed on November 10, 2021, with prejudice for failure to conform his infringement contentions to the court's rules. *Golden v. United States*, 156 Fed. Cl. 623, 632 (2021). Plaintiff appealed, and the Federal Circuit affirmed the dismissal on September 8, 2022. *Golden v. United States*, No. 2022-1196, 2022 WL 4103287 (Fed. Cir. 2022). Mr. Golden also filed two other actions in this court, founded on constitutional theories, which are not germane to the present issues.[2]

Mr. Golden also recently brought his theories to the federal district courts in South Carolina and California, asserting similar patent claims to those here against Google and other companies. We need not discuss all of the litigation that those complaints have spawned. What is relevant here, however, is that Mr. Golden filed infringement claims against Apple, and others, in the District of South Carolina which were dismissed as frivolous. On appeal, however, the Federal Circuit reversed, holding that the Apple

---

[2] Plaintiff filed his second action on January 17, 2019, alleging a Fifth Amendment taking based on the Patent Trial & Appeal Board's cancellation of certain claims of another of plaintiff's patents during an *inter partes* review ("IPR") ("*Golden II*"). The court dismissed *Golden II* with prejudice on May 14, 2019, finding that the cancellation of the patent claims was plainly the result of plaintiff's voluntary amendment, not government action. *Golden v. United States*, No. 19-104C, 2019 WL 2056662 (Fed. Cl. 2019) ("*Golden II*"). The Federal Circuit also affirmed this dismissal. *Golden v. United States*, 955 F.3d 981 (Fed. Cir. 2020).

Plaintiff filed his third action here on February 7, 2023, again on the grounds that DHS took one of his patents during the IPR without compensating him. *See Golden v. United States*, No. 23-185C, 2023 WL 4466401 (Fed. Cl. May 30, 2023) ("*Golden III*"). Before granting the government's motion to dismiss for lack of jurisdiction on statute of limitations grounds, we noted that *res judicata* would otherwise clearly bar the claim due to its near-identical nature to the claims proposed in *Golden II*. *Id.*, *aff'd*, No. 2023-2139, 2023 WL 8663093 (Fed. Cir. Dec. 15, 2023).

complaint was not facially frivolous, but the court took no position on the merits of the infringement claim itself. *Golden v. Apple, Inc.*, No. 2022-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022). As discussed later, a misunderstanding of the import of that decision was the impetus for plaintiff's instant case.

In the present suit, defendant has moved to dismiss on the basis that Mr. Golden's claim is barred due to the preclusive effect of the judgment entered in *Golden I*.[3] Plaintiff has since filed a motion for summary judgment, arguing that the Federal Circuit's reversal of the South Carolina district's dismissal is grounds for judgment in his favor here. Mr. Golden notes in that motion that the elements of the accused devices in this case and those in the South Caroline case are "virtually identical." Mr. Golden also filed a motion for disqualification of the undersigned on the grounds of coercion and "difficulty," or, in the alternative, bias. Lastly, plaintiff filed two motions for judicial notice, the first regarding certain facts he believes relevant to his theory of infringement, and the second concerning filings he made in one of his cases in the Northern District of California.[4] Because, as explained below, the complaint fails to state a claim upon which relief can be granted, we need not reach any of the latter motions. The motion for disqualification we deny.

Defendant argues that plaintiff's claims against the government accusing Google phones are barred by the doctrine of claim preclusion, traditionally known as *res judicata*, because the newly accused devices are virtually identical to the devices he has previously accused. The government argues that, because his prior case was dismissed with prejudice, which operates as a judgment of non-infringement, his new claim is also barred because it has already been decided. *See Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1297 (Fed. Cir. 2001) ("a dismissal with prejudice . . . is a judgment on the merits"). Put another way, because there is no practical difference, at least as to the features alleged to be infringing, between the Google phones now accused and the Apple and Samsung products previously accused, there is nothing new to be decided now. The thing has been decided

---

[3] Defendant also argues that plaintiff's theory of infringement is facially defective and fails to state a claim. We do not reach this issue because the complaint is plainly barred by *res judicata* and the associated *Kessler* doctrine.

[4] Plaintiff also filed a motion to strike defendant's motion to dismiss, which we denied by order on July 31, 2023.

("*res judicata*"). Further, to the extent that our judgment in *Golden I* would not cover any alleged infringement post-dating that judgment, defendant argues that the *Kessler* doctrine expands the reach of claim preclusion to cover those allegations as well. *Kessler v. Eldred*, 206 U.S. 285 (1907) (206 U.S. 285 (1907) (Holding that a judgment of a product's non-infringement may not be re-litigated, even if the parties are different and the alleged infringement post-dates the earlier judgment).

The doctrine of *res judicata* prevents re-litigation of claims previously decided. *See generally Sharp Kabushiki Kaisha v. ThinkSharp, Inc.*, 448 F.3d 1368, 1372 (Fed. Cir. 2006). The current complaint, however, is aimed at different infringing devices, Google phones, not expressly implicated in *Golden I*. Defendant, however, argues that, because there is no substantive difference between the phones now implicated by the present complaint and those alleged to be infringing in the earlier case, claim preclusion applies. We agree.

In the Federal Circuit, claim preclusion in a patent suit generally applies "when a patentee seeks to assert the same patent against the same party and the same subject matter." *Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 1349 (Fed. Cir. 2014). The same patents and the same parties are clearly involved. The question then is whether the Google phones are the same as the subject of the previous suit. They are, of course, not literally the same phones. As defendant rightly points out, however, the subject matter is the same for claim preclusion in an infringement suit if the formerly accused and the newly accused devices are "essentially the same." *Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 479-80 (Fed. Cir. 1992). They are essentially the same if the new devices are "materially identical . . . [to the earlier devices] with respect to the pertinent claim limitations at issue." *Nystrom v. Trex co., Inc.*, 580 F.3d 1281, 1286 (Fed. Cir. 2009). The focus is thus on what is claimed to be infringing in the new devices to see whether it is "essentially the same" as what was claimed to have been infringing in the old devices. Here, as explained below, the elements in these new phones that Mr. Golden alleges to be infringing are the same as those he claimed to be infringing in *Golden I*. Thus, claim preclusion applies, at least as to pre-*Golden I* judgment infringement.[5]

---

[5] Any alleged infringing acts after the judgment in *Golden I* are not barred by claim preclusion because they do not arise from the same transactional facts, or "infringing acts." Definitionally, post-judgment infringement cannot be the same acts already considered, and thus the claims cannot be the same for purposes of claim preclusion. *See, e.g, Brain Life, LLC v. Elektra Inc.*, 746 F.3d 1045, 1054 (Fed. Cir. 2014). Absent the *Kessler*

In the present complaint, Mr. Golden concedes that his current claim is "virtually identical" in that "the results are the same" when compared to devices also accused in *Golden I*. Compl. ¶ 17; *see also* ¶¶ 18-20. Further illustrating that the subject matter is essentially the same in this suit as his first, the complaint also contains a comparison between the Google Pixel 5 phone and the Apple iPhone 12, Samsung Galaxy S21, and LG V60 phones. The latter three of those phones were all accused by plaintiff in *Golden I*, as evidenced by the Corrected Claim Chart filed by Mr. Golden there, excerpts of which were appended to defendant's motion to dismiss in this docket, which we treat as judicial admissions by Mr. Golden. Plaintiff went on to explain on page 13 of the present complaint that the use of the Pixel 5 phone is illustrative of the infringement of the other Google phones that he is accusing in this suit. Thus we are assured that all of the newly alleged infringement overlaps with what he claimed in *Golden I*. Even a cursory review of the rest of the present complaint—the comparison of devices mentioned above—reveals that they are materially identical to the charts filed in *Golden I*. The same elements of the Apple, Samsung, and LG phones alleged to be infringing in the first suit are what he accuses now in the Google phones, as illustrated by the Pixel 5 claim chart in his complaint (e.g., a central processing unit, GPS, wifi or Bluetooth connectivity, and biometrics). In fact, he performs the comparison himself in the present complaint again by including a comparison of the Apple, Samsung and LG devices with the Google Pixel 5. The subject of the two suits is "essentially the same" because the devices are identical with respect to the elements plaintiff claims are infringing.

The Federal Circuit has on several instances stated that claim preclusion has a temporal limitation as to the date of the preclusive judgment. *E.g.*, *In re PersonalWeb Techs. LLC*, 961 F.3d 1365, 1376 (Fed. Cir. 2020). The government thus invokes the *Kessler* doctrine as covering the "temporal limitation" gap of claim preclusion. In *Kessler v. Eldred*, the Supreme Court adopted an enlargement of traditional claim and issue preclusion doctrines to further preserve the utility of previous judgments of non-infringement by holding that a prior judgment of non-infringement would bar new

---

doctrine, the issue of whether a prior judgment of non-infringement was preclusive of post-judgment acts would be considered under the rubric of issue preclusion, also known as collateral estoppel. Collateral estoppel was not raised by the government, nor need it have been, because, in the patent context, as will be discussed below, *Kessler* enlarges the reach of non-infringement judgments, or, as defendant puts it, bridges the temporal gap left by claim preclusion.

infringement claims for post-judgment acts, against third parties, and covering very similar accused devices. 206 U.S. 285 (1907); *see also SpeedTrack, Inc. v. Office Depot, Inc.,* 971 F.3d 1317, 1318 (Fed. Cir. 2015) (recognizing that, absent *Kessler*, patent holders could escape prior judgments of non-infringement by suing customers of the earlier defendant for post-judgment infringement). The key issue is whether the accused devices are the same or "essentially the same," just as with claim preclusion. *Brain Life, LLC v. Elektra Inc.*, 746 F.3d 1045, 1057 (Fed. Cir. 2014). If so, pursuant to *Kessler*, a trade right in the devices attaches after a judgment of non-infringement and those devices, along with others that are "essentially the same," are protected from future allegations of infringement. *In re PersonalWeb*, 961 F.3d at 1379. As explained above, the newly accused devices are essentially the same as those previously accused, and thus doctrines of *res judicata* and *Kessler* preclude litigating these issues against the government again.

Plaintiff's only argument is that, because the Federal Circuit reversed and remanded the decision of the District Court for South Carolina in *Golden v. Apple Inc.*, we should overlook *Kessler*. In Mr. Golden's view of the circuit's opinion, infringement has been established. That, however, is a dramatic misreading of the appellate opinion. The Federal Circuit was careful to note that it "express[ed] no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous." *Golden v. Apple Inc.*, No. 2022-1229, 2022 WL 4103285, at *2 (Fed. Cir. Sept. 8, 2022). Nothing in the Federal Circuit's opinion is germane to the questions of claim preclusion and the *Kessler* doctrine, both of which we find preclude consideration of the present complaint because the devices accused are, as conceded by plaintiff, "virtually identical," or "essentially the same" as those already adjudged in the first suit, *Golden I.* Compl. ¶17.

The Federal Circuit was recently confronted with a similar situation in which the patentee had infringement claims dismissed with prejudice for discovery abuses. When that patentee brought a later suit, accusing different devices, the district court dismissed it, *inter alia*, as precluded by *Kessler*. The Federal Circuit affirmed, holding that a dismissal with prejudice, whatever the underlying reason, is a judgment of non-infringement for purposes of the *Kessler* doctrine. *Askan v. FARO Techs., Inc.*, 2023 WL 4101351, at *3 (Fed. Cir. June 21, 2023). Thus, because the devices were found to be essentially the same, *Kessler* applied. *Id.* at *4. Here, Mr. Golden's claims in his first suit were dismissed with prejudice. 156 Fed. Cl. at 632. As explained above, the newly accused devices are essentially the same as those previously alleged to be infringing, as plaintiff admits. Thus,

*Kessler* applies, and the present claim is barred. Accordingly, the following is ordered:

1. Plaintiff's motion seeking disqualification of the undersigned is denied.

2. Defendant's motion to dismiss is granted.

3. The Clerk of Court is directed to dismiss the complaint pursuant to rule 12(b)(6) for failure to state a claim.

4. All other motions are denied as moot.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

# In the United States Court of Federal Claims

## No. 23-811 C
### Filed: April 24, 2024

```
************************************
LARRY GOLDEN,                      *
            Plaintiff,             *
                                   *            JUDGMENT
      v.                           *
                                   *
                                   *
THE UNITED STATES,                 *
            Defendant.             *
************************************
```

Pursuant to the court's Order, filed April 23, 2024, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed for failure to state a claim.


Lisa L. Reyes
Clerk of Court

By: *Ashley Reams*
Deputy Clerk


NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Effective December 1, 2023, the appeals fee is $605.00.

# In the United States Court of Federal Claims

No. 23-811C
(Filed: July 30, 2024)

* * * * * * * * * * * * * * * * *

LARRY GOLDEN,

        *Plaintiff,*

v.

THE UNITED STATES,

        *Defendant.*

* * * * * * * * * * * * * * * * *

## ORDER ON RECONSIDERATION

Plaintiff Larry Golden, appearing *pro se*, filed his fourth complaint in this court on May 31, 2023, alleging that the United States government, acting through the Defense Threat Reduction Agency ("DTRA"), implicitly authorized the use of three of his patents by several third party corporations in violation of 28 U.S.C. § 1498(a). On April 23, 2024, the court dismissed plaintiff's claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), finding that his claim was barred by claim preclusion and the related *Kessler* doctrine. *Golden v. United States*, 171 Fed. Cl. 33, 37 (2024) (relying on *Kessler v. Eldred*, 206 U.S. 285 (1907)). Plaintiff filed a motion for reconsideration and notice of pending motion for disqualification on April 30, 2024, asserting that the court's dismissal of his claim had been rooted in racial bias and was not in accordance with the doctrine of vertical *stare decisis*.

Turning to the present motion, although denominated as a motion for reconsideration, it appears that the thrust of the motion is aimed at disqualification of the undersigned, but we note that most of the arguments in support of that relief are disagreements with the merits of our dismissal decision.[1] We begin by noting that there is no provision in the court's rules

---

[1] We are unsure if plaintiff's notice of pending motion for disqualification is a reference to his earlier-filed motion, which was disposed of in our opinion

for the filing of a post-judgment motion for disqualification. Plaintiff cites 28 U.S.C. § 144 as grounds for the requested disqualification. That statute, by its very terms, however, applies only to the federal district courts, and not to the Court of Federal Claims. 28 U.S.C. § 144 ("Whenever a party . . . *in a district court* makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice . . . such judge shall proceed no further therein.") (emphasis added). Nor would such a request be timely after judgment has been entered. We thus consider the motion under the rubric of reconsideration.

Motions for reconsideration are governed by Rule 59(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). Pursuant to Rule 59(a)(1)(A), "the court may, on motion, grant . . . a motion for reconsideration on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." A motion for reconsideration may also be granted "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or upon the showing of evidence . . . that any fraud, wrong, or injustice has been done to the United States." RCFC 59(a)(1)(B–C). Specifically, RCFC 59 permits reconsideration for one of three reasons: 1) an intervening change in the controlling law has occurred; 2) previously unavailable evidence is now available; or 3) the motion is necessary to prevent manifest injustice. *Matthews v. United States*, 73 Fed. Cl. 524, 525 (2006). Furthermore, "the movant must point to a manifest error of law or mistake of fact" and must do more than "merely reassert[] arguments which were previously made and were carefully considered by the court." *Henderson Cnty. Drainage Dist. No. 3 v. United States*, 55 Fed. Cl. 334, 337 (2003). A motion under RCFC 59 "must be based upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." *Parsons ex rel. Linmar Prop. Mgmt. Tr. v. United States*, 174 Fed. Appx. 561, 563 (Fed. Cir. 2006).

Plaintiff does not argue a change in the controlling law or offer any newly discovered evidence. Instead his motion largely restates arguments he made in his complaint. Mr. Golden presents four broad reasons for why he believes our previous opinion should be reconsidered. First, he alleges that our opinion runs afoul of the doctrine of *stare decisis*. Second, he argues that his Fifth Amendment due process rights have been violated. Third, plaintiff argues that we misapplied the doctrine of res judicata, or claim preclusion. Fourth, plaintiff suggests throughout his motion that our opinion was

---

of April 23, or whether plaintiff intends to convey that he is asking for that same relief in this motion.

motivated by racial bias, though he does not point to any specific evidence or details that support this allegation. We address these four arguments in turn.

Plaintiff argues that the doctrine of *stare decisis* requires the Court of Federal Claims to follow the decisions of the Court of Appeals for the Federal Circuit, specifically the circuit court's decision in Mr. Golden's appeal from the dismissal of his claims in district court in South Carolina. We note, to start, that that decision is not the law of this case because it was not an appeal in this case. It is also unpublished and thus, by the circuit's own rules, not binding precedent. *See* Fed. Cir. R. 32.1(d). It is persuasive authority only to the extent that it prescribes some rule of law applicable to the issues in this case. It did not. The issue there was whether plaintiff's pleadings were facially frivolous. *Golden v. Apple Inc.*, No. 2022-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022). The issue here was whether the doctrine of claim preclusion, as expanded by *Kessler*, barred relitigation of the issue of infringement. *Golden*, 171 Fed. Cl. at 37.

As we observed in our dismissal opinion, plaintiff has fundamentally misunderstood the Federal Circuit's ruling in *Golden v. Apple Inc*. The present motion raises no new argument in this regard, and the argument he does make hinges on a "dramatic misreading of the appellate opinion." *Id*.

Next, plaintiff alleges that his Fifth Amendment due process rights have been violated, because the court has allegedly deprived plaintiff of his property through "unfair and unjustified" means. Mot. Recons. 2. Though not clear, his argument seems to be that he should have won his case on its merits, and because he did not, his due process rights have been violated. Plaintiff has not identified any process that was due him and which was denied. His claims were barred by *res judicata*. That is not a violation of due process. *See Searcy v. Dep't of Agriculture*, 813 Fed. App'x 472, (Fed. Cir. 2011) (holding that the Merit Systems Protection Board did not violate the appellant's due process rights by *sua sponte* dismissing the claim as barred by *res judicata*). As the Supreme Court has explained, the fundamental requirements of procedural due process are notice and opportunity to respond, both of which are met here. *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

As to *res judicata* itself, plaintiff argues that "issue preclusion"[2] does not apply here and is inapplicable to his infringement claims. He calls the

---

[2] We understand plaintiff to actually be referring to claim preclusion, which was the grounds for his complaint's dismissal.

*Kessler* doctrine a "special" preclusion doctrine "created" by the Federal Circuit which should not apply here, because it supersedes congress' intent to allow patent infringement suits to be brought against the government "whenever" under 28 U.S.C. § 1498(a). Mot. Recons. 4. Plaintiff is wrong. The doctrine of *res judicata* applies to all claims at law and equity. It protects the preclusive effect of judgments and preserves the court's and prevailing parties' resources by preventing relitigation of previously decided claims. *See Montana v. United States*, 440 U.S. 147, 153–154 (1979) (stating that *res judicata* protects against the "expense and vexation attending multiple lawsuits, conserves judicial resources," and minimizes the "possibility of inconsistent decisions."). We have applied *Kessler* before in the section 1498 context. *See, e.g., JG Techs., LLC v. United States*, 156 Fed. Cl. 691, 713 (2021) (finding that certain of plaintiff's infringement claims against the United States were barred by *Kessler*).

In Mr. Golden's view, we have unduly relied on the previous cases in which Golden lost. As explained in April, however, the doctrine, as expanded by *Kessler*, applies, and it bars plaintiff's latest complaint. *Golden*, 171 Fed. Cl. at 37. This motion for reconsideration casts no doubt on that result.

Lastly, we address the allegations of racial bias which plaintiff peppers throughout his motion without substantiation or citation to evidence outside of his disagreement as to the disposition of his cases. An adverse result is not evidence, by itself, of bias. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion."). *See also Johnson v. Warden*, No. 2:16-cv-985, 2020 U.S. Dist. LEXIS 54236, at *49 (S.D. Ohio March 27, 2020) ("Evidence of racial bias cannot be inferred but must be clearly demonstrated in the record."). In short, plaintiff has not presented any basis to reconsider on grounds of bias.

Plaintiff's motion fails to demonstrate any bases for reconsideration under RCFC 59. Thus no response from defendant is necessary, and the motion is denied.[3]

---

[3] Plaintiff also attempted to file a motion for status update regarding his motion for reconsideration. The clerk's office received that document on July 17, 2024, but did not docket it because there is no provision in the court's rules for the filing of such a motion. We allow the motion to be filed and deny it as moot.

Judicial Council of the Ninth Circuit

## COMPLAINT OF JUDICIAL MISCONDUCT OR DISABILITY

To begin the complaint process, complete this form and prepare the brief statement of facts described in item 5 (below). The RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS, adopted by the Judicial Conference of the United States, contain information on what to include in a complaint (Rule 6), where to file a complaint (Rule 7), and other important matters. The Ninth Circuit Judicial Council also adopted local misconduct rules. The rules are available in federal court clerks' offices, on individual federal courts' Web sites, and on www.uscourts.gov, and https://www.ca9.uscourts.gov/misconduct/rules/.

Your complaint (this form and the statement of facts) should be typewritten and must be legible. Under the Ninth Circuit's local misconduct rules, you are required to file an original and one copy of (1) the complaint form, (2) the statement of facts, and (3) any documents submitted. Enclose your complaint in an envelope marked "COMPLAINT OF MISCONDUCT" or "COMPLAINT OF DISABILITY". **Do not put the name of any judge on the envelope.** All complaints **must** be mailed to:

**United States Court of Appeals for the Ninth Circuit**
**Office of the Circuit Executive**
**P.O. Box 193939**
**San Francisco, CA 94119-3939**

1. Name of Complainant: _LARRY GOLDEN_

   Contact Address: _746 WOODRUFF RD #1107_

   _GREENVILLE, SC 29607_

   Daytime telephone: _864 992-7164_

2. Name(s) of Judge(s): _JUDGE RITA F. LIN_

   Court: _U.S. DISTRICT COURT FOR THE NORTHERN_
   _DISTRICT OF CALIFORNIA_

3. Does this complaint concern the behavior of the judge(s) in a particular lawsuit or lawsuits?

   [✓] Yes      [ ] No

   If "yes," give the following information about each lawsuit:

   Court: _NORTHERN DISTRICT CALIFORNIA – SAN FRANCISCO_

   Case Number: _4:22-CV-05246-RFL_

Docket number of any appeal to the *FEDERAL* Circuit: _24-2024_

Are (were) you a party or lawyer in the lawsuit?

