No: 2024-2256

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

LARRY GOLDEN
*Plaintiff-Appellant*

v.

The United States
*Defendant-Appellee*

**RECEIVED**

SEP 17 2024

United States Court of Appeals
For the Federal Circuit

---

ON APPEAL FROM THE UNITED STATES COURT OF
FEDERAL CLAIMS IN GOLDEN v. THE UNITED STATES
[DEFENSE THREAT REDUCTION AGENCY]
IN 1:2023cv00811-EGB; JUDGE ERIC BRUGGINK

---

## PLAINTIFF-APPELLANT'S RESPONSE AND CROSS-MOTION TO STRIKE DEFENDANT-APPELLEE'S MOTION FOR SUMMARY AFFIRMANCE

LARRY GOLDEN, *Pro Se*
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

September 14, 2024

Federal Rule of Civil Procedure 12(f) states that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Ayers v. Consolidated Construction*, 07-123, 2007 WL 4181910 at *1 (M.D. Fla. Nov. 26 2007) (Steele, J.) (striking insufficient and inapplicable affirmative defenses).

Rule 12(f) is appropriate here where Defendants' affirmative defenses are obviously false, have little or no bearing on the adjudication of Golden's claims, and serve to prejudice Plaintiff [] *Wlodynski v. Ryland Homes*, 08-cv-361, 2008 WL 2783148 at *1 (M.D. Fla. July 17, 2008) (Whittemore, J.) ("if the allegations have no possible relation to the controversy, may confuse the issues, or may cause prejudice to one of the parties, a court may grant the motion.")

This case, *Golden v. US* CAFC Case No. 24-2256, is on appeal from the United States Court of Federal Claims in *Golden v. US* CFC Case No. 23-811C. Golden is appealing the decision of the Claims Court to dismiss Golden's case under the doctrines of *Res judicata*.

Throughout Golden's pleadings, both in the Claims Court and here in the Appellate Court, demonstrates the Government's defense falls far short of its burden to establish res judicata here; these are new claims.

The Government is attempting to improperly cut this appeal short with a motion of summary affirmance. Golden, like any other plaintiffs, should be allowed to substantiate his well-pleaded new claims in the district court, and the Government should be compiled to answer the new claims.

As the Supreme Court explained more than 50 years ago in *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), res judicata does not bar a suit, even if it involves the same course of conduct as alleged earlier, so long as the suit alleges new facts or a worsening of the earlier conditions.

That is precisely the case here, with (1) expanded alleged infringement of at least three more of Golden's patented inventions; (2) expanded alleged infringement of at least three more of Golden's patents not asserted in the previous case. The new complaint raises alleged patent infringement against Golden's new patent claims that could not have been raised in the prior litigation; and (3) at least nine judges have determined, since the ruling of the first case *Golden v. US* no. 13-307C, that infringement occurs when Golden's patented inventions of a new, improved upon cell phone; a central processing unit (CPU); and, a multi-sensor detection device of chemical, biological, radiological, nuclear, or explosives sensors, are combined.

Golden has also alleged in this current case, infringement of Golden's patented stall, stop, or vehicle system for unmanned aerial vehicles (UAVs) or drones. The new complaint raises alleged patent infringement against Golden's patented stall, stop, or vehicle system for unmanned aerial vehicles (UAVs) or drones that could not have been raised in the prior litigation.

In *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), the Supreme Court unanimously reversed the application of res judicata where the lower [appellate] court applied the same reasoning as the district court applied here. There, the plaintiffs brought an antitrust suit that was ultimately dismissed with prejudice. *Id.* at 324.

Seven years later, the plaintiffs brought a second antitrust suit against many of the same defendants, alleging the same course of wrongful conduct, which had worsened in the interim. *Id.* at 328. The lower courts applied res judicata to bar the second suit. *Id.*

The Supreme Court reversed, explaining that even though "both suits involved essentially the same course of wrongful conduct," res judicata did not apply. *Id.* at 327 (internal quotation marks omitted). The Court noted that "such a course of conduct—for example, an abatable nuisance—may frequently give rise to more than a single cause of action." *Id.* at 327–28.

The Court held that claims in the second suit based on events that had not yet occurred at the time of the first suit were not barred: "While the [earlier] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Id.*

The Court further held that the plaintiffs' claims in the second suit survived res judicata to the extent that those claims alleged worsening of the earlier wrongful conduct: "In the interim, moreover, there was a substantial change in the scope of the defendants' alleged monopoly ... with the result that the defendants' control over the market . . . had increased to nearly 100%." *Id.* (emphasis added). "Under these circumstances," the Supreme Court explained, "whether the defendants' conduct be regarded as a series of individual torts or as one continuing tort, the [earlier] judgment does not constitute a bar to the instant suit." *Id.*

*Lawlor* retains its vitality to this day. *See, e.g., Darney v. Dragon Prods. Co., LLC*, 592 F. Supp. 2d 180 (D. Me. 2009) (applying *Lawlor* to deny application of res judicata where second complaint included new factual allegations, even though there was "facial similarity" with the first complaint). *See Quality Ready Mix, Inc. v. Mamone*, 520 N.E.2d 193, 197 (1988) (for res judicata to apply, the prior proceeding "must involve the same issues").

**SINCE JUDGE BRUGGINK'S DECISION IN *GOLDEN v. US* CASE NO. 13-307C; NINE FEDERAL JUDGES DETERMINED THE UNITED STATES DIRECTLY INFRINGED GOLDEN'S PATENTED INVENTIONS COMBINATIONS**

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Judge Bruggink | 1:2013cv00307 | Golden v. USA | U.S. Court of Federal Claims | 05/01/2013 - *11/10/2021* |

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors allegedly infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v.***

***Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024. "Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2." "We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

**The Northern District of California Court Judge Haywood S. Gilliam, Jr. in *Golden v. Google, LLC*, Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge Haywood S. Gilliam, Jr. agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**The Northern District of California Court Judge Rita F. Lin in *Golden v. Google, LLC*, Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU, and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

**Judge Bruggink's decision on 11/10/2021 in *Golden v. US* Case No. 13-307C became "*MOOT*" when on Appeal in *Golden v. Google* Case No. 22-1267; determined on 09/08/2022 Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Consumer Device**

As the Court explained in its 1950 opinion in *United States v. Munsingwear, Inc.*, "[t]he established practice of the Court in dealing with a civil case from a court in the federal system which has become moot" on appeal or before the Court has issued its "decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). (analyzing the *Munsingwear* rule); *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 22 (1994) (describing *Munsingwear* as "[t]he leading case on vacatur"); *Great W. Sugar Co. v. Nelson*, 442 U.S. 92, 93 n.* (1979) (per curiam) ("*United States v. Munsingwear, Inc.*, is perhaps the leading case on the proper disposition of cases that become moot on appeal."). Disposing of a moot case in this manner thereby:

"[c]lears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance."

Put another way, the *Munsingwear* procedure for disposing of cases that become moot on appeal "prevent[s] a judgment, unreviewable because of mootness, from spawning any legal consequences," and thereby ensures that the federal appellate courts, rather than individual litigants, have the last word on the answers to legal questions.

Judge Bruggink's decision became "*moot*" when nine judges, six from the Federal Circuit and three from the Northern District of California, acknowledged the "U.S. Government", the single entity under 28 USC § 1498 for direct infringement, is more likely than not, the direct infringer because the element-by-element requirement is only satisfied under 28 USC § 1498 when Golden's entire patented invention combination is made and is "suitable for use".

6

**GOLDEN'S "FOUR" PATENTED INVENTION(S) COMBINATIONS ASSERTED IN THIS CAFC CASE NO. 24-2256 *GOLDEN v. US* WAS NEVER ADJUDICATED AND THEREFORE CANNOT BE DISMISSED FOR ISSUE PRECLUSION**

Golden is not "precluded" from asserting in this current case on appeal *Golden v. US* CAFC Case No. 24-2256, claim 1 of Golden's U.S. Patent "10,984,619" that was issued on April 20, 2021 for Golden's invention of "a communication device, comprising; a central processing unit (CPU); capable of CBRNE detection; and capable of stalling or stopping a vehicle". [Claim 1 of Golden's U.S. Patent "10,984,619" that was never asserted in *Golden v. US* COFC Case No. 13-307C, which means the claim cannot be dismissed for issue preclusion because the Claims Court never adjudicated the claim for validity or construed the claim].

Golden is not "precluded" from asserting in this current case on appeal *Golden v. US* CAFC Case No. 24-2256, claim 11 of Golden's U.S. Patent "10,984,619" that was issued on April 20, 2021 for Golden's invention of "a central processing unit (CPU); integrated with a communication device: capable of CBRNE detection; and capable of processing instructions for stalling or stopping a vehicle". [Claim 11 of Golden's U.S. Pat. "10,984,619" was never asserted in *Golden v. US* COFC Case No. 13-307C, which means the claim cannot be dismissed for issue preclusion because the Claims Court never adjudicated for validity or construed the claim].

Golden is not "precluded" from asserting in this current case on appeal *Golden v. US* CAFC Case No. 24-2256, claim 1 of Golden's U.S. Patent "11,645,898" that was issued on May 9, 2023 for Golden's invention of "a pre-programmed stall, stop, vehicle slow-down system; comprising a communication device: a central processing unit (CPU); and capable of processing instructions for stalling or stopping a vehicle when CBRNE is detected". [Claim 1 of Golden's U.S. Patent "11,645,898" that was not issued before the close of *Golden v. US* COFC Case No. 13-307C, which means the claim cannot be dismissed for issue preclusion].

Golden is not "precluded" from asserting in this current case on appeal *Golden v. US* CAFC Case No. 24-2256, claim 6 of Golden's U.S. Patent "10,163,287" that was issued on December 25, 2018 for Golden's invention of "[] monitoring equipment, comprising; communication device; a central processing unit (CPU); capable of CBRNE detection; and capable of stalling or stopping a vehicle".

Golden is not "precluded" from asserting in this current case on appeal *Golden v. US* CAFC Case No. 24-2256 claim 1 of Golden's U.S. Patent "9,589,439". See the following charts.