[✓] Party      [ ] Lawyer      [ ] Neither

If you are (were) a party and have (had) a lawyer, give the lawyer's name, address, and telephone number:

_____

_____

_____

4.     Have you filed any lawsuits against the judge?

      [ ] Yes       [✓] No

If "yes," give the following information about each such lawsuit:

Court: _____

Case Number: _____

Present status of lawsuit: _____

Name, address, and telephone number of your lawyer for the lawsuit against the judge:

_____

_____

_____

Court to which any appeal has been taken in the lawsuit against the judge:

_U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT_

Docket number of the appeal: _24-2024_

Present status of the appeal: _DOCKETING_

5.     **Brief Statement of Facts.** Attach a brief statement of the specific facts on which the claim of judicial misconduct or disability is based. Include what happened, when and where it happened, and any information that would help an investigator check the facts. If the complaint alleges judicial disability, also include any additional facts that form the basis of that allegation. Local Rule 6.1(b) provides that your statement of facts must not be longer than five pages (five sides), or 1,200 words, whichever is less.

**You must provide objectively verifiable proof such as the names of witnesses or recorded documents or transcripts to support your allegations.** Adverse rulings do not support misconduct allegations, as the appropriate forum for an argument that a judge erred is the appellate court. Thus, you need not include copies of your filings in the

underlying case or the judge's orders because even if a review of those documents is necessary, the documents are accessible via PACER. Excess or irrelevant documentation will be returned to the complainant.

**6. Acknowledgment, declaration, and signature:**

**In the space provided below, please write the following statement: "I understand that even if I successfully prove that the judge engaged in misconduct or is disabled, this procedure cannot change the outcome of the underlying case." (If this statement is not written, your complaint will not be processed and will be returned to you.)**

"I UNDERSTAND THAT EVEN IF I SUCCESSFULLY PROVE THAT THE JUDGE ENGAGED IN MISCONDUCT OR IS DISABLE, THIS PROCEDURE CANNOT CHANGE THE OUTCOME OF THE UNDERLYING CASE"

I declare under penalty of perjury that the statements made in this complaint are true and correct to the best of my knowledge.

(Signature) _____     (Date) 7/12/2024

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

0Email: atpg-tech@charter.net

---

| | |
|---|---|
| LARRY GOLDEN, | CASE NO: <u>4:22-cv-05246-RFL</u> |
| *Plaintiff,* | |
| V. | **Judicial-Conduct** |
| GOOGLE LLC | |
| *Defendant.* | July 12, 2024 |

---

## STATEMENT OF FACTS

Pursuant to 28 U.S.C. § 351(a): Golden presents this complaint against Judge Rita F. Lin as evidence the Judge "[] has engaged in conduct prejudicial to the effective and expeditious administration of the business of th[is] court". This complaint is not an argument of any presumed merits of this current case *Golden v. Google LLC*, NDC No. 4:22-cv-05246-RFL; or, the preceding related case *Golden v. Google LLC*, SCDC No. 6:2021cv00244 filed by Golden against Google, LLC for the alleged patent infringement of Golden's patents.

"I understand that even if I successfully prove that the judge engaged in misconduct or is disable, this procedure cannot change the outcome of the underlying case."

Golden alleges in the complaint that Judge Rita F. Lin is a co-conspirator in at least two already established conspiracies to ensure Golden, a Black and/or African American is not compensated for his works or contributions to the development and growth of our Nation's

economy. The Judge is also alleged to be an active participant in a judicial system of "systemic and structural racism".

Considering history, and the procedural posture of this case, it is easy to say Judge Rita F. Lin is bias in favor of Google and a co-conspirator who joined an already established conspiracy to ensure Blacks and/or African Americans are not compensated for their work.

"Systemic racism is said to occur when racially unequal opportunities and outcomes are inbuilt or intrinsic to the operation of a society's structures. Simply put, systemic racism refers to the processes and outcomes of racial inequality and inequity in life opportunities and treatment. Systemic racism permeates a society's (a) institutional structures (practices, policies, climate), (b) social structures (state/federal programs, laws, culture), (c) individual mental structures (e.g., learning, memory, attitudes, beliefs, values), and (d) everyday interaction patterns (norms, scripts, habits)." (Jones, 1971)

"Systemic racism not only operates at multiple levels; it can emerge with or without animus or intention to harm and with or without awareness of its existence. Its power derives from it being integrated into a unified system of racial differentiation and discrimination that creates, governs, and adjudicates opportunities and outcomes across generations. Racism represents the biases of the powerful" (Jones, 1971). Jones JM. The political dimensions of black liberation. The Black Scholar. 1971;3(1):67–75).

"Intellectual property--specifically patents and copyrights--is expressly protected by the U.S. Constitution. The evolution of intellectual property law, concurrent with our country's laws, has been laced with both overt and covert elements of racism. Not only was the *Dred Scott* decision used to bar Blacks from the personhood required to qualify for patent protection, the U.S. Patent Office also declared that enslaved Blacks could not hold patents. As the "promotion of progress," as mandated by the Constitution, became embedded in our national psyche, our country is charged with advancing that goal." (Iams, 2023)

Sophia Cortez Iams. (01 August 2023). Race, Racism, and the Law. "*Patently Biased: A Discussion of Historical and Systemic Causes of Racial Disparity in Patent Law*". Retrieved from: https://racism.org/articles/basic-needs/propertyland/218-intellectual-property/11443-patently-biased

*Dred Scott v. Sandford*, decided by the U.S. Supreme Court on March 6, 1857, declared that Black people, whether free or enslaved, could not be American citizens and were thus constitutionally unable to sue for citizenship in the federal courts. The Court's majority opinion also declared that the 1820 Missouri Compromise was unconstitutional and that the U.S. Congress could not prohibit enslavement in the U.S. territories that had not attained statehood.

Why would the patent office of the North be so discriminatory against black people during the Civil War? Joseph Holt, head of the Patent Office at the time, was from Kentucky and interpreted *Dredd Scott* to mean that a free black person who had escaped to the North didn't have the right to patent his invention. Holt also denied free black men from northern states the same right, despite objections from northern senators like Charles Sumner of Massachusetts.

Among constitutional scholars, *Scott v. Sandford* is widely considered the worst decision ever rendered by the Supreme Court. It has been cited in particular as the most egregious example in the Supreme Court's history of wrongly imposing a judicial solution on a political problem. A later chief justice, Charles Evans Hughes, famously characterized the decision as the court's great "self-inflicted wound."

This complaint of "judicial misconduct" in the NDC case of 4:22-cv-05246-RFL is directed at Judge Rita F. Lin of the United States District Court for the Northern District of California, for whom the complainant believes willfully violated Golden's civil rights under statutes 18 U.S.C. § 241 and 18 U.S.C. § 242. Golden is alleging Judge Rita F. Lin conspired against the rights of the complainant and acted under the color of the law to willfully deprive Golden of his Seventh Amendment right to a trial by jury or privilege protected by the United States Constitution or laws of the United States. According to the Civil Rights Division of the Department of Justice:

18 U.S.C. § 241, Conspiracy against Rights: Section 241 makes it unlawful for two or more persons to agree to injure, threaten, or intimidate a person [Golden] in the United States in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the United States or because of his or her having exercised such a right. Unlike most conspiracy statutes, § 241 does not require, as an element, the commission of an overt act.

18 U.S.C. § 242, Deprivation of Rights Under Color of Law: This provision makes it a crime for [Judge Rita F. Lin] acting under color of law to willfully deprive a

3

person [Golden] of a right or privilege protected by the Constitution or laws of the United States. It is not necessary that the offense be motivated by racial bias or by any other animus. Those prosecuted under the statute include judges, district attorneys, other public officials.

In order to promote the proper administration of justice, Judge Rita F. Lin enjoy absolute immunity from suit. See *Mireles v. Waco*, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991); *Boyd v. Biggers*, 31 F.3d 279 (5th Cir.1994). But Judge Rita F. Lin does not escape penalties for "judicial misconduct" and for willfully violating the "code of conduct" for United States judges.

The complainant may overcome Judge Rita F. Lin judicial immunity under certain circumstances. For example, the Supreme Court has recognized two circumstances in which a complainant may overcome Judge Rita F. Lin's immunity: "First, [the] judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. ... Second, [the] judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11-12, 112 S. Ct. 286.

In other words, Judge Rita F. Lin was absent of all jurisdiction of the Northern District of California Court when the Judge made it a requirement that the complainant "prove direct infringement under 28 U.S.C. § 1498(a) [government infringement of compining patented combinations - Golden's patented cell phone with the DoD DTRA ATAK software] as a necessary predicate to proving direct infringement under 35 U.S.C. § 271(a). *Zoltek III.*

Judge Rita F. Lin dismissed Golden's case because Golden refuse to deny or reject the opinion of the Federal Circuit in *Golden v. Google, LLC* CAFC Case No. 22-1267, that his patented combinations more likely than not prove literal infringement and/or infringement under the doctrine of equivalents. [28 U.S.C. § 271(a)].

In *Zoltek V*, the appellate court emphasized that § 1498(a) is "its own independent cause of action" with three elements to trigger government liability: (1) the invention must be claimed in a patent; (2) it must be "used or manufactured by or for the United States," meaning each limitation of the claims must be present in the accused product or process; and (3) the "use or manufacture" of the patented invention must be done without license or lawful right—i.e. "use of an invention that, if done by a private party, would directly infringe the patent." 672 F.3d at 1321, 1323.

Therefore again, Judge Rita F. Lin adjudicated Golden's case in a way that she knew it was outside the Northern District of California Court jurisdiction. Consequently, any decisions made by Judge Rita F. Lin are considered moot and cannot be a decision based on the merits of the case, because Judge Rita F. Lin adjudicated the case in the wrong jurisdiction.

Because Judge Rita F. Lin allegedly knew the Northern District of California Court lack jurisdiction, the Court is barred from deciding Golden's suit under 28 U.S.C. § 1498(a) [government infringement]. Because of race, Judge Lin deprived Golden of his constitutional right to a trial by jury [U.S. CONST amend. VII]; deprived Golden of his property without due process of law and without paying just compensation [U.S. CONST amend. V]; knowingly violated Golden's civil rights under 42 U.S.C. § 1983 and 18 U.S.C. §§ 241 & 242; and joined as a co-conspirator an already established conspiracy of judicial systemic and structural racism.

Some will argue the Supreme Court decisions was nullified with the Thirteenth Amendment of the U.S. Constitution which abolished slavery, and the Fourteenth Amendment of the U.S. Constitution which declared citizenship of American born persons; but this case is evidence that the culture of systemic and structural racism still thrives within the Nation's judicial system. Complainant believes with a reasonable amount of certainty, Judge Lin decided to join as a co-conspirator the already established conspiracy to promote systemic and structural racism.

Sincerely,

Larry Golden, *Pro Se* Complainant
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech @ charter.net

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

Larry Golden. *Pro Se* Plaintiff

740 Woodruff Rd.. #1102

Greenville. SC 29607

Phone (864) 288-5605

OEmail: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN, | CASE NO: <u>4:22-cv-05246-RFL</u> |
| *Plaintiff,* | |
| V. | **Judicial-Conduct** |
| GOOGLE LLC | |
| *Defendant.* | July 12, 2024 |

## EVIDENCE – VERIFIABLE PROOF

Pursuant to 28 U.S.C. § 351(a): Golden presents this supportive evidence against Judge Rita F. Lin as evidence the Judge "[] has engaged in conduct prejudicial to the effective and expeditious administration of the business of th[is] court". This evidence is not an argument of any presumed merits of this current case *Golden v. Google LLC*. NDC No. 4:22-cv-05246-RFL..

Because Judge Lin allegedly knew the NDC Court lack jurisdiction. the Court is barred from deciding Golden's suit under 28 U.S.C. § 1498(a) [government infringement]. Judge Lin deprived Golden of his constitutional right to a trial by jury [U.S. CONST amend. VII]; deprived Golden of his property without due process of law and without paying just compensation [U.S. CONST amend. V]; knowingly violated Golden's civil rights under 42 U.S.C. § 1983. 18 U.S.C. §§ 241 & 242; bias in favor of Google and against Golden; and joined as a co-conspirator an already established conspiracy of judicial systemic and structural racism.

# CONTENT PAGE(S)

*Page*

INTRODUCTION ................................................................................................. 5

JUDGE RITA F. LIN IS A CO-CONSPIRATOR IN
AN ALREADY ESTABLISHED JUDICIAL SYSTEM
OF "SYSTEMIC AND STRUCTURAL RACISM" ...................................... 7

    The Justices of the United States Supreme Court are Alleged to
    be Co-Conspirators in an already Established Conspiracy ................................ 10

    The "Conspiracy" Formed Between the Judges of the Appellate
    Courts, District Courts, and the Court of Federal Claims ................................ 10

PURSUANT TO 28 U.S.C. § 351(A): JUDGE RITA F. LIN
HAS ENGAGED IN CONDUCT PREJUDICIAL TO THE
EFFECTIVE AND EXPEDITIOUS ADMINISTRATION OF
THE BUSINESS OF THE COURTS ....................................................... 17

    *Larry Golden v. Google LLC*, Case No. 22-1267 ................................. 17

    *United States Department of Homeland Security v.*
    *Larry Golden* Case IPR2014-00714 ................................. 21

    The Claims of a Patent Define the Invention ................................. 25

GOLDEN ALLEGES JUDGE RITA F. LIN KNOWINGLY
VIOLATED GOLDEN'S CIVIL RIGHTS UNDER 42 U.S.C.
§ 1983 AND UNDER 18 U.S.C. § 242 ....................................................... 27

    Example of How Judge Rita F. Lin Knowingly and Willingly
    Violated Golden's Civil Rights by allowing the White-owned
    Google company the opportunity to Re-structure the Company's
    dealings before determining liability for Google's current offenses ......................... 30

    The "Reversed Engineered" Claim Chart Presented to the Federal
    Circuit is proof Judge Rita F. Lin Knowingly violated Golden's
    Civil Rights by Re-litigating Issues already decided, while depriving
    Golden of his Seventh Amendment right to a Trial by Jury ................................. 31

THE JUDGE FAIL TO STRICTLY FOLLOW THE
DECISION(S) HANDED DOWN BY THE HIGHER
COURT WITHIN THE SAME JURISDICTION ....................................................... 37

Standard Claim Charts - I ..................................................................... 38

Standard Claim Charts - II ................................................................... 44

CONTRIBUTORY INFRINGEMENT: JUDGE RITA
F. LIN VIOLATED GOLDEN'S "DUE PROCESS"
RIGHT WHEN SHE FRUSTRATED THE FAIRNESS
OF THE PROCEEDINGS ......................................................................... 50

    Judge Rita F. Lin Acknowledges Google knew Golden's Patents
    are Infringed by the Combination ................................................. 51

WHEN JUDGE RITA F. LIN UNLAWFULLY
SEPERATED GOLDEN'S PATENTED INVENTION
COMBINATION, THE JUDGE ALSO KNOWINGLY
CHANGED THE CAUSES OF ACTION FOR THE
ALLEGED INFRINGING PRODUCTS .................................................. 60

GOLDEN ALLEGES JUDGE RITA F. LIN CONSPIRED
WITH GOOGLE TO MAKE A PARTICULAR RULING ..................... 67

    Claim Chart of Induced Infringement [DTRA ATAK-MILITARY
    and Draper's ATAK-CIVILIAN: Contributory Infringement of
    Google's Pixel 6a, 7, 7a, 7 Pro, and Fold Smartphones ................ 74

JUDGE RITA F. LIN OUTRIGHT LIED WHEN SHE
STATED, "AS THE COMPLAINT DID NOT ALLEGE
THAT THE GOOGLE SMARTPHONES *THEMSELVES*
INFRINGED ON THE PATENTS" ......................................................... 78

"SENSOR TYPES SUPPORTED BY THE "ANDROID"
PLATFORM" .......................................................................................... 80

"GOOGLE CAUSED THE INFRINGEMENT OF
PLAINTIFF'S PATENTS" ..................................................................... 82

    "Google's Open-Source: Public domain and 'Free for Any Use'" ........... 85

JUDGE RITA F. LIN JOINS AS A CO-CONSPIRATOR
QUALCOMM INCORPORATION'S CONSPIRACY .............................. 86

    The Northern District of California Court Joins the Conspiracy ............. 93

    Co-Conspirator Judge Rita F. Lin Protects Qualcomm's
    *"DOUBLE STANDARD"* ................................................................. 96

Double Standard—Comparison ................................................................. 100

GOLDEN ALLEGES JUDGE RITA F. LIN, WITH
KNOWLEDGE, WILLFULLY VIOLATED
GOLDEN'S SEVENTH AMENDMENT
CONSTITUTIONAL RIGHT TO A TRIAL BY JURY ................................................ 103

Issues of Fact are to be Determined by a Jury ................................................ 105

CONCLUSION ................................................................................. 111

*Vertical Stare Decisis* ................................................................. 114

Due Process ................................................................................. 114

12(b)(6) ................................................................................. 115

Doctrine of *Res Judicata* ................................................................. 116

# INTRODUCTION

This complaint of "judicial misconduct" in the NDC case of 4:22-cv-05246-RFL is directed at Judge Rita F. Lin of the United States District Court for the Northern District of California, for whom the complainant believes willfully violated Golden's civil rights under statutes 18 U.S.C. § 241 and 18 U.S.C. § 242. Golden is alleging Judge Rita F. Lin conspired against the rights of the complainant and acted under the color of the law to willfully deprive Golden of his Seventh Amendment right to a trial by jury or privilege protected by the United States Constitution or laws of the United States. According to the Civil Rights Division of the Department of Justice:

> 18 U.S.C. § 241. Conspiracy against Rights: Section 241 makes it unlawful for two or more persons to agree to injure, threaten, or intimidate a person [Golden] in the United States in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the United States or because of his or her having exercised such a right. Unlike most conspiracy statutes, § 241 does not require, as an element, the commission of an overt act.
>
> 18 U.S.C. § 242. Deprivation of Rights Under Color of Law: This provision makes it a crime for [Judge Rita F. Lin] acting under color of law to willfully deprive a person [Golden] of a right or privilege protected by the Constitution or laws of the United States. It is not necessary that the offense be motivated by racial bias or by any other animus. Those prosecuted under the statute include judges, district attorneys, other public officials.

In order to promote the proper administration of justice, Judge Rita F. Lin enjoy absolute immunity from suit. See *Mireles v. Waco*, 502 U.S. 9, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991); *Boyd v. Biggers*, 31 F.3d 279 (5th Cir.1994). But Judge Rita F. Lin does not escape penalties for "judicial misconduct" and for willfully violating the "code of conduct" for United States judges.

The complainant may overcome Judge Rita F. Lin judicial immunity under certain circumstances. For example, the Supreme Court has recognized two circumstances in which a complainant may overcome Judge Rita F. Lin's immunity: "First, [the] judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. ... Second, [the] judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11-12, 112 S. Ct. 286.

In other words, Judge Rita F. Lin was absent of all jurisdiction of the Northern District of California Court when the Judge made it a requirement that the complainant "prove direct infringement under 28 U.S.C. § 1498(a) [government infringement of combining patented combinations—Golden's patented cell phone with the DoD DTRA ATAK software] as a necessary predicate to proving direct infringement under 35 U.S.C. § 271(a). *Zoltek III.*

Judge Rita F. Lin dismissed Golden's case because Golden refuse to deny or reject the opinion of the Federal Circuit in *Golden v. Google, LLC* CAFC Case No. 22-1267, that his patented combinations more likely than not prove literal infringement and/or infringement under the doctrine of equivalents. [28 U.S.C. § 271(a)].

In *Zoltek V*, the appellate court emphasized that § 1498(a) is "its own independent cause of action" with three elements to trigger government liability: (1) the invention must be claimed in a patent; (2) it must be "used or manufactured by or for the United States," meaning each limitation of the claims must be present in the accused product or process; and (3) the "use or manufacture" of the patented invention must be done without license or lawful right—i.e., "use of an invention that, if done by a private party, would directly infringe the patent." 672 F.3d at 1321, 1323.

Therefore again, Judge Rita F. Lin adjudicated Golden's case in a way that she knew it was outside the Northern District of California Court jurisdiction. Consequently, any decisions made by Judge Rita F. Lin are considered moot and cannot be a decision based on the merits of the case, because Judge Rita F. Lin adjudicated the case in the wrong jurisdiction.

Because Judge Rita F. Lin allegedly knew the Northern District of California Court lack jurisdiction, the Court is barred from deciding Golden's suit under 28 U.S.C. § 1498(a) [government infringement]. Because of race, Judge Lin deprived Golden of his constitutional right to a trial by jury [U.S. CONST amend. VII]; deprived Golden of his property without due process of law and without paying just compensation [U.S. CONST amend. V]; knowingly violated Golden's civil rights under 42 U.S.C. § 1983 and 18 U.S.C. §§ 241 & 242; and joined as a co-conspirator an already established conspiracy of judicial systemic and structural racism.

## JUDGE RITA F. LIN IS A CO-CONSPIRATOR IN AN ALREADY ESTABLISHED JUDICIAL SYSTEM OF "SYSTEMIC AND STRUCTURAL RACISM"

Considering the evidence presented in this complaint, it is easy to say Judge Rita F. Lin is bias in favor of Google and a co-conspirator who joined an already established conspiracy to ensure Blacks and or African Americans are not compensated for their work.