| THE GOVERNMENT'S REQUEST FOR _FOUR_ OF GOLDEN'S PATENTED INVENTION(S) COMBINATIONS – PATENT CLAIMS | | | | |
|---|---|---|---|---|
| **Patent Claims** *-for-* **Patented Inventions** | **Claim 1 of U.S. Patent "10,984,619"** | **Claim 11 of U.S. Patent "10,984,619"** | **Claim 1 of U.S. Patent "11,645,898"** | **Claim 6 of U.S. Patent "10,163,287"** |
| **Communication Device** CMDC Device(s) i.e., Smartphones, PCs, Laptops, Tablets, Monitoring Equipment and Cell-phone Detection Devices | **A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner,** | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, | processing instructions to stall, stop, or slow-down a vehicle [] receives a signal from [] (PC), ... a smartphone, a laptop, a tablet, a PDA, or a handheld; | [] communication with [] one CPU configured to send signals ... communication device [] capable of communicating, monitoring, detecting, and controlling. |
| **Central Processing Unit (CPU)** CPU / Processor / Chipset / SoC | comprising at least a central processing unit (CPU), capable of: | **A central processing unit (CPU) of ... a ... (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, ...:** | Wherein, when the [] (CPU) processes instructions to stall, stop, or slow-down a vehicle, ... is sent [] monitoring site | at least one central processing unit (CPU) |
| **Detection Device** Placed In, On, Upon, Adjacent the CMDC Device(s) | processing instructions to [] detect [] chemical [], biological [], radiological [], nuclear [], or explosive [], ... (WMDs); | processing instructions to [] detect [] chemical [], biological [], radiological [], nuclear [], or explosive [], ... (WMDs); | processing instructions to stall, stop, or slow-down a vehicle when ... chemical [], a biological [], a radiological []; a nuclear []; or explosives [] detected; | **A monitoring equipment, comprising... detecting at least ... chemical, biological, radiological, or explosive agents;** |
| **Stall, Stop, Vehicle Slow-Down System** Remote, Cellular, Satellite, Pre-Programmed | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | **A pre-programmed stall, stop, vehicle slow-down system, ... processing instructions to ... vehicle when ... driverless []; self-drive []; an[d] autonomous ...** | at least one of a transmitter or a transceiver ... at least one CPU configured to ... monitor ... a vehicle, or [] send signals to control components of a vehicle... |

| THE GOVERNMENT'S REQUEST FOR *FOUR* OF GOLDEN'S PATENTED INVENTION(S) COMBINATIONS – PATENT CLAIM LIMITATIONS | |
|---|---|
| *Preamble*<br><br>**Claim 1 of Golden's 9,589,439 Patent** | A multi sensor detection system capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities vulnerable to terrorist activity that can be integrated with and interconnected to watchtowers to form a network, comprising: |
| **Communication Device** | a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, [] phone, a personal digital assistant (PDA), [] or a handheld interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom; |
| **Central Processing Unit (CPU)** | a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom; |
| **Detection Device** | a plurality of sensors for detecting or sensing humans that is at least one of a chemical human sensor, biological human sensor, radiological human sensor, infrared human detector, motion human detector, or image human detector, interconnected to or disposed within the multi-sensor detection system for sending signals thereto and receiving signals therefrom;<br><br>a mobile multi-sensor detection device that is at least one of a ground surveillance sensor, a surveillance radar sensor, a surveillance camera, or a stand-alone surveillance scanner, that is mounted in, on, or upon at least one of a car, a truck, a camper, a bus, a van, an unmanned aerial vehicle (UAV), an unmanned ground vehicle (UGV), or a utility vehicle, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; |
| **Stall, Stop, Vehicle Slow-Down System** | whereupon, detection of an unauthorized vehicle, an unauthorized driver or operator of a vehicle or mobile unit, a signal is sent from the communication device to the vehicle or mobile unit to stop, stall or slowdown the vehicle; |

## THE GOVERNMENT WORSENING OF EARLIER CONDITIONS

The United States Court of Federal Claims ["the Government's Court] Judge, was *"precluded"* under 28 U.S. Code § 144 - Bias or prejudice of judge, from adjudicating the current case and entering a final decision. Golden filed a timely motion for disqualification under 28 U.S. Code § 144 for racial bias and bias in favor of the Government that the Judge ignored and allowed to set on the docket for seven months. "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." [28 U.S. Code § 144]

The Government is *"precluded"* by the United States Supreme Court from appropriating or using Golden's patented invention(s) without just compensation: "In *James v. Campbell*, 104 U.S. 356, 357-58 (1882), the Supreme Court explained that when the government grants a patent, it "confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation."

The Government is *"precluded"* by the Fifth Amendment Clause of the United States Constitution from depriving Golden of his property without paying just compensation: "No person shall … be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." [U.S. Cons't. amend. V]

The United States Court of Federal Claims ["the Government's Court] is *"precluded"* by the Tucker Act (March 3, 1887, ch. 359, 24 Stat. 505, 28 U.S.C. § 1491) from adjudicating outside the Court's jurisdiction Golden's money-mandating claims against the Government: "While the Tucker Act confers jurisdiction on the Court of Federal Claims and also waives the sovereign immunity of the federal government, it does not create a substantive claim. Instead, the statute authorizes money claims against the government "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States . . . The Tucker Act points to these other sources of substantive law to identify a cognizable cause of action. The statute provides the right to file a lawsuit to obtain a monetary remedy, while leaving the content of the legal claim to the Constitution, federal statutes and regulations, and contract law."

The Government is "*precluded*" by Title 28 of the United States Code; Section 1498 from using or manufacturing Golden's inventions without license; the lawful right; or reasonable and entire compensation: "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture… For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States." [28 U.S. Code § 1498(a)]

The Government is "*precluded*" by the Federal Circuit in *Zoltek V* from requiring Golden to prove direct infringement of Apple and Google products under 35 U.S.C. § 271(a) as a necessary predicate to proving direct infringement by or for the Government under 28 U.S.C. § 1498(a): "[I]n the 2012 *en banc* decision *Zoltek V*, the Federal Circuit abrogated *Zoltek III*, holding that establishing conduct falling within the definition of direct infringement codified in 35 U.S.C. § 271(a) is not a predicate to finding infringement under § 1498(a)… In *Zoltek V*, the appellate court emphasized that § 1498(a) is "its own independent cause of action" with three elements to trigger government liability: (1) the invention must be claimed in a patent; (2) it must be "used or manufactured by or for the United States," []; and (3) the "use or manufacture" of the patented invention must be done without license or lawful right—i.e., "use of an invention that, if done by a private party, would directly infringe the patent."

The Government is "*precluded*" by the Bayh-Dole Act, from extending its license to practice Golden's inventions for commercial use by third-parties to compete with Golden on the open market: "While the Government retains a royalty-free license under the Bayh–Dole to practice the invention under the Bayh–Dole Act, the right is limited to practice "for or on behalf of the United States." Therefore, the license does not extend to commercial use by third parties. For example, the government's license could not be used to allow a third party to practice the inventing party's invention and thereby compete with the inventing party on the open market."

The Government is "*precluded*" by the US Court of Appeals for the Federal Circuit from limiting or restricting the components [elements] of the alleged infringing products to those

"*native*" to the manufacture of the Apple and/or Google products: "In *FastShip, LLC v. United States*, the US Court of Appeals for the Federal Circuit held that to be manufactured under 28 U.S.C. Section 1498, an accused product must include each claim limitation so it is "suitable for use" … On June 5, 2018, in *FastShip, LLC v. United States*, the US Court of Appeals for the Federal Circuit affirmed … a US Court of Federal Claims decision and interpreted the term "manufactured" as used in 28 U.S.C. Section 1498, which waives the US government's sovereign immunity and provides a remedy whenever a patented invention is used or manufactured by or for the government without a license from the patent owner, to require the accused product to include each asserted claim limitation so it is suitable for use ( (Fed. Cir. June 5, 2018)). In a matter of first impression, the Federal Circuit interpreted the term "manufactured" in Section 1498:

- According to its ordinary, contemporary, common meaning, ruling that the plain meaning of "manufactured" encompasses products made or worked into a form that is suitable for use.
- In the context of the overall statutory scheme, concluding that interpreting "manufactured" so the product must be suitable for use aligns with the Federal Circuit's prior interpretation of "use" in Section 1498 requiring each claim limitation to be present in the thing invented.

As a result, the Federal Circuit concluded that a product is manufactured within the meaning of the statute when it is made to include each limitation of the thing invented and is therefore "suitable for use".

The Government is "*precluded*" by the United States Supreme Court from extending the preclusion doctrines to include a new freestanding preclusion doctrine—the *Kessler* Doctrine: "In May 2020, the Supreme Court decided the case of *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589 (2020) and expressly refused to extend preclusion doctrines beyond their traditional bounds set by the doctrines of issue and claim preclusion. The Supreme Court has repeatedly held that, absent guidance from Congress, courts should not create special procedural rules for patent cases or devise novel preclusion doctrines that stray beyond the traditional bounds of claim and issue preclusion. Nonetheless, over the past several years, the Federal Circuit has created and then repeatedly expanded a special, patent-specific preclusion doctrine that it attributes to the Supreme Court's 114-year-old decision in *Kessler v. Eldred*, 206 U.S. 285 (1907)—a case the Court has not cited for almost 70 years.

Absent guidance from Congress, the Government in this case has devised a way to stray beyond the traditional bounds of claim and issue preclusion, to create a new freestanding preclusion doctrine [*Kessler*] that may apply even when claim and issue preclusion do not. The freestanding *Kessler* doctrine does not supersede the Constitutional provisions of the Fifth Amendment "No person shall…be deprived of life, liberty, or property, without due process of law;" and the freestanding doctrine do not supersede Congress intent in creating the statute for patent infringement under 28 U.S.C. § 1498(a).

Parallel to Section 1498 permitting the federal government to "use or manufacture", **whenever**, or at any time the Government choses, technologies protected under current U.S. patents without the permission of the patent holder; is the Patent Owner's right to bring an action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation, **whenever**, or at any time the Government appropriates or uses the patented invention.

The Government is *"precluded"* by the Courts from dismissing Golden's case solely on mootness grounds; which is not a final judgment "on the merits". "A party may raise a mootness challenge at any time during the litigation, including for the first time on appeal. *DBSI/TRI IV Ltd. P'ship v. United States*, 465 F.3d 1031, 1038 (9th Cir. 2006) (explaining that mootness is a "jurisdictional issue that may be raised at any time, even for the first time on appeal").

*Res judicata* and claim preclusion require a final judgment. But here, the prior judgment, though challenged on appeal, was dismissed on *"mootness"* grounds. A dismissal solely on mootness grounds does not result in a final judgment "on the merits" as required to apply the doctrine of res judicata. Published opinion in *Parkford Owners for a Better Community v. Windeshausen* (D3 Jul. 14, 2022 No. C094419) 81 Cal.App.5th 216. *(Exhibit A)*

Claim preclusion requires a final judgment on the merits, while issue preclusion requires a final adjudication of an issue. (*Samara v. Matar* (2018) 5 Cal.5th 322, 324.) *(Exhibit B)* Here, the court held that an appeal challenging the trial court's conclusions, and then decided by the Court of Appeal, but decided on appeal solely on "a purely procedural or technical ground distinct from an actual determination of the merits," does not result in a judgment on the merits for purposes of *res judicata* or preclusion. A dismissed appeal is not "on the merits" if the dismissal was for "mootness".

The United States Court of Federal Claims ["the Government's Court] is *"precluded"* by the doctrine of vertical stare decisis from dishonoring the precedence set by the higher United States Court of Appeals for the Federal Circuit in two separate cases within the Federal Circuit's jurisdiction: "Vertical stare decisis is the rule binding a lower court to adhere to the decisions of higher courts in its jurisdiction. For example, the United States Court of Federal Claims is generally considered duty bound to attempt faithfully to apply the precedents of the Federal Circuit. Under the doctrine vertical stare decisis it is a court's obligation to follow the precedent of a superior court; and, under the doctrine horizontal stare decisis, a court's obligation to follow its own precedent. Vertical stare decisis is an inflexible rule that admits of no exception. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). See chart below:

- The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone
- The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone

In general, any appeal from a civil action involving claims of patent infringement must be made to the Federal Circuit in Washington, D.C. A recent case from the Ninth Circuit, *Amity Rubberized Pen Company v. Market Quest Group*, illustrates this principle. The Ninth Circuit concluded that it lacked jurisdiction to hear Amity's appeal. The Court recognized, that Congress had granted the Federal Circuit "exclusive jurisdiction ... of an appeal from a final decision of a district court of the United States ... in any civil action arising under ... any act of Congress relating to patents."

Therefore, all the decisions in *Golden v. Samsung Electronics America, Inc.* Case No. 23-0048; and in *Golden v. Google LLC* Case No. 22-5246 that was decided, "direct infringement by or for the Government arises when there's the combined ATAK Software; CBRN Plugins; CPU; and Smartphone, made after the decision in *Golden v. USA* Case No. 13-307C on 11/10/2021, is perceived as moot. The dismissal of this current case *Golden v. Google* Case No. 23-811C on appeal is not "on the merits" if the dismissal is for issue preclusion of a case perceived as *moot*.

Also, the decisions of the higher United States Court of Appeals for the Federal Circuit made in *Golden v. Google LLC* Case No. 22-1267 and in *Golden v. Samsung Electronics America, Inc.* Case No. 23-2120 that was decided, "direct infringement by or for the Government arises when there's the combined ATAK Software; CBRN Plugins; CPU; and Smartphone, is binding precedence under the doctrine of *vertical stare decisis*. The United States Court of Federal Claims is duty bound to attempt faithfully to apply the precedents of the Federal Circuit.