"Systemic racism is said to occur when racially unequal opportunities and outcomes are inbuilt or intrinsic to the operation of a society's structures. Simply put, systemic racism refers to the processes and outcomes of racial inequality and inequity in life opportunities and treatment. Systemic racism permeates a society's (a) institutional structures (practices, policies, climate), (b) social structures (state federal programs, laws, culture), (c) individual mental

structures (e.g., learning, memory, attitudes, beliefs, values), and (d) everyday interaction patterns (norms, scripts, habits)." (Jones, 1971)

"Systemic racism not only operates at multiple levels; it can emerge with or without animus or intention to harm and with or without awareness of its existence. Its power derives from it being integrated into a unified system of racial differentiation and discrimination that creates, governs, and adjudicates opportunities and outcomes across generations. Racism represents the biases of the powerful" (Jones, 1971). Jones JM. The political dimensions of black liberation. The Black Scholar. 1971;3(1):67–75).

"Intellectual property--specifically patents and copyrights--is expressly protected by the U.S. Constitution. The evolution of intellectual property law, concurrent with our country's laws, has been laced with both overt and covert elements of racism. Not only was the Dred Scott decision used to bar Blacks from the personhood required to qualify for patent protection, but the U.S. Patent Office also declared that enslaved Blacks could not hold patents. As the "promotion of progress," as mandated by the Constitution, became embedded in our national psyche, our country is charged with advancing that goal." (Iams, 2023)

Sophia Cortez Iams. (01 August 2023). Race, Racism, and the Law. *"Patently Biased: A Discussion of Historical and Systemic Causes of Racial Disparity in Patent Law"*. Retrieved from: https://racism.org/articles/basic-needs/propertyland/218-intellectual-property/11443-patently-biased

*Dred Scott v. Sandford*, decided by the U.S. Supreme Court on March 6, 1857, declared that Black people, whether free or enslaved, could not be American citizens and were thus constitutionally unable to sue for citizenship in the federal courts. The Court's majority opinion also declared that the 1820 Missouri Compromise was unconstitutional and that the U.S. Congress could not prohibit enslavement in the U.S. territories that had not attained statehood.

Why would the patent office of the North be so discriminatory against black people during the Civil War? Joseph Holt, head of the Patent Office at the time, was from Kentucky and interpreted *Dredd Scott* to mean that a free black person who had escaped to the North didn't have the right to patent his invention. Holt also denied free black men from northern states the same right, despite objections from northern senators like Charles Sumner of Massachusetts.

Among constitutional scholars, *Scott v. Sandford* is widely considered the worst decision ever rendered by the Supreme Court. It has been cited in particular as the most egregious example in the Supreme Court's history of wrongly imposing a judicial solution on a political problem. A later chief justice, Charles Evans Hughes, famously characterized the decision as the court's great "self-inflicted wound."

In the Supreme Court, *Return Mail, Inc. v. United States Postal Service*, 868 F. 3d 1350, BREYER, J., filed a dissenting opinion, in which GINSBURG and KAGAN, JJ., joined. The Court ruled that Government agencies are not "persons" authorized to petition the PTAB for inter partes review to invalidate a patent. But Justice Breyer writes in his dissenting opinion:

> "[w]hen, for example, the Department of Homeland Security recently instituted a research initiative to equip cell phones with hazardous-materials sensors in order to mitigate the risk of terrorist attacks, it faced an infringement lawsuit that threatened to interfere with the project. See *Golden v. United States*, 129 Fed. Cl. 630 (2016): ...

Golden has petition for writ in three different cases only to be denied. The Supreme Court can publicly enter Golden's case into an unrelated case *Return Mail* only to say 'Golden should have had his patents taken by the unauthorized government agencies', because Golden will never get the chance, as a Black and/or African American inventor, to correct the record and explain to the Court that it was Golden who spent four years sharing with DHS; before the DHS decided in 2008 to give seven white-owned companies his intellectual property to develop. Chart follows:

## THE JUSTICES OF THE UNITED STATES SUPREME COURT ARE ALLEGED TO BE CO-CONSPIRATORS IN AN ALREADY ESTABLISHED CONSPIRACY

**U.S. Supreme Court:** Docket for 23-904. Title: Larry Golden, Petitioner v. United States *Petition Denied* March 25, 2024 Larry Golden, Petitioner United States Court of Appeals for the Federal Circuit Petition for a writ of certiorari filed. Party name: Larry Golden

**U.S. Supreme Court:** Docket for 23-740. Title: Larry Golden, Petitioner v. Qualcomm, Inc. *Petition Denied* March 18, 2024 Larry Golden, Petitioner United States Court of Appeals for the Federal Circuit Petition for a writ of certiorari filed. Party name: Larry Golden

**U.S. Supreme Court:** Docket for 23-1001. Title: Larry Golden, Petitioner v. Samsung Electronics America, Inc. *Petition Denied* April 22, 2024 Larry Golden, Petitioner United States Court of Appeals for the Federal Circuit Petition for a writ of certiorari filed. Party name: Larry Golden

## THE "CONSPIRACY" FORMED BETWEEN THE JUDGES OF THE APPELLATE COURTS, DISTRICT COURTS, AND THE COURT OF FEDERAL CLAIMS

| Party Name | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Larry Golden | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - 02/12/2024 |
| Larry Golden | 2018cvus01942 | Golden v. US | U.S. Court Of Appeals, Federal Circuit | 05/10/2018 - 08/01/2018 |
| Larry Golden | 2019and00100 | Golden In re: Golden | U.S. Court Of Appeals, Federal Circuit | 10/03/2018 - 11/05/2018 |
| Larry Golden | 2019cvus02134 | Golden v. US | U.S. Court Of Appeals, Federal Circuit | 07/12/2019 - 04/10/2020 |
| Larry Golden | 2019cvus02135 | Golden v. US | U.S. Court Of Appeals, Federal Circuit | 07/12/2019 - 09/13/2019 |
| Larry Golden | 2020cvpri01508 | Golden v. Apple Inc. | U.S. Court Of Appeals, Federal Circuit | 02/25/2020 - 09/03/2020 |
| Larry Golden | 2022cvus01196 | Golden v. US | U.S. Court Of Appeals, Federal Circuit | 11/29/2021 - 09/08/2022 |
| Larry Golden | 2022cvpri01229 | Golden v. Apple Inc. | U.S. Court Of Appeals, Federal Circuit | 12/07/2021 - 09/08/2022 |
| Larry Golden | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - 09/08/2022 |

| Larry Golden | 2023cvpri01161 | Golden v. Apple Inc. | U.S. Court Of Appeals, Federal Circuit | 01/18/2022 - 05/12/2023 |
|---|---|---|---|---|
| Larry Golden | 2023cvpri01257 | Golden v. Intel Corporation | U.S. Court Of Appeals, Federal Circuit | 12/16/2022 - 05/05/2023 |
| Larry Golden | 2023cvpri01818 | Golden v. Qualcomm Incorporated | U.S. Court Of Appeals, Federal Circuit | 04/28/2023 - 10/10/2023 |
| Larry Golden | 2023cvus02139 | Golden v. US | U.S. Court Of Appeals, Federal Circuit | 07/11/2023 - 12/15/2023 |
| Larry Golden | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - 04/03/2024 |
| Larry Golden | 4:2022cv03283 | Golden v. Qualcomm, Inc. | California Northern District Court | 06/06/2022 - 03/15/2023 |
| Larry Golden | 5:2022cv03828 | Golden v. Intel Corporation | California Northern District Court | 06/28/2022 - 11/22/2022 |
| Larry Golden | 3:2022cv04152 | Golden v. Apple Inc. | California Northern District Court | 07/15/2022 - 10/20/2022 |
| Larry Golden | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - 06/08/2023 |
| Larry Golden | 1:2013cv00307 | Golden v. USA | U.S. Court of Federal Claims | 05/01/2013 - 11/10/2021 |
| Larry Golden | 1:2019cv00104 | Golden v. USA | U.S. Court of Federal Claims | 01/17/2019 - 05/15/2019 |
| Larry Golden | 1:2023cv00185 | Golden v. USA | U.S. Court of Federal Claims | 02/07/2023 - 05/31/2023 |
| Larry Golden | 1:2023cv00811 | Golden v. USA | U.S. Court of Federal Claims | 05/31/2023 - 04/24/2024 |
| Larry Golden | 6:2021cv00244 | Golden v. Google LLC | South Carolina District Court | 01/26/2021 - 04/19/2023 |
| Larry Golden | 6:2019cv02557 | Golden v. Apple Inc. et al | South Carolina District Court | 09/11/2019 - 01/27/2020 |
| Larry Golden | 6:2020cv02270 | Golden v. Apple Inc. et al | South Carolina District Court | 06/16/2020 - 09/20/2021 |
| Larry Golden | 6:2020cv04353 | Golden v. Apple Inc. et al | South Carolina District Court | 12/16/2020 - 12/01/2021 |

The chart above is representative of the number of times Golden, a Black and/or African American, have filed cases in the Supreme Court, the Appellate Courts, the District Court, and the Court of Federal Claims and has never gotten pass the pleading stage, over the past ten years.

The chart above is also illustrative of the number of times Golden, a Black and/or African American, have been deprived of his property "due process of law" and a jury trial as guaranteed by the Seventh Amendment of the United States Constitution.

In this current case, *Larry Golden v. Google LLC*, NDC Case 3:22-cv-05246-RFL Order Granting Motion to Dismiss… Dkt. 68; Filed 04/03/24, Judge Rita F. Lin confirmed to all the other co-conspirators that she was onboard with the purpose and intent of the conspiracy and that she was not going to be the one to break ranks.

> "The motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND. This ruling assumes the reader is familiar with the facts, the applicable legal standard, and the arguments made by the parties" … "This case is one of several patent infringement cases that Golden has filed against Google and other defendants. See *Golden v. Samsung Elecs. Am., Inc.*, No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), aff'd. No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024) (***describing Golden's litigation history over the past ten years in multiple jurisdictions***)" … "Leave to amend may be denied for "repeated failure to cure deficiencies by previous amendment." *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008)." … "The flaws in the FAC are the same as those identified in the order dismissing Golden's original complaint. As Golden was already granted leave to amend once in this case but was unable to correct the deficiencies, further leave to amend would be futile."

> "Furthermore, ***Golden has had multiple suits with similar allegations dismissed, some as frivolous.*** See, e.g., *Golden v. Samsung Elecs. Am., Inc.*, No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), aff'd, No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024); *Golden v. Qualcomm. Inc.*, No. 22-CV-03283-HSG, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023) *Golden v. Apple Inc.*, No. 20-cv-04353-JD-KFM, 2021 WL 5074739 (D.S.C. Nov. 2, 2021) (dismissing complaint as "frivolous");

*Golden v. Apple Inc.*, No. 20-cv-02270-JD-KFM, 2021 WL 4260782 (D.S.C. Sept. 20, 2021) (dismissing complaint as "frivolous").

Judge Rita F. Lin qualified herself as a co-conspirator to the already established conspiracy formed and administered by the Judges, defendants, and defendants' attorneys of previous cases filed by Golden. The conspiracy is to never allow Golden's case to ever get pass the pleading stage, no matter what evidence Golden submits to support his case at the pleading stage, and to never allow the facts of Golden's case to ever be heard by a jury of his peers. Judge Rita F. Lin is in violation of 18 U.S.C. § 241, Conspiracy against Rights:

> "Section 241 makes it unlawful for two or more persons to agree to injure, threaten, or intimidate a person [Golden] in the United States in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the United States or because of his or her having exercised such a right. Unlike most conspiracy statutes, § 241 does not require, as an element, the commission of an overt act."

Judge Rita F. Lin acknowledges "[t]his case is one of several patent infringement cases that Golden has filed against Google. If the two cases filed (*Golden v. Google LLC*, SCDC No. 6:2021cv00244 and *Golden v. Google LLC*, N.D.Cal. No.4:22-cv-05246-RFL) qualifies as several, then so be it. Judge Rita F. Lin supports the theory of the conspiracy—use whatever means necessary to ensure Golden, a Black and/or African American—do not proceed beyond the pleading stage, even if it means classifying Golden's case as too unbelievable or too fantastical (i.e., "frivolous").

The co-conspirator Judge Rita F. Lin is especially fascinated in applying "frivolous" to Golden's patented inventions because "[t]here have been numerous expressly racially biased laws promulgated throughout the United States. Among the earliest was the "Three-Fifths Compromise" established in 1787 which treated each enslaved African as only three-fifths of a

person for representation in the House of Delegates. In 1857, the Supreme Court essentially held that Blacks were not citizens and thus were not afforded protection under the Constitution in their infamous *Dred Scott v. Sandford* decision."

The "Three-Fifths Compromise" is said to have been nullified in the adoption of the 13th and 14th Amendments, but the spirit of the compromise lives on in a judicial system of "systemic and structural" racism, and the co-conspirator Judge Rita F. Lin is at the heart of it all.

The original case *Golden v. Google LLC*, SCDC No. 6:2021cv00244 was filed in the South Carolina District Court on 01/26/2021. The case was dismissed as being "frivolous". Golden appealed the case to the U.S. Court of Appeals for the Federal Circuit.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met." *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Larry Golden v. Google LLC*: Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." |

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court *again* concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three

claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Although the Federal Circuit did not specifically say "'without a doubt', Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not, directly infringing Golden's patents asserted in the case. Therefore, Golden has satisfied his burden of proof under the "preponderance of evidence" standard with "enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

In short, the co-conspirator Judge Rita F. Lin is precluded from re-litigating the issues already decided by the Federal Circuit. If Google believe the Circuit erred in their determination that Golden has pled "enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged". Google should have filed a petition for review at the Supreme Court; if Google believes Golden's case is about the DoD DTRA ATAK CBRNE sensors. Google should have filed a petition for review at the Supreme Court; and, if Google disagrees with the Circuit and believes Golden's claim chart does not map features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and does so in a relatively straightforward manner. Google should have filed a petition for review at the Supreme Court.

The co-conspirator Judge Rita F. Lin gives more influence on the decisions from previous cases that victimized Golden in a judicial system of systemic and structural racism, judicial bias

in favor of the white-owned corporation [Google]. and, the deprivation of a Seventh Amendment right to a trial by jury, than to honor the decision handed down by a higher Federal Circuit court within the same jurisdiction.

## PURSUANT TO 28 U.S.C. § 351(A): JUDGE RITA F. LIN HAS ENGAGED IN CONDUCT PREJUDICIAL TO THE EFFECTIVE AND EXPEDITIOUS ADMINISTRATION OF THE BUSINESS OF THE COURTS

Judge Rita F. Lin spent nineteen months--(09 14 2022 -- 04/03/2024)—relitigating issues already decided by the Federal Circuit in *Larry Golden v. Google LLC*, Case No. 22-1267, and the United States Patent Trials and Appeals Board in the *Department of Homeland Security v. Larry Golden* Case No. IPR2014-00714.

***Larry Golden v. Google LLC, Case No. 22-1267***

Issue preclusion, also called collateral estoppel. means that a valid and final judgment binds Google and Judge Rita F. Lin as to same issues actually litigated and essential to the judgment in the first action.

In the first action the District Court of South Carolina dismissed Golden's complaint and claim charts as being "frivolous". On appeal in *Larry Golden v. Google LLC*, Case No. 22-1267 the Appellate Court "vacated and remanded" the case back to the District Court because the Federal Circuit found the complaint and the claim chart not to be facially frivolous. Therefore, it is the judgement of the superior Appellate Court that precludes Google, the Northern District of California Court Judge Rita F. Lin from relitigating certain issues already litigated.

The four essential elements to decide if issue preclusion applies are: 1) the former judgement must be valid and final: 2) the same issue is being brought: 3) the issue is essential to the judgement: 4) the issue was actually litigated.

Google and Judge Rita F. Lin are collateral estoppel from relitigating the same issues found in Golden's complaint and claim charts submitted in the South Carolina District Court case [*Golden v. Google*] that was found not to be facially frivolous by the Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267.

Google and Judge Rita F. Lin are precluded from relitigating the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) for this case that has already been decided by the Federal Circuit.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

> Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met." *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead ""enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

Judge Rita F. Lin and Google are precluded from relitigating the independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189". The Federal Circuit in *Larry Golden v. Google LLC* Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally, and/or under the doctrine of equivalents, more likely than not, infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart…." |

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Although the Federal Circuit did not specifically say "without a doubt, Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not is directly infringing Golden's patents asserted in the case.

> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

Judge Rita F. Lin and Google are also precluded from relitigating the construction for the patent claims' limitations for where and how the CBRNE device(s) can be found "within" the Google alleged infringing devices. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
| --- | --- |
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms.

The Judge Rita F. Lin again erred in allowing Google to re-litigate issues that had already been adjudicated and a final decision was issued. The PTAB clearly stated the DTRA ATAK app and Draper's CBRNE Plug-in sensors are "an integral part of the device [Google smartphone]".

The federal circuit maintains that claim construction is not the type of legal question that should be resolved [or re-litigated] by a judge on the pleadings without the due consideration given in the *Markman* process.

The question presented is whether Judge Rita F. Lin and Google correctly held, consistent with the Supreme Court's instruction in *Markman v. Westview Instruments. Inc.* 517 U.S. 370, 372 (1996). that it is the province of the jury to determine whether an accused product infringes the claims of an asserted patent.

A *Markman* hearing is a court hearing in which a Judge determines the meaning of disputed words and phrases in a patent infringement lawsuit. A *Markman* hearing is also known as a construction hearing. When [a] Judge Rita F. Lin determines the meaning of the disputed words. it's called claim construction. But Judge Rita F. Lin is collateral estoppel from construing claim terms, or re-defining claim terms. already construed and a final decision was issued.

To determine patent infringement, a jury [not just Judge Rita F. Lin alone, with the Defense] must fully understand the definition of words used in the patent. A patented invention must be described with precise wording on its patent application. This wording and the defined definitions from the *Markman* hearing is what jurists use to determine if patent infringement has occurred.

In *Nalco v. Chem-Mod* (Fed. Cir. 2018), *Nalco* explained in detail its theory of infringement. For its part. the district court appeared to have conducted an informal claim construction that led to its ruling of no possible infringement.

Likewise, in the current case. the basic problem is Golden's patent claims do not include: nor expressly claim, the defendant's added limitation of "modified by a third-party in order to function". in the asserted patent claims limitations.

However, the Federal Circuit in *Nalco* rejected the lower court's informal claim construction as premature at the pleading stage:

> "As *Nalco* explained, these disputes between the parties' hinge on [] what limitations are appropriate ... 'It is not appropriate to resolve these disputes, or to determine whether the method claimed in the '692 patent should be confined to the preferred embodiment, on a Rule 12(b)(6) motion, without the benefit of claim construction.' The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits."

What does this mean within the confines of the current case – although claim construction is an issue of law, the Federal Circuit maintains that claim construction is not the type of legal question that should be resolved by a judge on the pleadings without the due consideration given in the *Markman* process. The Federal Circuit admonishes that invalidating any patent prior to claim construction is the exception rather than the rule. *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1274-75 ("[I]t will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis...").

Therefore, Judge Rita F. Lin erred in dismissing Golden's case on a limitation, function, action, or step that does not appear in any of Golden's patent claims asserted in this case, and is only fabricated by the defense.

Judge Rita F. Lin inappropriately dismissed Golden's case at the pleadings stage, with knowledge that Defendant's added "modified by a third-party in order to function" limitation does not appear in any of Golden's patent claims asserted in this case.

Golden believes Judge Rita F. Lin, needlessly spent over nineteen months re-litigating the term "modified". It doesn't matter that any of the devices, apparatuses, etc. capable of CBRNE detection were modified in order to function or not. What matters is, whether the devices,

apparatuses, etc. capable of CBRNE detection was made an *integral part of the [smartphone] device* by means of being "built-in, embedded", "included within", "incorporated into", "disposed within", "affixed to", "connected to", or, "mounted to another device". Following is an example using two of the patent claims asserted in the current case:

> **Independent Claim 23 of Patent #: 9,589,439;** "A cell phone comprising: … 'whereupon the cell phone is *interconnected* to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device' … 'the cell phone is at least a fixed, portable or mobile communication device *interconnected* to the cell phone detection device, capable of wired or wireless communication therebetween;'"

> **Independent Claim 1 of Patent #: 9,096,189;** "A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal … 'the communication device is at least a fixed, portable or mobile communication device *interconnected* to a fixed, portable or mobile product, capable of wired or wireless communication therebetween' … 'whereupon the communication device, is *interconnected* to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems'"

Judge Rita F. Lin's overstep, is evidence the Judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the Court. In *Markman v. Westview Instruments, Inc.*, the Supreme Court held that patent infringement cases "must be tried to a jury," whose role is to "answer [] the ultimate question of infringement." 517 U.S. 370, 377, 385 (1996) (citing *Bischoff v. Wethered*, 76 U.S. 812, 814 (1869).

Judge Rita F. Lin has demonstrated she is not one skilled in the art to recognize the numerous alterations, modifications, and variations of Golden's patented communicating, monitoring, detecting, and controlling (CMDC) invention. Judge Rita F. Lin is completely unaware of the structure and the novel way Golden created his patented CMDC devices. The Judge has made an unsuccessful attempt at hiding her ignorance of patent law, but cannot hide her prejudice and bias in favor of Google.

## The Claims of a Patent Define the Invention

Judge Rita F. Lin is not allowed to add, convert, change, or modify the patent claim terms beyond the scope of the invention. "Modified by a third-party for the device to function" is nowhere to be found in the patent claims asserted in the case.

> "It is a bedrock principle of patent law," says the Federal Circuit Court of Appeals, that "the claims of a patent define the invention." *Innova Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). And the U.S. Supreme Court agrees: "the claims made in the patent are the sole measure of the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961). In the words of Judge Giles Rich, an author of the U.S. Patent Act of 1952, "the name of the game is the claim." Giles S. Rich, *The Extent of the Protection and Interpretation of Claims - American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990).

As noted above, Golden is reliant on the various types of "interconnection" to establish the functionality of his claimed inventions. Interconnection is integral to achieving a globally connected digital ecosystem, allowing for seamless collaboration, innovation, and service delivery across continents. Interconnect, on the other hand, encompasses the establishment of multiple network connections, allowing various networks to interact and share data.