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Judge Bruggink | 1:2013cv00307 | Golden v. USA | U.S. Court of Federal Claims | 05/01/2013 - *11/10/2021* |
| **# of Judge(s)** | **Case Number** | **Case Title** | **Court** | **Filed - Closed** |
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |

## WHETHER GOLDEN'S CONDUCT IS REGARDED AS A SERIES OF INDIVIDUAL CAUSES OF ACTIONS OR AS ONE CONTINUING CAUSE OF ACTION, THE [EARLIER] JUDGMENT DOES NOT CONSTITUTE A BAR TO THE INSTANT CASE

In addition to a detailed description of the combined efforts of all third-party contractors, the "language of intent", wherever necessary to show the Government has "authorized and consented" to combining components of Golden's patented combination, is included in the

government solicitation(s), awards, and contracts. An example of the "language of intent", to combine the combined components of Golden's patented combination is recognized in the DHS *Cell-All* initiative; the DoD DTRA *ATAK* initiative; and the DoD "JPEO-CBRND" initiative.

**DHS S&T "*Cell-All*" [Past "Language of Intent" to Combine]**

Spearheaded by the Department of Homeland Security's (DHS) Science and Technology Directorate (S&T), Cell-All aims to equip your cell phone with a sensor capable of detecting deadly chemicals ... "Our goal is to create a lightweight, cost-effective, power-efficient solution," says Stephen Dennis, Cell-All's program manager:

> In 2007, S&T called upon the private sector to develop concepts of operations. To this end, three teams from Qualcomm, the National Aeronautics and Space Administration (NASA), and Rhevision Technology are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station. And technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically ... Similarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. *The Department of Homeland Security's (DHS) 2007.*

Qualcomm, the primary contractor for the *Cell-All* initiative, role has been to develop a smartphone app [CPU/Chipset] and the associated network software for processing data. Smartphone users can download the app from Google Play and, from Apple's iTunes store, so *Cell-All* will be operational on all phones using either Google's Android operating systems or Apple's iPhone operating systems.

The Senior Judge Bruggink redirected and broadened the jurisdiction of the Claims Court by narrowing the case to a dispute between two private entities under 35 U.S.C. § 271(a); Golden and Apple, Inc. "[P]roving direct infringement under 35 U.S.C. § 271(a) is not a necessary predicate for proving direct infringement under 28 U.S.C. § 1498(a)." *Zoltek V*

When Senior Judge Bruggink redirected and broadened the jurisdiction of the Claims Court by narrowing the case to a dispute between the two private entities, *Golden v. Apple, Inc.*, Senior Judge Bruggink personally destroyed any and all possibilities of Golden proving, under §

1498(a), that Golden's entire patented combination had been made by the combined efforts of the third-party contractors, and is "suitable for use" *FastShip, LLC v. United States.*

## DoD DTRA ATAK [Current "Language of Intent" to Combine]

Another example of the "language of intent", to combine the components of Golden's patented combination is recognized in the DoD DTRA initiative [the current case]. The Android Team Awareness Kit (ATAK) is an Android smartphone geospatial infrastructure and military situation awareness app for Google, Samsung, LG, Qualcomm, etc. ATAK has a CBRNE plugin architecture which allows developers to add functionality. This extensible plugin architecture that allows enhanced capabilities for specific mission sets. [Draper Laboratory, Inc.]

In September 2015, Defense Advanced Research Projects Agency (DARPA) reported that ATAK was used in a successful demonstration of the Persistent Close Air Support Program, and is in use by thousands of users. In 2018, the United States Air Force (USAF) Security Forces deployed ATAK at Eglin AFB, Florida. The Android Team Awareness Kit or TAK is currently used by thousands of Department of Homeland Security (DHS) personnel, along with other members of the Homeland Security Enterprise including state and local public safety personnel. TAK has supported the rescue of over 2,000 people during disaster response for seven major hurricanes (Harvey, Irma, Maria, Florence, Lane, Michael, and Dorian). The capability is also regularly used during public safety operations and national security special events like United Nations General Assembly meetings and the Super Bowl.

The focal point of this initiative that differentiates it from the *Cell-All* initiative is the operating system as an article of manufacture that is interconnected or integrated with Golden's patented central processing unit CPU.

The TAK has various end-user versions such as the iTAK that is built on Apple's iOS operating system; ATAK that is built on Google's android open-source operating system; and, WinTak that is built on Microsoft's operating system. Also, ATAK has various end-user versions: ATAK - Civilian (ATAK-CIV); ATAK - Government (ATAK-GOV); and, ATAK - Military (ATAK-MIL). This initiative combines Golden's patented CMDC device, CPU, and Multi-Sensor Detection device.

This initiative also expands in the areas of consumer devices *i.e.*, laptops, PCs, tablet's that are covered under Golden's patents, but were not asserted in the *Cell-All* initiative. Plus, it expands to include smartphones devices other than the Apple smartphone that enables iTAK.

| DEPARTMENT OF DEFENSE (DOD) DEFENSE THREAT REDUCTION AGENCY (DTRA) | | | | | | |
|---|---|---|---|---|---|---|
| **iTAK** | **ATAK** | | | | **WinTAK** | |
| Apple iPhone 12 Smartphone | Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | LG V60 ThinQ 5G | Qualcomm Smartphone for Snapdragon Insiders | Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode] | HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC |
|  |  |  |  |  |  |  |
| **Chipset:** Apple A14 Bionic (5 nm). **CPU:** Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). | **Chipset:** Qualcomm Snapdragon 765G **CPU:** Octa-core (1 × 2.4 GHz Kryo 475 Prime | **Chipset:** Qualcomm SM8350 **CPU:** Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | **Chipset:** Qualcomm SM8250 **CPU:** Octa-core (1x2.84 GHz Cortex-A77 & 3x2.42 GHz | **Chipset:** Qualcomm SM8350 **CPU:** Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | **CPU:** Intel® Core™ i5-1235U / Intel® Core™ i7-1255U. Processor Speed 1.3GHz / 1.7 GHz. | **CPU:** 11th Generation Intel® Xeon® W-11955M vPro® with Intel® UHD Graphics |
| **OS:** Apple iOS 14.1, upgradable to iOS 16.1 | **OS:** Google Android 11, upgradable to Android 13 | **OS:** Google Android 11, upgradable to Android 13 | **OS:** Google Android 10, upgradable to Android 13 | **OS:** Google Android 11 | **OS:** Preinstalled Microsoft Windows 11 | **OS:** Preinstalled Microsoft Windows 11 Pro2 |
| **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc | **CBRNE PLUGINS** Draper Laboratory, Inc |

## DoD "JPEO-CBRND" [Future "Language of Intent" to Combine]

Another example of the "language of intent", to combine the components of Golden's patented combination is recognized in the DoD JPEO-CBRND initiative [a future case for filing]. The Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND) is a component of the U.S. Department of Defense's Chemical and Biological Defense Program, the JPEO-CBRND protects the entire Joint Force – Army, Navy,

Air Force, Marines, Coast Guard, and First Responders – through the advanced development of CBRN defense capabilities.

Four Joint Project Managers (JPM) provide oversight for the portfolios, including JPM CBRN Protection, JPM CBRN Medical, JPM CBRN Sensors and JPM CBRN Special Operations Forces. Two Joint Project Leads (JPL) focus on CBRN defense enabling biotechnologies and CBRN integration. The JPLs provide portfolio-wide enabling support across the JPEO-CBRND.

Draper Laboratory has been awarded a $26 million (all options) contract by the U.S. Department of Defense (DOD) to further expand the capabilities of its unmanned autonomous systems (UAS) software to perform chemical, biological, radiological and nuclear (CBRN) reconnaissance missions in collaborative teams and in degraded operating environments.

Draper's UAS on a CBRN reconnaissance mission includes a TAK-enabled consumer device. Draper will advance its system under an effort at JPEO-CBRND called CSIRP, which stands for CBRN Sensor Integration on Robotic Platforms. Additional enhancements to the system will include advances in CBRN sensors.

The autonomous software on the aerial unmanned platform will be designed to operate with the command-and-control user interface for the U.S. Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform currently being developed by Teledyne FLIR. Both the autonomous SkyRaider and the new sensor payloads will be designed to operate with the command-and-control user interface for the US Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform.

Draper will integrate communications with the TAK platform, enabling the unmanned systems to send images to a mobile device (i.e., smartphone, laptop) and overlay the locations of detected objects of interest on an aerial map for human team members, all in real-time.

A major focus for Draper is to extend its air-ground teaming architecture to link multiple systems into a mesh network. With mesh, every autonomous vehicle; the aerial (UAV), ground (UGV), and maritime (USV), becomes an access point and relays messages among themselves.

The UASs will use Draper's novel algorithm to synthesize the data from onboard sensors including GPS, LiDAR, accelerometer, magnetometer and onboard cameras, and be able to communicate with human operators, centralized command centers, and other teamed UASs.

In addition to the DoD and Draper manufacturing or using Golden's patented invention combinations in the current case *Golden v. DTRA* (the "Government"), that includes as one of the combined component a TAK-enabled device or mobile device (i.e., smartphone, etc.); DoD and Draper have extended their reach into Golden's patented combined combinations of at least Golden's patented TAK-enabled CMDC device(s) for purposes of section 1498(a).

The DoD and Draper has combined Golden's patented stall, stop, and vehicle slow-down system for controlling the operational systems of an unmanned aerial vehicle (UAV) in the DoD JPEO-CBRND initiative. Golden's stall, stop, slow-down system was never asserted in the earlier case Golden v. US no. 13-307C.

Golden provides additional patent claims not already asserted in this current case, but are relevant to the future case, whereby DoD JPEO-CBRND is defendant. This initiative combines Golden's patented CMDC device, CPU, Multi-Sensor Detection device; and stall, stop, slow-down system for autonomous vehicles.

| THE GOVERNMENT'S REQUEST FOR GOLDEN'S PATENTED INVENTION(S) COMBINATIONS - CONTRACTORS | | | | |
|---|---|---|---|---|
| | Central Processing Unit (CPU) CPU / SoC Processor / Chipset | Communication Device Smartphones, PCs, Laptops, Tablets | Detection Device Placed In, On, Upon, Adjacent – i.e., Plugins | Stall, Stop, Vehicle Slow-Down System Remote, Cellular, Satellite, Pre-Programmed |
| **DHS** (*Cell-All*) | X | Apple | Apple | X |
| **DTRA** (ATAK) | DTRA Qualcomm Apple Google Microsoft Intel | Google Apple Samsung LG Qualcomm Hewlett Packard | Draper | X |
| **DoD** (JPEO-CBRND) | Draper DTRA Google Apple Microsoft Intel | Google Apple Samsung LG Qualcomm Hewlett Packard | Draper | Draper |

## CONCLUSION

The Supreme Court has stated that [] a litigant has "a 'continuing duty to inform the Court'" of intervening events that could potentially render a case moot. (For many years Golden has complied with the Supreme Court's decision and did just that). *See*, e.g., *United States v. Juvenile Male*, 564 U.S. 932, 933–34 (2011) (per curiam) (deeming case moot even though "[n]o party had raised any issue of mootness [], and the Court of Appeals did not address the issue *sua sponte*"); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 537 (1978) ("At the threshold, we confront a question of mootness.

Appellant Golden, is asking the Court to strike the Government's most recent filings of its "Motion for Summary Affirmance". In the United States, the Federal Rules of Civil Procedure state that Golden can file a [cross] motion to strike against the Government's pleadings if the pleadings contain redundant material, immaterial elements, impertinent aspects, or even scandalous content.

Golden is also asking the Court to affirm his Motion for Summary Affirmance and remand the case back to the Claims Court to determine damages.