This can include connections between different types of networks, such as public and private, or between two networks with different service providers. Interconnect is more about creating a network ecosystem, facilitating a wide range of data exchanges, and offering flexibility and scalability in network architecture. https://www.flexential.com/resources/blog/interconnection-examples

It is infeasible, or impractical for Golden to "modify" the smartphone device for every component, device, or apparatus that is located remote the smartphone device itself, such as GPS satellites, Cellular Towers, Smartwatches, Connected Vehicles, Internet-of-Things (IoTs) devices

and sensors, and Remote Detection Devices. Modification is done on a per/event or per occurrence basis, whereby, if it's interconnected it's more alone the lines of being permanent.

The chart below illustrates the relevant patent claims' *elements* of Golden's asserted patents and how they are *interconnected* to various components remote the Google phone.

| CLAIM CONSTRUCTION BASICS FOR INTERCONNECTING COMPONENTS AND IDENTIFYING ELEMENTS INSIDE THE ALLEGED INFRINGING SMARTPHONES | | |
|---|---|---|
| **Components** | **Elements** | **Functions Substantially the Same as a "Transceiver"** |
| Located **remote** the smartphones but are interconnected to the elements identified in the smartphones | Located **inside** the smartphones but are interconnected to the components identified remote the smartphones | The smartphone transceiver performs substantially the same function: in substantially the same way: to achieve substantially the same results |
| GPS Satellites | GPS Receiver | Receives radio waves from each satellite. Transmits the GPS data received, to track. |
| Cellular Towers | Primary Cellular Antenna | Receives and sends radio frequency (RF) signals |
| Smartwatch / Car | Bluetooth Antenna | Send and receive radio waves |
| Internet-of-Things (IoTs) [Devices and Sensors] | Cellular Modem | Translate data sent to and from the smartphone devices |
| Remote Detection Device | Operating System | Send and receive signals to enable communication between the devices' hardware and software |

# GOLDEN ALLEGES JUDGE RITA F. LIN KNOWINGLY VIOLATED GOLDEN'S CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AND UNDER 18 U.S.C. § 242

The requirement of willfulness for a Judge Rita F. Lin to be prosecuted under section 2 of 18 U.S.C. § 242, which was enacted in the Civil Rights Act of 1866, is as follows: ("[C]itizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude. . . . shall have the same right, in every State and Territory in the United States. . . . to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.") *Civil Rights Act of 1866,* Ch. 31, § 1, 14 Stat. 27, 27

Congress requirement of willfulness for a judge to be prosecuted under section 2: responding to the critique that errors of judgment would lead to [Judge Rita F. Lin] being fined or imprisoned, Congress states: "[T]his is by no means [section 2's] purpose or its legal effect. The universal rule of law is that there can be no crime unless there be willful wrong. . .. [I]f an officer [Judge Rita F. Lin] shall intentionally deprive a citizen [Golden] of a right, knowing him to be entitled to it, then [the Judge] is guilty of a willful wrong which deserves punishment."

After numerous conversations and remarks about judges being open to prosecution due to section 2, in April of 1866, the Senate and the House of Representatives overrode President Johnson's veto, passing the Civil Rights Act of 1866 into law. *See Senate Vote #94 in 1866 (39th Congress.* In the years since its passage, section 2 has been revised and amended and now appears in the U.S. Code as 18 U.S.C. § 242, though it largely retains the original text of section 2 of the Civil Rights Act of 1866. *See 18 U.S.C. § 242*

Under 18 U.S.C. § 242, it is a crime for a person acting under color of law to willfully deprive a person [Judge Rita F. Lin] of a right or privilege protected by the Constitution or the laws of the United States. *See 18 U.S.C. § 242.* Consistent with the legislative history of the Civil Rights Act of 1866, the Supreme Court has held that ***judges are not immune*** from 18 U.S.C. § 242, stating:

> "[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach "so far as to immunize criminal conduct proscribed by an Act of Congress . . .."

To highlight the point: despite criminal prosecutions inevitably having an effect on judicial behavior, and despite the fact that judicial immunity from criminal and civil suit was well established since the days of *Floyd v. Barker*, the Supreme Court has held that judges lack immunity from prosecution for violating constitutional rights under 18 U.S.C. § 242 because Congress acted to proscribe criminal conduct by judges in the Civil Rights Act of 1866.

This conclusion makes sense: after all, absolute judicial immunity was not universal in 1866, so the framers of what became 18 U.S.C. § 242 would not have needed to insert a clear statement in the text of the statute: it was obvious that the statute would open judges up to prosecution. Indeed, in the immediate aftermath of the Civil War, the prosecution of state judges for violating people's civil rights under a congressional statute was affirmed by the Supreme Court as a valid exercise of Congress's power. *See, e.g., Ex parte Virginia,* 100 U.S. 339, 348 (1880) (permitting criminal prosecution of state judge where state judge excluded Black jurors from jury selection in violation of the Constitution).

And in any event, if there were any doubt remaining, the Supreme Court enshrined the lack of judicial immunity from criminal prosecution under 18 U.S.C. § 242 in *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974), *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976), and *Dennis v. Sparks*, 449 U.S. 24, 31 (1980); see also *United States v. Lanier*, 520 U.S. 259, 269 (1997).

Finally, the Supreme Court failed to consider the legislative history of 42 U.S.C. § 1983, including its basis in 18 U.S.C. § 242. As the sponsor of the Ku Klux Klan Act of 1871 made clear, the text of 42 U.S.C. § 1983 was explicitly modeled on the text of 18 U.S.C. § 242. Moreover, this provision for civil liability was intended to be even more expansive than 18 U.S.C. § 242, even omitting in 42 U.S.C. § 1983 the requirement in 18 U.S.C. § 242 that violations be willful.

Just as members of Congress assumed that 18 U.S.C. § 242 would expose judges to criminal liability, a hypothesis that was later affirmed by the Supreme Court, members of Congress debating the Ku Klux Klan Act of 1871 also assumed that 42 U.S.C. § 1983 would expose judges to civil liability:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." *42 U.S. Code § 1983 - Civil action for deprivation of rights*

Golden alleges Judge Rita F. Lin, with knowledge, willfully violated Golden's Seventh Amendment constitutional right to a trial by jury.

**Example of How Judge Rita F. Lin Knowingly and Willingly Violated Golden's Civil Rights by allowing the White-owned Google company the opportunity to Re-structure the Company's dealings before determining liability for Google's current offenses.**

Judicial Conduct and Disability Act

28 U.S.C. § 351(a): "Any person alleging that a judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" may file a written complaint.

Willful Misconduct

Judge Rita F. Lin's "willful misconduct" refers to the Judge knowingly requiring Golden to prove direct infringement under 28 U.S.C. § 1498(a) as a necessary predicate to proving direct infringement under 35 U.S.C. § 271(a). *Zoltek III*

In this current case, *Larry Golden v. Google LLC*, NDC Case 3:22-cv-05246-RFL AMENDED COMPLAINT against Google LLC, Dkt. 42; Filed 08/23/23, Golden informed the Court that an amended complaint was necessary because "Google has discontinued the making, offering for sell, and selling of the Google Pixel 5 Smartphone; discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Golden's "joint infringement" claim; and discontinued offering for sell, and selling, the ATAK-Military on Google Play, to avoid liability for the actions brought against them"

"This amended complaint is necessary because after the Federal Circuit's order on 09/08/2022, in *Larry Golden v. Google LLC*, Case No. 22-1267, to "VACATE AND REMAND" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". Google has discontinued the making, offering for sell, and selling of the Google Pixel 5 Smartphone; discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Plaintiff's "joint infringement" claim; and discontinued offering for sell, and selling, the ATAK-Military on Google Play, to avoid liability for the actions brought against them."

Upon information and belief, the presiding Judge ordered the amended complaint because he believed Golden claims of patent infringement was no longer valid because of the actions of Google to stop selling the Google Pixel 5; stop using Qualcomm's alleged infringing CPU/chipset; and stop selling the ATAK-Military software app in the Google Play store. All three components were significant to the decision made in *Larry Golden v. Google LLC*; Case No. 22-1267, to "VACATE AND REMAND" the case. Back to the District Court.

**The "Reversed Engineered" Claim Chart Presented to the Federal Circuit is proof Judge Rita F. Lin Knowingly violated Golden's Civil Rights by Re-litigating Issues already decided, while depriving Golden of his Seventh Amendment right to a Trial by Jury**

This is not an argument of the merits of the case. Golden is simply pointing out that Judge Rita F. Lin herself verified the Federal Circuits findings. Judge Rita F. Lin determined there could be no infringement unless the Google phone is modified by a third-party to function.

Golden agrees with Judge Rita F. Lin because it's what Golden have been pleading throughout this entire case. Judge Lin identified certain claim limitations (see the chart below) that requires modification to function, in accordance with Golden's claim limitations.

Judge Rita F. Lin identified Draper's CBRNE Plug-in seniors and the DTRA ATAK software; she recites from Golden's claim limitations, qualifies for direct infringement under the doctrine of equivalents because the CBRNE Plug-in seniors and the DTRA ATAK software combination performs substantially the same function; in substantially the same way; to achieve the same result! *Jenkinson Co. v. Hilton Davis Chem. Co. (1997)*

The following Claim Chart is a duplicate of the Claim Chart submitted on appeal to the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267. The chart illustrates show the "reverse engineering" Google's alleged literal infringement and/or infringement under the doctrine of equivalents of Golden's '287, '439, and '189 patents.

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Indep. Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal … |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, … |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 ÷ 5.0 GHz, Bluetooth 5.0 ÷ LE, NFC, GPS (GLONASS, Galileo. BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, ... or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, ... short-range radio frequency (RF) connection, or GPS connection; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 ÷ 5.0 GHz, Bluetooth 5.0 ÷ LE, NFC, GPS (GLONASS, Galileo. BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of... WiFi connection, internet connection, radio frequency (RF) connection, cellular connection... capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group... of satellite, Bluetooth, WiFi... |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 ÷ 5.0 GHz, Bluetooth 5.0 ÷ LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a... Bluetooth connection. WiFi connection, internet connection... cellular connection... short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism ... known as pattern lock. To set, drag your finger along [] the screen. To unlock, replicate the pattern drawn. ... the phone locks and cannot be unlocked without logging int... Google Nest × Yale Lock ... you can lock or unlock door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device. the at least one locking mechanism configured to at least one of engage (lock) the ... device. disengage (unlock) the ... device, or disable (make unavailable) the ... device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection. to provide power to the communication device | X | X |

| | | | |
|---|---|---|---|
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, ... such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler ... of a fingerprint recognition, ... face recognition... of the cell phone, the smart phone, the desktop, ... the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) ... a single interface for ... different CBRN-sensing technologies... a wearable smartwatch that measures ..., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical. biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed. portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed. portable or mobile communication device interconnected to a fixed. portable or mobile product. capable of wired or wireless communication therebetween... |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK—on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes ... (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor. a biological sensor, an explosive sensor. a human sensor, a contraband sensor. or a radiological sensor capable of being disposed within. on. upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz; Bluetooth 5.0 + LE. NFC, GPS (GLONASS. Galileo, BeiDou). eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... | X | X |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing tech. | at least one of a transmitter or a transceiver in communication with ... CPU configured to send signals to ... detect at least one of a chemical biological... agent ... device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device: | a transmitter for transmitting signals and messages to at least one of plurality product groups ..., a cell phone detection device... locking device;<br><br>a receiver for receiving signals, data or messages from at least one of ... a cell phone detection device... locking device; |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing tech. | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors. activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now ... (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device: | wherein at least one .... Bluetooth connection, WiFi connection, internet connection. ... cellular connection, ... signal communication with the transmitter and the receiver of the ...device and transceivers of the products; |
| *Android Team Awareness Kit*, ATAK ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes CBRN plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from ... chemical sensor, the biological sensor, the explosive sensor, ... or the radiological sensor, causes a signal that includes at least one of location data ... | X |

The United States has both statutory equivalents doctrine that is codified in 35 U.S.C. §

112, which extends to equivalents available at patent's issuance. "[t]he specification shall contain

a written description of the invention, and of the manner and process of making and using it, in

such full, clear, concise, and exact terms as to enable any person skilled in the art to which it

pertains, or with which it is most nearly connected, to make and use the same, and shall set forth

the best mode contemplated by the inventor or joint inventor of carrying out the invention", and

"[t]he specification shall conclude with one or more claims particularly pointing out and

distinctly claiming the subject matter which the inventor or a joint inventor regards as the

invention." (35 U.S. Code § 112 - Specification (a)(b)), and a more general (non-statutory,

created by courts) doctrine of equivalents, which extends to technological equivalents developed

after the patent is granted. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co. (1997)*

"In American practice, the doctrine of equivalents analysis is applied to individual
claim limitations, not to the invention as a whole. The legal test, articulated in *Warner-
Jenkinson Co. v. Hilton Davis Chem. Co. (1997)*, is whether the difference between the
feature in the accused device and the limitation literally recited in the patent claim is
'insubstantial'."

"One way of determining whether a difference is 'insubstantial' or not is called
the 'triple identity' test. Under the triple-identity test, the difference between the feature
in the accused device and the limitation literally recited in the patent claim may be found
to be "insubstantial" if the feature in the accused device:
1. Performs substantially the same function
2. In substantially the same way
3. To obtain the same result

as the limitation literally recited in the patent claim. See *Graver Tank & Manufacturing
Co. v. Linde Air Products Co., (1950)*.

# THE JUDGE FAIL TO STRICTLY FOLLOW THE DECISION(S) HANDED DOWN BY THE HIGHER COURT WITHIN THE SAME JURISDICTION

Judge Rita F. Lin is in violation of the doctrine of *vertical stare decisis* for not honoring the decision of the higher Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267:

The Northern District of California Court Judge, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" literally and/or under the doctrine of equivalents infringes Golden's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... and it does so in a relatively straightforward manner". The District Court Judge was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

*Vertical stare decisis* binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court Judge must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines *vertical stare decisis* as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

Judge Rita F. Lin engages in *vertical stare decisis* when she applies precedent from the higher court. For example, if the Northern District of California Court Judge in *Golden v. Golden* adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be *vertical stare decisis*.

The bigger question is why? Why did Judge Rita F. Lin ignore the ruling from the higher court and decided to be the defendant; the judge; and the jury? "But for" the Judge is racially bias against Golden and is more concern with earning the respect of her co-conspirators who supports a judicial system of systemic and structural racism.

**Standard Claim Charts – I**

The claim chart presented and reviewed by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 is based on "reverse engineering". Reverse engineering, also called "tear down", is a method or process to discover how the DTRA ATAK software and/or its Draper CBRNE Plug-in Sensors functions with a Google smartphone product.

In Golden's patent specifications: "[p]roduct grouping 2 (sensors) include, but are not limited to, chemical, biological, [] motion sensors, [] biometric sensors, [] human…" Golden, during patent prosecution was able to get the "heart-rate sensor" allowed as the species of the sensors listed above, to include the signature sensor (i.e., unique cardiac signature) as genesis.

Therefore, one way to read the following standard claim chart is to read it from the Google smartphone; to the Google smartwatch; to the Google smartwatch chemical, biological, motion, biometric, human, or signature "heart-rate" sensor. Another way to read the standard claim chart is to identify exactly where the element can be found in the accused devices (CPU, transmitter, receiver, transceiver, GPS receiver[and antennas for Bluetooth, cellular and Wi-Fi).

Although Golden is not required to plead infringement on an element-by-element basis at the pleading stage, Golden not only plead infringement on an element-by-element basis at the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 with a reverse engineered claim chart. Golden also pled infringement on an element-by-element basis that can be read two ways with the standard claim chart in this current case *Golden v. Google LLC*; NDC Case 3:22-cv-05246-RFL. Why would Judge Rita F. Lin not consider Golden's evidence?

The following standard claim chart was presented to Judge Lin for an element-by-element analysis of a Google smartphone and how it functions with a Google smartwatch CBRNE sensing for claim 1 of '189 patent; claim 23 of '439 patent; and claim 5 of '287 patent.



**Google Smartwatch CBR Detector for Smartphone**

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

ATAK (built on the Google Android operating system) ... controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) ...

## IDENTIFYING IN THE ALLEGED INFRINGING SMARTPHONE WHERE EACH ELEMENT IS FOUND THAT LITERALLY AND/OR UNDER THE DOCTRINE OF EQUIVALENTS INFRINGES GOLDEN'S PATENTS.

| Google Pixel 8 Smartphone | Patent No. 9,096,189 (claim 1 of the '189 patent) |
|---|---|
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program ... or a front-end processor for communication between a host computer and other devices; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device ... a cell phone detection |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device ... a cell phone detection device |

| | |
|---|---|
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween | the communication device is at least a ... mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |
| Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel smartwatch as having voice recognition, "Google Assistant voice commands on Google Pixel Watch" https://support.google.com/googlepixel watch/answer/12677020?hl=en | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; |

## IDENTIFYING IN THE ALLEGED INFRINGING SMARTPHONE WHERE EACH ELEMENT IS FOUND THAT LITERALLY AND/OR UNDER THE DOCTRINE OF EQUIVALENTS INFRINGES GOLDEN'S PATENTS.

| Google Pixel 8 Smartphone | Patent No. 9,589,439 (claim 23 of the '439 patent) |
|---|---|
| Golden has identified the Google smartphone(s) as "a new, improved upon, and useful cell phone" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A cell phone comprising:* |

| | |
|---|---|
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a transmitter for transmitting signals and messages to a cell phone detection device; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a receiver for receiving signals from the cell phone detection device; |
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween, and | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; |
| Golden is identifying the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch as the cell phone detection device to receive signals or send signals to activate or deactivate | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to ... activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |
| Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is adjacent the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device" | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |

| | |
|---|---|
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; |
| Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel smartwatch as having voice recognition. *"Google Assistant voice commands on Google Pixel Watch"* https://support.google.com/googlepixelwatch/answer/12677020?hl=en | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; |

## IDENTIFYING IN THE ALLEGED INFRINGING SMARTPHONE WHERE EACH ELEMENT IS FOUND THAT LITERALLY AND/OR UNDER THE DOCTRINE OF EQUIVALENTS INFRINGES GOLDEN'S PATENTS.

| Google Pixel 8 Smartphone | Patent No. 10,163,287 (claim 5 of the '287 patent) |
|---|---|
| Golden has identified the Google smartphone(s) as "a monitoring device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A monitoring device, comprising:* |
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | at least one central processing unit (CPU); |
| Golden has identified the Wi-Fi 7 (802.11be) with 2.4GHz~5GHz~6GHz,2x2~2x2 MIMO of the Google Pixel smartphone that is in communication with the Google "Tensor" CPU/Chipset]; and the Wi-Fi 802.11 b/g/n 2.4GHz that is in communication with the Google Pixel smartwatch; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |

| | |
|---|---|
| Golden has identified the Bluetooth® v5.3 with dual antennas for enhanced quality of the Google Pixel smartphone that is in communication with the Google "Tensor" CPU/Chipset]; and the Bluetooth® 5.0 that is in communication with the Google Pixel smartwatch; the Qualcomm SW5100 / Cortex M33 CPU/Chipset | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Golden has identified the Google Pixel smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band that is in communication with the Google "Tensor" CPU/Chipset; and the NFC connectivity of the Google Pixel Smartwatch that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; |
| The Google Pixel smartphone is equipped with the ability to check a "human" heart rate i.e. the number of beats per minute with the smartphone camera, and the working camera flash unit that is in communication with the Google "Tensor" CPU/Chipset; and check a "human" heart rate with the multi-path optical heart rate sensor of the Google Pixel smartwatch that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is in communication with the Google Pixel smartphone "Tensor" CPU/Chipset; and in communication with the Google Pixel smartwatch Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Golden is identifying the Google Pixel smartphone(s), that is in communication with the Google "Tensor" CPU/Chipset, as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch, that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset, as the cell phone detection device capable of receiving signals or sending signals | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor ... or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

## Standard Claim Charts – II

In Golden's patent specifications: "[p]roduct grouping 2 (sensors) include, but are not limited to, chemical, biological, [] motion sensors, [] biometric sensors, [] human…" Golden, during patent prosecution was able to get the "heart-rate sensor" allowed as the species of the sensors listed above, to include the signature sensor (i.e., unique cardiac signature) as genesis.

Therefore, one way to satisfy the asserted patent claims requirement for detection of at least the sensors listed in the above paragraph is with the Google smartphone camera "heart-rate" sensor (i.e., chemical, biological, motion, biometric, human, or signature "heart-rate" sensor).

The Google Fit app., that is preinstalled on the Google Pixel handset (smartphone), is used to measure a heart rate on the Google Pixel smartphone. Google Pixel smartphones are capable of monitoring a heart rate even though there isn't any dedicated hardware in the handset to track these metrics. It instead uses a smart approach that leverages the phone's rear camera.

Within the Google Fit app, the user will be able to track their heart rate and their respiratory rate. The user will need a compatible smartphone to be able to do this though, which includes every Google Pixel smartphones since the Google Pixel 3 and Google Pixel 3 XL.

Another way is to identify exactly where in the alleged infringing Google smartphone device, that include identifying where the CPU, transmitter, receiver, transceiver, GPS receiver, and the antennas for Bluetooth, cellular and Wi-Fi can be located that are at least interconnected to the components, devices, or apparatuses capable of CBRNE detection.

Although Golden is not required to plead infringement on an element-by-element basis at the pleading stage, Golden not only plead infringement on an element-by-element basis at the Federal Circuit in *Larry Golden v. Google LLC*, Case No. 22-1267 with a reverse engineered claim chart. Golden also pled infringement on an element-by-element basis that can be read two

ways with the standard claim chart in this current case *Golden v. Google LLC*; NDC Case 3:22-cv-05246-RFL. Why would Judge Rita F. Lin not consider Golden's evidence?

Lastly, the following claim chart of patent claims that was reviewed by the Federal Circuit in *Golden v. Google*; Case No. 22-1267, and presented to Judge Rita F. Lin for an element-by-element analysis between claim 1 of '189 patent; claim 23 of '439 patent; and claim 5 of '287 patent, and the alleged infringing Google smartphone product, is illustrated below. The Google smartphone camera designed for CBR detection is ***internal*** the Google smartphone.