Sincerely,

*(signature)* Larry Golden

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 14th day of September, 2024, a true and correct copy of the foregoing "Plaintiff-Appellant's Response and Cross-Motion to Strike Defendant-Appellee's Motion for Summary Affirmance", was served upon the following Defendant by priority "express" mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# Exhibit A

Filed 7/14/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| PARKFORD OWNERS FOR A BETTER COMMUNITY,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>JENINE WINDESHAUSEN, as County Treasurer-Tax Collector, etc., et al.,<br><br>  Defendants and Respondents;<br><br>SILVERSWORD PROPERTIES, LLC, et al.,<br><br>  Real Parties in Interest and Respondents. | C094419<br><br>(Super. Ct. No. SCV0041548) |

APPEAL from a judgment of the Superior Court of Placer County, Charles D. Wachob, Judge. Reversed with directions.

Law Office of Donald B. Mooney and Donald B. Mooney for Plaintiff and Appellant Parkford Owners for a Better Community.

Clayton T. Cook, County Counsel for Defendants and Respondents Jenine Windeshausen, as County Treasurer-Tax Collector and County of Placer.

1

Remy Moose Manley, James G. Moose, Laura M. Harris and Nathan O. George for Real Parties in Interest and Respondents Silversword Properties, K.H. Moss Company, and Moss Equity.

This is the second appeal arising out of a dispute over the operation of a commercial self-storage facility (Treelake Storage) within a planned unit development in Granite Bay (Treelake Village). Real party in interest, Silversword Properties, LLC (Silversword) owns the property upon which real parties in interest K.H. Moss Company and Moss Equity (collectively, Moss) operate Treelake Storage.

In a separate but related lawsuit filed in 2017, Parkford Owners for a Better Community (Parkford) challenged Placer County's (County) issuance of a building permit for the construction of an expansion of Treelake Storage, asserting that the County failed to comply with both the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and the Planning and Zoning Law (Gov. Code, § 65000 et seq.). The trial court concluded: (1) the County's issuance of the building permit was ministerial rather than discretionary, and therefore CEQA did not apply; and (2) Parkford's challenge under the Planning and Zoning Law was barred by the statute of limitations. Parkford appealed, challenging each of these conclusions.

In August 2020, a different panel of this court dismissed the appeal in a published opinion, concluding that completion of the challenged expansion of Treelake Storage prior to entry of judgment rendered moot Parkford's challenge to the County's issuance of a building permit authorizing construction of the expansion. (*Parkford Owners for a Better Community v. County of Placer* (2020) 54 Cal.App.5th 714 (*Parkford I*).)

Nearly a year later, in June 2021, the trial court concluded that the present lawsuit, which was filed by Parkford in 2018 and challenged the County's issuance of a business license for the operation of Treelake Storage, was barred by both aspects of the doctrine of res judicata--claim and issue preclusion. This appeal followed.

2

We conclude that *Parkford I* does not constitute a final judgment "on the merits" as defined by the applicable authority explaining what constitutes a final judgment on the merits for purposes of determining whether a new claim is barred by the law of preclusion; therefore, the doctrine of res judicata (including both claim and issue preclusion) does not operate to bar the present lawsuit. Accordingly, we will reverse the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts are set forth in greater detail in our prior published opinion, *Parkford I, supra*, 54 Cal.App.5th 714. We summarize those facts herein as relevant to provide context for the current appeal.

Treelake Storage, which is located within the Treelake Village planned unit development in Granite Bay, has been in operation for more than 20 years. (*Parkford I, supra*, 54 Cal.App.5th at p. 717.) As originally approved more than 30 years ago, Treelake Village would consist of over 1,000 residential units and various amenities, including a number of lakes and waterways, and storage for boats and recreational vehicles owned by residents of the community. (*Ibid.*) The latter amenity, to be located on a power line easement that crossed the property, would eventually become Treelake Storage. (*Ibid.*)

### Environmental Review

In June 1987, after preparation of a final environmental impact report (EIR), a notice of determination was filed indicating the County determined that the Treelake Village development project would not have a significant effect on the environment, an EIR was prepared, and mitigation measures were made a condition of the project's approval. (*Parkford I, supra*, 54 Cal.App.5th at p. 717.)

Over a decade later, in June 1998, an addendum to the final EIR was completed. (*Parkford I, supra*, 54 Cal.App.5th at p. 717.) The addendum was prepared due to modifications to the Treelake Village Master Plan, which included increasing the

3

minimum lot size and subdividing certain parcels into smaller lots. (*Ibid.*) That September, a notice of determination was filed indicating the County determined that the modifications would not have a significant effect on the environment, an addendum to the previous EIR was prepared, and mitigation measures were made a condition of the project's approval. (*Ibid.*)

The final subdivision map for Treelake Village was recorded in April 1999. (*Parkford I, supra*, 54 Cal.App.5th at p. 717.)

*Initial Construction of Treelake Storage*

The authorization of a commercial self-storage facility within the Treelake Village development occurred through modification of the conditional use permit (CUP-1006) for the Treelake Village project. (*Parkford I, supra*, 54 Cal.App.5th at pp. 717-718.) In relevant part, condition 7 of CUP-1006 originally stated: "The following uses are among those permitted within and adjacent to the high-voltage power line easements crossing the project property. Developer shall select from his list such facilities as in his judgment best serve the project and shall provide a schedule for the review and approval by [the County's development review committee] . . . [¶] . . . [¶] (G) Recreational vehicle and boat storage for project residents only." (*Id.* at p. 718.)

In November 1993, the County Planning Department approved ministorage as an appropriate use within the power line easement. (*Parkford I, supra*, 54 Cal.App.5th at p. 718.) In the meantime, an amendment of CUP-1006 resulted in a renumbering of the conditions that caused condition 7 to become condition 8. (*Ibid.*)

In May 1996, the County Planning Commission approved a requested modification of condition 8(G) to remove the residents-only restriction on use of the planned storage facilities. (*Parkford I, supra*, 54 Cal.App.5th at p. 718.)

In August 1997, a building permit was issued for construction of Treelake Storage. (*Parkford I, supra*, 54 Cal.App.5th at p. 718.) A building permit for "Phase II" of the

4

construction was issued in September 1998. (*Ibid.*) After construction was completed, a certificate of occupancy was issued in November 1999. (*Ibid.*)

*Subsequent Expansion of Treelake Storage*

In April 2001, and again in August 2004, two additional phases of construction to expand Treelake Storage's facilities were approved, and building permits were issued for each phase of expansion. (*Parkford I, supra*, 54 Cal.App.5th at p. 718.) Certificates of occupancy were issued in 2002 and 2005, respectively, after construction of each expansion phase was completed. (*Ibid.*)

Finally, in August 2016, plans for the most recent expansion of Treelake Storage were approved. (*Parkford I, supra*, 54 Cal.App.5th at p. 718.) The building permit for this expansion was issued in October 2016; it authorized construction of a 28,240-square-foot building and associated utilities. (*Id.* at pp. 718-719.) After construction was completed, a certificate of occupancy was issued in October 2017. (*Ibid.*)

*Parkford I*

In February 2017, Parkford filed a separate but related lawsuit, i.e., *Parkford I*. (*Parkford I, supra*, 54 Cal.App.5th at p. 719.) The operative pleading challenged the County's issuance of the October 2016 building permit under CEQA and the Planning and Zoning Law and sought a writ of mandate directing the County to set aside its approval of the building permit and all related approvals, prepare and certify an adequate EIR for the expansion project, and suspend all construction activity until the County complied with CEQA and all other applicable laws. (*Id.* at pp. 718-719.)

In April 2018, the trial court concluded that the County did not violate CEQA because the issuance of the challenged building permit was a ministerial action. (*Parkford I, supra*, 54 Cal.App.5th at p. 720.) Thereafter, the trial court concluded that Parkford's Planning and Zoning Law claim was barred by the 90-day statute of limitations set forth in Government Code section 65009. (*Parkford I*, at p. 721.) Parkford appealed, challenging each of these conclusions. (*Ibid.*)

Parkford filed the present lawsuit in July 2018, less than three weeks after judgment was entered against it in *Parkford I*. The operative pleading challenged the County's issuance of a business license to Treelake Storage on the ground that a ministorage facility was not an allowable use for property zoned "Residential-Ag" under the county code. Parkford asserted that Treelake Storage was operating without a valid business license because a ministorage facility was not an allowable use in residentially zoned districts, even by special permit such as a conditional use permit. Parkford sought a writ of mandate directing the County to vacate and set aside the current business license, an order declaring that the issuance of any renewals of the business license would be in violation of the county code, and a permanent injunction prohibiting the County from issuing any further renewals of the business license.

In January 2019, the trial court stayed the present lawsuit pending the outcome of the appeal in *Parkford I*. In August 2020, a panel of this court dismissed the appeal in *Parkford I*, finding that completion of the challenged expansion of Treelake Storage prior to entry of judgment rendered moot Parkford's challenge to the County's issuance of the building permit authorizing construction of the expansion. (*Parkford I, supra*, 54 Cal.App.5th at p. 725.)

After the remittitur was issued, the trial court lifted the stay of the present lawsuit in February 2021. In April 2021, Silversword and Moss (collectively, real parties in interest or real parties) filed a motion for judgment on the pleadings, which was joined by defendants the County and Jenine Windeshausen, in her official capacity as the Placer County Treasurer-Tax Collector (collectively, defendants). Real parties asserted that the present lawsuit was barred by both aspects of the doctrine of res judicata--claim and issue preclusion. As for the requirement of a final judgment on the merits, the moving papers provided no analysis of the relevant case law and simply stated in a conclusory manner that the judgment in the prior case qualified as a final judgment on the merits.

In response, Parkford argued (among other things) that neither claim nor issue preclusion applied because there was no final judgment on the merits, relying in part on cases we later discuss. In reply, real parties argued that there *was* a final judgment on the merits because our prior opinion in *Parkford I* left the judgment intact when dismissing the appeal as moot, also citing cases that we later discuss in purported support of their argument.

The trial court issued a tentative decision granting the motion, which became the final order of the court. The tentative decision did not discuss the relevant case law or explain why there was a final judgment on the merits for purposes of the law of preclusion. The trial court's analysis in support of its decision was as follows: "A review of the first amended petition, in conjunction with judicially noticeable documents, shows the claims are barred by the doctrines of res judicata and collateral estoppel. [¶] Specifically, Exhibit A shows plaintiff previously filed a writ petition against the respondents and real parties, or are in privity with the respondents, involving the same CUP permit and storage facility with the respondents and real parties prevailing in the action. The causes of action within the two actions stem from the same primary right. In light of this, current action is barred."

This appeal followed.[1] Briefing was completed on February 22, 2022, and the case was assigned to a panel of this court shortly thereafter. The panel as presently constituted was assigned in May 2022. The parties requested oral argument, which was heard on June 24, 2022.

## DISCUSSION

Parkford contends reversal is required because the trial court erred in determining the present lawsuit is barred by the principles of claim and issue preclusion. We agree.

---

[1] Defendants filed a joinder to real parties' appellate briefing.

Although we do not dispute that our dismissal of the appeal in *Parkford I* left the judgment of the trial court intact, we do not agree with real parties that the dismissal solely on mootness grounds resulted in a final judgment "on the merits" as required to apply the doctrine of res judicata. Due to the dismissal of the appeal, the merits of the trial court's challenged rulings in *Parkford I* evaded appellate review. Thus, as we next explain, the earlier litigation did not result in a final judgment on the merits such that application of the doctrine of res judicata is proper.