Camera [1][2] Used for Detecting Chem/Bio Agents.



🖫Panache

1    The camera captures the image from the array of nanopores that uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the resolution phone camera. The resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

2    Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of

| The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone | |
|---|---|
| **Patent No. 9,096,189 (Patent Claim 1 of Golden's '189 Patent)** | **Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween** |
| *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | [Golden has identified the Google smartphone(s) as "a communication device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program ... or a front-end processor for communication between a host computer and other devices; | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device ... a cell phone detection device ...; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device ... a cell phone detection device ...; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| the communication device is at least a ... mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; | [Golden has identified the Google smartphone(s) as "a communication device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween] |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |

| | |
|---|---|
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products: | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |

## The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone

| Patent No. 9,589,439 (Patent Claim 23 of Golden's '439 patent) | Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween |
|---|---|
| *A cell phone comprising* | [Golden has identified the Google smartphone(s) as "a new, useful, and improved upon cell phone" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program: | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| a transmitter for transmitting signals and messages to a cell phone detection device: | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |

| | |
|---|---|
| a receiver for receiving signals from the cell phone detection device; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; | [Golden has identified the Google smartphone(s) as "a new, useful, and improved upon cell phone" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween]. |
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone | [Golden is identifying the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is embedded in the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device"] |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; | [Golden has identified the Google smartphone(s) fingerprint recognition and the Google "megapixel" Camera as having facial recognition. |

## The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone

| Patent No. 10,163,287 (Patent Claim 5 of Golden's '287 patent) | Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween |
|---|---|
| *A monitoring device, comprising*: | [Golden has identified the Google smartphone(s) as "a monitoring device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| at least one central processing unit (CPU): | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone: the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU: | [Golden has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+ 2x2 MIMO of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU: | [Golden has identified the Bluetooth® v5.3 with dual antennas for enhanced quality of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU: | [Golden has identified the Google Pixel smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band that is in communication with the Google "Tensor" CPU/Chipset] |

| | |
|---|---|
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | The Google Pixel smartphone is equipped with the ability to check a "human" heart rate i.e. the number of beats per minute with the smartphone camera, and the working camera flash unit that is in communication with the Google "Tensor" CPU/Chipset] |
| one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | [Golden is identifying the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is in communication with the Google Pixel smartphone "Tensor" CPU/Chipset] |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | [Golden is identifying the Google Pixel smartphone(s), that is in communication with the Google "Tensor" CPU/Chipset, as "a monitoring device" or "communication device", interconnected to the Google "megapixel" Camera as the cell phone detection device capable of receiving signals or sending signals] |

## CONTRIBUTORY INFRINGEMENT: JUDGE RITA F. LIN VIOLATED GOLDEN'S "DUE PROCESS" RIGHT WHEN SHE FRUSTRATED THE FAIRNESS OF THE PROCEEDINGS

Although the Fifth Amendment "Due Process" Clause is brief, important parts of the Supreme Court's constitutional doctrine rest on it. At the most general level, the clause reiterates the principle of the rule of law: the government [Judge Rita F. Lin] must act in accordance with legal rules and not contrary to them.

A more specific application of the Clause is the doctrine today called "procedural due process," which concerns the fairness and lawfulness of decision-making methods used by the courts [Judge Rita F. Lin] and the executive.

Governmental actors [Judge Rita F. Lin] violate due process when [she] frustrates the fairness of proceedings. Likewise, fair notice and the opportunity to be heard are due process requirements in criminal, civil, and other proceedings.

## Judge Rita F. Lin Acknowledges Google knew Golden's Patents are Infringed by the Combination:

At the very least, in order to reach liability for contributory infringement, Google must know of Golden's patents to be liable for its contributory infringement: "§ 271(c) requires knowledge of the existence of the patent that is infringed." *Global-Tech* (U.S. 05/31/2011) (calling this "§ 271(c)'s intent requirement."). But the statute implies more: "knowing the same to be especially made or especially adapted for use in an infringement of such patent," suggesting that accused party must know there is an infringement.

The Supreme Court has held that the statute requires knowledge of infringement: "On this question a majority of the Court is of the view that § 271(c) does require a showing that the alleged contributory infringer Google knew that the ***combination*** for which his component was especially designed was both patented and infringing." *Aro Mfg.* (Aro II) (U.S. 06/08/1964): "In *Aro II*, a majority held that a violator of § 271(c) must know 'that the ***combination*** for which his component was especially designed was both patented and infringing.' 377 U.S., at 488.

Both Google and the co-conspirator Judge Rita F. Lin knew the CBRNE devices allegedly infringes Golden's patents when combined with the Google smartphones:

"Plaintiff's complaint alleges that ATAK is not made by Google, and he does not allege that ATAK comes pre-loaded on Google phones: Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK). ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial

51

mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins." *Golden v. Google* Case 3:22-cv-05246-RFL Document 41 Filed 08/10/23

"The FAC alleges five theories of direct infringement (id. ¶ 75, Exs. G & H), all of which suffer from the same defect for which the original complaint was dismissed: the theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit. ... "Mr. Golden's allegations, even if true, at best establish that [defendant's] smartphones might be modified post-sale to perform the accused detector/sensor functionality, which is not enough for direct infringement on the claims here." *Golden v. Google* Case 3:22-cv-05246-RFL Document 68 Filed 04/03/24

> ***ATAK application***: "finding that the defendants' products "do not infringe without modification—the modification of installing the required software". [gateway to the alleged infringing Draper CBRNE Plug-in sensors]
>
> ***NFC tags***: "Golden' second theory [] requires combining "Google's NFC sensor," which are allegedly embedded in the accused products, with external NFC tags that have been converted to detect certain chemicals in order for there to be alleged infringement."
>
> ***Camera sensors***: "The FAC also alleges that "[s]martphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing," further confirming that the sensors are separate devices that may be "incorporated" into the smartphone. (Id.) Therefore, this theory of infringement also fails because the accused products do not infringe without modification."
>
> ***Smartphone biosensors***: "The diagram shows an "add on device" with the alleged biosensors (i.e., "capillary inlet," "microfluidic cassette," VIS-NIR spectrometer, and "NNAP electrodes") attached to a nondescript smartphone. (Id.) As such, this theory also requires modification to the accused smartphones to state an infringement claim."
>
> ***Google Beacon***: Golden's fifth theory (see Ex. G at 34–41) fails for the same reason, as it requires "Google Beacon," which the FAC's own illustrations show is a separate device from the accused smartphones." *Golden v. Google* Case 3:22-cv-05246-RFL Document 68 Filed 04/03/24

Unlike the lie Judge Rita F. Lin implied, "[t]he FAC alleges five theories of direct infringement": the FAC actually alleges five theories of indirect [contributory] infringement, whereby the Google smartphone is the "material part" of the alleged infringing CBRNE devices listed above and illustrated in the claim chart below:

# CBRNE — Multi-Sensor Detection Systems

Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak

**ATAK-CIV (CBRN):** "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google.com/store/apps/details?id=com.atakmap.app.civ&hl=en_US&gl=US



**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas.1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4280584/



*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

**Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time*. Source: https://www.understanding nano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-



🄰Panache

Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link.springer.com/article/10. 1007/s11468-022-01672-1

## Smartphone Biosensors:
1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels



**Google Beacon: Bluetooth; GPS; Wi-Fi**
Google Android smart phones and
WiFi/Bluetooth beacons as detectors and
sources. Google smart phone sensors (GPS.
WiFi, Bluetooth) and beacon signals to
calculate distance between detector and source.
Filtering WiFi/ Bluetooth ranging functions and
GPS location data. Filtering GPS derived
distances based on jump in calculated position
or when GPS reports jump in position but
phone accelerometer sensors do not show rapid
acceleration. Specific models in different
categories of radiation instruments (dosimeters.
survey meters. personal radiation detectors.
backpacks. nuclide identifiers. and mobile
systems).



Google Beacon is a type of Bluetooth
technology with proximity-based triggers. These
triggers affect both the physical and digital
world. Using Bluetooth low energy (BLE)
hardware technology, beacons communicate
with nearby smart devices like smartphones.
tablets. etc. Different types of beacons that
perform different tasks.

## Multi-Sensor Detection System — CBRNE

| Multi-Sensor Detection Systems | Patent #: 9,589,439; Independent Claim 19 | Patent #: 9,096,189; Independent Claim 7 |
|---|---|---|
| CBRNE. Smartwatch. CBR Smartphone Camera. CBR—NFC Smartphone Sensors CBR Smartphone Beacon (Bluetooth) Smartphone Biosensors CBRNE Plug-in Sensors | A multi-sensor detection system for detecting at least one explosive. nuclear. contraband. chemical. biological. human. radiological agent. or compound. comprising: | A multi-sensor detection system for detecting at least one explosive. nuclear. contraband. chemical. biological. human. or radiological agents and compounds. comprising: |

| | | |
|---|---|---|
| CBRNE Smartwatch, <br><br>CBR Smartphone Camera, <br><br>CBR—NFC Smartphone Sensors <br><br>CBR Smartphone Beacon (Bluetooth) <br><br>Smartphone Biosensors <br><br>CBRNE Plug-in Sensors <br><br>Built on the Android, iOS, and Windows operating system for connecting the software (i.e., ATAK) and the hardware — CBRN sensors and detectors | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |
| The Smartphones and Smartwatches of Google, Qualcomm, LG, Apple, and Samsung; and, the Laptops, Tablets, and Desktop PCs of Intel and Samsung | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| The Smartphone(s) [Google Pixel 8] connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. Satellite communication on smartphones. The iPhone 14 is the first smartphones widely available in the market that support satellite connectivity. Android 15 extends platform support for satellite connectivity. The platform now has UI elements that are needed to "ensure a consistent user experience across the satellite connectivity landscape." | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

| | | |
|---|---|---|
| The Smartphone(s) [Google Pixel 8] connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. Satellite communication on smartphones. The iPhone 14 is the first smartphones widely available in the market that support satellite connectivity. Android 15 extends platform support for satellite connectivity. The platform now has UI elements that are needed to "ensure a consistent user experience across the satellite connectivity landscape." | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |
| The internet connection is shared by many smartphone functions on the Google Pixel 8 smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google Pixel 8 smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

| | | |
|---|---|---|
| The '287, '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| The Android-based [Google] smartphone[s] now contained integrated satellite ...

Wi-Fi is a method for Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves...

The internet connection is shared by many functions on the Google Pixel 8 smartphone such as internet browsing, email messaging; installing apps...

The Google Pixel 8 phone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data... | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow secure authentication on the Google Android platform. The Google Android framework includes face and fingerprint biometric authentication.

The Smartphones and Smartwatches of Google, Qualcomm, LG, Apple, and Samsung; and, the Laptops, Tablets, and Desktop PCs of Intel and Samsung | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] smartphone[s] now contained integrated satellite … | | |
| Wi-Fi is a method for devices such as the Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves… | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |
| The internet connection is shared by many ATAK functions on the Google Pixel 8 smartphone such as internet browsing, receiving email messages; installing apps… | | |
| The Google Pixel 8 phone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | | |

"Whoever [Google LLC] offers to sell or sells within the United States [] a component [smartphone] of a [] combination [] or apparatus for use in practicing a patented process, constituting a *material part* of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." *35 U.S.C. § 271(c).*

As this is a "contributory" liability doctrine, there must be a direct infringement for there to be Sec. 271(c) liability. Golden alleged the multi-sensor detection systems of a CBRNE Smartwatch, a CBR Smartphone Camera, a CBR—NFC Smartphone Sensor, a CBR Smartphone Beacon, Smartphone Biosensors, and CBRNE Plug-in Sensors infringes Golden's patents.

# WHEN JUDGE RITA F. LIN UNLAWFULLY SEPERATED GOLDEN'S PATENTED INVENTION COMBINATION, THE JUDGE ALSO KNOWINGLY CHANGED THE CAUSES OF ACTION FOR THE ALLEGED INFRINGING PRODUCTS

Initially, Golden alleged Google's Pixel 5 smartphone directly infringed Golden's patents; Golden alleged the Google Android Open-Source Operating System platform is the device (software) Google used to induced the infringement of Golden's patents; and Qualcomm contributed to the infringement of Golden's patents with its Snapdragon CPU/Chipset that has no substantial non-infringing use.

Golden also informed the Court that DTRA ATAK software and Draper's CBRNE Plug-in Sensors combination also allegedly infringes Golden's patents, but a claim of direct infringement was not entered in this Court for or by Golden for lack of subject matter jurisdiction. A claim of direct infringement for the alleged patented combination should be made in the United States Court of Federal Claims.

Upon receiving notice that the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 "vacated and remanded" the case back to the District Court because the Federal Circuit determined that Google more likely than not, directly (literally) infringed Golden's patents, Google discontinued the making, using, offering for sell, and selling the of the Google Pixel 5 smartphones and selling the ATAK-MIL software from its Google Play store; and discontinued the contract with Qualcomm for its Snapdragon CPU Chipset.

Judge Rita F. Lin immediately overstepped the jurisdiction of the Northern District of California and demanded Golden prove direct infringement of the ATAK software and Draper CBRNE Plug-in sensors under 28 U.S.C. § 1498(a) as a necessary predicate to proving direct infringement under 35 U.S.C. § 271(a). Which means proving the Government's ATAK infringe.

In complying with Judge Rita F. Lin's demand that Golden prove direct infringement of Golden's multi-sensor detection device(s) and/or Golden's cell phone detection device(s) of at least that of a CBRNE Smartwatch, a CBR Smartphone Camera, a CBR—NFC Smartphone Sensor, a CBR Smartphone Beacon, Smartphone Biosensors, and CBRNE Plug-in Sensors, Golden submitted to the Court a claim chart identifying the alleged infringement of Golden's patented inventions. *See the claim chart in the previous section of this document.*

The claim chart in the previous section of this document, also illustrates how the Google Pixel smartphone series contributes to the infringement of Golden's multi-sensor detection device(s) and/or Golden's cell phone detection device(s) of at least that of a CBRNE Smartwatch, a CBR Smartphone Camera, a CBR—NFC Smartphone Sensor, a CBR Smartphone Beacon, Smartphone Biosensors, and CBRNE Plug-in Sensors. Golden only needs to show that the distinct and separate "components" has no substantial non-infringing use.

> Labeling it "an important, and previously unresolved, question," a 2-1 panel held that contributory infringement arises where sold devices (optical disc drives) "contain hardware or software components that have no substantial non-infringing use []," even though device has other hardware and embedded software module that cannot be used to infringe—distinguishing *Hodosh* (Fed. Cir. 11/25/87) and relying on *Grokster* (U.S. 06/27/2005) ("one who distributes a device with the object of promoting its use to infringe [], as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.") *Ricoh* (Fed. Cir. 12/23/08).
>
> *In re Bill of Lading* (Fed. Cir. 06/07/12) ("Where the product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie."; distinguishing *Ricoh*

The following claim chart was presented to Judge Rita F. Lin for an element-by-element analysis of products Google's alleged infringing smartphone product and how it functions with the Google Tensor CPU / Chipset designed to carry out the operational and functional instructions of the Google smartphone. Which means the Google Smartphone series and the Google Tensor CPU/Chipset; both contributes to the infringement of Golden's patents.

| Google Tensor; Tensor 2; and Tensor 3 | Patent #: 10,984,619; Independent Claim 1 | Patent #: 10,984,619; Independent Claim 11 |
|---|---|---|
|  *The Google Tensor (i.e. CPU; Chipset)* is considered the "brain" of the Smartphone, … | *A communication device* that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: | *A central processing unit (CPU)* of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to lock, unlock, or disable the lock of the communication device; | processing instructions to lock, unlock, or disable the lock of the communication device; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; |

| | | |
|---|---|---|
| The Google Tensor (i.e. CPU: Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |
| The Google Tensor (i.e. CPU: Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; |
| The Google Tensor (i.e. CPU: Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); |
| The Google Tensor (i.e. CPU: Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |
| The Google Tensor (i.e. CPU: Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| | | |
|---|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and. | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and. |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. |

Judge Rita F. Lin and Google completely ignored Golden's claim that Google's Tensor, Tensor 2, and Tensor 3 CPU Chipset allegedly infringes independent claims 4, 5, & 6 of Golden's '287, and independent claim 11, and dependent claims 12-20 of Golden's '619 patent.

Dismissing the case without a jury trial to rule on Golden's claim that the Google Tensor Series CPU Chipset allegedly infringes Golden patents is a clear-cut indication that Judge Rita F. Lin is bias in favor of Google and against Golden.

In the current case *Golden v. Google* LLC, N.D.Cal. Case 3:22-cv-05246-RFL Document 68 Filed 04/03/24, Judge Rita F. Lin outright lies when she says, "Golden does not allege that Google directly infringe the patents-in-suit". Golden claim Google directly infringed before Judge Rita F. Lin separated the Google phone from any means of detecting CBRN&E. Upon separation, Golden preceded to show how the Google phones 'contribute' to the infringement.

> "Liability for [] contributory infringement is dependent upon the existence of direct infringement," and "[t]here can be no [] contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) … "However, Golden does not allege that Google, [] directly infringed the patents-in-suit." … "To the contrary, Golden concedes that there was no such direct infringement" … "the FAC lacks factual allegations regarding Google's knowledge of the patents-in-suit and patent infringement." *Golden v. Google* N.D.Cal. Case 3:22-cv-05246-RFL Document 68 Filed 04/03/24. [Order Granting Google's Motion to Dismiss]

Following are numbered excerpts taken from Golden's amended complaint in *Golden v. Google* N.D.Cal. Case 3:22-cv-05246-RFL Document 42 Filed 08/23/23. Golden submits the excerpts as evidence Judge Rita F. Lin is lying when she says, "Golden does not allege that Google, [] directly infringed the patents-in-suit" … and "Golden concedes that there was no such direct infringement":

> Pursuant to the Court Order filed on 08/10/23 Dkt. 41 in *Larry Golden v. Google LLC*, Case No. 4:22-cv-05246-HSG, Plaintiff is submitting this amended **complaint against Google LLC for alleged direct infringement**, induced and contributory infringement, joint infringement, and willful infringement of Plaintiff's United States Patent Nos. 10,984,619 ('619 Patent), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent).
>
> 1.    On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, **directly**, and/or indirectly the tort of **literal patent infringement or infringement under the "doctrine of equivalents"** giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.
>
> 2.    Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. **Google LLC directly**, jointly, and/or indirectly distributes, markets, offers to sell, sells,

and/or imports the infringing Google Pixel Series of smartphones. Google Tensor CPU, and Google Android Operating Systems.

23. In the Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on *direct infringement, either literally or under the doctrine of equivalents.*

77. On information and belief, Google is jointly, *directly*, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claim 11 of the '619 patent. *The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.*

78. As set forth in Golden's preliminary infringement contentions, Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have *at a minimum directly infringed* the '619 patent and Google is thereby liable for infringement of the '619 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

81. On information and belief, Google is jointly, *directly*, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claim 5 of the '287 patent. *The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.*

82. As set forth in Golden's preliminary infringement contentions, Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have *at a minimum directly infringed* the '287 patent and Google is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

85. On information and belief, Google is jointly, *directly*, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 19 and 23 of the '439 patent. *The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.*

86. As set forth in Golden's preliminary infringement contentions, Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have *at a minimum directly infringed* the '439 patent and Google is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

89. On information and belief, Google is jointly, *directly*, indirectly and/or under the 'doctrine of equivalents', infringing claims 1 & 7 of the '189 patent. *The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.*

90. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device *have at a minimum directly infringed* the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

# GOLDEN ALLEGES JUDGE RITA F. LIN CONSPIRED WITH GOOGLE TO MAKE A PARTICULAR RULING

Golden alleges Google challenged Judge Rita F. Lin to join an already established conspiracy to ensure Blacks and/or African American inventors, in a judicial system of systemic and structural racism, do not prevail at suing the Federal Government or any of the multi-billion-dollar companies [Google, LLC] who relies on the Government to treat Blacks and/or African American inventors unfairly.

Co-conspirator Google has aligned itself with the intent of the already established conspiracy to separate the patented combinations of Golden's inventions before introducing the intent to "separate and then destroy" any and all possibility of Golden being able to persuade the presiding Judge not to join the already established conspiracy.

Time and time again the Judges, including Judge Rita F. Lin, conduct is prejudicial to the effective and expeditious administration of the business of the courts. There's no law, or pending law, that Golden is aware of that allow Judges to add an inventive step to an already issued patent. The inventive step in this current case is, "the phone is modified by a third-party to function".

Rule 4 Misconduct and Disability Definitions

(a) Misconduct Generally. Cognizable Misconduct is conduct prejudicial to the effective and expeditious administration of the business of the courts. Cognizable misconduct includes, but is not limited to, the following:

(3) Discrimination. Cognizable misconduct includes intentional discrimination on the basis of race, color, sex, gender, gender identity, pregnancy, sexual orientation, religion, national origin, age, or disability:

[A]n allegation that a judge conspired with a prosecutor to make a particular ruling is not merits-related, even though it "relates" to a ruling in a colloquial sense. Such an allegation attacks the propriety of conspiring with the prosecutor and goes beyond a challenge to the correctness — "the merits" — of the ruling itself. An allegation that the judge ruled against the complainant because the complainant is a member of a particular racial or ethnic group, or because the judge dislikes the complainant personally, is also not merits-related. *Such an allegation attacks the propriety of arriving at rulings with an illicit or improper motive.* An allegation that a judge treated litigants, [], or others in a demonstrably egregious and hostile manner is also not merits-related.

In this case, *Larry Golden v. Google LLC,* N.D.Cal. Case 3:22-cv-05246-RFL, Golden presented as Exhibit H of the Amended Complaint, Dkt 41; Filed 08/23/23 *"HazMat CBRNE Mobile Apps Application Note: July 2013"*[1] - Pages 56-71 of 125.