I

*The Law of Preclusion and Standard of Review*

A. *Claim and Issue Preclusion*

"The law of preclusion helps to ensure that a dispute resolved in one case is not relitigated in a later case. Although the doctrine has ancient roots [citation], its contours and associated terminology have evolved over time." (*Samara v. Matar* (2018) 5 Cal.5th 322, 326 (*Samara*).) Courts have at times used "res judicata"--"Latin for 'a thing adjudicated' "--as an umbrella term, encompassing both the primary aspect of claim preclusion and the secondary aspect of issue preclusion. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 823-824 (*DKN Holdings*); *Guerrero v. Department of Corrections & Rehabilitation* (2018) 28 Cal.App.5th 1091, 1098.)

"*Claim preclusion* 'prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them.' [Citation.] Claim preclusion arises if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." (*DKN Holdings, supra*, 61 Cal.4th at p. 824.) If claim preclusion is established, it operates to bar causes of action that were, or could have been, litigated in the first suit. (*Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 975; *DKN Holdings*, at p. 824.) Claim preclusion promotes judicial economy and avoids piecemeal litigation by preventing a plaintiff from " ' "splitting a single cause of action or relitigat[ing] the same cause of

8

action on a different legal theory or for different relief." ' " (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 897.)

"*Issue preclusion* prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action. [Citation.] There is a limit to the reach of issue preclusion, however. In accordance with due process, it can be asserted only against a party to the first lawsuit, or one in privity with a party." (*DKN Holdings, supra*, 61 Cal.4th at p. 824.) Issue preclusion applies only: " '(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party.' " (*Samara, supra*, 5 Cal.5th at p. 327; *DKN Holdings*, at p. 825.) "Courts have understood the ' "necessarily decided" ' prong to 'require[] only that the issue not have been "entirely unnecessary" to the judgment in the initial proceeding' [citation]—leaving room for a decision based on two grounds to be preclusive as to both." (*Samara*, at p. 327.)

Whether claim or issue preclusion applies in a particular case is a question of law. (*Ayala v. Dawson* (2017) 13 Cal.App.5th 1319, 1325.)

B. *Standard of Review*

"In an appeal from a motion granting judgment on the pleadings, we accept as true the facts alleged in the complaint and review the legal issues de novo. 'A motion for judgment on the pleadings, like a general demurrer, tests the allegations of the [operative pleading], supplemented by any matter of which the trial court takes judicial notice, to determine whether [the party] has stated a cause of action. [Citation.] Because the trial court's determination is made as a matter of law, we review the ruling de novo, assuming the truth of all material facts properly pled.' " (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166.)

## II

### Analysis

#### A. *Forfeiture*

We first reject real parties' initial contention that Parkford has forfeited its appellate arguments by failing to request a statement of decision or challenge the trial court's tentative ruling. A party's "[s]ubmission on a tentative ruling is neutral; it conveys neither agreement nor disagreement with the analysis." (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406.) On appeal, Parkford asserts error as to legal issues that were briefed by the parties and specifically addressed in the tentative ruling. We find no merit in real parties' suggestion that a party must object to a tentative ruling and reiterate every rejected argument in order to preserve those arguments on appeal. (See *Schulz v. Jeppesen Sanderson, Inc.* (2018) 27 Cal.App.5th 1167, 1179-1180 [finding no such requirement with regard to a statement of decision].) Further, we find real parties' reliance on *Old East Davis Neighborhood Assn. v. City of Davis* (2021) 73 Cal.App.5th 895 and *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, misplaced. Both of those cases are clearly distinguishable. (See *Old East Davis*, at pp. 911-912 [failure to request a ruling on contentions the trial court *expressly declined to reach* in tentative ruling results in forfeiture of contentions on appeal]; *Porterville*, at pp. 911-912 [failure to object to tentative ruling or otherwise alert trial court of its *failure to expressly rule on an issue* results in forfeiture of issue on appeal].)

#### B. *Final Judgment for Purposes of Application of the Doctrine of Res Judicata*

We next conclude that the dismissal of the appeal in *Parkford I* on the ground of mootness did not constitute a final judgment "on the merits" for the purpose of applying the doctrine of res judicata. Thus, the trial court erred in determining that the present lawsuit is barred by the principles of claim and issue preclusion and reversal is required.

As noted *ante*, claim preclusion requires a final judgment on the merits, while issue preclusion requires a final adjudication of an issue. (*Samara, supra,* 5 Cal.5th at p. 327; *DKN Holdings, supra,* 61 Cal.4th at pp. 824-825.) A judgment or adjudication is on the merits if the substance of the claim or issue is tried and determined. (See *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 77; *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 325; *Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1203.) A trial court judgment determined to be moot on appeal and dismissed has not been fully litigated, as appellate review of the merits was never completed. (*Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2011) 198 Cal.App.4th 939, 943.)

As set forth *ante*, in *Parkford I* the trial court concluded that the County did not violate CEQA because the issuance of the challenged building permit was a ministerial action. (*Parkford I, supra,* 54 Cal.App.5th at p. 720.) The trial court further concluded that Parkford's Planning and Zoning Law claim was barred by the 90-day statute of limitations set forth in Government Code section 65009. (*Parkford I,* at p. 721.) In reaching these conclusions, the trial court did not determine whether Parkford's claims were moot due to the completion of the most recent expansion of Treelake Storage, as argued by real parties and defendants. (*Id.* at pp. 720-721.) However, an appeal challenging the trial court's conclusions was filed by Parkford and ultimately decided by this court solely on the ground of mootness (see *id.* at pp. 722-725), a purely procedural or technical ground that is distinct from an actual determination of the merits. (See *Assn. of Irritated Residents v. Dept. of Conservation* (2017) 11 Cal.App.5th 1202, 1220, 1224 [action dismissed due to mootness is not on the merits].) Accordingly, because the appeal in *Parkford I* was not disposed of "on the merits," neither claim nor issue preclusion apply. (See *id.* at p. 1226 [claim preclusion does not apply when prior judgment is based on the ground of mootness].)

11

We find unpersuasive real parties' contention that the judgment in *Parkford I* "remains 'on the merits' despite dismissal of the appeal as moot." In support of their position, real parties cite cases standing for the proposition that the involuntary dismissal of an appeal normally leaves the judgment intact (see e.g., *In re Jasmon O.* (1994) 8 Cal.4th 398, 413), and that if an appellate court wishes to avoid this result, "it can do so by reversing the judgment solely for the purpose of restoring the matter to the jurisdiction of the superior court with directions for that court to dismiss the action," as "[t]his approach disposes of the case, not merely the proceeding that brought it to the appellate court." (*County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1005, citing *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 134 (*Paul*) [describing limited reversal procedure].) We do not disagree with this basic proposition; here the original judgment remains intact despite the dismissal of the appeal in *Parkford I*. However, that is not the dispositive question in this case. As we have explained, the question we must answer in this appeal is whether the judgment is final "on the merits" for purposes of res judicata, where the merits of the trial court's rulings evaded appellate review despite their being argued on appeal. Simply put, an appeal was taken that challenged trial court rulings, but the validity of those rulings was never adjudicated on appeal.

At oral argument, counsel for real parties argued that he specifically asked the *Parkford I* panel to affirm the judgment and dismiss only the appeal in that case. We do not dispute that this approach was requested by counsel both in the briefing and at oral argument in *Parkford I*. However, the *Parkford I* panel did *not* explicitly affirm the judgment on its merits when it dismissed the appeal as moot. This disposition resulted in the trial court's judgment remaining intact; however, as we have explained, that is not the dispositive issue here. We reject the real parties' suggestion that the judgment in *Parkford I* has preclusive effect because this court, in disposing of the appeal in that case, did not follow the procedure described by our Supreme Court in *Paul, supra*, 62 Cal.2d at page 134. First, *Paul* was not a preclusion case. Second, in *Paul*, the regulation that was

found unconstitutional by the trial court had been superseded by a new regulation. (*Paul*, *supra*, 62 Cal.2d at pp. 131-132, 134.) Under those circumstances, "since the basis for that judgment has now disappeared," our Supreme Court found it proper to reverse the judgment and remand with directions to dismiss the proceeding in order to avoid " 'impliedly' affirming" a judgment holding a regulation unconstitutional. (*Id.* at p. 134.) *Paul* did not hold that absent a similar disposition, a dismissal for mootness results in appellate affirmance of the underlying judgment "on the merits" for purposes of res judicata. In short, *Paul* does not establish that judgment in *Parkford I* has preclusive effect in subsequent litigation.

Our conclusion is consistent with our Supreme Court's recent decision in *Samara*. There, our high court held that, for purposes of the law of preclusion, "a ground reached by the trial court and properly challenged on appeal, but not embraced by the appellate court's decision, should not affect the judgment's preclusive effect." (*Samara, supra*, 5 Cal.5th at p. 334.) Instead, the preclusive effect of the judgment should be evaluated as though the trial court had not reached the issue that the appellate court did not reach. (*Id.* at pp. 326, 334, 338 [refusing to give preclusive effect to a merits-based trial court determination that evaded appellate review, explaining that this "approach aligns far better with the recognition that although trial court decisions are often thorough, thoughtful, and correct, litigants should be afforded more procedural fairness before being bound by all aspects of a trial court's challenged determination"].)[2]

---

[2] We note that the *Samara* court identified a limitation on its holding: "We caution . . . that we take no position on the significance of an independently sufficient alternative ground reached by the trial court and *not* challenged on appeal." (*Samara, supra*, 5 Cal.5th at p. 337.) Our Supreme Court made this cautionary comment after explaining that "[c]ourts have understood the ' "necessarily decided" ' prong to 'require[] only that the issue not have been "entirely unnecessary" to the judgment in the initial proceeding' [citation]—leaving room for a decision based on two grounds to be preclusive as to both." (*Id.* at p. 327)

In *Samara*, our Supreme Court overruled *People v. Skidmore* (1865) 27 Cal. 287, which gave preclusive effect to a trial court determination that evaded appellate review, and disapproved its progeny, such as *Bank of America v. McLaughlin Land & Livestock Co.* (1940) 40 Cal.App.2d 620. (*Samara, supra*, 5 Cal.5th at pp. 329-330, 337-338.) In doing so, the *Samara* court rejected the so-called traditional rule announced in *Skidmore* and followed the modern rule expressed in the Second Restatement. (*Samara*, at pp. 331-338.) This was in accord with more recent appellate court authority. (See *Newport Beach Country Club, Inc. v. Founding Members of Newport Beach Country Club* (2006) 140 Cal.App.4th 1120, 1123, 1126-1132 [rejecting *Skidmore* and following the modern or Second Restatement rule, which provides that " ' "[i]f the appellant [*sic*] court upholds one of [two] determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is [only] conclusive as to the first determination" ' "]; see also *Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 83-85; *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1446-1447, 1460.) In concluding that neither claim nor issue preclusion applied, the *Samara* court assumed, without deciding its correctness, that a decision on timeliness grounds (i.e., statute of limitations) is not a decision on the merits for purposes of the law of preclusion. (*Samara*, at p. 338 [noting that the issue was undisputed].) Thus, where, as here, an appellate court disposes of an appeal solely on a procedural or technical ground that does not reach the merits of the underlying controversy, such as mootness, the judgment does not have preclusive effect in subsequent litigation. (See *ibid.* [holding that neither claim nor issue preclusion apply where the trial court rules on both the merits and a procedural ground in the first suit, but the appellate court affirms based solely on the procedural ground, because it is not "a 'final judgment on the merits,' " as the merits were not " 'necessarily decided in the first suit,' or even 'decided' at all"].)

Other authority decided prior to *Samara* agrees that a judgment becoming final after an appeal is dismissed as moot does not have preclusive effect in a subsequent

action because the judgment does not constitute a final judgment "on the merits" of the controversy. (*Chamberlin v. City of Palo Alto* (1986) 186 Cal.App.3d 181, 187; see also *Minor v. Lapp* (1963) 220 Cal.App.2d 582, 584; Rest.2d Judgments (1982) § 28.) This authority is consistent with *Samara*, and we agree with it. Real parties' attempts to distinguish these cases are not persuasive.