Golden presented this document as evidence the Google phone is not modified; and, does not need to be modified by a third-party in order to perform in an infringing manor. The software apps are developed to conform with an open-source code Google issues with each version of its Google android operating system software. Following are excerpts from the document Judge Rita F. Lin should have considered before joining the Defendant [Google], as a co-conspirator in an already established conspiracy:

- "Hazardous material (HazMat) and chemical, biological, radiological, nuclear, and explosive (CBRNE) incidents occur when substances such as toxic chemicals, biological agents, radiological or nuclear materials, or explosives pose a threat to life, property, and/or the environment." …

---

[1]  The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders making

- "Software applications installed on mobile devices, such as smartphones and tablets, can be useful to emergency responders, humanitarian groups, and the public. The use of these software applications, commonly called mobile apps, can improve situational awareness for the emergency responder during a HazMat/CBRNE incident" ...

- "A mobile app is similar to software installed on a personal computer, but it is developed for a mobile device operating system (OS) such as [Google] Android, Apple® iOS®, BlackBerry®, or Windows® Mobile. These apps are able to integrate with other features of a mobile device, enabling them to capitalize on the functionality of global positioning system (GPS) technology, e-mail, a built-in camera, and a notification system."

- HazMat/CBRNE mobile apps can use GPS data to help responders identify access routes to an incident. An example of this type of GPS mobile app is Navfree, which allows users to access maps with or without a data connection. Other features include turn-by-turn directions, spoken instructions, and address search. Navfree is available for Apple iOS, [Google] Android, and Windows.

---

procurement decisions. Located within the Science and Technology Directorate (S&T) of DHS, the Emergency Response Guide (ERG) 2012 mobile app provides information to help manage a HazMat/CBRNE incident ... standard HazMat cargo signage can be quickly the SAVER Program conducts objective assessments and validations on commercial equipment and systems and provides those results along with other relevant equipment information to the emergency response community in an operationally useful form. SAVER provides information on equipment that falls within the categories listed in the DHS Authorized Equipment List (AEL). The SAVER Program mission includes: • Conducting impartial, practitioner-relevant, operationally oriented assessments and validations of emergency responder equipment; and • Providing information, in the form of knowledge products, that enables decision-makers and emergency responders to better select, procure, use, and maintain emergency responder equipment. Information provided by the SAVER Program will be shared nationally with the responder community, providing a life- and cost-saving asset to DHS, as well as to Federal, state, and local responders. The SAVER Program is supported by a network of Technical Agents who perform assessment and validation activities. Further, SAVER focuses primarily on two main questions for the emergency responder community: "What equipment is available?" and "How does it perform?" As a SAVER Program Technical Agent, the Space and Naval Warfare Systems Center (SPAWARSYSCEN) Atlantic has been tasked to provide expertise and analysis on key subject areas, including communications, sensors, security, weapon detection, and surveillance, among others. In support of this tasking, SPAWARSYSCEN Atlantic developed this application note to provide emergency responders with information on commercially available HazMat/CBRNE mobile apps. HazMat/CBRNE mobile apps fall under AEL reference number 04AP-06-CBRN: Software, CBRNE/Commercial Chemical/Hazard.

- identified with the aid of the ERG mobile app. The ERG mobile app is available for Apple iOS and [Google] Android.
- Radiological tools can ... calculate the mass and volume of radiological material based on its corresponding activity ... Mobile radiation emergency medical management (Mobile REMM) is an example of a radiological mobile app tool that helps diagnose radiation exposure and determines the proper treatment during radiological or nuclear emergencies. Mobile REMM is available for Apple iOS and [Google] Android.
- Explosives tools can provide information that is helpful to emergency responders in an IED or homemade explosive (HME) incident ... Alluviam LLC's HazMasterG3 ® mobile app provides tactical decision support for threat identification and response. Capabilities include: identification of unknown threats whether chemical, radiation or IED/HME; calculation of standoff distances and blast effects; location of hidden labs; and calculation of improvised nuclear device stand-off distances, stay-times, and fatalities. HazMasterG3 is available for Apple iOS, [Google] Android, Blackberry, and Windows.
- Currently, there are no universally recognized standards and regulations governing mobile app development.

Upon information and belief in the information presented above, Golden alleged that the defendant Google induced infringement; thereby, causing direct infringement with its Android Open-Source Operating System under 35 U.S.C. § 271(b). Golden alleged Google actively encouraged the DoD DTRA and Draper Laboratory Inc.'s infringement, knowing that the acts they induced constituted patent infringement, and their encouraging acts actually *resulted* in direct patent infringement.

In *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, the Federal Circuit considered whether proof of induced infringement requires proof that the encouragement of infringement was successfully communicated to the direct infringer and actually *resulted* in direct infringement. However, *Fairchild* claimed there was no evidence that it encouraged its accused chips to be incorporated into products ... with the specific intent to induce infringement.

The court disagreed, noting that *Fairchild* was involved in activities related to the use of its products ... Fairfield designed its products [same as Google designed the Android Open-Source Operating System] to meet certain [] standards, provided demonstration boards containing the infringing chips to customers and potential customers in the United States, and maintained a technical support center in the United States that provided support to customers based in the United States."

Golden must prove the inducement *resulted* in direct infringement, not that the inducement was of a product that already directly infringes. According to the evidence presented in this case as Exhibit H, *"HazMat CBRNE Mobile Apps Application Note: July 2013"*, the Google Android operating system inducement resulted in direct infringement. Therefore, it doesn't matter if the inducement, which resulted in direct infringement, came about by way of modification, adaptation, or codifying. The direct infringement is already done. *Larry Golden v. Google LLC,* N.D.Cal. Case 3:22-cv-05246-RFL Amended Complaint, Dkt 42-2 Filed 08/23/23.

Golden disclosed this information to Judge Rita F. Lin but she seems to be so blinded by prejudice, discrimination, racism, bias, and her need to fulfill her obligations as a co-conspirator in an already established conspiracy, she just could not see the hand writing on the wall that was right in front of her: The following was retrieved from the Amended Complaint, Dkt. 42.

49.    Example: Plaintiff owns [the patent rights to] three (3) of four (4) essential components for Google's smartphone sensing device. The host device smartphone; the central processing unit (CPU), and the smartphones camera used for CBR sensing. The only component Plaintiff have not directly written a patent claim on, but is covered in Plaintiff's patent specifications as a "transceiver" is the operating system.

50.    The ATAK-CBRN plugins software is built on Google's Android Open-Source Operating System (OS). The OS is responsible for managing both software and hardware components. All computer programs and apps require an operating system to

do any work. Yet the OS is not the central processing unit (CPU). Plaintiff's patented CPU serves as the smartphones brain, and the OS serves as the brain's conscience.

51.   Android is an open-source operating system for mobile devices and a corresponding open-source project led by Google. The Android Open-Source Project (AOSP) repository offer the information and source code needed to create custom variants (i.e., ATAK is built on the Android operating system) of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users.

52.   Google oversees the development of the core Android open-source platform and works to create robust developer and user communities. For the most part, the Android source code is licensed under the permissive Apache License 2.0. Google chose the Apache 2.0 license because it encourages widespread Android software adoption. Google has committed the professional engineering resources necessary to ensure that Android is a fully competitive *software* platform.

*Larry Golden v. Google LLC*, N.D.Cal. Case 3:22-cv-05246-RFL Amended Complaint, Dkt 42-2 Filed 08/23/23

ATAK (built on the Android operating system) With DTRA ... ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile.gotennapro.com/four-useful-atak-app-plugins/

Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Golden has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated direct patent infringement by

those encouraging acts. Golden's evidence proves the inducement resulted in direct infringement, not that the inducement was of a product that already directly infringes.

Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field.

| iTAK | ATAK | | | | WinTAK | |
|---|---|---|---|---|---|---|
| Apple iPhone 12 Smartphone | Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | LG V60 ThinQ 5G | Asus / Qualcomm Smartphone for Snapdragon Insiders | Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode] | HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC |
|  |  |  |  |  |  |  |
| Chipset: Apple A14 Bionic (5 nm), CPU: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). | Chipset: Qualcomm Snapdragon 765G CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | Chipset: Qualcomm SM8250 CPU: Octa-core (1x2.84 GHz Cortex-A77 & 3x2.42 GHz | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | CPU: Intel® Core™ i5-1235U / Intel® Core™ i7-1255U. Processor Speed 1.3GHz / 1.7 GHz. | CPU: 11th Generation Intel® Xeon® W-11955M vPro® with Intel® UHD Graphics |
| OS: Apple iOS 14.1, upgradable to iOS 16.1 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 10, upgradable to Android 13 | OS: Google Android 11 | OS: Preinstalled Microsoft Windows 11 | OS: Preinstalled Microsoft Windows 11 Pro2 |
| CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc |

# Claim Chart of Induced Infringement [DTRA ATAK-MILITARY and Draper's ATAK-CIVILIAN; Contributory Infringement of Google's Pixel 6a, 7, 7a, 7 Pro, and Fold Smartphones

| DRAPER'S ATAK-CIVILIAN & DoD/DTRA ATAK-MILITARY | Patent #: 9,589,439; Independent Claim 19 | Patent #: 9,096,189; Independent Claim 7 |
|---|---|---|
|  Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Golden has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated direct patent infringement by those encouraging acts. Golden's evidence proves the inducement **resulted** in direct infringement, not that the inducement was of a product that already directly infringes. | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |
| **ATAK-CIVILIAN** Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field. **ATAK-MILITARY** ATAK (built on the Android operating system) With DTRA … ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile.gotennapro.com/four-useful-atak-app-plugins/ | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |

| | | |
|---|---|---|
| Pursuant to 35 U.S.C. § 271(c), Google has contributed an element(s) [ at least that of Google Pixel 6a, 7, 7a, 7 Pro, or Fold] to the alleged infringing ATAK CBRNE Plugins of Draper Laboratory, Inc. and the Defense Threat Reduction Agency (DTRA).<br><br>Google is contributing to the infringement of independent claim 19 of Golden's '439 patent, and independent claim 7 of Golden's '189 patent.<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device.<br><br>ATAK-MIL is a government-off-the-shelf app for Android smartphones. The mobile broadband 4G LTE connection is able to facilitate the data throughput required for the operation of the ATAK. https://apps.dtic.mil/sti/pdfs/AD1069441.pdf<br><br>Golden has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Golden's patented inventions. that would constitute infringement. | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| Google Pixel 6a, 7, 7a. 7 Pro, and Fold smartphones connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go.<br><br>Draper designed a chemical, biological. radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK. collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

| | | |
|---|---|---|
| The Android-based Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite on-the move capability, on-the-move mapping solutions, and a commercial laser range finder that significantly expanded the end-user range data flow and functionality. The Primary, Alternate, Contingency, and Emergency (PACE) communications architectures established was: • Primary communications structure (P): ATAK— 4G/LTE; Antenna: international [] satellite (INMARSAT) https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |
| The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based on the TAK platform developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne drone imagery, GPS locations, photos, and satellite imagery. Fully secure and compatible with ATAK, WinTAK, and iTAK. Sit(x) accessed via free downloadable gateway apps. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

| | | |
|---|---|---|
| The '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite ...<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves...<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps ..<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https: www.civtak.org atak-about . ATAK can be downloaded to a phone, tablet, or handheld device. (Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones) | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite … <br><br> Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves… <br><br> The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps… <br><br> The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

## JUDGE RITA F. LIN OUTRIGHT LIED WHEN SHE STATED, "AS THE COMPLAINT DID NOT ALLEGE THAT THE GOOGLE SMARTPHONES *THEMSELVES* INFRINGED ON THE PATENTS"

To be clear, Golden is not arguing the merits of the case. Golden is simply asking the question, why is it Judge Rita F. Lin is willing to go so far as to outright lie about the merits of the case? To outright lie about the case, obviously means the Judge has a personal bias against Golden as a Black and or African American. It also means the Judge is willing to go to any length—lying on an official document—to fulfill her obligation as a co-conspirator in an already established conspiracy of systemic and structural racism within the judicial system.

As stated earlier, the reason Golden filed the case is because the Federal Circuit in *Larry Golden v. Google LLC*, Case No. 22-1267 reversed and remanded the alleged direct infringement of Google's Pixel 5 smartphone. "Mr. Golden's complaint includes a detailed claim chart

mapping features of an accused product. the Google Pixel 5 Smartphone. to independent claims from U.S. Patent Nos. 10.163.287. 9.589.439. and 9.069.189 ... It [claim chart] attempts [] to map claim limitations to infringing product features. and it does so in a relatively straightforward manner ...".

But yet. Judge Rita F. Lin writes in an official document. "[a]s the complaint did not allege that the Google smartphones *themselves* infringed on the patents. Golden failed to allege direct infringement".

> As the complaint did not allege that the Google smartphones *themselves* infringed on the patents. Golden failed to allege direct infringement. (Id. at 6.) As liability for indirect infringement is dependent on the existence of direct infringement. Golden also failed to allege indirect infringement. (Id. at 7.)"

Also. Judge Rita F. Lin's ignorance does not equate to a ruling on the merits. If the Judge has access to the information and is capable of interpreting or comprehending the information but rules away from what she knows to be true. then it's a lie. In this case the Judge was provided all the information she needed to make an informed decision on the merits. or at the very least enough information that upon discovery Google can be charged with "exercising the requisite 'direction or control' over the others" in a cause of "joint infringement".

> Golden fails to allege joint infringement. "A claim of joint infringement . . . requires pleading facts sufficient to allow a reasonable inference that all steps of the claimed method are performed and either (1) one party exercises the requisite 'direction or control' over the others' performance []" *Lyda v. CBS Corp..* 838 F.3d 1331. 1339 (Fed. Cir. 2016) ... It appears that Golden is alleging joint infringement by Google and Draper Laboratory. or possibly by Google and DTRA. but there are no factual allegations regarding the degree of control that Google had over Draper Laboratory or DTRA. or vice versa...

Golden has repeatedly. over and over again. provided Judge Rita F. Lin with an abundance of evidence proving Google has a lot more than just a degree of control. First. Google is more than just a distributor. Google makes. uses. sells. and offers for sell the Google Pixel

Smartphone Series; second, Google owns the Google Tensor CPU/Chipset Series, that is considered the "brains" of the smartphone devices capable of carrying out the operational and functional instructions of the devices; and third, Google owns the Android Open-Source Operating System Platform. Golden has explained in great detail, because the DoD DTRA ATAK software is built on the Android Open-Source Operating System, the level of degree this system has on the control of integrating software and software. Golden provided an entire section to this fact in the original complaint:

SENSOR TYPES SUPPORTED BY THE *"ANDROID"* PLATFORM

| | | | |
|---|---|---|---|
| **Type**<br>Accelerometer | Hardware | Measures the acceleration force in m/s² that is applied to a device on all three physical axes (x, y, and z). including the force of gravity. | Motion detection (shake. tilt. etc.). |
| **Type**<br>Ambient<br>Temperature | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| **Type**<br>Gravity | Software or Hardware | Measures the force of gravity in m/s² that is applied to a device on all three physical axes (x. y. z). | Motion detection (shake, tilt etc.). |
| **Type**<br>Gyroscope | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x. y. and z). | Rotation detection (spin, turn etc.). |
| **Type**<br>Light | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |
| **Type**<br>Linear<br>Acceleration | Software or Hardware | Measures the acceleration force in m/s² that is applied to a device on all three physical axes (x. y. and z), excluding the force of gravity. | Monitoring acceleration along a single axis |
| **Type**<br>Magnetic Field | Hardware | Measures the ambient geomagnetic field for all three physical axes (x. y. z) in μT. | Creating a compass. |
| **Type**<br>Orientation | Software | Measures degrees of rotation that a device makes around all three physical axes (x. y. z). As of API level 3 you can obtain the | Determining device position. |

| | | | |
|---|---|---|---|
| | | inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | |
| Type Pressure | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| Type Proximity | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| Type Relative Humidity | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint. absolute and relative humidity. |
| Type Rotation Vector | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| Type Temperature | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the **Type— Ambient Temperature** sensor in API Level 14 | Monitoring temperatures. |

❖ **BIOMETRICS:** Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

❖ **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone known as pattern lock. When setting the pattern. you must drag your finger along lines on the screen between different nodes. Afterward. to unlock the phone. you'll need to replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in. you'll have to employ some other methods to restore control of your phone.

❖ **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:** Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit. ATAK).* ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an

end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

❖ **HEART RATE:** *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

❖ **NEAR FIELD COMMUNICATION (NFC):** Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

❖ **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

Golden devoted an entire section in the Amended Complaint to demonstrating the degree of control that Google had over the DoD DTRA ATAK software development:

## GOOGLE CAUSED THE INFRINGEMENT OF PLAINTIFF'S PATENTS

51.     Android is an open-source operating system for mobile devices and a corresponding open-source project led by Google. The Android Open-Source Project (AOSP) repository offer the information and source code needed to create custom variants (i.e., ATAK is built on the Android operating system) of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users.

52.     Google oversees the development of the core Android open-source platform and works to create robust developer and user communities. For the most part, the Android source code is licensed under the permissive Apache License 2.0. Google chose the Apache 2.0 license because it encourages widespread Android software adoption. Google has committed the professional engineering resources necessary to ensure that Android is a fully competitive *software* platform.

53. Each platform version of Android (such as 1.5 or 8.1) has a corresponding branch in the open-source tree. The most recent branch is considered the current stable branch version. This is the branch that manufacturers port to their devices.

54. The Google Android *software* is first built into a system image for a device and put through various forms of certification, including government regulatory certification for the regions the phones will be deployed.

55. When the release is approved by the regulators and operators, the manufacturer begins mass producing devices, and Google begin releasing the source code. Simultaneous to mass production, the Google team kicks off several efforts to prepare the open-source release, that include making final API changes and updating documentation to reflect any modifications that were made during qualification testing. Google's legal team does a final sign-off to release the code into open source.

56. The Android Open-Source Project maintains Android software, and develops new versions. Because it's open source, this software can be used for any purpose. The function of the Android Compatibility Program is to define a baseline implementation of Android that is compatible with third-party apps [DoD/DTRA/ATAK apps] written by developers. Devices that are Android compatible are eligible to participate in the Android ecosystem.

57. Google APIs are mechanisms that enable two software components [Google Android operating system software and the ATAK software that is built on the Android operating system] to communicate with each other using a set of definitions and protocols.

58. API stands for Application Programming Interface. In the context of APIs, the word Application refers to any software with a distinct function. Interface can be thought of as a contract of service between two applications. This contract defines how the two communicate with each other using requests and responses.

59. *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

60. *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies.

whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

## 1

**Google Tensor G2
i.e., Central Processing Unit (CPU)
Processor, SoC, Chipset**

*Software
Integration*

## 4

**ATAK-CIV CBRNE
Plugins. Draper
Laboratory, Inc**

## 2

**Google Android
Operating System**

*Hardware
Integration*

*Software
Integration*

## 3

**ATAK-CIV: Built on Android
Operating System**

61.     The TAK suite of tools uses plugins, allowing users to design applications specific to their mission needs. For example, ATAK can connect to sensors. satellites, drones, and smartwatches, enabling integration of valuable data from operators and team members and the environment.

62. Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field.

Given the information above that was retrieved from both the original complaint and the amended complaint, and the information below that was retrieved from the Google website, one could say Google is very close to being entirely in control of the DoD DTRA ATAK software development for the function of Draper's CBRNE Plug-in sensors.

Google's Open-Source: Public domain and "Free for Any Use"
NOTE: Apply this label with caution. Public domain is a complex topic that requires legal analysis on a case-by-case basis. You must email and ask for a special review before you check in public domain code.

The 'unencumbered' licenses include those often referred to as "Public Domain" or "free for any use." These licenses have even fewer restrictions than licenses in the 'notice' category, but this license type should be assigned to a third-party build rule with caution, because:

- It is non-trivial to place software in the public domain. While an explicit disclaimer of copyright protection is required, that is not necessarily sufficient.
- While works of the U.S. Government are placed in the public domain, works created by contractors under government contracts may not be.

As noted at go/thirdparty documentation=google-owned-code. The LICENSE file for Google-authored, not-yet-released code should only contain the following text: "Google owned, no external contributions." Once a project has been open sourced with an accompanying LICENSE, the project must use the LICENSE in the package rather than be treated as unencumbered and any external contributions must sign a Contributor License Agreement (see go/cla).
https://opensource.google/documentation/reference thirdparty/licenses

Effective software supply chain management requires licensing as well as security compliance. The DTRA use of Google's open-source components and libraries to build the

DTRA ATAK software knew those components are governed by Google's open-source licenses. Even one noncompliant license in the ATAK software can result in legal issues, loss of lucrative intellectual property, time-consuming remediation efforts, and delays in getting the DTRA ATAK software product to market.

Therefore, as stated earlier, Judge Rita F. Lin's reliance on the theory "the Google phones had to be modified to perform the detector/sensor function" is without merit. Google owns the phones; owns the CPUs; owns the operating systems and platform; and; Google controls the development of software built or developed on the Google Android Open-Source Operating System Platform through its licensing agreements.

The Co-conspirator Judge Rita F. Lin has a personal bias against Golden and in favor of Google, LLC.

## JUDGE RITA F. LIN JOINS AS A CO-CONSPIRATOR QUALCOMM INCORPORATION'S CONSPIRACY

In 2008, the White-owned company Qualcomm Inc.; six other White-own companies of SeaCoast, Rhevision, Synkera, Apple, Samsung, and LG; and; one Government agency of NASA formed a conspiracy with the Department of Homeland Security (DHS) to appropriate and use Golden's patented inventions without paying just compensation.

> "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser." *James v. Campbell*, 104 U.S. 356, 358 (1882)

A conspiracy is traditionally defined as "an agreement between two or more persons to achieve an unlawful object or to achieve a lawful object by unlawful means." See *Douglas G.*

*Smith, Comment, The Intracorporate Conspiracy Doctrine* and 42 U.S.C. § 1985(3): *The Original Intent*, 90 NW. U. L. REV. 1125, 1170(1996) (defining "conspiracy").

According to the Supreme Court, the plurality element of a conspiracy charge represents a "distinct evil." See *United States v. Jimenez Recio*, 537 U.S. 270, 274-75 (2003) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). This stems from the idea that two people who agree to commit a crime create a more dangerous threat to society than one or both of them planning to commit the same offense independently. See *Krulewitch v. United States*, 336 U.S. 440, 448-49 (1949).