We acknowledge that one appellate court appears to have disagreed as to whether such a judgment may be considered a final judgment "on the merits" for purposes of the law of preclusion. (*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1016-1018 [concluding that the dismissal of an appeal on the ground of mootness that was not made without prejudice results in a final judgment for purposes of claim preclusion].) Real parties relied on *Lyons* in the trial court and also in their briefing on this appeal. Our reading of *Lyons* indicates that although the *Lyons* court purported to find the judgment final for purposes of res judicata, its analysis (including its attempts to distinguish *Chamberlin v. City of Palo Alto, supra,* 186 Cal.App.3d at page 187 and *Minor v. Lapp, supra,* 220 Cal.App.2d at page 584) centers on the issue of finality of a trial court judgment in general. The relevant portion of the opinion does not distinguish or even reference the "on the merits" requirement of res judicata, and expresses disagreement with a hypothetical argument that dismissal of an appeal based on mootness precludes a judgment from ever becoming final. (*Lyons*, at p. 1018.) As we have explained *ante*, the lack of finality on the merits for purposes of application of the doctrine of res judicata is not the same thing as the lack of a final judgment in any given case or controversy. In any event, *Lyons* predates *Samara* and, to the extent *Lyons* supports the real parties' contention that *Parkford I* constitutes a final judgment "on the merits," we decline to follow it for the reasons previously stated.

In sum, we conclude that the present lawsuit is not barred by the law of preclusion. Neither claim nor issue preclusion apply because *Parkford I* does not constitute a final judgment "on the merits." Indeed, no merits-based determination was made in *Parkford I*, as the appeal in that case was dismissed on the ground of mootness.[3]

## DISPOSITION

The judgment is reversed. The trial court shall vacate the order denying Parkford's first amended petition for writ of mandate and enter an order denying the motion for judgment on the pleadings filed by real parties in interest and joined by defendants. Parkford shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


                                    /s/
                                 Duarte, J.


We concur:


     /s/
Robie, Acting P. J.


     /s/
Earl, J.

---

[3] In light of our conclusions, we need not and do not consider the parties' remaining arguments.

# Exhibit B

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| RANA SAMARA, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S240918 |
| v. | ) | |
| | ) | Ct.App. 2/7 B265752 |
| HAITHAM MATAR, | ) | |
| | ) | Los Angeles County |
| Defendant and Respondent. | ) | Super. Ct. No. EC056720 |
| | ) | |

When a trial court judgment rests on more than one ground, it may be impossible for a losing party to obtain appellate review of all of the court's determinations. In a breach of contract action, for example, a trial court might grant a defense motion for summary judgment because no contract was formed, and because in any event there was no breach. On direct review, an appellate court could affirm if either of those conclusions was correct, without resolving or even considering the other one. Thus, a plaintiff who argues on appeal that there was a contract (and that the contract was breached) might lose based on a lack of breach without appellate review of whether a contract existed in the first place.

This case concerns the claim- and issue-preclusive significance, in future litigation, of a conclusion relied on by the trial court and challenged on appeal, but not addressed by the appellate court. We hold that the preclusive effect of the judgment should be evaluated as though the trial court had not relied on the

unreviewed ground. Our contrary decision in *People v. Skidmore* (1865) 27 Cal. 287 (*Skidmore*) is overruled.

## I. BACKGROUND

### A. Claim and Issue Preclusion

The law of preclusion helps to ensure that a dispute resolved in one case is not relitigated in a later case. Although the doctrine has ancient roots (see Note, *Developments in the Law: Res Judicata* (1952) 65 Harv. L.Rev. 818, 820-822), its contours and associated terminology have evolved over time. We now refer to "claim preclusion" rather than "res judicata" (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896-897 (*Mycogen*)), and use "issue preclusion" in place of "direct or collateral estoppel" (*Migra v. Warren City School Dist. Bd. of Educ.* (1984) 465 U.S. 75, 77, fn. 1; see *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 824 (*Vandenberg*)).[1]

Claim and issue preclusion have different requirements and effects. Claim preclusion prevents relitigation of entire causes of action. (*Mycogen, supra*, 28 Cal.4th at p. 896; see also *id.*, at p. 904 [discussing "primary right theory," which defines the scope of a cause of action].) Claim preclusion applies only when "a second suit involves (1) the same cause of action (2) between the same parties [or their privies] (3) after a final judgment on the merits in the first suit."

---

[1] We also avoid using " 'res judicata' as an umbrella term" capable of referring to claim preclusion, issue preclusion, or both. (*DKN Holdings v. Faerber* (2015) 61 Cal.4th 813, 823 (*DKN Holdings*); see *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. 3 (*Lucido*).) Even the more modern terminology of "claim" and "issue" preclusion can be further refined. (See, e.g., *Standefer v. United States* (1980) 447 U.S. 10, 21 [describing "nonmutual" issue preclusion]; *Parklane Hosiery Co., Inc. v. Shore* (1979) 439 U.S. 322, 329 [distinguishing "offensive" and "defensive" issue preclusion].) But for present purposes, "claim" and "issue" preclusion will suffice.

(*DKN Holdings*, *supra*, 61 Cal.4th at p. 824.) Issue preclusion, by contrast, prevents "relitigation of previously decided issues," rather than causes of action as a whole. (*Ibid.*) It applies only "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.*, at p. 825.) Courts have understood the " 'necessarily decided' " prong to "require[] only that the issue not have been 'entirely unnecessary' to the judgment in the initial proceeding" (*Lucido*, *supra*, 51 Cal.3d at p. 342) — leaving room for a decision based on two grounds to be preclusive as to both.

### B. Facts and Procedural History

Plaintiff Rana Samara was missing a tooth. Dr. Haitham Matar recommended that she receive a dental implant, and Dr. Stephen Nahigian performed the implantation surgery. Samara later sued them both for professional negligence. Our focus is Samara's contention that defendant Matar is vicariously liable for former defendant Nahigian's alleged tort.

#### 1. First judgment, in favor of Nahigian

Nahigian moved for summary judgment. He argued, in pertinent part, that the suit against him was untimely and that he did not cause Samara's alleged injuries. The trial court agreed that the suit was untimely with respect to Nahigian (unlike Matar) and further agreed that no material factual dispute prevented judgment in Nahigian's favor on the issue of causation. The court entered judgment on both grounds.

Samara appealed. She conceded that the judgment against her could be affirmed based on the statute of limitations. Concerned about the potential preclusive effect of the trial court's determination regarding a lack of causation, however, she urged the Court of Appeal to reverse that portion of the trial court's

decision. The Court of Appeal declined to do so in an unpublished opinion, stating, "We need not, and do not, reach the court's alternative ground for granting summary judgment." It added, "Because the question is not before us, we also do not address whether collateral estoppel may be used with regard to an alternative ground for judgment not reviewed by the appellate court."

### 2. Second judgment, in favor of Matar

Around the time Samara noticed an appeal from the first judgment, Matar moved for summary judgment in the trial court. As relevant here, Matar argued that the court's earlier no-causation determination precluded holding him liable for Nahigian's conduct. After the remittitur issued in the first appeal, the trial court agreed, granting Matar's motion for summary judgment. Although the particulars of the trial court's reasoning are not entirely clear, the core of its rationale was that because Nahigian was not liable to Samara for his conduct, Matar could not be liable for that conduct vicariously.

The Court of Appeal, in an opinion issued by the same panel that decided the first appeal, reversed and remanded the matter. It concluded that preclusion provided no basis for the trial court's decision. The court's analysis of claim preclusion focused on whether there had been "a final judgment on the merits in the first suit." (*DKN Holdings, supra*, 61 Cal.4th at p. 824.) The court observed that the prior judgment was affirmed solely because of the statute of limitations, which the court believed to be a "purely procedural ground" rather than a decision on the merits. Nevertheless, the court acknowledged that under our decision in *Skidmore, supra*, 27 Cal. 287, a judgment on the merits affirmed on purely procedural grounds might qualify as a judgment on the merits in the relevant sense. Noting that "the Supreme Court [of California] might want to address" the continuing vitality of the "Civil War-era" *Skidmore* decision, the Court of Appeal

instead ruled that claim preclusion was unavailable because Samara sued Nahigian and Matar in a single lawsuit, rather than two successive suits. The court further held that *Skidmore* was inapplicable to issue preclusion, concluding that "an affirmance on an alternative ground operates as collateral estoppel/issue preclusion only on the ground reached by the appellate court."

We granted Matar's petition for review. He contends that the Court of Appeal's claim- and issue-preclusion analysis is inconsistent with *Skidmore* and asks us to "address the viability of" that 1865 decision. Because we conclude that *Skidmore* must be overruled, we agree with the Court of Appeal that Matar is not entitled to summary judgment on preclusion grounds.

## II. *SKIDMORE*'S VIABILITY

### A. The *Skidmore* Decision

To contextualize *Skidmore*'s analysis of the preclusive effect of a particular judgment, we begin by describing the litigation resulting in that judgment.

Walter Skidmore was charged with murder. (*Skidmore, supra*, 27 Cal. at p. 289.) To secure his appearance to answer the charge, Skidmore and his sureties entered into a recognizance, something roughly akin to a bail bond. (See *ibid.*) Skidmore also created a trust for his sureties' financial protection, pledging property toward the payment and extinguishment of the recognizance should he fail to appear. (*People v. Skidmore* (1861) 17 Cal. 260, 261; unless otherwise noted, all short-form *Skidmore* citations concern the 1865 appellate decision.) After he failed to appear, the People sued. (*Ibid.*) The suit sought equitable relief against the trustee, urging that the property held in trust "be applied to the debt due by the recognizance." (*Ibid.*; see also *Skidmore, supra*, 27 Cal. at p. 289.) The trial court entered judgment against the People, and the People appealed.

We affirmed. (*People v. Skidmore, supra*, 17 Cal. at p. 262 [initial appeal].) Our opinion addressed a demurrer based on "a misjoinder of causes of action, among other [objections]." (*Id.*, at p. 261.) Declining to reach those other objections, we agreed that there had been a misjoinder: "It may be that the sureties will not be held liable at all; or it may be, if they are, that they are ready and willing to pay whenever their liability is declared; and in that case, there would be no necessity of coming upon this fund. If, after judgment, the defendants are insolvent, another question might arise, or the question might arise of a right to sell or subject this property as the property of Skidmore. But it is not necessary to pass upon this matter in advance of the proper stage of the inquiry." (*Id.*, at p. 262.) "The effect of the judgment and of this affirmance," we added, "will not be to preclude the plaintiff from suing again when the cause of action can be more formally set out." (*Ibid.*)

A second suit followed. (See *Skidmore, supra*, 27 Cal. at p. 289.) In the decision at the core of this case, we held that the People's claim was barred. In determining whether the decision in the first case barred the second suit, we treated as dictum our earlier statement that the first suit would not preclude a second one (*id.*, at p. 293) and deemed the dispositive issue whether the judgment in the first suit was "based upon the merits" (*id.*, at p. 289). We concluded that it was. (*Id.*, at p. 294.) The judgment entered by the trial court, we reasoned, was "based upon the merits of the claim, and not upon the dilatory matters raised by the demurrer nor any other mere technical defect." (*Ibid.*) And although our affirmance had been limited to the misjoinder problem — a non-merits issue — we noted that we had not reversed or modified the trial court's judgment. (*Id.*, at pp. 292-293.) As we explained, "in examining the judgment in connection with the errors assigned, [we] found that there was at least one ground upon which the judgment could be justified, and therefore very properly refrained from

6

considering it in connection with the other errors. But the affirmance, still, was an affirmance to the whole extent of the legal effect of the judgment at the time when it was entered in the court below. [We] found no error in the record, and therefore not only allowed it to stand, but affirmed it as an entirety, and by direct expression." (*Ibid.*) Treating "the judgment rendered in the first action . . . now as it was in the beginning," we held that the People's claim was barred. (*Id.*, at p. 293.) In doing so, we allowed a trial court's ruling to determine the preclusive effect of the judgment, without regard for whether that ruling was addressed on appeal.