A civil conspiracy, while not criminally punishable, contains the same plurality of actors' element. See *Beye v. Bureau of Nat'l Affairs*, 477 A.2d 1197, 1206 (Md. Ct. Spec. App. 1984) (defining civil conspiracy). A civil conspiracy is defined as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Id.* (citing *Green v. Wash. Sub. San. Comm'n*, 296 A.2d 815, 824 (Md. 1970)).

Qualcomm has eluded prosecution for its illegal behavior, actions, and activities for years. Qualcomm has taken advantage of a judicial system that is plagued with systemic and structural racism; and Judges who are judicially bias toward the Government agencies and large corporations, over that of a *Pro Se* Black and/or African American litigant.

In 2008, Qualcomm was one of seven White-owned companies awarded contracts by the Dept. of Homeland Security (DHS) in the DHS S&T *Cell-All* BAA07-10 initiative, as the prime contractor responsible for developing three of Golden's, a Black and/or African American, inventions [new, improved cell phone; CBRNE sensors; and smartphone CPUs]. As long as

Qualcomm was performing work for the Government under the *Cell-All* BAA07-10 initiative. Qualcomm was shielded by the DHS [Government] from infringement liability.

Golden, the Black and/or African American who owns the patent rights for the technology the DHS authorized and consented to Qualcomm et al infringing upon, was not awarded a contract or offered a licensing agreement. Qualcomm was named the prime contractor responsible for the development and assembly of three of the requested components that infringes Golden's patents, i.e., the new, improved upon, and useful cell phone, the central processing unit (CPU), and the CBRNE sensors/detectors.

Title VI, 42 U.S.C. § 2000d et seq., was enacted as part of the landmark Civil Rights Act of 1964. It prohibits the DHS, who awarded seven White-owned companies' contracts, from discriminating against Golden, on the basis of race, color or national origin, in programs and activities receiving federal financial assistance. As President Kennedy said in 1963:

> "Simple justice requires that public funds, to which all taxpayers of all races [colors, and national origins] contribute, not be spent in any fashion which encourages, entrenches, subsidizes or results in racial [color or national origin] discrimination."

The DHS avoided liability because at the time, as long as one process of Golden's patented invention was made or assembled abroad, the Government (DHS) could not be held liable for direct infringement under 28 U.S.C. § 1498(a). *Zoltek III* [overturned in *Zoltek V*].

In 2014, the Dept. of Homeland Security (DHS), who was protecting Qualcomm from patent infringement liability, and the Dept. of Justice (DOJ), who was representing Qualcomm and the six other third-party White-owned companies in *Golden v. USA* case no. 13-307C; petition the Patent Trials and Appeals Board (PTAB) as "persons" not authorized to do so [*Return Mail v. U.S. Postal Service*], with three unqualified patent references that do not antedate Golden's patent(s).

The PTAB [the third Government agency to join the conspiracy], being judicially bias for the benefit of Qualcomm et al. the DHS and the DOJ, decided to institute trial against Golden, a Black and/or African American, with the three unqualified references of Astrin, Breed, and Mostov.

Qualcomm, or any of the six other White-owned companies could have petitioned the PTAB as "persons" authorized to do so. The DHS, DOJ, and PTAB have never before instituted an IPR against a White with unqualified patent references to invalidate their patents.

In 2019, the Ninth Circuit in *FTC v. Qualcomm*, reversed the opinion of the Northern District of California Court of a permanent injunction against Qualcomm. The injunction was issued to enjoin Qualcomm from charging and collecting a royalty on Golden's patented CPU Qualcomm "tied" to its cellular modem and sells as a Snapdragon chipset; and collecting a 5% running royalty on the price of Golden's patented handsets.

Senior Judge Eric Bruggink and the Court of Federal Claims who joined the conspiracy In 2013, knew the prime contractor Qualcomm for the *Cell-All* initiative was responsible for providing the CPU's "brains" of the handset devices and wanted to protect Qualcomm's illegal collecting of a "running royalty of 5% on the price of each smartphone sold". *FTC v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. 2019). District Judge Lucy H. Koh concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

> "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs (i.e., Samsung, LG, Apple, Google, etc.) at a *5% running royalty on the price of each handset sold.* These licenses are called Subscriber Unit License Agreements ("SULA")"

> "Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio. Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices."

Judge Lucy H. Koh concluded Qualcomm is being "unjustly enriched" from its anticompetitive practices of collecting a 5% running royalty on the price of each "smartphone" sold [FTC - "unfair methods of competition" and "unfair or deceptive acts or practices"] from the OEMs Samsung, Google, etc. Qualcomm monopolized the market on illegally collecting royalties on Golden's patented smartphone invention, thereby restraining Golden from collecting royalties from the OEMs Samsung, Google, etc. for the making, using, offering for sell, and selling of Golden's patented smartphone invention [35 U.S.C. § 271(a)].

This type of antitrust injury to Golden is of a type that the antitrust laws were intended to prevent; and Golden's injury flows from that which makes Qualcomm's acts unlawful. The District Court and Appellate Court ignored the fact that the controversy exceeds twenty dollars, and Golden's right of trial by jury is preserved [U.S. CONST. amend. VII].

The District Court and the Appellate Court, who joined the conspiracy as co-conspirators, fail to allow a trial by jury [U.S. CONST. amend. VII] upon Golden, a Black and/or African American demand, to determine if Qualcomm's illegal collection of a 5% running royalty on the price of each "smartphone" sold violates antitrust laws only [FTC v. Qualcomm, 411 F. Supp. 3d 658 (N.D. Cal. 2019]; patent laws only [whoever "uses" any patented invention without authority or legal right to do so, infringes the patent- -35 U.S.C. § 271(a)], or both antitrust laws and patent laws.

The DOJ and the DOE [who join the conspiracy] intervened at the Ninth Circuit against a sister agency, the FTC, and basically stated the only person harmed by Qualcomm's actions is a Black and/or African American patent owner. Qualcomm was made knowledgeable of Golden's IP in 2008.

In 2019, Qualcomm was notified by the co-conspirators DOJ and the U.S. Court of Federal Claims (COFC) to appear in *Golden v. USA* case no. 13-307C, but Qualcomm failed to appear. The co-conspirator DOJ proceeded to drop everything the prime contractor Qualcomm in the DHS S&T *Cell-All* BAA07-10 initiative was responsible for developing [Golden's patented new, improved cell phone; CBRNE sensors; and CPUs] just to make the case a dispute between private parties.

The co-conspirator COFC Judge, knew or should have known, the COFC does not have jurisdiction to litigate disputes between private parties [the DOJ dropped Qualcomm and the other six white-owned companies awarded contracts under the DHS S&T *Cell-All* BAA07-10 initiative and narrowed the dispute between the private parties of Golden and Apple, away from that of *Golden v. The DHS*]. Golden is not required to prove direct infringement under 35 U.S.C. § 271(a) as a predicate to proving direct infringement under 28 U.S.C. § 1498(a) *Zoltek I*.

The COFC [Government], being judicially bias in favor of the DHS and DOJ, decided to blame the Golden, a Black and/or African American, for failure to prove direct infringement under 35 U.S.C. § 271(a) as a predicate to proving direct infringement under 28 U.S.C. § 1498(a) (*Zoltek I*) and dismissed the case.

Between the years 2019 and 2022, Golden, a *Pro Se* Black and/or African American, have demanded a jury trial under the Seventh Amendment to litigate Golden's alleged patent infringement claims against Qualcomm, in the U.S. District Court for the District of South Carolina and the U.S. District Court for the Northern District of California; but, because of systemic/structural racism and judicial bias in favor of Qualcomm, Golden have been denied his Seventh Amendment right to a trial by jury. Golden's patent infringement claims against Qualcomm is an issue-of-fact tried by a jury under the Seventh Amendment.

The Due Process Clause of the Fifth Amendment generally prohibit federal governments [Judge Rita F. Lin included] from "depriving any person of [] property, without due process of law." Due process, while not "precisely defined," generally refers to a "fundamental fairness" requirement when the government [Judge Rita F. Lin included] seeks to burden an individual's property interests. According to the Supreme Court, the "touchstone" of due process is "the protection of the individual against arbitrary action of government [Judge Rita F. Lin]."

The Supreme Court has determined that the Due Process Clause contain both "substantive" and "procedural" components. Procedural due process is concerned with fairness of the procedures employed when the government seeks to deprive an individual of their property interests. The substantive component "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" The substantive due process inquiry revolves around deprivation of a person's property is justified.

The District Court Judge Lin have deprived Golden of his property without due process of law, and has denied Golden, a Black and/or African American, his Seventh Amendment right to a jury trial. Plus, the District Court Judge Lin lack the ability to be impartial and unbiased; and has violated certain codes of conduct for United States Judges:

> Canon 2A. "An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired."

> "[P]ublic manifestation by a judge of the judge's knowing approval of invidious discrimination on any basis gives the appearance of impropriety under Canon 2 and diminishes [] the integrity and impartiality of the judiciary, in violation of Canon 2A."

> "The duty under Canon 2 to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary applies to all the judge's activities, including the

discharge of the judge's adjudicative [] responsibilities. The duty to be respectful includes [] avoid [] behavior that could reasonably be interpreted as []. prejudice or bias."

Canon 3C. "Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including []: (a) the judge has a personal bias or prejudice concerning a party..."

Canon 3B(6). "Public confidence in the integrity and impartiality of the judiciary is promoted when judges take appropriate action based on reliable information of likely misconduct. Appropriate action [] should be to prevent harm to those affected by the misconduct and to prevent recurrence."

As Justice Kennedy acknowledged in *Williams v. Pennsylvania*, impartiality in our justice system and the guarantees of due process are "necessary to the public legitimacy of judicial pronouncements and to the rule of law itself."

## The Northern District of California Court Joins the Conspiracy

The Northern District of California Court, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [vertical stare decisis] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that a "smartphone" [Qualcomm's Smartphone for Snapdragon Insiders] literally and/or under the doctrine of equivalents infringes Golden's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... and it does so in a relatively straightforward manner". The District Court denied Golden [systemic/structural racism] a trial by jury in this patent infringement claim that is an issue-of-fact [U.S. CONST. amend. VII].

Likewise, the U.S. Court of Appeals for the Federal Circuit [horizontal stare decisis] fail to adhere to the Circuit's own precedence in *Larry Golden v. Google LLC* Case No. 22-1267, that a "smartphone" [Qualcomm's Smartphone for Snapdragon Insiders] literally and/or under the

doctrine of equivalents infringes Golden's independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … "and it does so in a relatively straightforward manner". The Appellate Court was complicit in denying Golden, a Black and/or African American, [systemic/structural racism] a trial by jury in this patent infringement claim that is an issue-of-fact [U.S. CONST. amend. VII].

The District Court and the Appellate Court ignored the precedence set by the U.S. Court of Appeals for the Federal Circuit [vertical stare decisis] in *Larry Golden v. Google LLC* Case No. 22-1267 that establishes the "smartphone" directly infringes at least Golden's independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … "and it does so in a relatively straightforward manner", when establishing the "direct infringement" requirement for induced patent infringement—35 U.S.C. § 271(b); and, contributory patent infringement—35 U.S.C. § 271(c).

The District Court and the Appellate Court fail to realize it is a jury's responsibility to decide if Qualcomm, with knowledge, has induced patent infringement by selling its Qualcomm Snapdragon Chipset that "ties" Golden's patented CPUs, through advertising; with instructions; and with a threat to refuse licensing its cellular modems for smartphones if the OEMs (i.e., Samsung; Google) does not purchase the two combined components [Golden's patented CPUs and Qualcomm's patented cellular modems] that forms Qualcomm's Snapdragon Chipset/SoC/CPU/Processor [*FTC v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. 2019).]

The District Court and the Appellate Court fail to realize it is a jury's responsibility to decide if Qualcomm, with knowledge, has offered to sell or has sold within the United States, Qualcomm's Snapdragon Chipset that "ties" Golden's patented CPUs [*FTC v. Qualcomm*]; is liable as a contributory infringer for using the "chipset" in practicing Golden's patented process.

constituting a material part of the Golden's smartphone invention, knowing the same to be especially made or especially adapted for use in an infringement of Golden's patent(s), and not a staple article or commodity of commerce suitable for substantial non infringing use [contributory infringement].

The District Court and the Appellate Court ignored the precedence set by the U.S. Court of Appeals for the Federal Circuit [vertical stare decisis] in *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.,* 946 F.3d 1367 (Fed. Cir. 2020): "[t]he Federal Circuit court emphasized the actual standard that "willfulness requires a jury [U.S. CONST. amend. VII] to find no more than deliberate or intentional infringement."

On November 4, 2010, Golden emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com): Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC––Smartphone––device: central processing unit (CPU)), and asked if Qualcomm would be interested in entering into a licensing agreement. December 7, 2010, Golden mailed letters addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, informing the Executives of the Patent Owner's (Golden) patented technology and asked if Qualcomm would be interested in entering into a licensing agreement. After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate". On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate". On October 11, 2011, the Patent Owner (Golden) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner made several attempts to contact Ms.

Lane via e-mail and by phone after that, but never heard back from Ms. Lane. This evidence allows Golden to argue to a jury [U.S. CONST. amend. VII] that his patented technology was vital to Qualcomm's chipsets and smartphone products being able to compete.

The District Court and the Appellate Court fail to realize that regardless of whether the above evidence ultimately results in a willfulness finding, getting the evidence before the jury [U.S. CONST. amend. VII] may increase the likelihood that the jury [U.S. CONST. amend. VII] will find infringement and the asserted patents valid. Depriving Golden, a Black and/or African American, of his right to present Qualcomm's alleged deliberate and intentional infringement to a jury, not only violates Golden's right granted under the Seventh Amendment, it also demonstrates and verifies Golden's claim of racism [systemic and structural racism].

## Co-Conspirator Judge Rita F. Lin Protects Qualcomm's "*DOUBLE STANDARD*"

A double standard is defined as a rule or principle which is unfairly applied in different ways to different people or groups, and is a concept that can still be heavily applied to the history of the United States. The topics of racism, discrimination, and prejudice make many individuals uncomfortable, furious, or indifferent. Since humans began developing social classes, racial division has been a key factor in how societies organize - however, it's important to note that race is simply a social construction. Clark0, Anthony. "*Double standards are stunting America's growth.*" UWIRE Text, 8 May 2020, p. 1. Gale Academic OneFile, link.gale.com apps doc A623469076 AONE?u=anon~18e9207f&sid=googleScholar&xid=3bcd7ca9. Accessed 17 Aug. 2023.

Qualcomm announced it was developing the Scorpion central processing unit (CPU) for mobile devices in November 2005. This was followed by the first shipments of the Snapdragon

system-on-chip product, which includes a CPU, camera support and other software and semiconductors, in November 2007.

Qualcomm is the world's biggest provider of mobile chips, and it created technology that's essential for connecting phones to cellular networks. The company derives a significant portion of its revenue from licensing those inventions to hundreds of device makers, with the fee based on the value of the phone, not the components.

Because Qualcomm owns patents related to 3G, 4G and 5G networking technology, as well as other features like *software*, all handset makers [i.e., Google] building a device that connects to cellular networks have to pay it a licensing fee, even if they don't use Qualcomm's [*software*] chips. https://www.cnet.com/tech/mobile/qualcomm-settles-huawei-patent-spat-warns-of-5g-flagship-phone-delay-likely-the-iphone/

Qualcomm receives a licensing fee on the price of handsets (i.e., smartphones) that Golden, an African American inventor, owns the patent rights for. Qualcomm receives the royalty fee even if Google don't use Qualcomm's *software* chips. Google's Pixel devices are "capable of" being modified by Qualcomm's Snapdragon X65 5G Modem-RF *software* to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

The Federal Circuit has applied this principle in cases involving the modification of hardware through the addition of *software*. See *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without modification—the modification of installing the required software").

Based on the Federal Circuit's principles, Qualcomm should not be receiving royalties because the infringement only occurs with the *software* modification of the smartphone.

Qualcomm is especially privileged because Qualcomm collects royalties on the price of the smartphone, even when the *software* modification is made by someone other than Qualcomm. Following is an image of Qualcomm's Snapdragon X65 5G Modem-RF *[software]* System and Golden's Independent Claim 1 of Golden's '189 patent asserted in this case.



| Patent #: 9,096,189; Independent Claim 1 [Asserted in Complaint] |
|---|
| A communication device of at least one of a cell phone, *a smart phone*, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, *comprising*: |
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or *a front-end processor* for communication between a host computer and other devices; |
| whereupon the communication device, is *interconnected to a product equipped to receive signals from or send signals to* lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, *radio frequency (RF) connection*, cellular connection, broadband connection… *short range radio frequency (RF) connection* is capable of signal communication with the transmitter and the receiver of the communication device and *transceivers* of the products; |

When Golden, an African American inventor, attempts to prove infringement in this case, Golden case is dismissed because "Google contends that "Mr. Golden thus alleges not that Google sells infringing Pixel devices, but that someone else could modify Google's Pixel devices, by adding non-Google software, to make them allegedly infringing'."

Upon information and belief, Google pays Qualcomm a royalty fee on the price of each smartphone sold if Google uses Qualcomm's software, or chose not to use Qualcomm's software; Qualcomm's infringement theory of "software modification" still stands.

Inside every cellular device [Google smartphone] is a component known as a cellular modem. Google developing its own phone processor would mean dumping the Qualcomm SoC's it usually uses. Of course, you can never truly be rid of Qualcomm: Google would presumably still need to use Qualcomm modems, something that even Apple still needs to do. There are other modem manufacturers out there—Samsung, Huawei, Mediatek—but Qualcomm's combination of patents and strong-arm licensing techniques has effectively locked its competitors out of the US and other markets.

Qualcomm's core technology connects devices -- including Apple's iPhone 12 lineup -- to cellular networks, and acts as the brains of phones such as Samsung's Galaxy S21 devices. It's benefitted from soaring demand for 5G chips as the tech industry moves to the newest standard of connectivity. https://www.cnet.com/roadshow/news/qualcomm-makes-cars-even-smarter-with-its-newest-snapdragon-auto-chipsets/

In stronger signal areas, the antennas can work in parallel, and the tower can simultaneously send a different signal to each antenna using the same broadcast channels. In short, Qualcomm's cellular modems do not work without the cellular towers. Which also means Qualcomm's cellular modems lacks utility and are therefore unpatentable.



Cellular technology is the most common way for RVers and Cruisers to get online - whether utilizing a smart-phone, a mobile hotspot (aka Jetpacks or MiFis), or a full-on cellular-embedded router. A modem translates analog wireless signals to/from the cell tower to your digital devices. Cellular bands are the invisible highways in the sky that the cell towers use to communicate.

### Double Standard—Comparison

Qualcomm's wireless cellular modems' software is located in all of Google's Pixel smartphones. Qualcomm's wireless cellular modems must be interconnected with a cellular tower in order to function. The Qualcomm wireless cellular modem is also interconnected to the Google smartphone central processing unit (CPU) that is located inside the Google Pixel smartphone device.

According to Judge Rita F. Lin's non-infringement theory of "a third-party must modify the device in order for it to function", *every* patent that Qualcomm owns for its wireless cellular modems that must be modified by the third-party(s) [AT&T, Verizon, T-Mobile] are invalid

because they are unenforceable. Likewise, the same results applies when Judge Rita F. Lin's theory of non-infringement "the device must be modified with software for it to function".



**10 Gbps**     **4.4 Gbps**

The Qualcomm X62 modem is the mainstream version of the flagship X65 - and marks the beginning of 5G "Phase 2" becoming everyday technology.

Under normal conditions, both Golden and Qualcomm's patents would be considered invalid for lack of utility which makes them unenforceable, or both Golden and Qualcomm's patents would be "presumed valid" upon issue from the USPTO.

But these aren't normal conditions. Golden is a Black and/or African American inventor, and Qualcomm is a White-owned company that has a long history of stealing the ideas of others and violated antitrust laws.

Judge Rita F. Lin and the Courts theoretically invalidated Golden's patents because "the sensors are not *native* to the manufacture of the smartphones", "third-party modification in order to function", "software modification in order to function", and failure to locate the sensors inside the smartphones. Not once in sixteen (16) years has anyone ordered Qualcomm to locate the "cellular tower"; yes, cellular tower" inside the smartphone or stated the cellular tower had to be *native* to the manufacture of the smartphone.

When Judge Rita F. Lin join the conspiracy as a co-conspirator, she became also responsible for the discrimination, prejudice, racism, and bias. Judge Rita F. Lin had all

opportunity to bring Qualcomm to trial because the Federal Circuit in *Larry Golden v. Google LLC* Case No. 22-1267, that a "smartphone" [Qualcomm's Smartphone for Snapdragon Insiders] literally and/or under the doctrine of equivalents infringes Golden's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... and it does so in a relatively straightforward manner".

The Circuit also stated Golden's complaint, the same complaint submitted in this case as the "original complaint", is not facially frivolous.

When Judge Rita F. Lin join the conspiracy as a co-conspirator, she knew Qualcomm is receiving a 5% running royalty on the price of each of Golden's patented smartphones [including Google], and is doing so without license or authorization.

When Judge Rita F. Lin join the conspiracy as a co-conspirator, she also knew Qualcomm is "tying" Golden's patented CPU to Qualcomm's cellular modem and selling the combination as its Snapdragon CPU/Chipset; and it also collecting a royalty on Golden's patented CPU.

Instead of bringing Golden's allegations that the Google Tensor CPU/Chipset allegedly infringes Golden's patents to a jury, Judge Rita F. Lin decided to show her loyalty to the intent of the conspiracy by protecting Qualcomm and using Golden's case against Qualcomm against him:

> Likewise, for contributory infringement, the FAC fails to plead facts supporting any of the elements of that claim against Google: "(1) selling a device capable of infringing the patent, which is not suitable for substantial non-infringing use; (2) with knowledge that the infringing device was especially adapted for use in an infringement of such patent; and (3) actual infringement by another. ***Golden v. Qualcomm, Inc., No. 22-CV-03283-HSG, 2023 WL 2530857, at \*3 (N.D. Cal. Mar. 15, 2023)***. For example, the FAC lacks factual allegations regarding Google's knowledge of the patents-in-suit and patent infringement. Also, the FAC does not explain to whose infringement the Tensor Chipset contributes, and his allegations that the Tensor Chipset lacks any substantial non-infringing uses are entirely conclusory. (See FAC at 3–4.)