Courts considering *Skidmore* have disagreed about whether its precedential force extends to issue preclusion. (Compare, e.g., *Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 86 (*Zevnik*) [no] with, e.g., *Diruzza v. County of Tehama* (9th Cir. 2003) 323 F.3d 1147, 1153 (*Diruzza*) [yes].) It might be argued that *Skidmore* addressed only claim preclusion and that requirements unique to issue preclusion make *Skidmore* inapplicable in that context. (See, e.g., *Zevnik*, at p. 86 ["*Skidmore* involved res judicata rather than collateral estoppel and therefore is not on point"].) *Skidmore*, however, cannot be so easily limited. It is not enough to observe, for example, that issue preclusion applies only to issues "actually litigated and necessarily decided in the first suit" (*DKN Holdings, supra*, 61 Cal.4th at p. 825; see *Zevnik*, 159 Cal.App.4th at p. 88), because it matters which court's decision is the focus of the inquiry. If, as in *Skidmore*, the focus of the preclusion inquiry is the trial court's decision, then an issue might have been "actually litigated and necessarily decided" (*DKN Holdings*, at p. 825) whether or not an appellate court agreed with the trial court's disposition of the issue.

We need not decide exactly what *Skidmore* means for the law of issue preclusion. (Cf. *Moss v. Superior Court* (1998) 17 Cal.4th 396, 401 [disapproving a prior decision "insofar as it might be read to apply" to certain orders]; *People v.*

*Carbajal* (1995) 10 Cal.4th 1114, 1126 [disapproving a prior decision "insofar as [it] may be read" in a particular way].) For present purposes, it is enough to say that *Skidmore*'s focus on the trial court's decision, without regard for the basis of the appellate court's affirmance, could reasonably be understood to bear on the issue preclusion inquiry. (See *Diruzza, supra,* 323 F.3d at p. 1153; see also *People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1574-1575 [suggesting that *Skidmore* was relevant to issue preclusion, but refusing to follow it]; *Newport Beach Country Club, Inc. v. Founding Members of Newport Beach Country Club* (2006) 140 Cal.App.4th 1120, 1130-1132 [same].)

## B. *Skidmore*'s Aftermath

Although *Skidmore* has not been widely cited, there was once broad support for the view that the preclusive effect of an affirmed judgment should be determined without regard for the basis of the affirmance. (See, e.g., *Bank of America v. McLaughlin etc. Co.* (1940) 40 Cal.App.2d 620, 628-629; *State ex rel. Squire v. City of Cleveland* (Ohio 1937) 22 N.E.2d 223, 225-226; *Kinsley Bank v. Woods* (Mo.Ct.App. 1934) 78 S.W.2d 148, 149; *Russell v. Russell* (3d Cir. 1905) 134 F. 840, 840-841; *Town of Fulton v. Pomeroy* (Wis. 1901) 831, 832-834; *Finch v. Hollinger* (1877) 46 Iowa 216, 217-218; but see, e.g., *Moran Towing & Transportation Co. v. Navigazione Libera Triestina, S.A.* (2d Cir. 1937) 92 F.2d 37, 40-41.)

However, courts' understanding of preclusion has evolved in the more than 150 years since *Skidmore* was decided. Although no precise turning point can or must be identified, one influential development occurred in 1942, when the Restatement First of Judgments diverged from *Skidmore*'s reasoning. The Restatement, concerning claim preclusion, conveyed that "[w]here the trial court bases the judgment for the defendant upon two alternative grounds, one on the

8

merits and the other not on the merits, and an appellate court affirms the judgment solely on the ground which is not on the merits, the judgment does not bar a subsequent action by the plaintiff based upon the same cause of action." (Rest., Judgments (1942) § 49, com. c., p. 196; see also *Mycogen, supra*, 28 Cal.4th at pp. 896-897 [dividing claim preclusion into "merge[r]" and "bar"].) The Restatement similarly opined, in passages addressing issue preclusion, that a judgment affirmed on one of two alternative grounds "is not conclusive in a subsequent action in which the other ground is in issue" (Rest., Judgments, *supra*, § 68, com. n, p. 308), and that "[i]f the appellate court determines that one of these grounds is sufficient and refuses to consider whether or not the other ground is sufficient, and accordingly affirms the judgment, the judgment is conclusive only as to the first ground" (*id.*, § 69, com. b, p. 316). In short, the Restatement would evaluate the claim- and issue-preclusive effect of the judgment without regard for a determination relied upon by the trial court but not embraced on appeal.

The Restatement Second of Judgments, published in 1982, echoes the position of the Restatement First of Judgments with respect to issue preclusion. (See Rest.2d Judgments (1982) § 27, com. o, p. 263.) The second Restatement does not appear to take an explicit position on the claim preclusive effect of a judgment affirmed on a non-merits ground, perhaps reflecting aversion to the terminology " 'on the merits[,]' " which has "possibly misleading connotations." (*Id.*, § 19, com. a, p. 161.) Regardless, the second Restatement conveys that in the absence of an appeal, a trial court "dismissal . . . based on two or more determinations, at least one of which, standing alone, would not render the judgment a bar to another action on the same claim . . . should not operate as a bar." (*Id.*, § 20, com. e, p. 172.) Nothing in the second Restatement suggests that if such a judgment is affirmed solely on grounds that would not trigger claim preclusion, the judgment should be imbued with claim preclusive effect.

The weight of more recent authority is in accord with these Restatements, at least with respect to cases in which an appeal has been taken. (See 18 Wright et al., Fed. Practice and Procedure: Jurisdiction & Related Matters (3d ed. 2016) § 4421, p. 619 ["The federal decisions agree with the Restatement view that once an appellate court has affirmed on one ground and passed over another, preclusion does not attach to the ground omitted from its decision"]; 18A Wright et al., *supra*, § 4432, p. 60 ["the nature of the ultimate final judgment in a case ordinarily is controlled by the actual appellate disposition"]; see also, e.g., *Omimex Canada, Ltd. v. State, Dept. of Revenue* (Mont. 2015) 346 P.3d 1125, 1129-1130; *Tydings v. Greenfield, Stein & Senior, LLP* (N.Y. 2008) 897 N.E.2d 1044, 1046-1047; *Beaver v. John Q. Hammons Hotels, L.P.* (Ark. 2003) 138 S.W.3d 664, 666-670; *Stanton v. Schultz* (Colo. 2010) 222 P.3d 303, 309; *Connecticut Nat. Bank v. Rytman* (Conn. 1997) 694 A.2d 1246, 1254; *Humana, Inc. v. Davis* (Ga. 1991) 407 S.E.2d 725, 726-727; but see, e.g., *Markoff v. New York Life Ins. Co* (9th Cir. 1976) 530 F.2d 841, 842 [attempting to discern Nevada law].) Although most of these authorities concern issue rather than claim preclusion, their refusal to afford preclusive significance to a trial court determination that evades appellate review is informative.

## C. *Skidmore*'s Continuing Vitality

### *1.* Skidmore *reflects a flawed view of preclusion*

We agree with the weight of modern authority that *Skidmore*'s approach to preclusion is flawed.

Rules of claim and issue preclusion are, or at least should be, inextricably intertwined with rules of procedure. (See Rest.2d Judgments, *supra*, Introduction, pp. 5-13.) The law of preclusion reflects a view "that at some point arguable questions of right and wrong for practical purposes simply cannot be argued any

more. It compels repose. In substituting compulsion for persuasion, the law of [preclusion] trenches upon freedom to petition about grievances and autonomy of action, very serious concerns in an open society." (*Id.*, at p. 11.) This finality "has to be accepted if the idea of law is to be accepted, certainly if there is to be practical meaning to the idea that legal disputes can be resolved by judicial process." (*Ibid.*) But that does not mean finality should be embraced reflexively, nor attached to every decision rendered. "The 'chance' to litigate is not simply some unspecified opportunity for disputation over legal rights; it is the opportunity to submit a dispute over legal rights to a tribunal legally empowered to decide it according to definite procedural rules." (*Id.*, at pp. 6-7.) The less robust the process involved in resolving litigation the first time, the stronger the argument for permitting litigation once more. (Compare, e.g., *Sanderson v. Niemann* (1941) 17 Cal.2d 563 [deeming small claims court too informal to support issue preclusion] with, e.g., *Perez v. City of San Bruno* (1980) 27 Cal.3d 875, 884-885 [more formal trial on appeal from small claims court judgment can support issue preclusion].)

The availability of a direct appeal reflects a sensible determination that the process culminating in a trial court's disputed decision is not sufficient to resolve litigation conclusively. Of course, a litigant's ability to secure appellate review may be waived or forfeited, as when a litigant fails to file a timely notice of appeal or fails to make an objection in the trial court. But when a litigant properly seeks appellate review of a ground underlying a trial court's determination, the fortuity that the judgment may be sustained on some other ground should not imbue the challenged ground with final and conclusive effect. The challenged ground is no more reliable — no more deserving of finality — merely because it need not be evaluated to resolve the appeal. (See *Zevnik*, *supra*, 159 Cal.App.4th at p. 85.)

11

Recall, for example, the hypothetical breach of contract action in which the trial court concludes that no contract existed, and that even if a contract existed, the contract was not breached. (See *ante*, at p. 1.) If an appellate court agrees that any existing contract was not breached — but does not consider whether any contract existed in the first place — it would be harsh indeed to bind the plaintiff to the trial court's "no contract" determination, preventing the plaintiff from suing the defendant on the contract even for subsequent conduct that clearly would constitute a material breach. Perhaps there was a contract, perhaps not. But the trial court's answer to that question should not be final merely because the judgment could be affirmed on another ground. *Skidmore*'s focus on the trial court's reasoning, however, is in tension with this conclusion.

*Skidmore* also is in tension with some of our other preclusion case law. We have repeatedly underscored the important role that the availability of appellate review plays in ensuring that a determination is sufficiently reliable to be conclusive in future litigation. We have, for example:

- Refused to give preclusive effect to a trial court's legal ruling on child custody issues presented by writ of habeas corpus, acknowledging that, "[s]ince an order denying an application for writ of habeas corpus is not appealable," finding preclusion would "wrongfully deprive[]" "the unsuccessful petitioner" "of custody until such time as he could allege a change in circumstances" (*In re Richard M.* (1975) 14 Cal.3d 783, 790);

- Held that a finding made in connection with a cause of action should not have preclusive effect when the finding was adverse to the party that prevailed on that cause of action, in part because the party could not appeal (see *Albertson v. Raboff* (1956) 46 Cal.2d 375, 384-385);

- Embraced a rule that an entity cannot be bound by a judgment as a privy, based on alleged control over the underlying litigation, if the entity lacks

control over whether to take an appeal (see *Minton v. Cavaney* (1961) 56 Cal.2d 576, 581-582);

- Held that at least a certain type of issue preclusion might not attach to the decision of a private arbitrator, in part because "the arbitrator's errors must be accepted without opportunity for review" (*Vandenberg, supra,* 21 Cal.4th at p. 832); and

- Explained that, when evaluating the preclusive effect of an administrative determination, " '[t]he opportunity for judicial review of adverse rulings' is an important procedural protection against a potentially erroneous determination and is a factor to consider in determining whether collateral estoppel [(that is, issue preclusion)] applies. ([Citation]; see also Rest.2d Judgments, § 28(1), p. 273 [issue preclusion will not apply if the party to be precluded could not, as a matter of law, obtain review].)" (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 875-876.)[2]

The fundamental problem with *Skidmore*, then, is that it improperly gave effect to a trial court determination that evaded appellate review. Our opinion in the appeal preceding *Skidmore* considered only whether there had been a misjoinder of causes of action. We nevertheless held in *Skidmore* that the judgment at issue in the first case was "upon the merits," because of a trial court determination that we did not embrace on appeal. (*Skidmore, supra,* 27 Cal. at p. 293.) More than a century later, and consistent with the modern approach to preclusion described above, we now conclude that a ground reached by the trial court and properly challenged on appeal, but not embraced by the appellate court's

---

2    Our law's emphasis on the importance of some form of judicial review is not limited to the preclusion context. (See generally *Powers v. City of Richmond* (1995) 10 Cal.4th 85 [discussing state constitutional right of review].)

decision, should not affect the judgment's preclusive effect. This approach aligns far better with the recognition that although trial court decisions are often thorough, thoughtful, and correct, litigants should be afforded more procedural fairness before being bound by all aspects of a trial court's challenged determination.