> Furthermore, Golden has had multiple suits with similar allegations dismissed, some as frivolous. See, e.g., Golden v. Samsung Elecs. Am., Inc., No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), aff'd, No. 2023-2120, 2024 WL 539973 (Fed. Cir.

Feb. 12. 2024); *Golden v. Qualcomm, Inc., No. 22-CV-03283-HSG, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023)* Golden v. Apple Inc.. No. 20-cv-04353-JD-KFM. 2021 WL 5074739 (D.S.C. Nov. 2. 2021) (dismissing complaint as "frivolous"); Golden v. Apple Inc.. No. 20-cv-02270-JD-KFM. 2021 WL 4260782 (D.S.C. Sept. 20, 2021) (dismissing complaint as "frivolous"). As such. leave to amend is denied.

# GOLDEN ALLEGES JUDGE RITA F. LIN, WITH KNOWLEDGE, WILLFULLY VIOLATED GOLDEN'S SEVENTH AMENDMENT CONSTITUTIONAL RIGHT TO A TRIAL BY JURY.

Judge Rita F. Lin knowingly violated Golden's civil rights [42 U.S.C. section 1983] when she deprived Golden of his guaranteed constitutional right to a trial by jury under the Seventh Amendment of the United States Constitution because of his race.

No particular form for a jury trial demand is prescribed by California statute or court rule. (See Code Civ. Proc. § 631(a): "[t]he right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate": "[t]rial by jury is an inviolate right—not to be violated or broken—and shall be secured to all").

A demand may be made either in writing or orally on the record (i.e.. Golden made the demand in the initial complaint at Dkt. 1: and. in the case management statement at Dkt. 34).

[Cal. Rules of Court. rule 3.727. Subjects to be considered at the case management conference: "(13) Whether a jury trial is demanded. and. if so. the identity of each party requesting a jury trial: (14) If the trial date has not been previously set. the date by which the case will be ready for trial and the available trial dates: (15) The [] length of trial"]

It has been over twenty-five years since the Court last assessed the scope of the constitutional right to a jury in a patent-infringement case. *Markman v. Westview Instruments. Inc.,* 517 U.S. 370. 372 (1996). More remarkable. that decision has been its only direct pronouncement on the matter in the 230 years that patent infringement has been actionable [Act of Apr. 10. 1790. ch. 7. §§ 1. 4. 1 Stat. 109. 110. 111 (first federal patent act)].

The Seventh Amendment requires juries in "Suits at common law" [U.S. CONST. amend. VII]: law courts always offered juries; and early juries tried nearly all infringement and validity issues.

Patent infringement is an issue-of-fact tried by a jury under the Seventh Amendment. Typically, a jury is asked to decide whether the evidence shows that the defendant is performing the claimed invention. Many litigants now prefer juries whenever the Constitution says they can demand them, and they always can when the patentee seeks damages at trial (with or without injunctive relief). Patent cases were "tried at law in the 18th century, and there is no dispute that infringement cases today must be tried to a jury." *Markman*, 517 U.S. at 377.

*Markman*, in fact, involved a patentee who sought damages and injunctive relief, the same as Golden in this current case, and yet neither the parties nor the Court thought twice in assuming that the patentee's case cleared the first step of the Court's historical test.

The Court quickly cleared the first step because the petition for review noted that the patentee [same as Golden] sought damages. Petition for a *Writ of Certiorari* at *Markman*, 517 U.S. 370 (No. 95-26), 1995 WL 17063340, ("In a patent infringement action for damages, is there a right to a jury trial under the Seventh Amendment of the United States Constitution of genuine factual disputes about the meaning of a patent?").

The Seventh Amendment uses the term "common law" to refer to cases in which the right to jury trial was preserved. The Supreme Court resolved the difficulty by stressing the fundamental nature of the jury trial right and protecting it against decrease to equitable principles.

Long-standing equity principles, according to the Court, dictated that "only under the most imperative circumstances which in view of the flexible procedures of the Federal Rules we

cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims." Golden's right was lost through the racist and prejudicial tactics of Judge Rita F. Lin.

In *Ross v. Bernhard*, the Court held that the right to a jury trial depends on the nature of the issue to be tried, rather than the procedural framework in which it is raised. Because the Federal Rules of Civil Procedure merged law and equity in the federal courts, there was no longer any procedural obstacle to transferring jurisdiction to the law side once the equitable issue of standing was decided. Thus, the Court continued, if the claim that is asserted is legal in nature, it should be heard on the law side before a jury.

*Sullivan v. Redfield*, 23 F. Cas. 357 (C.C.D.N.Y. 1825) (No. 13,597), in 1825 exemplifies the early view on these issues. There, Justice Thompson stated that in cases properly filed in equity, the validity of an invention patent was something on which the parties had a right to a jury, and thus the court was obligated to send the parties to the court's law side for trial:

> "Whether the complainant's patent is good and valid so as ultimately to secure to him the right he claims, is not a question for decision upon the equity side of this court. That is a question which belongs to a court of law, in which the parties have a right of trial by a jury."

### Issues of Fact are to be Determined by the Jury

The primary purpose of the Seventh Amendment is to preserve the common law distinction between the province of the court and that of the jury, whereby, in the absence of express or implied consent to the contrary, issues of law are resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the court. *Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 657 (1935); *Walker v. New Mexico & So. Pac. R.R.*, 165

U.S. 593, 596 (1897); *Gasoline Products Co. v. Champlin Ref. Co.*, 283 U.S. 494, 497–99 (1931); *Dimick v. Schiedt*, 293 U.S. 474, 476, 485–86 (1935).

Patent infringement is an issue-of-fact tried by a jury under the Seventh Amendment. The issues of facts, acknowledged by the Defendant in their second motion to dismiss, are to be determined by a jury. The following issues are taken from Google's Motion to Dismiss Plaintiff's Amended Complaint, NDC Case 3:22-cv-05246-RFL Document 44 Filed 09/07/23:

- "In pleading direct patent infringement, a plaintiff cannot satisfy "the pleading standards set forth in *Twombly* and *Iqbal* 'by reciting the claim elements and merely concluding that the accused protect [sic] has those elements. There must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'"

- "Where a plaintiff "fails to allege facts plausibly supporting an inference that [the defendant] purposely induced another party to infringe any patent." courts dismiss claims of induced infringement."

- "Willful blindness is a high standard, requiring that the alleged inducer (1) subjectively believe that there is a high probability that a fact exists and (2) take deliberate actions to avoid learning of that fact."

- "[P]utting Global-Tech together with *Iqbal*, the question before the Court" at the pleading stage is whether a plaintiff has pleaded "sufficient facts . . . for the Court to infer" willful blindness."

- "The amended complaint contains no allegations either that Google "subjectively believe[d] that there is a high probability that a fact exists" or that Google took any "deliberate actions to avoid learning of that fact."

- "Mr. Golden merely asserts that Google contributes its Google Tensor Chipset, but does not allege to whom Google contributes the Tensor Chipset, nor any factual allegations supporting his threadbare claims that Google is liable for contributory infringement"

- "Here, just as in Bill of Lading, the complaint "supplies the very facts which defeat its claims of contributory infringement."

- "To state a claim for willful infringement, the plaintiff must plead that the defendant acted with knowledge of the patent and of his alleged infringement, or equivalent facts." ... "Although the jury decides willfulness, willfulness only goes to the jury if it was properly framed by the pleadings."

A patent infringement claim is an issue-of-fact tried by a jury under the Seventh Amendment. The issues of facts, acknowledged by the Defendant in their second motion to dismiss, are to be decided by a jury. Judge Rita F. Lin joined the conspiracy as a co-conspirator and dismissed Golden's case because he's a Black and/or African American who brought a case of stealing against the White-owned company Google, in her Court that is governed and guided by systemic and structural racism.

Judge Rita F. Lin's racism is so deep she is willing, with knowledge, to violate Golden's Constitutional rights under the Fifth Amendment Clause of the U.S. Constitution ("deprivation of property without due process of law, and without paying just compensation"), and the Seventh Amendment of the U.S. Constitution ("guaranteed right to a trial by jury in claims of patent infringement, that are issues-of-fact").

A jury needs to decide if the phases "smartphone must be modified for detection functionality", "modified by a third-party in order to function", and "software modification is needed for infringement to occur". Judge Rita F. Lin improperly added these abstract ideas.

The three phases are theoretical or hypothetical, and are not found in any of Golden's patent claim limitations asserted in this case.

In *Research Corporation Technologies Inc. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010) (RCT). The patent at issue was U.S. Patent No. 5,111,310. Hypothetical claims 1-3 are directed to an abstract idea [ineligible] and have additional elements that amount to significantly more than the abstract idea because they show an improvement in the functioning of the computer itself and also show an improvement to another technology/technical field, either of which can show eligibility.

In *SiRF Technology Inc. v. International Trade Commission*, 601 F.3d 1319 (Fed. Cir. 2010) (SiRF Tech). The patent at issue was U.S. Patent No. 6,417,801. Hypothetical claims 1 and 2 are directed to an abstract idea [ineligible] and have additional elements that amount to significantly more than the abstract idea because they show an improvement to another technology or technical field.

In *Google Inc. v. Simpleair, Inc.*, Covered Business Method Case No. CBM 2014-00170 (Jan. 22, 2015), ... The patent at issue was U.S. Patent No. 7,035,914 entitled *"System and Method for Transmission of Data."* Hypothetical claim 1 is directed to an abstract idea [ineligible] and does not have additional elements that amount to significantly more than the abstract idea. Hypothetical claim 2 also recites an abstract idea [ineligible] but does contain additional elements that amount to significantly more because there are meaningful limitations beyond generally linking the use of the abstract idea to a particular technological environment.

The following claim was found ineligible by the Federal Circuit in *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014). The patent at issue was U.S. Patent No. 7,644,019. The claim is directed to an abstract idea and has additional elements that do not amount to significantly more than the abstract idea.

For the same reasons set forth above, by taking all the abstract ideas and adding them to the claim elements individually, and in combination; Golden's patent claims as a whole amounts to significantly more than the abstract ideas of "smartphone must be modified for detection

functionality", "modified by a third-party in order to function", and "software modification is needed for infringement to occur".

Upon reviewing the chart below, it's obvious Judge Rita F. Lin does not know what she's talking about. Nowhere in the claim limitations are the phases "smartphone must be modified for detection functionality", "modified by a third-party in order to function", and "software modification is needed for infringement to occur".

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Indep. Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal … |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, … |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK—end-user device smartphone or tablet. With DTRA's contribution, ATAK now includes … (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | at least one of a chemical sensor, a biological sensor, an explosive sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing tech. | at least one of a transmitter or a transceiver in communication with … CPU… | whereupon a signal sent to the receiver … causes a signal that includes at least one of location data … | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to… |

After reviewing the chart, it's easy to see Golden's only responsibility is to first identify the Google Pixel smartphone as "[a] monitoring device", "[a] cell phone", and "[a] communication device". Next, Golden needs to identify where in the Google smartphone the central processing unit(s) (CPUs) can be found. Following, Golden needs to identify where in the Google smartphone the CBRNE are found, or identify the CBRNE detectors/sensors that are disposed within, on, upon or adjacent the cell phone. Lastly, Golden needs to identify where in the Google smartphone the transmitters, receivers, and transceivers.

A claim construction hearing is also needed so that Judge Rita F. Lin can identify and explain "software modification". It's important Judge Lin identify and point to what third-party is using what software, to modify what device. Judge Lin's language is so broad it's hard to pin point exactly what she is saying.

For example: The DTRA ATAK software is built on the Google Android Open-Source Operating system software; the Google Android Open-Source Operating System [software] that is built on the open-source code of Linux; the Linux Operating System is a type of operating system that is built upon the Linux Kernel; and Linux distribution is an operating system that is made up of a collection of software based on Linux kernel. Therefore, again, what software, what third-party, what device? Because, through it all the operating systems and the third-party devices are interconnected to Golden's patented central processing unit for functionality.

The only time Golden is responsibility for locating a third-party, or software in the Google smartphone; and locating in the Google smartphone the unforeseen abstract step of modifying, is when Judge Rita F. Lin orders Golden to do so. That's why a trial by jury is not only a right guaranteed Golden by the Seventh Amendment of the United States Constitution, in this case a jury trial is pertinent to the pursuit for justice and fairness.

# CONCLUSION

In *Twombly*, the Supreme Court considered the adequacy of a complaint alleging that defendants orchestrated an antitrust conspiracy in violation of the Sherman Act. 550 U.S. at 555. The Court observed that the complaint contained no factual allegations of an agreement as needed to establish a conspiracy. *Id.* at 564. Instead, the pleading rested on legal conclusions premised upon descriptions of parallel conduct. *Id. Twombly* held that Rule 8 requires plaintiffs to include enough facts "to raise a right to relief above a speculative level," and cautioned that "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

The Supreme Court provided further clarification of the necessary pleading standard in *Iqbal*, where it considered a claim alleging that several high-ranking officials violated the First and Fifth Amendments by purposefully instituting a policy of discrimination that resulted in plaintiff's incarceration at a facility where the conditions of confinement were inadequate. 556 U.S. at 668-69. *Iqbal* explained that "[t]wo working principles underlie" *Twombly*: (1) courts need not accept as true legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" and (2) only a complaint that states a plausible claim for relief with well pleaded facts demonstrating the pleader's entitlement to relief can survive a motion to dismiss. Id. at 678-79. Because the complaint in *Iqbal* included only conclusory assertions of discrimination without factual allegations that plausibly gave rise to an entitlement of relief, the complaint was fatally defective. *Id.* at 679-80. The Court explained that plaintiff's allegation that officials "purposefully adopted" a policy of discrimination was inadequate because it lacked factual allegations that could "'nudg[e]' [his] claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Id.* at 682-83 (quoting *Twombly*, 550 U.S. at 570).

Taken together, *Iqbal* and *Twombly* require well-pleaded facts, not legal conclusions. *Twombly*, 550 U.S. at 570, that "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. The plausibility of a pleading thus derives from its well-pleaded factual allegations. *Id*

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*: Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "in a relatively straightforward manner" ... and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

In a Three-Judge Panel DISCUSSION: "Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 ... [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) ... this court has explained that a plaintiff ... must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden

has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...."

In the Federal Circuit's order to vacate and remand, the Circuit determined Golden's complaint is not facially frivolous; has alleged enough facts to state a claim to relief that is plausible on its face; has plead 'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged; has plead facts that give rise to more than a sheer possibility that a defendant has acted unlawfully; has included a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189; attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner; and, has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.

The Federal Circuit "conclude[d] that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart." Which means Golden submitted enough factual information on literal infringement, infringement under the doctrine of equivalents, induced infringement, contributory infringement, willful infringement, and joint infringement; to Judge Rita F. Lin in this Northern District of California Court case.

The question here is, what motivated Judge Rita F. Lin to overturn every cause of action [above] Golden submitted against Google, that was identical to the cause of actions submitted to the Federal Circuit?

Judge Rita F. Lin overstepped the doctrine of *vertical stare decisis* to overturn every cause of action, and she did so without a jury; without discovery; and without claim construction. Judge Lin's motivation stems from racism and the conspiracies she joined as a co-conspirator.

### Vertical stare decisis

Vertical stare decisis binds Judge Rita F. Lin to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines vertical stare decisis as the doctrine, "a lower court [Judge Rita F. Lin] must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

Judge Rita F. Lin engages in vertical stare decisis when she applies precedent from the higher court. For example, if the Northern District of California Court [Judge Rita F. Lin] adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be vertical stare decisis.

When Judge Rita F. Lin applies the decision from the higher court, [vertical stare decisis] it bars Google from challenging whether Golden has pled enough facts and provided sufficient notice to the Defendant Google. The Federal Circuit's ruling: "the complaint includes a detailed claim chart mapping features of an accused product, the Google [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "in a relatively straightforward manner"", indicates Golden has pled enough facts and any challenges Judge Rita F. Lin allows should be presented to a jury.

Again, Golden believes Judge Lin's motivation to disregard the decisions of the higher court, stem from systemic racism and the conspiracies she joined as a co-conspirator.

### "Due Process"

The Fifth Amendment states, "No person shall…be deprived of life, liberty, or property, without due process of law;", and among other things, the government [Judge Rita F. Lin] cannot deprive Golden of his property without following certain procedures. This is known as "due

process," which is further broken down into two concepts: procedural due process and substantive due process.

The Supreme Court has explained that [p]rocedural due process rules are meant to protect persons [Golden] not from the deprivation, but from the mistaken [unfair] or unjustified deprivation of his property. *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

As the Supreme Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:

> "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."

The Court of Federal Claims Senior Judge Bruggink, in multiple cases, has deprived Golden of his property through unfair means that resulted in the loss of his property and the continued appropriation or use by the government without paying Golden just compensation. Judge Bruggink and Judge Lin are co-conspirators in the same already established conspiracy.

Judge Rita F. Lin's procedural due process violation under the Fifth Amendment Clause of the United States Constitution is a violation of Golden's civil rights when the offense is motivated by race discrimination.

## 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), Judge Rita F. Lin must accept as true all factual allegations in the complaint, which means all factual evidence of literal infringement determined by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267, and must draw inferences in a light most favorable to the Golden. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

"The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint. not to assay [examine] the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dept. Store Co.*. 34 F. Supp. 2d 130. 131 (D. Conn. 1999) (quoting *Ryder Energy Distribution v. Merrill Lynch Commodities. Inc.*. 748 F.2d 774. 779 (2d Cir. 1984)). and <u>certainly not to do everything. including lying. avoiding the issues. and adjudicating outside the Court's jurisdiction</u>. to overturn the decision of the higher United States Court of Appeals for the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267.

"The issue on a motion to dismiss is not whether the Golden will prevail. but whether Golden is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.*. 727 F. Supp 784. 786 (D. Conn. 1990) (citing *Scheuer*. 416 U.S. at 232).

## Doctrine of *Res Judicata*

The doctrine of res judicata seeks "(1) to promote judicial economy by minimizing repetitive litigation: (2) to prevent inconsistent judgments which undermine the integrity of the judicial system: and (3) to provide repose by preventing a person from being harassed by vexatious litigation." *See State v. Ellis*. 466. 497 A.2d at 990

Judge Rita F. Lin's theories of "issue preclusion" does not apply and is inapplicable to valid claims submitted with valid patents under § 271. Golden has the right to bring an action against Google for the recovery of damages any time Google appropriates or uses Golden's patented invention(s) without license or legal right to do so.

Judge Rita F. Lin's theories of jurisdiction and the boundaries the Judge applies to *"whoever"* under § 271(a)(b)(c). if allowed to stand. rewrites patent infringement under 35 U.S.C. § 271(a) (b)(c). Judge Rita F. Lin's non-infringement theories create "loopholes" for Google to infringe Golden's patents without liability:

116

Judge Rita F. Lin's non-infringement theories are displaced and only applies to a certain race of people; only at certain times; only under certain conditions; and only without using the same patents that are within the patents 20-year term limit.

It's dinosaur judges like Judge Rita F. Lin's that keeps systemic and structural racism alive in the Federal judicial system. It's obvious Golden's cases means more to Judge Rita F. Lin's than just adjudicating the merits. It means not allowing a Black man to succeed in defending his property within her jurisdiction, and outside her jurisdiction.

Golden believes Judge Rita F. Lin's non-infringement theories are racially motivated. Golden believes Judge Rita F. Lin knew she was barred [precluded] from re-litigating the same issues of literal infringement and/or infringement under the doctrine of equivalents that had already been decided in *Larry Golden v. Google LLC*; Case No. 22-1267 with the use of identical patents and patent claims.

This document is verifiable proof and supporting evidence that Judge Rita F. Lin knowingly, willfully, and repeatedly violated Golden's civil rights.

Sincerely,

Larry Golden, *Pro Se* Complainant
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

GREENVILLE, SC 2~~~~
AUG 26, 2024

20439

**$63.70**

S2324K504193-25

RDC 07



# UNITED STATES POSTAL SERVICE®

## PRIORITY MAIL EXPRESS®



EI 975 707 083 US

### CUSTOMER USE ONLY

FROM: (PLEASE PRINT)  PHONE 864 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

### PAYMENT BY ACCOUNT (if applicable)
Federal Agency Acct. No. or Postal Service™ Acct. No.

### DELIVERY OPTIONS (Customer Use Only)
☐ **SIGNATURE REQUIRED** Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
  *Refer to USPS.com® or local Post Office™ for availability.

### ORIGIN (POSTAL SERVICE USE ONLY)

| | | ☐ Military | ☐ DPO |
|---|---|---|---|
| ☑ 1-Day | ☐ 2-Day | | |

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29615 | 8/27/24 | $ 63.70 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 8/26/24 | ☐ 6:00 PM  6pm | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 4:01 ☐ AM ☑ PM | | $ | $ |

TO: (PLEASE PRINT)  PHONE 202 275-8000

U.S. COURT OF APPEALS FOR THE FEDERAL CIR.
CASE No: 24-2256
717 MADISON PLACE, NW
WASHINGTON, DC

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | |

| Weight | ☐ Flat Rate | Acceptance Employee Initials | |
|---|---|---|---|
| 8.50 lbs. ozs. | | ƊN | $ 63.70 |

ZIP + 4® (U.S. ADDRESSES ONLY)

2 0 4 3 9 - _ _ _ _ _

### DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | | Employee Signature |
|---|---|---|---|
| | | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | | Employee Signature |
| | | ☐ AM ☐ PM | |

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

LABEL 11-B, NOVEMBER 2023   PSN 7690-02-000-9996

◁ **PEEL FROM THIS CORNER**