Matar contends, however, that *Skidmore* properly reflects the principle that a trial court's judgment is presumptively correct. (See, e.g., *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) This argument confuses two concepts. It is true that a trial court's judgment is presumed correct, and so ordinarily will not be set aside on appeal absent an affirmative showing of reversible error. (*See id.*; but see, e.g., Code Civ. Proc., § 128, subd. (a)(8) [stipulated reversals].) But that principle governs how appellate courts should review trial court determinations; it does not speak to the preclusive effect, in future litigation, of a challenged trial court determination that evaded appellate review. The distinction is particularly clear under California law: Although the presumption of correctness applies while direct review is ongoing (see *Denham*, at p. 564), under California law, an unsatisfied trial court judgment has no preclusive effect until the appellate process is complete (see, e.g., *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 954; *Brown v. Campbell* (1893) 100 Cal. 635, 646-647).

Matar also argues that affording preclusive effect to a trial court's alternative (but ultimately unnecessary) determination would reduce litigation, thereby promoting judicial economy. We are not so sure. "While the rules of preclusion are supported in part by considerations of efficiency, affording the possibility of reconsideration is also a matter of efficiency, for it relaxes the requirements of procedural meticulousness in the first instance." (Rest.2d Judgments, *supra*, Introduction, p. 12.) To hold that an unreviewed alternative ground has preclusive effect "would put pressure on appellate courts to review

alternative grounds as a matter of course . . . ." (*Zevnik, supra*, 159 Cal.App.4th at p. 85 [discussing issue preclusion].) Thus, "[a]ny benefit that might result from precluding" relitigation in future cases — cases "which may or may not arise" — "would come at the cost of increasing the burden on the appellate court in the initial action." (*Ibid.*)

Nor is it clear that affording preclusive effect to such an alternative ground would protect parties from the burdens of litigation, as Matar also argues. If all unreversed trial court determinations must be given preclusive effect, then nonparties, armed with the issue preclusive effect of the trial court's unreviewed determination, may be encouraged to engage in litigation with the party bound by the effectively unappealable determination. (Cf. *Vandenberg, supra*, 21 Cal.4th at pp. 831-834.)

In any event, our judicial system does not exist simply to resolve cases quickly, nor to prevent litigation from ever taking place. It is a serious matter whether a decision is correct in law and results from a fair process for all sides. Affording preclusive effect to a trial court determination that evades appellate review might speed up the resolution of controversies, but it would do so at the expense of fairness, accuracy, and the integrity of the judicial system. We decline to endorse that tradeoff. (Cf. *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 77 (*Johnson*) [refusing to give preclusive effect to a judgment based on laches, notwithstanding "the public policies of giving certainty to legal proceedings, preventing parties from being unfairly subjected to repetitive litigation, and preserving judicial resources"].)

We further observe that Matar's concerns about repetitive litigation are overstated. For one thing, if Matar had sought summary judgment on causation grounds when Nahigian did, Matar, too, would have had the benefit of the trial court's decision. Had Samara appealed, the judgment would not have been

15

affirmed *with respect to Matar* simply because Samara's suit *against Nahigian* was untimely; the Court of Appeal would likely have confronted the merits of the trial court's no-causation ruling. In other words, Matar could have promoted judicial economy and protected himself from the burdens of further litigation simply by timely filing such a motion. (Cf. *Love v. Waltz* (1857) 7 Cal. 250, 252 ["If defendants had any doubt in regard to the right of plaintiff to sue, and wished to be protected from any further liability to Mrs. Love, they should have made her a party to the first suit, and then the judgment would have been conclusive upon all parties that could have any interest"].)

More generally, courts are not powerless to prevent a waste of judicial resources. Appellate courts can affirm on multiple grounds where appropriate. Trial courts can decline to reach issues that are unnecessary for judgment. And although, on remand, the trial court in this case should resolve Matar's motion for summary judgment without relying on the supposedly preclusive effect of the judgment in favor of Nahigian, the court need not forget or ignore the work it has already completed in this litigation. Declining to find preclusion does not require that a new judge be assigned and the case start afresh; it means only that a prior determination by itself does not necessarily, as a matter of law, bind the future one — and that the correctness of that future determination, if appealed, can be reviewed on its merits.

### 2. *Stare decisis does not compel continued adherence to* Skidmore

"[T]he doctrine of stare decisis" is "a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices." (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296.) But the policy is just that — a policy — and it admits of exceptions in rare and appropriate

cases. Factors that have contributed to our reconsideration of precedent include: "a . . . tide of critical or contrary authority from other jurisdictions" (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 100); our precedent's "divergence from the path followed by the Restatements" (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1179); and our concern that no "satisfactory rationalization has been advanced" for the decision at issue (*Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 812 [overruling mutuality requirement for issue preclusion]). As discussed, these rare factors are present here, as is tension between *Skidmore* and our other preclusion case law.

Moreover, several of the concerns that can give stare decisis particular force are not applicable in this case. When the party urging us to overrule a decision could have easily avoided the decision's effect, for example, we are less inclined to disturb our precedent. (See, e.g., *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 272 [declining to overrule principle that nonparty class member cannot appeal, where other options meant that member would not be "discourage[d] . . . from filing a meritorious appeal"]; cf. *Kimble v. Marvel Entertainment, LLC* (2015) __ U.S. __, __ [135 S.Ct. 2401, 2408] [declining to overrule case that contracting "parties can often find ways around"].) Under *Skidmore*, however, a party that has lost in the trial court and has appealed the trial court's rulings can do little to ensure reversal of an adverse but ultimately unnecessary trial court determination.

Nor does *Skidmore* implicate the reliance concerns that have encouraged adherence to precedent in other contexts. We are particularly reluctant to overrule precedent when, unlike here, "[d]oubtless many people" have entered into transactions in reliance upon that precedent. (*Sacramento Bank v. Alcorn* (1898) 121 Cal. 379, 382.) Although *Skidmore* might theoretically have induced some

number of settlements following unsuccessful appeals, it is not the sort of "rule of property" that encourages strict adherence to precedent. (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 1000.) Perhaps for this reason, no party has urged us to depart from "the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation," rather than purely prospective. (*County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 680-681.)

Under all these circumstances, we conclude that *People v. Skidmore, supra,* 27 Cal. 287 should be — and is now — overruled. We caution, however, that we take no position on the significance of an independently sufficient alternative ground reached by the trial court and *not* challenged on appeal.

### III. Neither Claim Nor Issue Preclusion Supports the Summary Judgment in Favor of Matar

Whether the trial court erred by granting Matar's motion for summary judgment is a question of law we review de novo. (See, e.g., *Johnson, supra,* 24 Cal.4th at pp. 67-68.) We hold that it did. The critical point here is that the preclusive effect of the judgment in favor of Nahigian should be evaluated as though the trial court had not reached the causation issue. (See *ante,* Part II.C.) That premise implies that the causation issue was not "necessarily decided in the first suit," or even "decided" at all, rendering issue preclusion unavailable. (*DKN Holdings, supra,* 61 Cal.4th at p. 825.) Moreover, the Court of Appeal concluded, and Matar's briefing does not dispute, that a decision on timeliness grounds is not a decision "on the merits" in the relevant sense. Accepting that premise as undisputed (and without deciding its correctness), it follows that the ruling in favor of Nahigian was not a "final judgment on the merits," and that claim preclusion is likewise unavailable. (*DKN Holdings, supra,* 61 Cal.4th at p. 824.) Thus, neither claim nor issue preclusion can support the summary judgment entered in favor of Matar, and the trial court's ruling to the contrary was erroneous.

## IV. DISPOSITION

We affirm the judgment of the Court of Appeal; overrule *Skidmore, supra,* 27 Cal. 287; and disapprove *Bank of America v. McLaughlin etc. Co., supra,* 40 Cal.App.2d 620, to the extent it is inconsistent with this opinion.[3]

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**HOCH, J.***

---

[3]     We decline to address any other issues raised by the parties. (See Cal. Rules of Court, rule 8.516(b)(3).)

*     Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Samara v. Matar

---

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 8 Cal.App.5th 796
**Rehearing Granted**

---

**Opinion No.** S240918
**Date Filed:** June 25, 2018

---

**Court:** Superior
**County:** Los Angeles
**Judge:** William D. Stewart

---

**Counsel:**

Curd, Galindo & Smith, Alexis Galindo and Tracy Labrusciano for Plaintiff and Appellant.

Ford, Walker, Haggerty & Behar, Katherine M. Harwood; Tardiff Law Offices and Neil S. Tardiff for Defendant and Respondent.

McGarrigle Kenney & Zampiello, Patrick C. McGarrigle and Michael J. Kenney for Kenneth Barton as Amicus Curiae on behalf of Defendant and Respondent.

Law Offices of Mary A. Lehman and Mary A. Lehman for Stephen H. Bennett, Richard T. Letwak and Letwak & Bennett as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Tracy Labrusciano
Curd, Galindo & Smith
301 East Ocean Boulevard, #1700
Long Beach, CA 90802
(562) 624-1177

Neil S. Tardiff
Tardiff Law Offices
P.O. Box 1446
San Luis Obispo, CA 93406
(805) 544-8100

Patrick C. McGarrigle
McGarrigle Kenney & Zampiello
9600 Topanga Canyon Boulevard, Suite 200
Chatsworth, CA 91311
(818) 998-3300



**Retail**

 

20439

U.S. POSTAGE PAID
PME
GREENVILLE, SC 29616
SEP 14, 2024

**$30.45**

**RDC 07**

S2324K504191-64

PRESS FIRMLY TO SEAL

 

# UNITED STATES POSTAL SERVICE®

## PRIORITY MAIL EXPRESS®



EI 975 707 137 US

### CUSTOMER USE ONLY
**FROM:** (PLEASE PRINT)   PHONE 864-288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

### DELIVERY OPTIONS (Customer Use Only)
☒ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
  *Refer to USPS.com® or local Post Office™ for availability.

### TO: (PLEASE PRINT)   PHONE 202-275-8000
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
CASE NO: 24-2256
717 MADISON PLACE, NW
WASHINGTON, DC

**ZIP + 4®** (U.S. ADDRESSES ONLY)
2 0 4 3 9 -

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

**PAYMENT BY ACCOUNT** (if applicable)
Federal Agency Acct. No. or Postal Service™ Acct. No.



### ORIGIN (POSTAL SERVICE USE ONLY)

| ☐ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) 9/16/2024 | Postage $ 30.45 | |
| Date Accepted (MM/DD/YY) 09/14/2024 | Scheduled Delivery Time ☐ 6:00 PM | Insurance Fee $ | COD Fee $ |
| Time Accepted 12:37 ☐ AM ☐ PM | | Return Receipt Fee $ | Live Animal Transportation Fee |
| Special Handling/Fragile $ | Sunday/Holiday Premium Fee $ | Total Postage & Fees | |
| Weight ☐ Flat Rate lbs. 13 ozs. | Acceptance Employee Initials BB | $ | |

### DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |
|---|---|---|
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |

LABEL 11-B, NOVEMBER 2023    PSN 7690-02-000-9996

 **PEEL FROM THIS CORNER**