No: 2024-2256

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

LARRY GOLDEN
*Plaintiff-Appellant*

v.

The United States
*Defendant-Appellee*



---

ON APPEAL FROM THE UNITED STATES COURT OF
FEDERAL CLAIMS IN GOLDEN v. THE UNITED STATES
[DEFENSE THREAT REDUCTION AGENCY]
IN 1:2023cv00811-EGB; JUDGE ERIC BRUGGINK

---

## BY ORDER OF THE APPELLATE COURT PLAINTIFF-APPELLANT IS SUBMITTING A SECOND INFORMAL BRIEF

LARRY GOLDEN, *Pro Se*
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

November 21, 2024

## GOLDEN'S CLAIMS ARE BASED ON SECTION 1498(a), A STATUTE THAT IS MONEY-MANDATING ON ITS FACE

Based on the alleged facts presented by Plaintiff in the lower court pleadings, this Appellant court can reasonably infer that the Defense Threat Reduction Agency (DTRA) Android Tactical Assault Kit (ATAK) app. that was built on the Google android open-source operating system; the Defense Threat Reduction Agency (DTRA) Apple Tactical Assault Kit (iTAK) app. that was built on the Apple iOS operating system; [T]he Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND); Draper's Laboratories Inc.'s Chemical, Biological, Radiological, Nuclear, and Explosives Plug-in sensors; the U.S. Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform; and at least the mobile devices of Google, Samsung, LG, Qualcomm, and Apple, are government contractors who collectively manufactured the sensing devices alleged as infringing Golden's patented inventions, "for the benefit of the Department of Defense [DoD]." *See Advanced Software Design Corp.*, 583 F.3d at 1378.

In light of the allegations that the inventions disclosed in patents '189, '439, '287, '619, and 898 were designed to prevent terrorist activity, it is plausible that the government agencies and private entities manufactured the infringing devices for the benefit of the DoD to promote national security. *see, e.g., Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's participation in a satellite program was "for the Government," because the program was vital to the military defense and security of the United States).

Moreover, under section 1498(a), "Government authorization or consent" can be implied by circumstances. *See TVI Energy Corp.*, 806 F.2d at 1060. In this case, the Complaint alleges that the Department of Defense [DoD] contracted with the government agencies and private entities [listed above and asserted in this case, as "the government contractors"] develop and commercialize the sensing devices alleged as infringing Golden's patented inventions combinations. This contractual relationship supports a reasonable inference that the Government authorized the manufacture and use of the infringing devices.

Under the Tucker Act, the United States Court of Federal Claims has jurisdiction to adjudicate a claim if the statute, regulation, or constitutional provision that is the basis for that claim "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained," *United States v. Mitchell*, 463 U.S. 206, 217 (1983).

**TEN FEDERAL JUDGES WHO HAS REVIEWED GOLDEN'S PATENTED
INVENTIONS COMBINATIONS ALL AGREE THE GOVERNMENT
IS THE "SINGLE ENTITY' WHO ALLEGEDLY INFRINGED
GOLDEN'S PATENTS UNDER 28 U.S.C. § 1498(a).**

Although, it was not the intention of the United States Judges to confirm the United States liability for direct infringement under 28 U.S.C. § 1498(a); they inadvertently confirmed the United States liability when the judges collectively agreed: "direct infringement occurs when the products that allegedly infringes Golden's patented inventions are combined to create a product(s) "suitable for use".

Under 28 USC § 1498, the patentee's "exclusive remedy for an alleged infringement by or for the Government, which means the Government is the 'single entity' for the purpose of direct infringement, is a suit against the United States in the Court of Federal Claims."

The statue serves two purposes: (i) it waives sovereign immunity to permit a patent owner to recover damages for direct infringement "by or for the United States" as the single entity, and (ii) it protects contractors from liability for patent infringement committed on behalf of the United States.

The courts emphasized that the remedy provided in § 1498 is the "exclusive remedy" available when the U.S. Government, as the single entity, directly infringes a patent. A recent trend of Federal Circuit decisions, including *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359 (Fed. Cir. 2014) and *Zoltek Corp. v. United States*, 672 F.3d 1309 (Fed. Cir. 2012), holding that § 1498 affords government contractors a wide scope of protection against liability for infringement.

In the words of the Federal Circuit, there is "no justification" for "expos[ing] a significant range of government contractors to direct liability (and possible injunctive remedies), namely, those [that may be] accused of indirect infringement of claims [that are] directly infringed by the government."

On September 17, 2015, the Federal Circuit affirmed the dismissal under 28 U.S.C. § 1498(a) of a patentee's claims for indirect patent infringement against government contractors where the only alleged directed infringement was the Government's purported use of the patented invention. *Astornet Technologies Inc. v. BAE Systems, Inc.*, No. 14-1854 (Fed. Cir. Sept. 17, 2015). The decision is another in a line of recent Federal Circuit decisions reaffirming that

government contractors enjoy broad immunity from traditional patent infringement liability under § 1498.

Therefore, ten judges, one from the Court of Federal Claims, six from the Federal Circuit and three from the Northern District of California, acknowledged the "U.S. Government", the single entity under 28 USC § 1498 for direct infringement, is more likely than not, the direct infringer because the element-by-element requirement is only satisfied under 28 USC § 1498 when Golden's entire patented invention combinations are made and are "suitable for use".

**The United States Court of Federal Claims in *Golden v. US*, Case No. 13-307C; determined Direct Infringement by or for the Government, arises when there's a combined Mobile Device; CPU; CBRNE Detector/Sensor; and/or Unmanned Aerial Vehicle**

Judge Braden, in the United States Court of Federal Claims, *Golden v. United States*, Case No. 13-307C "Memorandum Opinion and Order Denying the Government's Motion to Dismiss, Dkt. 94, filed 11/30/16, fully described when a product is considered "manufactured" and is "suitable for use". (***Attached as an Appendix***). In *FastShip, LLC v. United States*, the U.S. Court of Appeals for the Federal Circuit held that to be "manufactured" under 28 U.S.C. Section 1498, an accused product must include each claim limitation so it is "suitable for use".

"The February 12, 2016 Amended complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts. or National Science Foundation ("NSF") grants. 2/12/16 Am. Compl. at ¶¶ 68-127. The relevant devices. are: M-Lock; High-Power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; Smartphone Biosensor Cradle; iPhone Biodetector Smartphone; Pathtracker; the Center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded Sensors; Smartphone-Based Rapid Diagnostic Tests; Lockheed Martin K-Max Unmanned Self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; SIN-VAPOR I Smartphone System; Samsung Galaxy s6 Microscope Smartphone; VOCket System; Nett Warrior Smartphone System; Northrop Grumman X-47B UCAS I X-478 Control Display Unit; GammaPix; NFC Samsung Galaxy s6 Smartphone Sensor; Cell-All Synkera MikroKera Ultra; Biotouch System; iPhone Biodetector Smartphone; Navy Marine Corps Intranet; FLIR identiFINDER R300; AOptix Stratus MX Peripheral; MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX; 1"x2" Detection Device Samsung Galaxy s6 Smartphone; 2"x2" Detection Device Samsung Galaxy s6 Smartphone;

NetS2 SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the Passport Systems Base Control Unit; Oshkosh Defense Autonomous Unmanned Ground Vehicle TerraMax; and the Variable NODE+Oxa. 2/72/76 Am. Compl. at, ¶¶ 68-127."

"The February 12, 2016 Amended Complaint's NFC claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of the Government." Authorization or consent can be implied from the circumstances, "e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.,806 F.2d at 1060*."

"In this case, the relevant NSF grants anticipate that the awardees will develop and test the devices proposed in their applications. *See, e.g.*, NSF Award No. 1444240 ("Annual and Final project reports, as required in the NSF Grant Conditions, should document all efforts and outcomes, whether or not they are successful."). Government funding of research that will lead to the development and testing of an accused device supports a reasonable inference that the Government impliedly sanctioned infringing activity."

"The relevant NSF grants are being used to develop: "a portable smartphone attachment that can be used to perform sophisticated field testing to detect viruses and bacteria," 2/12/16 Am. Compl. ¶78; "[a device] that derives biological signals from your smartphone's accelerometer … [and] [t]his information is useful to base medical diagnoses in real-life conditions and to help track chronic health conditions and effects of therapeutic interventions," 2/12/16 Am. Compl. ¶80; "a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera and processing power to detect any kind of biological molecules or cells," 2/12116 Am. Compl. ¶92; a handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaia, 2/12/16 Am. Compl. ¶102; "[a portable device for] real-time detection of explosives, toxicants, and radiation," 2/12/16 Am. Compl. ¶122; "highly sensitive rapid medical diagnostic tests," 2/12/16 Am. Compl. ¶126."

"Viewed in the light most favorable to Plaintiff, the February 12, 2016 Amended complaint alleges sufficient facts to raise a plausible right of relief under section 1498(a). See *Iqbal*, 556 U.S. at 677. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

"For the reasons discussed herein, the Government's June 24, 2016 Motion to Dismiss Certain Devices, pursuant to RCFC 12(b)(1) and 12(b)(6), is denied."

**Since Judge Bruggink's Decision in *Golden V. Us* Case No. 13-307c; Nine Federal Judges Determined the United States Directly Infringed Golden's Patented Inventions Combinations**

| # of Judge(s) | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Judge Bruggink | 1:2013cv00307 | Golden v. USA | U.S. Court of Federal Claims | 05/01/2013 - *11/10/2021* |
| **# of Judge(s)** | **Case Number** | **Case Title** | **Court** | **Filed - Closed** |
| Three Appellate Judges | 2022cvpri01267 | Golden v. Google LLC | U.S. Court Of Appeals, Federal Circuit | 12/16/2021 - *09/08/2022* |
| One District Judge | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023 - *06/08/2023* |
| Three Appellate Judges | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court Of Appeals, Federal Circuit | 07/07/2023 - *02/12/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |
| One District Judge | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022 - *04/03/2024* |

The doctrine of *Jes Judicata* [issue preclusion] prevents relitigating of factual issues already decided "if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding." *Portland Water Dist.*, 940 A.2d at 1100 (citation omitted). The question is, "how many more Judges' decisions does it take to know, the Government's "manufacture" of the product(s) asserted in this case, that senses for CBRNE, infringes Golden's patented inventions combinations?

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Google, LLC*, Case No. 22-1267; determined Direct Infringement by or for the Government, arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…" |

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a

court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Although the Federal Circuit did not specifically say "without a doubt, Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not is directly infringing Golden's patents asserted in the case.

The Judge gives more influence on the decisions from previous cases that victimized Golden in a judicial system of systemic and structural racism, judicial bias in favor of white-

owned corporations, and the deprivation of a Seventh Amendment right to a trial by jury, than to
honor the decision handed down by a higher Federal Circuit court within the same jurisdiction.

**The Northern District of California Court Judge Haywood S. Gilliam, Jr. in Case No. 22-
5246; determined Direct Infringement by or for the Government arises when there's a
combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion
to Dismiss with Leave to Amend" Document 41 Filed 08/10/23; the then presiding Judge
Gilliam, Jr. agreed with the Defendant that the Google Pixel devices only infringe Golden's
asserted patents if a user were to add the additional ATAK application and CBRN plugins.

"Google argues that "Mr. Golden alleges that some Google Pixel devices could infringe
his asserted patents if a user were to add an additional application, ATAK … Google contends
that "Mr. Golden thus alleges not that Google sells infringing Pixel devices, but that someone
else could modify Google's Pixel devices, by adding non-Google software, to make them
allegedly infringing." *Id.* (emphasis in original). Google argues that these allegations are not
sufficient to support an infringement claim. *Id. **The Court agrees**.*"

"Even under the "less stringent standards" afforded pro se plaintiffs, *Erickson*, 551 U.S.
at 94 (quotation omitted), Plaintiff's claims, as pled, only allege that Google's devices infringe
the patents in issue if the end user downloads a particular application. Plaintiff includes a claim
chart purporting to describe the components of the Google Pixel 5 (which Plaintiff asserts is
"representative of all the alleged infringing products of Google asserted in this complaint") that
allegedly map onto the elements of an independent claim for each of the asserted patents. See
Compl. ¶ 53. As the below excerpt of Plaintiff's chart indicates, however, at least two elements
of each independent claim included in the chart are allegedly satisfied only when the phone has
the Android Team Awareness Kit (ATAK) downloaded."

Golden is the first to admit, the ATAK software is not necessarily the problem. The mere
existence of the ATAK software does not infringe Golden's patents. But once a third-party
embodies the ATAK software with Golden's patented CPUs to carry out operational and
functional instructions; embodies the ATAK software with Golden's patented smartphone to
enable the hardware and software to communicate with each other; and embodies the ATAK
software to make Golden's patented CBRNE devices detect; then we do have a serious problem.

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent # 9,096,189; Independent Claim 1 |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides for a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween . . . |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat—on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, nuclear (CBRN) plug-ins | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |

See Compl. ¶ 53 at 23, 26-27.

"Even affording Plaintiff the benefit of the doubt, his own claim chart makes it clear that Defendant's products purportedly infringe because of the characteristics of the ATAK

application. But Plaintiff's complaint alleges that ATAK is not made by Google, and he does not allege that ATAK comes pre-loaded on Google phones:" *Judge Haywood S. Gilliam, Jr.*

> "Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK). *ATAK is a digital application* available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — *on an end-user device such as a smartphone or a tablet*. With DTRA's contribution, ATAK now *includes chemical, biological, radiological, and nuclear (CBRN) plug-ins*. See Compl. ¶ 18 at 13 (emphasis in original)."

**The Northern District of California Court Judge Rita F. Lin in Case No. 22-5246; determined Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU, and Smartphone**

In *Larry Golden v. Google, LLC* NDC Case 3:22-cv-05246-RFL "Order Granting Motion to Dismiss and Denying leave to File a Surreply" Document 68 Filed 04/03/24; the current presiding Judge Rita F. Lin agreed with the Defendant [Google] that the Google Pixel devices could only infringe Golden's asserted patents if a user were to add the additional ATAK application and CBRN plugins.

"As for the merits, the Court previously dismissed Golden's original complaint because it failed to allege either direct or indirect infringement of U.S. Patent Nos. 10,163,287 ("'287 Patent"), 9,589,439 ("'439 Patent"), and 9,096,189 ("'189 Patent") by Google. (See Dkt. No. 41.) The complaint's allegations made clear that whether Google's smartphones (Google Pixel 3, 3 XL, 3a, 3a XL, 4a, 4a (5G), and 5) allegedly infringed on the patents-in-suit depended on the end user's download of the Android Team Awareness Kit ("ATAK"), which is a third-party application not made by Google. (Id. at 5–6.) As the complaint did not allege that the Google smartphones themselves infringed on the patents, Golden failed to allege direct infringement."

"ATAK application. Golden's first claim of direct infringement (see FAC, Ex. G ("Ex. G") at 2–9) fails for the same reason as the original complaint: it requires the use of ATAK, a third-party application that the user must install on the accused product, for at least two elements of each asserted claim. (See id. at 6.) See *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without modification—the modification of installing the required software")."

Both Northern District of California Court Judges Haywood S. Gilliam Jr. and Rita F. Lin determined the combined ATAK software, smartphone, and CBRN plugin sensors, describes a method, system, or apparatus that is covered in Golden's patents. The Judges also described how the DoD authorized or consented to the DTRA, Draper, and Google infringing Golden's patented combination.

28 U.S.C. § 1498(a): "*Whenever* an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture ... For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."

Both Northern District of California Court Judges have communicated the case is outside their jurisdiction and as described, is in the jurisdiction of the United States Court of Federal Claims. "As § 1498(a) infringement actions are grounded in eminent domain and not defined by statute, the scope of what constitutes the unlawful taking of a license to use a patent is a creature of case law. As such, the basis for the USCFC's jurisdiction over infringement actions must be linked to the government's taking of a patent license through its "use or manufacture" of the patented invention "without license of the owner thereof or lawful right." *Decca Ltd. v. United States*, 640 F.2d 1156, 1166–67 (Ct. Cl. 1980)

**The United States Court of Appeals for the Federal Circuit Judges in *Golden v. Samsung* Case No. 23-2120; agreed with the Northern District of California Court Judge in *Golden v. Samsung* that Direct Infringement by or for the Government arises when there's a combined ATAK Software; CBRN Plugins; CPU; and Smartphone**

In *Golden v. Samsung Electronics America, Inc.* Case: 23-2120, Document 28; *OPINION* filed for the court by Prost, Circuit Judge; Taranto, Circuit Judge and Chen, Circuit Judge. Filed: 02/12/2024.

"Mr. Golden's complaint alleged, in part, that Samsung's smartphones possess that claimed detector/sensor functionality on three alternative bases: (1) through the "Android Team

Awareness Kit, ATAK," which is "[b]uilt on the Android operating system," involves "plug-ins" and "app specific software," was "[i]nitially created" by the "Air Force Research Laboratory" together with the "Defense Threat Reduction Agency," and is "available to warfighters throughout the DoD," Appx112 ¶ 55; Appx119, 127; (2) through add-on devices or modifications that utilize the smartphone's built-in camera, Appx111 ¶ 54, Appx124–25; and (3) through nine "standard sensors" which "can be used as 'biosensors,'" Appx126."

"Samsung moved to dismiss Mr. Golden's complaint, arguing that, among other things, Mr. Golden's complaint failed to plausibly state a patent-infringement claim. Appx146–48. More specifically, Samsung argued that Mr. Golden's complaint stated no alleged facts that went beyond allegations that Samsung was making and selling smartphones that could be modified post-sale by others to perform the accused detector/sensor functionality. On that basis, Samsung said, there are no plausible allegations Samsung was engaged in directly infringing activities. Appx146–47."

"The district court agreed and dismissed Mr. Golden's complaint with prejudice, concluding, in part, that "[t]he allegations that his patents cover the identified functionalities included in Samsung's products are wholly unsupported and implausible on their face." Golden, 2023 WL 3919466, at *2." "We reject Mr. Golden's appeal arguments and therefore affirm the district court's dismissal of his complaint."

## THE JUDGE FAIL TO STRICTLY FOLLOW THE DECISION(S) HANDED DOWN BY THE HIGHER COURT WITHIN THE SAME JURISDICTION

The Claims Court is in violation of the doctrine of *vertical stare decisis* for not honoring the decision of the higher Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267:

The Court of Federal Claims, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that the Google's "smartphone", [combined with the DTRA ATAK app. and Draper Laboratories, Inc.'s CBRN Plugin sensors] literally and/or under the doctrine of equivalents infringes Golden's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively straightforward manner". the Court of Federal Claims was bound by the doctrine of *vertical stare decisis*, to uphold the U.S. Court of Appeals for the Federal Circuit's decision.

## GOLDEN'S CLAIMS ALLEGED WORSENING OF THE EARLIER
## WRONGFUL CONDUCT

As the Supreme Court explained in *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), *res judicata* does not bar a suit, even if it involves the same course of conduct as alleged earlier, so long as the suit alleges new facts or a worsening of the earlier conditions.

In *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), the Supreme Court unanimously reversed the application of *res judicata* where the lower [appellate] court applied the same reasoning as the district court applied [].

Seven years later, the plaintiffs brought a second antitrust suit against many of the same defendants, alleging the same course of wrongful conduct, which had worsened in the interim. *Id.* at 328. The lower courts applied *res judicata* to bar the second suit. *Id.*

The Supreme Court reversed, explaining that even though "both suits involved essentially the same course of wrongful conduct," *res judicata* did not apply. *Id.* at 327 (internal quotation marks omitted). The Court noted that "such a course of conduct—for example, an abatable nuisance—may frequently give rise to more than a single cause of action." *Id.* at 327–28.

The Court held that claims in the second suit based on events that had not yet occurred at the time of the first suit were not barred: "While the [earlier] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Id.*

The Court further held that the plaintiffs' claims in the second suit survived *res judicata* to the extent that those claims alleged worsening of the earlier wrongful conduct: "In the interim, moreover, there was a substantial change in the scope of the defendants' alleged monopoly ... with the result that the defendants' control over the market . . . had increased to nearly 100%." *Id.* (emphasis added). "Under these circumstances," the Supreme Court explained, "whether the defendants' conduct be regarded as a series of individual torts or as one continuing tort, the [earlier] judgment does not constitute a bar to the instant suit." *Id.*

*Lawlor* retains its vitality to this day. *See, e.g., Darney v. Dragon Prods. Co., LLC*, 592 F. Supp. 2d 180 (D. Me. 2009) (applying *Lawlor* to deny application of *res judicata* where second complaint included new factual allegations, even though there was "facial similarity" with the first complaint). *See Quality Ready Mix, Inc. v. Mamone*, 520 N.E.2d 193, 197 (1988) (for *res judicata* to apply, the prior proceeding "must involve the same issues").

**NON-IDENTICAL ISSUES; ISSUES NOT DECIDED ON THE MERITS; AND SUBSEQUENT FACTS PERMIT PLAINTIFF TO LITIGATE THE DISTINCT FACTUAL ISSUES OF THE CURRENT CASE**

| Previous Case:<br><br>*Golden v. US*<br>CFC Case No. 13-307C | Current Case:<br><br>*Golden v. US*<br>CFC Case No. 23-811C | |
|---|---|---|
| **United States Department of Homeland Security's Science and Technology Directorate Broad Agency Announcement 07-10 *Cell-All Ubiquitous Chemical and Biological Sensing* (DHS S&T "*Cell-All*")** | **United States Department of Defense's Defense Threat Reduction Agency Android Tactical Assault Kit Chemical, Biological, Radiological, and Nuclear Plug-in Sensors (DoD DTRA-ATAK CBRNE)** | **United States Department of Defense's Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (DoD JPEO-CBRND)** |
| The CPU is considered the "brains" of the *Cell-All* mobile device manufactured by or for the Government. Qualcomm was tasked with the responsibility of developing the CPU for the *Cell-All* initiative. Qualcomm was not compelled by the CFC to appear and defend its interest. The CFC Court ordered Golden to identify the CPU as an element found inside the Apple device, and when Golden did, the CFC Court lied and dismissed the case because the Court claims identifying the CPU was an enlargement of the case. The CFC Court also lied and said Golden identified the CPU as a sensor for detecting CBRNE. Golden never presented his patented CPU in this previous case and after lying about the CPU as an element the CFC dismissed the case for improper reasons. Golden's CPU as his patented invention was never adjudicated on the merits, and therefore did not receive a final judgement on the merits. | In this current case Golden asserted as new, Ind. claims 1 & 11, and Dep. claims 2-10 & 12-20 of his '619 patent for his patented CPU invention. The CPU is considered an article of manufacture for Golden's patented cell phone; and the Mobile Operating System is considered an article of manufacture for Golden's patented CPU. An "article of manufacture," as used in §289, encompasses both a product sold [Golden's patented CPU], and a component [mobile operating system] of that product. ("Section 171 authorizes patents [] for articles of manufacture. While the design must be embodied in some articles, the statute is not limited to designs for complete articles, or 'discrete' articles, and certainly not to articles separately sold . . .."). Zahn, 617 F. 2d 261, 268 (CCPA 1980) [such as the mobile operating systems]. Under this initiative the ATAK is built on the Google Android Open-Source Operating System that is integrated with Golden's patented CPU. In the final judgement of the previous case Golden's patented CPU was never considered. | Also, in this current case Golden asserted as new, Ind. claim 1, of his '898 patent for his patented Pre-Programmed Stall, Stop, or Vehicle Slowdown System "CPU" invention. This initiative is an expansion of the DoD DTRA-ATAK CBRNE initiative. The CPU is considered an article of manufacture for Golden's patented Pre-Programmed Stall, Stop, or Vehicle Slowdown System invention. Golden's asserted as new his patented Pre-Programmed Stall, Stop, or Vehicle Slowdown System as a limitation [element] in Ind. claims 1 & 11 of Golden's '619 patent.<br><br>Golden's patented central processing unit (CPU) for mobile devices, and Golden's patented Pre-Programmed Stall, Stop, or Vehicle Slowdown System was never available for adjudication in the previous case. Therefore, the inventions were not decided in a final judgement on the merits; which means they cannot be dismissed under the doctrines of Issue Preclusion or Kessler. |

| | | |
|---|---|---|
| The United States Department of Homeland Security (DHS) is the U.S. federal executive department responsible for public security, The Science and Technology Directorate's (S&T's) Chem-Bio (CB) Detection program conducts research to assess, prevent, detect, prepare for, respond to, and recover from incidents involving CB threats and hazards. Spearheaded by the Department of Homeland Security's (DHS) Science and Technology Directorate (S&T), BAA07-10; *Cell-All Ubiquitous Chemical & Biological Sensing* initiative aims to equip your cell phone with a sensor capable of detecting deadly chemicals … "Our goal is to create a light-weight, cost-effective, power-efficient solution," says Stephen Dennis, Cell-All's program manager: In 2007, S&T called upon the private sector to develop concepts of operations: Qualcomm (engineers specialize in sensor miniaturization), NASA (chemical sensing on low powered plat-forms), and Rhevision (camera sensing) Technology. | The United States Department of Defense (DoD) is an executive branch department of the federal government charged with coordinating and supervising all agencies and functions of the U.S. government directly related to national security and the United States Armed Forces. The Defense Threat Reduction Agency (DTRA) is both a defense agency and a combat support agency within the DoD for countering WMD; CBRNE. The Android Team Awareness Kit, (ATAK) is a digital application available to war-fighters throughout the DoD. Built on the Android operating system, ATAK offers geospatial mapping for situational awareness on an end-user device such as a smartphone or a tablet. ATAK provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smart-watch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. Different executive branch departments; different sub-agencies; with different CBRNE sensing rationales from the previous case. | The United States Department of Defense (DoD) is an executive branch department of the federal government. The Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND) is a component of the U.S. Department of Defense's Chemical and Biological Defense Program, the JPEO-CBRND protects the entire Joint Force – Army, Navy, Air Force, Marines, Coast Guard, and First Responders – through the advanced development of CBRN defense capabilities. The U.S. Department of Defense (DOD) to further expand the capabilities of its unmanned autonomous systems (UAS) software to perform chemical, biological, radiological and nuclear (CBRN) reconnaissance missions in collaborative teams and in degraded operating environments. Different executive branch departments; different sub-agencies; with different CBRNE sensing rationales from the previous case, which means the case cannot be dismissed under the doctrines of Issue or Claim Preclusion, or Kessler. |
| Golden's patented lock-disabling mechanism invention that locks the mobile device after several failed attempts to unlock, was not requested by the DHS S&T *Cell-All* initiative. The DOJ's Attorney altered the initiative to include the locking mechanism and the CFC Court ordered Golden to identify in the Apple devices where the locking mechanism is found. 12 patent claims asserted in the case included the locking mechanism, as an element to be located in the accused devices. When Golden located the locking mechanism in the accused Apple devices, the CFC Court outright lied and said Golden did not. | In this current case The United States Department of Defense (DoD); The Defense Threat Reduction Agency (DTRA); Android Team Awareness Kit, (ATAK); CBRNE Initiative is not requesting a locking mechanism. [Golden's patented locking mechanism]. If the DOJ's Attorney is again allowed to altered the Gov't initiative to included or exclude the locking mechanism, Golden is prepared to locate in the accused devices where the locking mechanism can be found; and also, for the first time to assert in this current case at least Ind. claim 2 of Golden's '287 patent. For the mobile device. | In this current case The United States Department of Defense (DoD); Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND) Initiative is not requesting a locking mechanism. [Golden's patented locking mechanism]. If the DOJ's Attorney is again allowed to altered the Gov't initiative to included or exclude the locking mechanism, Golden is prepared to locate in the accused devices where the locking mechanism can be found; and also, for the first time to assert in this current case at least Ind. claim 3 of Golden's '287 patent. For the vehicle. |

The *Cell All* project is a multi-phased RDT&E project that began as a proof of concept (phase I). Phase I of the program consisted of the research and development of a suite of chemical sensors (e.g., carbon monoxide, ethanol, chlorine, and toluene).

The DHS S&T *Cell-All* initiative led to the creation of six workable first-generation prototypes with chemical sensors located *inside* devices; including a "form factor phone" developed by Qualcomm and a chemical nanosensor device developed by NASA. The second-generation prototypes, chemical sensors were *separated from the phones*, allowing for initial market deployment of the sensors through third-party products, to be added to existing phones (DHS, 2011a).

In the previous case *Golden v. US CFC* No.13-307C, the final judgement was Golden failed to comply with the Court's order to locate *within* the Apple device where the sensor for CBR detection can be found. The CFC Judge narrowed this case to a case between two private entities [Golden and Apple], therefore the Judge cannot change what the Court considers was adjudicated on the merits. The Judge ordered Golden to identify sensors that was only "*inside*" the Apple device, and only "*native*" to the manufacture of the Apple product. In doing so the Judge shifted away from the scheme of the *Cell-All* initiative; and that is to combine the contributions of eight entities, Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, LG, and Samsung to develop the *Cell-All* Sensing device. *"[O]nly "inside" the Apple device, and only "native" to the manufacture of the Apple product"*, is the only thing that may be considered under issue preclusion.

Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. ATAK can connect to sensors on many platforms (e.g., drones, smartwatches)

A plug-in adds functionality to the existing ATAK software app. that was not present before. Draper Lab is adding the CBRNE sensors as plug-ins to the existing DTRA ATAK software. The DTRA ATAK software provides a way to integrate the CBRNE plug-in sensors. The plug-in architecture is the best way to add the CBRNE sensors to a system that was not initially designed to support it. The CBRNE plug-ins sensors extensions to the existing ATAK app.

In the previous case *Golden v. US CFC* No.13-307C, the final judgement was Golden failed to comply with the Court's order to locate *within* the Apple device where the sensor for CBR detection can be found. The CFC Judge narrowed this case to a case between two private entities [Golden and Apple], therefore the Judge cannot change what the Court considers was adjudicated on the merits. The Judge ordered Golden to identify sensors that was only "*inside*" the Apple device, and only "*native*" to the manufacture of the Apple product. In doing so the Judge shifted away from the scheme of the *Cell-All* initiative; and that is to combine the contributions of eight entities, Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, LG, and Samsung to develop the *Cell-All* Sensing device. *"[O]nly "inside" the Apple device, and only "native" to the manufacture of the Apple product"*, is the only thing that may be considered under *Jes Judicata* [issue preclusion] in the current case.

Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. ATAK can connect to sensors on many platforms (e.g., drones, smartwatches)

A plug-in adds functionality to the existing ATAK software app. that was not present before. Draper Lab is adding the CBRNE sensors as plug-ins to the existing DTRA ATAK software. The DTRA ATAK software provides a way to integrate the CBRNE plug-in sensors. The plug-in architecture is the best way to add the CBRNE sensors to a system that was not initially designed to support it. The CBRNE plug-ins sensors extensions to the existing ATAK app.

In the previous case *Golden v. US CFC* No.13-307C, the final judgement was Golden failed to comply with the Court's order to locate *within* the Apple device where the sensor for CBR detection can be found. The CFC Judge narrowed this case to a case between two private entities [Golden and Apple], therefore the Judge cannot change what the Court considers was adjudicated on the merits. The Judge ordered Golden to identify sensors that was only "*inside*" the Apple device, and only "*native*" to the manufacture of the Apple product. In doing so the Judge shifted away from the scheme of the *Cell-All* initiative; and that is to combine the contributions of eight entities, Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, LG, and Samsung to develop the *Cell-All* Sensing device. *"[O]nly "inside" the Apple device, and only "native" to the manufacture of the Apple product"*, is the only thing that may be considered under *Jes Judicata* [issue preclusion] in the current case.

Golden is not "precluded" from asserting claim 1 of Golden's '619 patent, issued on 04/20/21 for Golden's CMDC device, comprising; a CPU; the device capable of CBRNE detection; and capable of stalling or stopping a vehicle". Claim 1 of Golden's '619 patent that was never asserted in the previous case *Golden v. US* COFC Case No. 13-307C, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 11 of Golden's '619 patent, issued on 04/20/21 for Golden's CPU; integrated with a CMDC device: capable CBRNE detection; and capable of processing instructions for stalling or stopping a vehicle". Claim 11 of Golden's '619 patent that was never asserted in the previous case *Golden v. US* COFC Case No. 13-307C, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 1 of Golden's '898 patent, issued on 05/09/23 for Golden's "a pre-programmed stall, stop, vehicle slow-down system; comprising a CMDC device: a CPU; and capable of processing instructions stall or stop when CBRNE is detected". Claim 1 of Golden's '898 patent that was not issued before the close of the previous *Golden v. US* No. 13-307C on 11/10/21, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 6 of Golden's '287 patent that was issued 12/25/18 for Golden's combined inventions of "[] monitoring equipment, comprising; CMDC device; a CPU; capable of CBRNE detection; and capable of stalling or stopping a vehicle". The combination was never considered and therefore cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 1 of Golden's '619 patent, issued on 04/20/21 for Golden's CMDC device, comprising; a CPU; capable of CBRNE detection; and capable of stalling or stopping a vehicle". Claim 1 of Golden's '619 patent that was never asserted in the previous case *Golden v. US* COFC Case No. 13-307C, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 11 of Golden's '619 patent, issued on 04/20/21 for Golden's CPU; integrated with a CMDC device: capable CBRNE detection; and capable of processing instructions for stalling or stopping a vehicle". Claim 11 of Golden's '619 patent that was never asserted in the previous case *Golden v. US* COFC Case No. 13-307C, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 1 of Golden's '898 patent, issued on 05/09/23 for Golden's "a pre-programmed stall, stop, vehicle slow-down system; comprising a CMDC device: a CPU; and capable of processing instructions stall or stop when CBRNE is detected". Claim 1 of Golden's '898 patent that was not issued before the close of the previous *Golden v. US* No. 13-307C on 11/10/21, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 6 of Golden's '287 patent that was issued 12/25/18 for Golden's combined inventions of "[] monitoring equipment, comprising; CMDC device; a CPU; capable of CBRNE detection; and capable of stalling or stopping a vehicle". The combination was never considered and therefore cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 1 of Golden's '619 patent, issued on 04/20/21 for Golden's CMDC device, comprising; a CPU; capable of CBRNE detection; and capable of stalling or stopping a vehicle". Claim 1 of Golden's '619 patent that was never asserted in the previous case *Golden v. US* COFC Case No. 13-307C, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 11 of Golden's '619 patent, issued on 04/20/21 for Golden's CPU; integrated with a CMDC device: capable CBRNE detection; and capable of processing instructions for stalling or stopping a vehicle". Claim 11 of Golden's '619 patent that was never asserted in the previous case *Golden v. US* COFC Case No. 13-307C, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 1 of Golden's '898 patent, issued on 05/09/23 for Golden's "a pre-programmed stall, stop, vehicle slow-down system; comprising a CMDC device: a CPU; and capable of processing instructions stall or stop when CBRNE is detected". Claim 1 of Golden's '898 patent that was not issued before the close of the previous *Golden v. US* No. 13-307C on 11/10/21, and cannot be dismissed for issue preclusion.

Golden is not "precluded" from asserting claim 6 of Golden's '287 patent that was issued 12/25/18 for Golden's combined inventions of "[] monitoring equipment, comprising; CMDC device; a CPU; capable of CBRNE detection; and capable of stalling or stopping a vehicle". The combination was never considered and therefore cannot be dismissed for issue preclusion.

In 2007, S&T called upon the private sector to develop concepts of operations. To this end, three teams from Qualcomm, the NASA, and Rhevision Technology are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market. Scientists from the Center for Nanotechnology at NASA's Ames Research Center have experience with chemical sensing on low-powered platforms, such as the International Space Station. And technologists from Rhevision have developed an artificial nose—a piece of porous silicon that changes colors in the presence of certain molecules, which can be read spectrographically … Similarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. *The Department of Homeland Security's (DHS) 2007.*

Also, included as third-party contractors for sensor development are SeaCoast, and Synkera; and as subcontractor to NASA is Genel for Phase II sensors remote the cell phone. Rhevision's also provided a cell phone camera sensor for CBR sensing. NC4 for monitoring and data transfer.

The CFC Judge narrowed this case to a case between two private entities [Golden and Apple], therefore the Judge cannot change, to whom, and to what, the Court considers was adjudicated as a final judgement on the merits.

After the close of the previous case *Golden v. US* no. 13-307C on 11/10/21, the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined on 09/08/22; how the Google "smartphone", that include the DTRA ATAK software and Draper's CBRN plugin sensors combination allegedly infringe Golden's patents: "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner … [W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

Nine judges, six from the Federal Circuit and three from the NDC Court, who reviewed the Google case after the close of the previous case on 11/10/21, acknowledged the "U.S. Gov't", the single entity under § 1498 for direct infringement, is more likely than not, the direct infringer because the element-by-element requirement is only satisfied under 28 USC § 1498 when Golden's entire patented invention combinations are made and is "suitable for use".

While Google is not Apple, but likewise is a single entity, this current case does not restrict or restrain Golden to identifying the sensing functionality *"[O]nly "inside" the Google device, and only "native" to the manufacture of the Google product"*. Which means this case is not precluded.

After the close of the previous case *Golden v. US* no. 13-307C on 11/10/21, the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined on 09/08/22; how the Google "smartphone", that include the DTRA ATAK software and Draper's CBRN plugin sensors combination allegedly infringe Golden's patents: "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner … [W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

Nine judges, six from the Federal Circuit and three from the NDC Court, who reviewed the Google case after the close of the previous case on 11/10/21, acknowledged the "U.S. Gov't", the single entity under § 1498 for direct infringement, is more likely than not, the direct infringer because the element-by-element requirement is only satisfied under 28 USC § 1498 when Golden's entire patented invention combinations are made and is "suitable for use".

While Google is not Apple, but likewise is a single entity, this current case does not restrict or restrain Golden to identifying the sensing functionality *"[O]nly "inside" the Google device, and only "native" to the manufacture of the Google product"*. Which means this case is not precluded.

In the previous case Golden alleged the Apple smartwatch infringes at least claim 19 of Golden's '439 patent: "A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a [] detection device.

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

Golden asserted Apple's smart-watch for two reasons: 1) to satisfy Phase II of the Cell-All initiative of a sensing capability separate from the phone; and 2) a sensing capability that is "native" to, and interconnected to the manufacture of the Apple product.

The CFC Judge did not accept the smartwatch and dismissed the case for failure to comply with a Court order of locating the sensing function "internal" Apple's device

"Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a *smartphone* or a *tablet*. Warfighters can now use ATAK to guide themselves to safety when confronted with a release of *chemical and biological agents and radiological and nuclear threats* (CBRN). ATAK can connect to [Draper's] sensors on many platforms (e.g., satellites, *drones*, *smartwatches*) and has many plugins that warfighters can download to customize their operating environment, depending on their role or mission. ATAK's *software architecture* allows [Draper's] plug-ins to share information with other plug-ins or applications on the end-user's device. With DTRA's contribution, ATAK now includes these three CBRN plug-ins: 1) CBRN Effects, 2) CBRN, and 3) Filter Times. The CBRN Effects plug-in also makes use of an existing ATAK [Draper] plug-in, the *Vehicle Navigation System (VNS)*. With Vehicle Navigation System (VNS), the CBRN Effects plug-in offers warfighters a complex routing tool that accounts for contamination and exposure. ATAK provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable *smartwatch* that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a *drone* to detect chemical warfare agents." https://www.dvidshub.net/news /367459/atak-field-forging-tactical-edge

Golden is not precluded from asserting his inventions of a CPU; CMDC device e.g. smartphone; multi-sensor detection device e.g., smartwatch; and vehicle stall, stop, and slow-down system in this current case that were not adjudicated in the previous case.

Draper announced it has been awarded a $26 million [] contract agreement by the U.S. Department of Defense (DOD) to further expand the capabilities of its unmanned autonomous systems (UAS) [drone] software to perform chemical, biological, radiological and nuclear (CBRN) reconnaissance missions in collaborative teams and in degraded operating environments. The Other Transaction Authority (OTA) agreement was awarded through the Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND). Draper will advance its system under an effort at JPEO-CBRND called CSIRP, which stands for CBRN Sensor Integration on Robotic Platforms. Additional enhancements to the system will include advances in CBRN sensors. The autonomous software on the aerial unmanned platform [drone] will be designed to operate with [] user interface for the U.S. Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform. Draper will integrate communications with the Tactical Assault Kit (TAK) platform, e.g., iTAK, ATAK, and WinTAK, enabling the unmanned systems to send images to a mobile device i.e., tablet, smartphone, etc. The UASs [drones] will use Draper's [] onboard sensors— including GPS, LiDAR, accelerometer, magnetometer and onboard cameras. Assisting in the development will be Draper's Human Systems and Mobile Applications Engineering cadre, a team that will help design and develop the mobile (tablet/phone) interface to support collaborative teaming. https://www.draper.com/ media-center/newsreleases/ detail/

Golden is not precluded from asserting the new factual issues of his inventions in this current case.

In this previous case Phase I of the *Cell-All* initiative requires the sensor be inside the device. Rhevision's camera sensor.

Chemical Detection: The sensor **Rhevision** and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

Rad Detection: Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Bio Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera."

Apple iPhone 12: Dual - 12 MP (megapixel), OIS 12 MP The sensors contained in one array is determined by the *pixel* resolution phone camera. *"Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www. understanding nano.com/cell-phone-sensors-toxins.html

The CFC Judge never adjudicated Rhevision or its camera senor. The Judge never adjudicated or issued a final judgement for the camera, on the merits. Therefore, the camera sensor cannot be identified as an issue precluded from the current case.

The DTRA ATAK software is built on the Google android open-source operating system. The following smartphones all have as standard the Android open-source operating system for which the DTRA ATAK software is built on.

- Google Pixel 5: Dual - 12.2 MP (megapixel), OIS 16 MP (megapixel)
- Samsung Galaxy S21: Triple - 12 MP (megapixel), OIS 64 MP (megapixel)
- LG V60 ThinQ 5G: Dual - 64 MP (megapixel), OIS 13 MP (megapixel)
- Qualcomm Smartphone for Snapdragon Insiders: Triple - 64 MP (megapixel) OIS; 8 MP, 12MP (megapixels)

Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A megapixel camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution in cell phone camera. Megapixel resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

ATAK can connect to sensors on many platforms (e.g., smart-watches). The smartwatches of Google, Samsung, Qualcomm, & LG are equipped with Android OS

In the previous case, the Judge never adjudicated megapixel camera senor of Apple as the CBR sensor located inside the Apple product; which means the camera sensor for CBR detection is not precluded in this current case

The DTRA ATAK software is built on the Google android open-source operating system. The following smartphones all have as standard the Android open-source operating system for which the DTRA ATAK software is built on.

- Google Pixel 5: Dual - 12.2 MP (megapixel), OIS 16 MP (megapixel)
- Samsung Galaxy S21: Triple - 12 MP (megapixel), OIS 64 MP (megapixel)
- LG V60 ThinQ 5G: Dual - 64 MP (megapixel), OIS 13 MP (megapixel)
- Qualcomm Smartphone for Snapdragon Insiders: Triple - 64 MP (megapixel) OIS; 8 MP, 12MP (mega)

Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A megapixel camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution in cell phone camera. Megapixel resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

ATAK can connect to sensors on many platforms (e.g., smart-watches). The smartwatches of Google, Samsung, Qualcomm, & LG are equipped with Android OS

In the previous case, the Judge never adjudicated the megapixel camera senor of Apple as the CBR sensor located inside the Apple product; which means the camera sensor for CBR detection is not precluded in this current case

| THE GOVERNMENT'S REQUEST FOR _FOUR_ OF GOLDEN'S PATENTED INVENTION(S) COMBINATIONS FOR GOVERNMENT "USE" | | | | |
|---|---|---|---|---|
| **Patent Claims** _-for-_ **Patented Inventions** | **Claim 1 of U.S. Patent "10,984,619"** | **Claim 11 of U.S. Patent "10,984,619"** | **Claim 1 of U.S. Patent "11,645,898"** | **Claim 6 of U.S. Patent "10,163,287"** |
| **Communication Device** CMDC Device(s) i.e., Smartphones, PCs, Laptops, Tablets, Monitoring Equipment and Cell-phone Detection Devices | A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, | processing instructions to stall, stop, or slow-down a vehicle [] receives a signal from [] (PC), … a smartphone, a laptop, a tablet, a PDA, or a handheld; | [] communication with [] one CPU configured to send signals … communication device [] capable of communicating, monitoring, detecting, and controlling. |
| **Central Processing Unit (CPU)** CPU / Processor / Chipset / SoC | comprising at least a central processing unit (CPU), capable of: | A central processing unit (CPU) of … a … (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, …: | Wherein, when the [] (CPU) processes instructions to stall, stop, or slow-down a vehicle, … is sent [] monitoring site | at least one central processing unit (CPU) |
| **Detection Device** Placed In, On, Upon, Adjacent the CMDC Device(s) | processing instructions to [] detect [] chemical [], biological [], radiological [], nuclear [], or explosive [], … (WMDs); | processing instructions to [] detect [] chemical [], biological [], radiological [], nuclear [], or explosive [], … (WMDs); | processing instructions to stall, stop, or slow-down a vehicle when … chemical [], a biological [], a radiological []; a nuclear []; or explosives [] detected; | A monitoring equipment, comprising… detecting at least … chemical, biological, radiological, or explosive agents; |
| **Stall, Stop, Vehicle Slow-Down System** Remote, Cellular, Satellite, Pre-Programmed | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's [] system; | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's [] system; | A pre-programmed stall, stop, vehicle slow-down system, … processing instructions to … vehicle when … driverless []; self-drive []; an[d] autonomous … | at least one of a transmitter or a transceiver … at least one CPU configured to … monitor … a vehicle, or [] send signals to control components of a vehicle… |

**THE UNITED STATES IS PRECLUDED FROM CHALLENGING GOLDEN'S
PATENTED INVENTIONS "COMBINATIONS" THAT IS SUPPORTED
BY HIS "PRODUCT GROUPING' TECHNOLOGY RATIONAL**

The Government's strategy is to divide or separate the components that forms the
Government requested product(s). In the lead case (13-307C) the Government isolated the Apple
smartphone and made the case a dispute between private parties. The Government is attempting
to do the same with the Google smartphone; making it a case between two private entities. The
Claims Court does not have the authority to adjudicate disputes between private parties.

The Government is also precluded from relitigating the construction for the patent
claims' limitations for where and how the CBRNE device(s) can be found "within" the Google
smartphone. In the *United States Department of Homeland Security v. Larry Golden* "Final
Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built
in, embedded" as "something is included within, incorporated into, disposed within, affixed to,
connected to, or mounted to another device, such that it is an integral part of the device".

In the Decision to Institute, we construed certain claim terms. Those
constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified
or removed in the amendment. To the extent that any of these constructions remain
relevant after the amendment, we see no reason to modify them.
We further determined that no explicit construction was necessary for any
other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we
see no need to construe any other terms.

The Trial Court Judge again erred in allowing Google to re-litigate issues that had already
been adjudicated and a final decision was issued. The PTAB determined the DTRA ATAK app
and Draper's CBRNE Plug-in sensors are "an integral part of the device [Google smartphone]".

**DTRA ATAK APP. BUILT FOR THE GOOGLE SMARTWATCH**

The claim chart presented and reviewed by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 is based on reverse engineering. Reverse engineering, also called "tear down", is a method or process to discover how the DTRA ATAK software and/or its Draper CBRNE Plug-in Sensors functions with a Google smartphone product.

The following claim chart was presented to the Claims Court Judge for an element-by-element analysis of Google's alleged infringing smartphone product and how it functions with a Google smartwatch designed for CBRNE sensing that is *remote* the Google smartphone.

| | |
|---|---|
|  ATAK (built on the Google Android operating system) … controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) … | **Google Smartwatch CBR Detector for Smartphone**<br><br>The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/<br><br>Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface<br><br>Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/ |

| Identifying in the Alleged Infringing Smartphone where each element is found to Literally and/or under the Doctrine of Equivalents infringes Golden's Patents. | |
|---|---|
| **Google Pixel 8 Smartphone** | **Patent No. 9,589,439 (claim 23 of the '439 patent)** |
| Golden has identified the Google smartphone(s) as "a new, improved upon, and useful cell phone" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A cell phone comprising:* |
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |

| | |
|---|---|
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a transmitter for transmitting signals and messages to a cell phone detection device; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth or WiFi | a receiver for receiving signals from the cell phone detection device; |
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween, and | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; |
| Golden is identifying the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch as the cell phone detection device to receive signals or send signals to activate or deactivate | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |
| Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is adjacent the Google Pixel smartphone(s) as "a new, improved upon, useful cell phone" or "communication device" | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth or WiFi | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth or Wifi | wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS … is capable of signal communication with the transmitter or receiver |
| Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel smartwatch as having voice recognition. "*Google Assistant voice commands on Google Pixel Watch*" https://support.google.com/ googlepixelwatch/answer/12677020?hl=en | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; |

25

## DRAPER'S $26 MILLION DOLLAR CONTRACT WITH JPEO-CBRND

An example of the "language of intent", to combine the components of Golden's patented combination is recognized in the DoD JPEO-CBRND initiative. The Joint Program Executive Office for Chemical, Biological, Radiological, and Nuclear Defense (JPEO-CBRND) is a component of the U.S. Department of Defense's Chemical and Biological Defense Program, the JPEO-CBRND protects the entire Joint Force – Army, Navy, Air Force, Marines, Coast Guard, and First Responders – through the advanced development of CBRN defense capabilities.

Four Joint Project Managers (JPM) provide oversight for the portfolios, including JPM CBRN Protection, JPM CBRN Medical, JPM CBRN Sensors and JPM CBRN Special Operations Forces. Two Joint Project Leads (JPL) focus on CBRN defense enabling biotechnologies and CBRN integration. The JPLs also provide portfolio-wide enabling support across the JPEO-CBRND.

Draper Laboratory has been awarded a $26 million (all options) contract by the U.S. Department of Defense (DOD) to further expand the capabilities of its unmanned autonomous systems (UAS) software to perform chemical, biological, radiological and nuclear (CBRN) reconnaissance missions in collaborative teams and in degraded operating environments.

Draper Laboratory ("Draper") will integrate flight software and sensor-driven algorithms that enable teams of unmanned systems to autonomously conduct CBRN missions.



The autonomous software on the aerial unmanned platform will be designed to operate with the command-and-control user interface for the U.S. Army's Nuclear, Biological and Chemical Reconnaissance Vehicle (NBCRV) Stryker platform currently being developed by Teledyne FLIR.



Under a $26 million contract with JPEO-CBRND, Draper will advance the development of its unmanned autonomous system so that it can operate in team formations and degraded operating environments. Pictured is Draper's UAS on a CBRN reconnaissance mission as viewed on a TAK-enabled device. Credit: Draper. The TAK-enable devices include smartphones, laptops, PCs, smartwatches, etc.

| DRAPER'S $26 MILLION DOLLAR CONTRACT WITH JPEO-CBRND | |
|---|---|
| **Autonomous Software** | **Patent No. 11,645,898 (claim 1 of the '898 patent)** |
| Qualcomm® Snapdragon™ processors enable developers to create the smallest autonomous drones out there. ModalAI's VOXL 2 is an improved version of the Qualcomm® Flight Pro™ architecture, and includes documentation and support by the same industry leading engineers that developed Snapdragon Flight and Qualcomm Flight Pro at Qualcomm. | A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of: |
| Draper will advance the development of its unmanned autonomous system so that it can operate in team formations and degraded operating environments. Draper's UAS on a CBRN reconnaissance mission as viewed on a TAK-enabled device. The TAK-enable devices include smartphones, laptops, PCs, smartwatches, etc. capable of sending and receiving signals | processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld; |
| One of the biggest challenges in developing self-driving cars and other modes of autonomous mobility is creating onboard artificial intelligence (AI) software. Given the complexity of the effort, the software must enable a vehicle to navigate the environment and detect and avoid people, buildings and other obstacles.<br><br>Frank Serna, principal director of strategic systems at Draper, says vision-aided navigation is critical to making self-driving mobility safe, secure, affordable, sustainable and accessible for everyone. "Draper occupies a special position within the technology ecosystem that gives the company deep expertise in what's required—and how to deliver—technologies that will perform in autonomous systems," Serna said.<br><br>Serna said: "Draper's vision-aided navigation uses various sensing and algorithm configurations and hardware to give a vehicle agile maneuvering and improved reliability and safety."<br><br>Drew Mitchell, defense systems associate director at Draper, says … AI can enable UASs to perform tasks that normally require human intelligence, for example, recognizing patterns, learning from experience, drawing conclusions, making predictions or taking action.<br><br>Draper described its sUAS system architecture … encompasses motion planning and control, [] and AI-based tracking []. Other functions [] includes the flight controller, high-rate sensors for collision avoidance, object detection and [] other systems to ensure stability and agility; | processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);<br><br>processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;<br><br>processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;<br><br>processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;<br><br>processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;<br><br>processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter; |

| | |
|---|---|
| Draper Laboratory has been awarded a $26 million (all options) contract by the U.S. Department of Defense (DOD) to further expand the capabilities of its unmanned autonomous systems (UAS) software to perform chemical, biological, radiological and nuclear (CBRN) reconnaissance missions in collaborative teams and in degraded operating environments. | processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected; |
| A major focus for Draper is to extend its proof-of-concept air-ground teaming architecture to link multiple systems into a mesh network. With mesh, every autonomous vehicle, including aerial (UAV), ground (UGV) and maritime (USV), becomes an access point and relays messages among themselves. | processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and, |
| Draper will integrate flight software and sensor-driven algorithms [i.e., processes, procedures, systems] that enable teams of unmanned systems to autonomously conduct CBRN missions. Draper's UAS for CBRN is expected to perform with limited operator interaction. Assisting in the development is a team that help design the tablet interface to support teaming, and Draper's Warfighter | Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage. |

| GOLDEN'S PATENTED INVENTION(S) COMBINATIONS | | | | |
|---|---|---|---|---|
| Author-- and Consent | CPU / Software CPU / Chipset / SoC [OS] | Consumer Device Smartphones, PCs, Laptops, Tablets | Detection Device Placed In, On, Upon, Adjacent, Plugins | Stall, Stop, Slow-Down System Placed In, Upon |
| DHS (*Cell-All*) | Qualcomm Apple, Google | Apple, Samsung LG, Qualcomm | SeaCoast, Rhevision NASA, Synkera Qualcomm | X |
| DTRA (ATAK) | Draper, DTRA Qualcomm Apple, Google Intel, Microsoft | Google, Intel, Apple Samsung, LG Qualcomm | Draper | Draper |
| DoD (JPEO-CBRND) | Draper, DTRA Qualcomm, Google Apple, Intel Microsoft | Google, Intel, HP Apple, Samsung LG, Qualcomm | Draper | Draper |

## THE GOVERNMENT CANNOT "APPROPRIATE OR USE" GOLDEN'S PATENTED INVENTION(S) WITHOUT JUST COMPENSATION

In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), however, the Court established the proposition that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a ***taking***."

### The Fifth Amendment of the United States Constitution

"No person shall be [] deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.": The Fifth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law. *U.S. Const. amend. V*. Generally, due process guarantees protect individual rights by limiting the exercise of government power. *Due Process, Black's Law Dictionary 610* (10th ed. 2014). The Supreme Court has held that the Fifth Amendment, which applies to federal government action, provides persons with both procedural and substantive due process guarantees. If the federal government seeks to deprive a person of a protected life, liberty, or property interest, the Fifth Amendment's Due Process Clause requires that the government first provide certain procedural protections." *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (citing *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961).

"The Takings Clause of the Fifth Amendment to the United States Constitution reads as follows: "Nor shall private property be taken for public use, without just compensation." In understanding the provision, we both agree that it is helpful to keep in mind the reasons behind it. We agree that the Clause is intended to uphold the principle that the government should not single out isolated individuals to bear excessive burdens, even in support of an important public good. When this happens, the payment of "just compensation" provides a means of removing any special burden. The most influential statement of this principle is found in *Armstrong v. United States* (1960), where the Supreme Court wrote: "The Fifth Amendment's [Takings Clause] . . . was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

In an important decision handed down on June 22, 2015, the Supreme Court explicitly recognized that patents are property secured by the Fifth Amendment Takings Clause. *In Horne v. Department of Agriculture*, the Court held that the Takings Clause imposes a "categorical duty" on the government to pay just compensation whether it takes personal or real property. This overruled the Ninth Circuit, which had held that personal property receives less protection under the Takings Clause than real property.

Chief Justice Roberts, writing for the Court, noted the long history of private property being secured against uncompensated takings by the government, beginning with the Magna Carta some 800 years ago. In further support, Roberts cited a Supreme Court opinion from the late nineteenth century:

> *Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in James v. Campbell, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:*
>
>> *"[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."*

The Supreme Court reiterate what it said over a century ago: A patented invention stands the same as other types of property, and it taking by the government without adequate compensation is unconstitutionally unjust.

## U.S. Supreme Court

In *James v. Campbell*, 104 U. S. 357 (1881), this Court said: "That the government of the United States, when it grants letters patent for a new invention or discovery in the arts, confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser we have no doubt." The Constitution gives to Congress power "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries".

"In *Hollister v. Benedict Manufacturing Co.*, 113 U. S. 59, 113 U. S. 67, the principles laid down in *James v. Campbell* and in *United States v. Great Falls Manufacturing Co.*, [] cited, were recognized and approved. And in *United States v. Palmer*, 128 U. S. 262, 128 U. S. 269, the decision was that the United States was liable to suit in the Court of Claims, as upon implied contract, for the value of the use of an invention which was used with the consent of the patentee."

*Schillinger v. United States*, 155 U.S. 163, 177-178 (1894): "The Constitution imposing that obligation is a covenant between the government and every citizen whose property is appropriated by it for public use. If Schillinger's patent was valid, then the government is bound by an obligation of the highest character to compensate him for the use of his invention, and its use by the government cannot be said to arise out of mere tort, at least when its representative did not himself dispute, nor assume to decide, the validity of the patent."

The Act of March 3, 1887, for the first time gives the Court of Claims jurisdiction, to hear and determine "all claims founded upon the Constitution of the United States." If the Schillinger patent be valid, and if the invention described in it has been used or appropriated by the government through its agent [], then the patentee, or those entitled to enjoy the exclusive rights granted by it, are entitled to be compensated by the government. And the claim to have 'just compensation' for such an appropriation of private property to the public use is "founded upon the Constitution of the United States."

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 24th day of September, 2024, a true and correct copy of the foregoing "By Order of the Appellate Court Plaintiff-Appellant is Submitting a Second Informal Brief", was served upon the following Defendant by priority "express" mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

<span style="color:red">CORRECTED</span>

# In the United States Court of Federal Claims

No. 23-811C<br>(Filed: April 23, 2024)

* * * * * * * * * * * * * * * * * * * * * * * * *

LARRY GOLDEN,

       *Plaintiff*,

v.

THE UNITED STATES,

       *Defendant*.

* * * * * * * * * * * * * * * * * * * * * * * * *

    *Larry Golden*, pro se.

    *Grant Johnson*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Scott Bolden*, Director, for defendant.

ORDER

BRUGGINK, *Judge*

    Plaintiff Larry Golden, appearing *pro se*, filed his most recent, fourth complaint in this court on May 31, 2023. In it, Mr. Golden alleges the United States, through the Defense Threat Reduction Agency "authorized or consented" to the use of Google phones that infringed on the same patents[1] as those previously asserted in his first case, filed in 2013 ("*Golden I*"). Compl. ¶ 21 (the present case is "*Golden IV*"). Except for the manufacturer of the accused devices and the agency alleged to have authorized the

---

[1] Those are U.S. Patents No. 10,163,287, 9,589,439, and 9,096,189. A fourth patent, not asserted in this case, was also alleged to have been infringed in *Golden I*.

infringing use, the present case is otherwise virtually identical to plaintiff's first patent complaint.

In *Golden I* (Case No. 13-307), plaintiff alleged that the government infringed the claims of five related patents through a Department of Homeland Security ("DHS") initiative known as "CELL-ALL." Eventually, he identified virtually all cell phones manufactured by Apple and Samsung after the 2011 DHS initiative as infringing. After plaintiff amended his complaint six times, *Golden I* was dismissed on November 10, 2021, with prejudice for failure to conform his infringement contentions to the court's rules. *Golden v. United States*, 156 Fed. Cl. 623, 632 (2021). Plaintiff appealed, and the Federal Circuit affirmed the dismissal on September 8, 2022. *Golden v. United States*, No. 2022-1196, 2022 WL 4103287 (Fed. Cir. 2022). Mr. Golden also filed two other actions in this court, founded on constitutional theories, which are not germane to the present issues.[2]

Mr. Golden also recently brought his theories to the federal district courts in South Carolina and California, asserting similar patent claims to those here against Google and other companies. We need not discuss all of the litigation that those complaints have spawned. What is relevant here, however, is that Mr. Golden filed infringement claims against Apple, and others, in the District of South Carolina which were dismissed as frivolous. On appeal, however, the Federal Circuit reversed, holding that the Apple

---

[2] Plaintiff filed his second action on January 17, 2019, alleging a Fifth Amendment taking based on the Patent Trial & Appeal Board's cancellation of certain claims of another of plaintiff's patents during an *inter partes* review ("IPR") ("*Golden II*"). The court dismissed *Golden II* with prejudice on May 14, 2019, finding that the cancellation of the patent claims was plainly the result of plaintiff's voluntary amendment, not government action. *Golden v. United States*, No. 19-104C, 2019 WL 2056662 (Fed. Cl. 2019) ("*Golden II*"). The Federal Circuit also affirmed this dismissal. *Golden v. United States*, 955 F.3d 981 (Fed. Cir. 2020).

Plaintiff filed his third action here on February 7, 2023, again on the grounds that DHS took one of his patents during the IPR without compensating him. *See Golden v. United States*, No. 23-185C, 2023 WL 4466401 (Fed. Cl. May 30, 2023) ("*Golden III*"). Before granting the government's motion to dismiss for lack of jurisdiction on statute of limitations grounds, we noted that *res judicata* would otherwise clearly bar the claim due to its near-identical nature to the claims proposed in *Golden II*. *Id.*, *aff'd*, No. 2023-2139, 2023 WL 8663093 (Fed. Cir. Dec. 15, 2023).

complaint was not facially frivolous, but the court took no position on the merits of the infringement claim itself. *Golden v. Apple, Inc.*, No. 2022-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022). As discussed later, a misunderstanding of the import of that decision was the impetus for plaintiff's instant case.

In the present suit, defendant has moved to dismiss on the basis that Mr. Golden's claim is barred due to the preclusive effect of the judgment entered in *Golden I.*[3] Plaintiff has since filed a motion for summary judgment, arguing that the Federal Circuit's reversal of the South Carolina district's dismissal is grounds for judgment in his favor here. Mr. Golden notes in that motion that the elements of the accused devices in this case and those in the South Caroline case are "virtually identical." Mr. Golden also filed a motion for disqualification of the undersigned on the grounds of coercion and "difficulty," or, in the alternative, bias. Lastly, plaintiff filed two motions for judicial notice, the first regarding certain facts he believes relevant to his theory of infringement, and the second concerning filings he made in one of his cases in the Northern District of California.[4] Because, as explained below, the complaint fails to state a claim upon which relief can be granted, we need not reach any of the latter motions. The motion for disqualification we deny.

Defendant argues that plaintiff's claims against the government accusing Google phones are barred by the doctrine of claim preclusion, traditionally known as *res judicata*, because the newly accused devices are virtually identical to the devices he has previously accused. The government argues that, because his prior case was dismissed with prejudice, which operates as a judgment of non-infringement, his new claim is also barred because it has already been decided. *See Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1297 (Fed. Cir. 2001) ("a dismissal with prejudice . . . is a judgment on the merits"). Put another way, because there is no practical difference, at least as to the features alleged to be infringing, between the Google phones now accused and the Apple and Samsung products previously accused, there is nothing new to be decided now. The thing has been decided

---

[3] Defendant also argues that plaintiff's theory of infringement is facially defective and fails to state a claim. We do not reach this issue because the complaint is plainly barred by *res judicata* and the associated *Kessler* doctrine.

[4] Plaintiff also filed a motion to strike defendant's motion to dismiss, which we denied by order on July 31, 2023.

("*res judicata*"). Further, to the extent that our judgment in *Golden I* would not cover any alleged infringement post-dating that judgment, defendant argues that the *Kessler* doctrine expands the reach of claim preclusion to cover those allegations as well. *Kessler v. Eldred*, 206 U.S. 285 (1907) (206 U.S. 285 (1907) (Holding that a judgment of a product's non-infringement may not be re-litigated, even if the parties are different and the alleged infringement post-dates the earlier judgment).

The doctrine of *res judicata* prevents re-litigation of claims previously decided. *See generally Sharp Kabushiki Kaisha v. ThinkSharp, Inc.*, 448 F.3d 1368, 1372 (Fed. Cir. 2006). The current complaint, however, is aimed at different infringing devices, Google phones, not expressly implicated in *Golden I*. Defendant, however, argues that, because there is no substantive difference between the phones now implicated by the present complaint and those alleged to be infringing in the earlier case, claim preclusion applies. We agree.

In the Federal Circuit, claim preclusion in a patent suit generally applies "when a patentee seeks to assert the same patent against the same party and the same subject matter." *Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 1349 (Fed. Cir. 2014). The same patents and the same parties are clearly involved. The question then is whether the Google phones are the same as the subject of the previous suit. They are, of course, not literally the same phones. As defendant rightly points out, however, the subject matter is the same for claim preclusion in an infringement suit if the formerly accused and the newly accused devices are "essentially the same." *Foster v. Hallco Mfg. Co., Inc.*, 947 F.2d 469, 479-80 (Fed. Cir. 1992). They are essentially the same if the new devices are "materially identical . . . [to the earlier devices] with respect to the pertinent claim limitations at issue." *Nystrom v. Trex co., Inc.*, 580 F.3d 1281, 1286 (Fed. Cir. 2009). The focus is thus on what is claimed to be infringing in the new devices to see whether it is "essentially the same" as what was claimed to have been infringing in the old devices. Here, as explained below, the elements in these new phones that Mr. Golden alleges to be infringing are the same as those he claimed to be infringing in *Golden I*. Thus, claim preclusion applies, at least as to pre-*Golden I* judgment infringement.[5]

_____

[5] Any alleged infringing acts after the judgment in *Golden I* are not barred by claim preclusion because they do not arise from the same transactional facts, or "infringing acts." Definitionally, post-judgment infringement cannot be the same acts already considered, and thus the claims cannot be the same for purposes of claim preclusion. *See, e.g, Brain Life, LLC v. Elektra Inc.*, 746 F.3d 1045, 1054 (Fed. Cir. 2014). Absent the *Kessler*

In the present complaint, Mr. Golden concedes that his current claim is "virtually identical" in that "the results are the same" when compared to devices also accused in *Golden I*. Compl. ¶ 17; *see also* ¶¶ 18-20. Further illustrating that the subject matter is essentially the same in this suit as his first, the complaint also contains a comparison between the Google Pixel 5 phone and the Apple iPhone 12, Samsung Galaxy S21, and LG V60 phones. The latter three of those phones were all accused by plaintiff in *Golden I*, as evidenced by the Corrected Claim Chart filed by Mr. Golden there, excerpts of which were appended to defendant's motion to dismiss in this docket, which we treat as judicial admissions by Mr. Golden. Plaintiff went on to explain on page 13 of the present complaint that the use of the Pixel 5 phone is illustrative of the infringement of the other Google phones that he is accusing in this suit. Thus we are assured that all of the newly alleged infringement overlaps with what he claimed in *Golden I*. Even a cursory review of the rest of the present complaint—the comparison of devices mentioned above—reveals that they are materially identical to the charts filed in *Golden I*. The same elements of the Apple, Samsung, and LG phones alleged to be infringing in the first suit are what he accuses now in the Google phones, as illustrated by the Pixel 5 claim chart in his complaint (e.g., a central processing unit, GPS, wifi or Bluetooth connectivity, and biometrics). In fact, he performs the comparison himself in the present complaint again by including a comparison of the Apple, Samsung and LG devices with the Google Pixel 5. The subject of the two suits is "essentially the same" because the devices are identical with respect to the elements plaintiff claims are infringing.

The Federal Circuit has on several instances stated that claim preclusion has a temporal limitation as to the date of the preclusive judgment. *E.g.*, *In re PersonalWeb Techs. LLC*, 961 F.3d 1365, 1376 (Fed. Cir. 2020). The government thus invokes the *Kessler* doctrine as covering the "temporal limitation" gap of claim preclusion. In *Kessler v. Eldred*, the Supreme Court adopted an enlargement of traditional claim and issue preclusion doctrines to further preserve the utility of previous judgments of non-infringement by holding that a prior judgment of non-infringement would bar new

---

doctrine, the issue of whether a prior judgment of non-infringement was preclusive of post-judgment acts would be considered under the rubric of issue preclusion, also known as collateral estoppel. Collateral estoppel was not raised by the government, nor need it have been, because, in the patent context, as will be discussed below, *Kessler* enlarges the reach of non-infringement judgments, or, as defendant puts it, bridges the temporal gap left by claim preclusion.

infringement claims for post-judgment acts, against third parties, and covering very similar accused devices. 206 U.S. 285 (1907); *see also SpeedTrack, Inc. v. Office Depot, Inc.*, 971 F.3d 1317, 1318 (Fed. Cir. 2015) (recognizing that, absent *Kessler*, patent holders could escape prior judgments of non-infringement by suing customers of the earlier defendant for post-judgment infringement). The key issue is whether the accused devices are the same or "essentially the same," just as with claim preclusion. *Brain Life, LLC v. Elektra Inc.*, 746 F.3d 1045, 1057 (Fed. Cir. 2014). If so, pursuant to *Kessler*, a trade right in the devices attaches after a judgment of non-infringement and those devices, along with others that are "essentially the same," are protected from future allegations of infringement. *In re PersonalWeb*, 961 F.3d at 1379. As explained above, the newly accused devices are essentially the same as those previously accused, and thus doctrines of *res judicata* and *Kessler* preclude litigating these issues against the government again.

Plaintiff's only argument is that, because the Federal Circuit reversed and remanded the decision of the District Court for South Carolina in *Golden v. Apple Inc.*, we should overlook *Kessler*. In Mr. Golden's view of the circuit's opinion, infringement has been established. That, however, is a dramatic misreading of the appellate opinion. The Federal Circuit was careful to note that it "express[ed] no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous." *Golden v. Apple Inc.*, No. 2022-1229, 2022 WL 4103285, at *2 (Fed. Cir. Sept. 8, 2022). Nothing in the Federal Circuit's opinion is germane to the questions of claim preclusion and the *Kessler* doctrine, both of which we find preclude consideration of the present complaint because the devices accused are, as conceded by plaintiff, "virtually identical," or "essentially the same" as those already adjudged in the first suit, *Golden I.* Compl. ¶17.

The Federal Circuit was recently confronted with a similar situation in which the patentee had infringement claims dismissed with prejudice for discovery abuses. When that patentee brought a later suit, accusing different devices, the district court dismissed it, *inter alia*, as precluded by *Kessler*. The Federal Circuit affirmed, holding that a dismissal with prejudice, whatever the underlying reason, is a judgment of non-infringement for purposes of the *Kessler* doctrine. *Askan v. FARO Techs., Inc.*, 2023 WL 4101351, at *3 (Fed. Cir. June 21, 2023). Thus, because the devices were found to be essentially the same, *Kessler* applied. *Id.* at *4. Here, Mr. Golden's claims in his first suit were dismissed with prejudice. 156 Fed. Cl. at 632. As explained above, the newly accused devices are essentially the same as those previously alleged to be infringing, as plaintiff admits. Thus,

*Kessler* applies, and the present claim is barred. Accordingly, the following is ordered:

1. Plaintiff's motion seeking disqualification of the undersigned is denied.

2. Defendant's motion to dismiss is granted.

3. The Clerk of Court is directed to dismiss the complaint pursuant to rule 12(b)(6) for failure to state a claim.

4. All other motions are denied as moot.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

# In the United States Court of Federal Claims

No. 23-811C

(Filed: July 30, 2024)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

LARRY GOLDEN,

    *Plaintiff,*

v.

THE UNITED STATES,

    *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER ON RECONSIDERATION

Plaintiff Larry Golden, appearing *pro se*, filed his fourth complaint in this court on May 31, 2023, alleging that the United States government, acting through the Defense Threat Reduction Agency ("DTRA"), implicitly authorized the use of three of his patents by several third party corporations in violation of 28 U.S.C. § 1498(a). On April 23, 2024, the court dismissed plaintiff's claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), finding that his claim was barred by claim preclusion and the related *Kessler* doctrine. *Golden v. United States*, 171 Fed. Cl. 33, 37 (2024) (relying on *Kessler v. Eldred*, 206 U.S. 285 (1907)). Plaintiff filed a motion for reconsideration and notice of pending motion for disqualification on April 30, 2024, asserting that the court's dismissal of his claim had been rooted in racial bias and was not in accordance with the doctrine of vertical *stare decisis*.

Turning to the present motion, although denominated as a motion for reconsideration, it appears that the thrust of the motion is aimed at disqualification of the undersigned, but we note that most of the arguments in support of that relief are disagreements with the merits of our dismissal decision.[1] We begin by noting that there is no provision in the court's rules

---

[1] We are unsure if plaintiff's notice of pending motion for disqualification is a reference to his earlier-filed motion, which was disposed of in our opinion

1

for the filing of a post-judgment motion for disqualification. Plaintiff cites 28 U.S.C. § 144 as grounds for the requested disqualification. That statute, by its very terms, however, applies only to the federal district courts, and not to the Court of Federal Claims. 28 U.S.C. § 144 ("Whenever a party . . . *in a district court* makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice . . . such judge shall proceed no further therein.") (emphasis added). Nor would such a request be timely after judgment has been entered.  We thus consider the motion under the rubric of reconsideration.

Motions for reconsideration are governed by Rule 59(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  Pursuant to Rule 59(a)(1)(A), "the court may, on motion, grant . . . a motion for reconsideration on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." A motion for reconsideration may also be granted "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or upon the showing of evidence . . . that any fraud, wrong, or injustice has been done to the United States." RCFC 59(a)(1)(B–C). Specifically, RCFC 59 permits reconsideration for one of three reasons: 1) an intervening change in the controlling law has occurred; 2) previously unavailable evidence is now available; or 3) the motion is necessary to prevent manifest injustice. *Matthews v. United States*, 73 Fed. Cl. 524, 525 (2006). Furthermore, "the movant must point to a manifest error of law or mistake of fact" and must do more than "merely reassert[] arguments which were previously made and were carefully considered by the court." *Henderson Cnty. Drainage Dist. No. 3 v. United States*, 55 Fed. Cl. 334, 337 (2003). A motion under RCFC 59 "must be based upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." *Parsons ex rel. Linmar Prop. Mgmt. Tr. v. United States*, 174 Fed. Appx. 561, 563 (Fed. Cir. 2006).

Plaintiff does not argue a change in the controlling law or offer any newly discovered evidence. Instead his motion largely restates arguments he made in his complaint. Mr. Golden presents four broad reasons for why he believes our previous opinion should be reconsidered. First, he alleges that our opinion runs afoul of the doctrine of *stare decisis*. Second, he argues that his Fifth Amendment due process rights have been violated. Third, plaintiff argues that we misapplied the doctrine of res judicata, or claim preclusion. Fourth, plaintiff suggests throughout his motion that our opinion was

---

of April 23, or whether plaintiff intends to convey that he is asking for that same relief in this motion.

motivated by racial bias, though he does not point to any specific evidence or details that support this allegation. We address these four arguments in turn.

Plaintiff argues that the doctrine of *stare decisis* requires the Court of Federal Claims to follow the decisions of the Court of Appeals for the Federal Circuit, specifically the circuit court's decision in Mr. Golden's appeal from the dismissal of his claims in district court in South Carolina. We note, to start, that that decision is not the law of this case because it was not an appeal in this case. It is also unpublished and thus, by the circuit's own rules, not binding precedent. *See* Fed. Cir. R. 32.1(d). It is persuasive authority only to the extent that it prescribes some rule of law applicable to the issues in this case. It did not. The issue there was whether plaintiff's pleadings were facially frivolous. *Golden v. Apple Inc.*, No. 2022-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022). The issue here was whether the doctrine of claim preclusion, as expanded by *Kessler*, barred relitigation of the issue of infringement. *Golden*, 171 Fed. Cl. at 37.

As we observed in our dismissal opinion, plaintiff has fundamentally misunderstood the Federal Circuit's ruling in *Golden v. Apple Inc*. The present motion raises no new argument in this regard, and the argument he does make hinges on a "dramatic misreading of the appellate opinion." *Id.*

Next, plaintiff alleges that his Fifth Amendment due process rights have been violated, because the court has allegedly deprived plaintiff of his property through "unfair and unjustified" means. Mot. Recons. 2. Though not clear, his argument seems to be that he should have won his case on its merits, and because he did not, his due process rights have been violated. Plaintiff has not identified any process that was due him and which was denied. His claims were barred by *res judicata*. That is not a violation of due process. *See Searcy v. Dep't of Agriculture*, 813 Fed. App'x 472, (Fed. Cir. 2011) (holding that the Merit Systems Protection Board did not violate the appellant's due process rights by *sua sponte* dismissing the claim as barred by *res judicata*). As the Supreme Court has explained, the fundamental requirements of procedural due process are notice and opportunity to respond, both of which are met here. *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

As to *res judicata* itself, plaintiff argues that "issue preclusion"[2] does not apply here and is inapplicable to his infringement claims. He calls the

---

[2] We understand plaintiff to actually be referring to claim preclusion, which was the grounds for his complaint's dismissal.

*Kessler* doctrine a "special" preclusion doctrine "created" by the Federal Circuit which should not apply here, because it supersedes congress' intent to allow patent infringement suits to be brought against the government "whenever" under 28 U.S.C. § 1498(a). Mot. Recons. 4. Plaintiff is wrong. The doctrine of *res judicata* applies to all claims at law and equity. It protects the preclusive effect of judgments and preserves the court's and prevailing parties' resources by preventing relitigation of previously decided claims. *See Montana v. United States*, 440 U.S. 147, 153–154 (1979) (stating that *res judicata* protects against the "expense and vexation attending multiple lawsuits, conserves judicial resources," and minimizes the "possibility of inconsistent decisions."). We have applied *Kessler* before in the section 1498 context. *See, e.g., JG Techs., LLC v. United States*, 156 Fed. Cl. 691, 713 (2021) (finding that certain of plaintiff's infringement claims against the United States were barred by *Kessler*).

In Mr. Golden's view, we have unduly relied on the previous cases in which Golden lost. As explained in April, however, the doctrine, as expanded by *Kessler*, applies, and it bars plaintiff's latest complaint. *Golden*, 171 Fed. Cl. at 37. This motion for reconsideration casts no doubt on that result.

Lastly, we address the allegations of racial bias which plaintiff peppers throughout his motion without substantiation or citation to evidence outside of his disagreement as to the disposition of his cases. An adverse result is not evidence, by itself, of bias. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion."). *See also Johnson v. Warden*, No. 2:16-cv-985, 2020 U.S. Dist. LEXIS 54236, at *49 (S.D. Ohio March 27, 2020) ("Evidence of racial bias cannot be inferred but must be clearly demonstrated in the record."). In short, plaintiff has not presented any basis to reconsider on grounds of bias.

Plaintiff's motion fails to demonstrate any bases for reconsideration under RCFC 59. Thus no response from defendant is necessary, and the motion is denied.[3]

---

[3] Plaintiff also attempted to file a motion for status update regarding his motion for reconsideration. The clerk's office received that document on July 17, 2024, but did not docket it because there is no provision in the court's rules for the filing of such a motion. We allow the motion to be filed and deny it as moot.

4

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

ORIGINAL

# In the United States Court of Federal Claims

**FILED**

No. 13-307C

Filed: November 30, 2016

NOV 3 0 2016

U.S. COURT OF
FEDERAL CLAIMS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | \* |
| LARRY GOLDEN, | \* |
| | \* |
| Plaintiff, *pro se*, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

28 U.S.C. § 1498(a) (Patent Infringement);
35 U.S.C. § 251 (Reissue); RCFC 12(b)(1)
   (Jurisdiction);
RCFC 12(b)(6) (Failure to State a Claim);
RCFC 12(e) (More Definite Statement);
RCFC 15(a)(2) (Amended Complaint,
   With Court's Leave);
Manual of Patent Examining Procedure
   (9th ed. 2015).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Larry Golden**, Greenville, South Carolina, *pro se*.

**Lindsay Kate Eastman**, United States Department of Justice, Civil Division, Washington, D.C.

### MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S
### MOTION TO DISMISS

**BRADEN,** *Judge*.

## I.    RELEVANT FACTUAL BACKGROUND.[1]

On April 5, 2006, Mr. Larry Golden filed Patent Application No. 11/397,118 ("the '118 Application"), titled "Multi Sensor Detection, Stall To Stop And Lock Disabling System," with the United States Patent and Trademark Office ("USPTO"). 2/12/16 Am. Compl. Ex. B. On June 10, 2008, the '118 Application resulted in the issuance of U.S. Patent No. 7,385,497 ("the '497 Patent"). 2/12/16 Am. Compl. Ex. B.

Several days prior, on June 6, 2008, Mr. Golden filed a continuation-in-part application,[2] No. 12/155,573 ("the '573 Application"), of the '118 Application. 2/12/16 Am. Compl. Ex. C.

---

[1] The facts discussed herein are derived from the May 1, 2013 Complaint ("Compl."); and the February 12, 2016 Amended Complaint ("2/12/16 Am. Compl.") and attached Exhibits A–K ("2/12/16 Am. Compl. Ex. A–K").

[2] "A continuation-in-part is an application filed during the lifetime of an earlier nonprovisional application, repeating some substantial portion or all of the earlier nonprovisional

On December 22, 2009, the '573 Application resulted in the issuance of U.S. Patent No. 7,636,033 ("the '033 Patent"). 2/12/16 Am. Compl. Ex. C.

On January 20, 2010, Mr. Golden filed a continuation application, Application No. 12/657,356 ("the '356 Application"), of the '573 Application. Thereafter, Mr. Golden filed several continuation applications of the '356 Application, resulting in:

- U.S. Patent No. 8,106,752 ("the '752 Patent"), issued on January 31, 2012;
- U.S. Patent No. 8,334,761 ("the '761 Patent"), issued on December 18, 2012;
- U.S. Patent No. 8,531,280 ("the '280 Patent"), issued on September 10, 2013;
- U.S. Patent No. 9,096,189 ("the '189 Patent"), issued on August 4, 2015; and
- Published Patent Application No. 2016-0027273 Al ("the '273 PG-PUB").

2/12/16 Am. Compl. Exs. D, E, F, I.

On March 31, 2011, Mr. Golden filed a reissue application for the '033 Patent that, on January 1, 2013, issued as U.S. Reissue Patent No. RE43,891 ("the '891 Patent").[3] 2/12/16 Am. Compl. Ex. G.

On September 9, 2011, Mr. Golden filed a second reissue application for the '033 Patent. On February 12, 2013, the application resulted in the issuance of U.S. Reissue Patent No. RE43,990 ("the '990 Patent"). 2/12/16 Am. Compl. Exs. G, H.

The patents listed above disclose inventions for the detection and automated isolation of dangerous chemical, biological, and radiological agents in shipping containers, tractor trailers, mail carriers, mail boxes and lockers. *See, e.g.,* 2/12/16 Am. Compl. Ex. B at 2. Mr. Golden is the owner, and sole inventor, of these patents. 2/12/16 Am. Compl. Exs. A–I.

---

application and adding matter not disclosed in the said earlier nonprovisional application." Manual of Patent Examining Procedure ("MPEP") §201.8 (9th ed. 2015).

[3] Under 35 U.S.C. § 251, defective patents may be corrected through a process known as "reissue." Section 251(a) provides:

> [w]henever any patent is, through error, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Director shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

35 U.S.C. § 251(a).

## II.    PROCEDURAL HISTORY.

On May 1, 2013, Mr. Golden ("Plaintiff") filed a Complaint in the United States Court of Federal Claims alleging that the Government infringed the '990 Patent, based on three solicitations published by the United States Department of Homeland Security ("DHS") seeking to develop technology for sensing biological and chemical substances. Compl. at 1–2. The Complaint alleges that the DHS solicitations directly infringed, infringed under the doctrine of equivalents, or infringed by inducement claims 11, 74 and 81 of the '990 Patent. Compl. at 3.

On August 15, 2013, Plaintiff filed a "Notice of Supplement" that the court considers an Amended Complaint. ECF No. 6.

On September 5, 2013, the Government filed a Motion For A More Definite Statement, pursuant to Rule of the United States Court of Federal Claims ("RCFC") 12(e), requesting that Plaintiff further amend the May 1, 2013 Complaint to incorporate numbered paragraphs, enumerate with particularity the Government devices or processes that allegedly infringe Plaintiff's patents, and identify the party in interest. ECF No. 9.

On September 20, 2013, Plaintiff filed: a Motion To Strike (ECF No. 10); a Motion To Amend Complaint (ECF No. 11); a Motion To Supplement Complaint (ECF No. 14); a Response to the September 5, 2013 Motion For A More Definite Statement (ECF No. 12); and a Motion For Summary Judgment (ECF No. 13).

On October 15, 2013, Plaintiff filed a second Response to the September 5, 2013 Motion For A More Definite Statement that the court considers a Second Amended Complaint. The October 15, 2013 Second Amended Complaint advised the court that Plaintiff is representing himself, not the company ATPG Technology. ECF No. 20.

On October 21, 2013, the court granted the September 10, 2013 Motion For A More Definite Statement, because the May 1, 2013 Complaint, the August 15, 2013 Amended Complaint, and the October 15, 2013 Second Amended Complaint were so vague and ambiguous that the Government could not prepare an informed Answer. ECF No. 21. That same day, the Government filed a Response To Plaintiff's Motion For Summary Judgment. ECF No. 22.

On November 22, 2013, Plaintiff filed a More Definite Statement. ECF No. 24.

On December 20, 2013, the court denied Plaintiff's September 20, 2013 Motion For Summary Judgment, without prejudice, because the Government had not filed an Answer. ECF No. 28.

On December 30, 2013, Plaintiff filed a Motion To Amend And Supplement Pleadings Of The More Definite Statement, pursuant to RCFC 15(a)(2). ECF No. 29.

On January 10, 2014, the Government filed an Answer to the December 30, 2013 Motion To Amend Pleadings. ECF No. 30. The Government treated the December 30, 2013 Motion To Amend Pleadings as filed by leave of court and, therefore, superseding Plaintiff's November 22, 2013 More Definite Statement. ECF No. 30 at n.1.

3

On February 7, 2014, the court granted the December 30, 2013 Motion to Amend Pleadings and ordered the parties to treat that motion as a Third Amended Complaint, superseding all prior complaints submitted by Plaintiff. ECF No. 32.

On April 30, 2014, DHS filed a petition for *inter partes review* ("IPR") of the '990 Patent before the USPTO Patent Trial and Appeal Board ("PTAB").

On May 28, 2014, Mr. Ha Kung Wong informed the court that he was counsel of record for Plaintiff (ECF No. 42) but, on September 12, 2014, he withdrew (ECF Nos. 49, 50).

On October 8, 2014, the PTAB filed a Decision To Institute IPR of claims 11, 74, and 81 of the '990 Patent. *See Department of Homeland Security v. Golden,* IPR2014-00714, 2014 WL 6999625, at *1 (P.T.A.B. Oct. 8, 2014). With the exception of a sixty-day stay for Plaintiff to seek legal representation, the court did not stay this case while PTAB proceedings were ongoing. The court, however, did not take any substantive action during those proceedings.

*    *    *

On October 1, 2015, the PTAB issued a final decision "grant[ing] Patent Owner's Motion to Amend . . . claims 11, 74, and 81 of the '990 Patent, and den[ying] the Motion to Amend . . . claims 154–156." *See Department of Homeland Security v. Golden,* IPR2014-00714, 2015 WL 5818910, at *17 (P.T.A.B. Oct. 1, 2015). On November 17, 2015, the PTAB denied Plaintiff's request for rehearing. *See Department of Homeland Security v. Golden,* IPR2014-00714, 2015 WL 10381775 (P.T.A.B. Nov. 17, 2015).

On December 22, 2015, the court convened a telephone status conference to discuss how the case should proceed in light of the PTAB's final decision. On December 23, 2015, the court granted Plaintiff leave to file another amended complaint. ECF No. 65.

On February 12, 2016, Plaintiff filed a Fourth Amended Complaint ("2/12/16 Am. Compl.") alleging that, the Government: (1) was liable for the infringement of Plaintiff's '497, '752, '891, '990, and '189 Patents under 28 U.S.C § 1498(a); and (2) violated the Fifth Amendment of the United States Constitution by taking Plaintiff's '497, '033, '752, '761, '280, '891, '990, '189 Patents and related '273 Application, without just compensation. 2/12/16 Am. Compl. at ¶¶ 68–127.

The February 12, 2016 Amended Complaint identifies over thirty devices that were developed or procured, as a result of Government solicitations, Government contracts, or National Science Foundation ("NSF") grants.[4] 2/12/16 Am. Compl. at ¶¶ 68–127. These devices allegedly

---

[4] The relevant devices are: M-Lock; High-Power Electromagnetic System ("HPEMS"); Smartphone Microscope; Biophone; Smartphone Biosensor Cradle; iPhone Biodetector Smartphone; Pathtracker; the Center of Integrated Nanomechanical Systems ("COINS") Nano-Embedded Sensors; Smartphone-Based Rapid Diagnostic Tests; Lockheed Martin K-Max Unmanned Self-flying Helicopter; Boeing MH-6 Little Bird Helicopter; SIN-VAPOR I Smartphone System; Samsung Galaxy s6 Microscope Smartphone; VOCket System; Nett Warrior Smartphone System; Northrop Grumman X-47B UCAS I X-47B Control Display Unit; GammaPix; NFC Samsung Galaxy s6 Smartphone Sensor; Cell-All Synkera MikroKera Ultra;

infringe claims in Plaintiff's '497, '752, '891, '990, and '189 Patents. 2/12/16 Am. Compl. at ¶¶ 68–127.

On April 8, 2016, the Government filed an Answer to the February 12, 2016 Amended Complaint. ECF No. 74.

On June 3, 2016, Plaintiff filed a Motion For Summary Judgment [On] Validity and, on June 8, 2016, Plaintiff filed a Motion For Entry Of Estimated Damages And Accounting Report.

On June 10, 2016 the court convened a telephone status conference. On June 13, 2016, based on the arguments raised during the status conference, the court ordered that the Government file a Motion To Dismiss, and stayed the June 3, 2016 Motion For Summary Judgment and June 8, 2016 Motion For Entry Of Estimated Damages And Accounting Report. ECF No. 85.

On June 24, 2016, the Government filed a Motion To Dismiss Certain Accused Devices ("Gov't Mot."). On July 5, 2016 Plaintiff filed a Response ("Pl. Resp."). On July 18, 2016, the Government filed a Reply ("Gov't Reply").

## III.    STANDARD OF REVIEW.

### A.    Standing.

Federal trial courts have been advised to "decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 111 (1998) (Breyer, J., concurring). The party invoking federal jurisdiction has the burden of proof to satisfy the constitutional requirements of Article III standing. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the party seeking to exercise jurisdiction to clearly allege facts sufficient to establish jurisdiction).

"A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *see also* 35 U.S.C. § 100(d) ("The word 'patentee' includes not only the patentee to whom the patent was issued but also the successors in title to the patentee."); *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003) ("[T]his court has determined that in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*.") (emphasis in original).

---

Biotouch System; iPhone Biodetector Smartphone; Navy Marine Corps Intranet; FLIR identiFINDER R300; AOptix Stratus MX Peripheral; MultiRae Pro Wireless Portable Multi Threat Radiation and Chemical Detector; PositiveID's M-BAND; PositiveID's Firefly DX; 1"x2" Detection Device Samsung Galaxy s6 Smartphone; 2"x2" Detection Device Samsung Galaxy s6 Smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the Passport Systems Base Control Unit; Oshkosh Defense Autonomous Unmanned Ground Vehicle TerraMax; and the Variable NODE+Oxa. 2/12/16 Am. Compl. at ¶¶ 68–127.

The standard set forth by the United States Supreme Court over a century ago in *Waterman v. MacKenzie*, 138 U.S. 252 (1891) still governs:

> There can be no doubt that he is "the party interested, either as patentee, assignee, or grantee," and as such entitled to maintain an action at law to recover damages for an infringement; and it cannot have been the intention of [C]ongress that a suit in equity against an infringer to obtain an injunction and an account of profits, in which the court is authorized to award damages, when necessary to fully compensate the plaintiff, and has the same power to treble the damages as in an action at law, should not be brought by the same person.

*Id.* at 260–61 (internal citations omitted).

The February 12, 2016 Complaint alleges that Plaintiff is the sole owner of the '497, '033, '752, '761, '280, '891, '990, and '189 Patents. 2/12/16 Am. Compl. at ¶¶ 6–7. Therefore, Plaintiff has standing to seek an adjudication of the claims alleged in the February 12, 2016 Amended Complaint.

**B.    Jurisdiction.**

The United States Court of Federal Claims has jurisdiction to adjudicate claims alleging,

> [that] an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same . . . [seeking] recovery of . . . reasonable and entire compensation for such use and manufacture. . . . [T]he use or manufacture of [a patented] invention by a contractor, a subcontractor, or any person, firm, or corporation *for the Government* and *with the authorization or consent of the Government*, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a) (emphasis added).

Infringing activity is "for the Government" under section 1498(a) if it is "for the benefit of the Government." *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*, 583 F.3d 1371, 1378 (Fed. Cir. 2009); *see also Madey v. Duke University*, 413 F. Supp. 2d 601, 607 (M.D.N.C. 2006) ("A use is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" (quoting *Riles v. Amerada Hess, Corp.*, 999 F. Supp. 938, 940 (S.D. Tex. 1998)). In *Hughes Aircraft Co. v. United States*, 534 F.2d 889 (1976), for example, the court held that a satellite program to advance the military defense and security of the United States was "for the Government." *Id.* at 898.

Moreover, "authorization or consent of the Government," does not need to be expressly stated. *See TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) ("[a]uthorization or consent by the Government can be express . . . [or] [i]n proper circumstances, Government

6

authorization can be implied."). Indeed, "authorization or consent . . . may be given in many ways other than by . . . direct form of communication—e.g., by contracting officer instructions, [or] by specifications . . . which impliedly sanction and necessitate infringement[.]" *Hughes Aircraft Co*, 534 F.2d at 901.

The February 12, 2016 Amended Complaint alleges that various nongovernment entities, including a number of corporations and public research universities, infringed the '497, '033, '752, '761, '280, '891, '990, and '189 Patents. Whether the court has jurisdiction over those claims is the subject of this Memorandum Opinion And Order.

### C.    Standard Of Review For *Pro Se* Litigants.

*Pro se* plaintiffs' pleadings are held to a less stringent standard than those of litigants represented by counsel. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that *pro se* complaints, "however inartfully pleaded," are held to "less stringent standards than formal pleadings drafted by lawyers"). The United States Court of Federal Claims traditionally examines the record "to see if [a *pro se*] plaintiff has a cause of action somewhere displayed." *Ruderer v. United States*, 412 F.2d 1285, 1292 (Ct. Cl. 1969). Nevertheless, while the court may excuse ambiguities in a *pro se* plaintiff's complaint, the court "does not excuse [a complaint's] failures." *Henke v. United States*, 60 F.3d 795, 799 (Fed. Cir. 1995). ("The fact that [the plaintiff] acted *pro se* in the drafting of his complaint may explain its ambiguities, but it does not excuse its failures, if such there be.").

A *pro se* plaintiff, however, is not excused from his burden of proving, by a preponderance of the evidence, that the court possesses jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) ("[The plaintiff] must allege in his pleading the facts essential to show jurisdiction."); *see also Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ([The *pro se* plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."). The plaintiff cannot rely solely on allegations in the complaint, but must bring forth relevant, adequate proof to establish jurisdiction. *See Reynolds*, 846 F.3d at 748 ("[I]t was incumbent upon [the *pro se* plaintiff] to come forward with evidence establishing the court's jurisdiction.").

### D.    Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); see also RCFC 12(b)(1) (allowing a party to assert, by motion, "lack of subject-matter jurisdiction"). When considering a motion to dismiss for lack of subject-matter jurisdiction, the court must take the facts alleged in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). The court may consider evidence beyond the pleadings, however, when the motion to dismiss challenges the jurisdictional facts alleged in the complaint. *See Moyer v. U.S.*, 190 F.3d 1314, 1318 (Fed. Cir. 1999). If the court determines that it does not have subject-matter jurisdiction, the court must dismiss the complaint. *See RCFC* 12(b)(1).

E.     **Standard of Review For Motion To Dismiss, Pursuant To RCFC 12(b)(6).**

A claim is subject to dismissal under RCFC 12(b)(6), if it does not provide a basis for the court to grant relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) ("[A well-pleaded complaint] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (internal citations omitted)); *see also Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed.Cir.2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Twombly*, 550 U.S. at 570). The allegations contained in a complaint also must indicate to the court that there is "more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* To determine whether a complaint states a plausible claim for relief, a court must engage in a context-specific analysis and "draw on its judicial experience and common sense." *Id.* at 678–79. The court, however, must construe the allegations of the complaint in the light most favorable to the plaintiff. *See Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir.1995).

## IV.   DISCUSSION.

A.     **The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's M-Lock And HPEMS Claims, Pursuant To RCFC 12(b)(6).**

1.     **The Government's Argument.**

The Government argues that, under section 1498(a), a patent owner can sue the United States for patent infringement only if the United States, a contractor, a subcontractor, a person, or a corporation uses or manufactures the patented invention (1) for the Government and (2) with the authorization or consent of the Government. Gov't Mot. at 3. The February 12, 2016 Amended Complaint alleges that iControl, Inc. ("iControl"), a Government contractor, used and manufactured a device called M-Lock that infringed Plaintiff's '752 and '990 Patents. Gov't Mot. at 3. The Amended Complaint, however, fails to allege sufficient facts to establish that the Government was directly involved in the manufacture or use of M-Lock or that the device was manufactured for the benefit of the Government. Gov't Mot. at 4.

Similarly, the February 12, 2016 Amended Complaint alleges that Eureka Aerospace, another Government contractor, used and manufactured a device called the High-Powered Electromagnetic System ("HPEMS") that infringed Plaintiff's '891 Patent. Gov't Mot. at 4. Plaintiff alleges that the United States Air Force ("USAF") issued a request related to HPEMS and that the United States Marines ("Marines") are a potential customer of the device, but otherwise fails to allege any manufacture or use "by or for the Government." Gov't Mot. at 4.

Accordingly, the February 12, 2016 Amended Complaint's M-Lock and HPEMS claims do not assert sufficient facts to entitle Plaintiff to a remedy under section 1498(a). Gov't Mot. at 4. Those claims should therefore be dismissed, pursuant to RCFC 12(b)(6). Gov't Mot. at 4.

### 2.    Plaintiff's Response.

Plaintiff argues that the Government's manufacture or use of an infringing device generally results from procurement contracts. Pl. Resp. at 6. Moreover, when purchasing goods and services from a contractor, the Government seeks to acquire the best product without delay and "will not refuse to award a contract on the grounds that the prospective contractor may infringe a patent." Pl. Resp. at 6 (quoting 48 C.F.R. 27.102(b)). Plaintiff does not explicitly apply these rules to the facts alleged in the February 12, 2016 Amended Complaint. But, his argument appears to be that the existence of a contract between the Government and iControl and Eureka Aerospace for the development of infringing devices supports a reasonable inference that the manufacture and use of the devices was "for the Government" and "with the authorization and consent of the Government." 28 U.S.C. § 1498(a).

### 3.    The Government's Reply.

The Government replies that Plaintiff did not address "[the Amended Complaint's] failure to state with particularity a cause of action for which relief can be granted relating to the M-Lock Device or the [HPEMS]." Gov't Reply at 2.

### 4.    The Court's Resolution.

#### a.    The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's M-Lock Claims, Pursuant To RCFC 12(b)(6), Is Denied.

The Government argues that the M-Lock claims should be dismissed, pursuant to RCFC 12(b)(6), because the February 12, 2016 Amended Complaint does not allege that M-Lock was manufactured for the benefit of the Government. Gov't Mot. at 4. The court disagrees.

Viewed in the light most favorable to Plaintiff, the February 12, 2016 Amended Complaint alleges sufficient facts to raise a plausible right of relief under section 1498(a). *See Iqbal*, 556 U.S. at 677. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The February 12, 2016 Amended Complaint alleges that DHS, a federal agency, contracted with iControl "for the development[,] commercialization [and purchase] of . . . M-Lock," an automated locking device that contains "a movement sensor, a temperature sensor, a humidity sensor, an infrared sensor, a radioactivity detection sensor, an acoustic sensor, [and/or] a chemical detection sensor." 2/12/2016 Am. Compl. ¶¶ 74–75. The February 12, 2016 Amended Complaint alleges that M-Lock infringes several claims of Plaintiff's '752 and '990 Patents, disclosing inventions that that automatically detect chemical, biological, and radiological agents so that terrorist activity can be prevented. *See* 2/12/16 Am. Compl. Ex. D at 16; *see also* 2 /12/16 Am. Compl. Ex. H at 17. And the February 12, 2016 Amended Complaint alleges that the

infringing device is being used and manufactured without license or legal right. 2/12/2016 Am. Compl. ¶ 75.

Based on the alleged facts, the court can reasonably infer that iControl is a government contractor and that the manufacture and use of M-Lock was "for the benefit of [DHS]." *See Advanced Software Design Corp.*, 583 F.3d at 1378. In light of the allegation that the inventions disclosed in patents '752 and '990 were designed to prevent terrorist activity, it is plausible that iControl manufactured an infringing device for the benefit of DHS to promote national security. *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's participation in a satellite program was "for the Government," because the program was vital to the military defense and security of the United States). Moreover, under section 1498(a), "Government authorization or consent" can be implied by circumstances. *See TVI Energy Corp.*, 806 F.2d at 1060.

In this case, the February 12, 2016 Amended Complaint alleges that DHS contracted with iControl to develop and commercialize M-Lock. This contractual relationship supports a reasonable inference that the Government authorized the manufacture and use of the infringing device.

> **b.    The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's HPEMS Claims, Pursuant To RCFC 12(b)(6), Is Denied.**

The Government also argues that the February 12, 2016 Amended Complaint's HPEMS claims should be dismissed, because they do not allege that Eureka Aerospace manufactured or used the HPEMS "for the Government." Gov't Mot. at 4. Again, the court does not agree with the Government's contention. The February 12, 2016 Amended Complaint alleges that "as a result of [] contracts with [USAF] . . . for the development and commercialization of the Eureka Aerospace HPEMS, the United States has used, authorized the use, and manufactured, without license or legal right, to Plaintiff's inventions [disclosed in patent '891]." 2/12/16 Am. Compl. ¶ 87. The HPEMS is a device that shoots an electromagnetic pulse so that vehicles can be disabled, without using firearms. *See* 2/12/16 Am. Compl. ¶ 86.

In light of these allegations, the court can reasonably infer that Eureka Aerospace's manufacture and use of the HPEMS advances the military defense and security of the United States and is thus "for the benefit of the Government." *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898. Moreover, construed in the light most favorable to Plaintiff, the February 12, 2016 Amended Complaint alleges that USAF contracted with Eureka Aerospace to develop and commercialize the HPEMS—sufficient facts to support a reasonable inference that USAF implicitly authorized the manufacture and use of the infringing device. *See TVI Energy Corp.*, 806 F.2d at 1060.[5]

---

[5] While the February 12, 2016 Amended Complaint does not clearly state whether USAF issued a solicitation for the HPEMS or awarded Eureka Aerospace a contract to develop that device, the court must interpret a complaint in the light most favorable to the plaintiff, when ruling on a motion to dismiss, pursuant to 12(b)(6). *See Henke*, 60 F.3d at 797. Therefore, the court reads the February 12, 2016 Amended Complaint to allege that the Government awarded Eureka Aerospace a contract to develop and commercialize the HPEMS.

For these reasons, the court denies the Government June 24, 2016 Motion To Dismiss the February 12, 2016 Amended Complaint's M-Lock and HPEMS claims, pursuant to RCFC 12(b)(6).

**B.    The Government's June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's National Science Foundation Claims, Pursuant To RCFC 12(b)(1) and 12(b)(6).**

### 1.    The Government's Argument.

The Government contends that, under section 1498(a), "merely funding an activity does not establish the Government's authorization and consent [to manufacture or use an infringing device]." Gov't Mot. at 5. The February 12, 2016 Amended Complaint alleges that the Government funded the development of multiple infringing devices through a series of NSF grants ("NSF claims"), but does not allege any other facts to establish the Government's authorization or consent to the manufacture or use of those devices.[6] Gov't Mot. at 5. Moreover, the February 12, 2016 Amended Complaint does not allege that the NSF-funded devices were used or manufactured "by or for the Government." Gov't Mot. at 5. Therefore, the February 12, 2016 Amended Complaint's NSF claims should be dismissed for failure to state a claim upon which relief can be granted. Gov't Mot. at 5.

The Government also argues—without additional explanation—that the court should dismiss the NSF claims for lack of subject matter jurisdiction. Gov't Mot. at 5.

### 2.    Plaintiff's Response.

Plaintiff responds that "[g]rant related agreements [are] contracts within Tucker Act jurisdiction when all the requisite elements of a contract were present, including a government representative with actual authority to bind the government in contract." Pl. Resp. at 7 (quoting *Pennsylvania Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) ("[g]rant related agreements have been held to be contracts within Tucker Act jurisdiction when all the requisite elements of a contract were present, including a government representative with actual authority to bind the government in contract.")). The February 12, 2016 Amended Complaint's NSF claims facially involve grant related agreements. Pl. Resp. at 8–9. Therefore, the United States Court of Federal Claims has jurisdiction, under the Tucker Act, to adjudicate those claims. Pl. Resp. at 8.

Plaintiff also argues that the Government's award of NSF grants for the development of infringing devices supports a reasonable inference that the manufacture and use of those devices was "for the Government" and "with the authorization and consent of the Government." Pl. Resp. at 10–11.

---

[6] The accused devices are: the Smartphone Microscope, Gov't Mot. at 5; Biophone, Gov't Mot. at 6; Smartphone Biosensor "Cradle", Gov't Mot. at 6; iPhone Biodetector Smartphone, Gov't Mot. at 7; Pathtracker, Gov't Mot. at 7; COINS, Gov't Mot. at 8; and Smartphone-Based Rapid Diagnostic Test Devices, Gov't Mot. at 8.

### 3.   The Government's Reply.

The Government concedes that NSF Research Grant Awards may be treated as contracts to establish jurisdiction under the Tucker Act, but argues that the existence of a contract is not sufficient to establish liability under section 1498(a). Gov't Reply at 2. Section 1498(a) allows a patent holder to sue the Government only if the infringing manufacture or use of the relevant invention was "for the Government" and "with the authorization or consent of the Government." Some courts have found that the terms of a NSF grant can satisfy section 1498(a). Gov't Reply at 2 (citing *McMullen Assoc., Inc. v. State Bd. Of Higher Ed.*, 268 F. Supp. 735 (D. Or. 1967)). The grants at issue in those cases, however, reserved property rights in the infringing device to the Government. Gov't Reply at 2. The February 12, 2016 Amended Complaint does not allege that the Government retained a property right in any of the accused devices and fails to allege any other facts that could plausibly establish that the manufacture or use of the patented invention was "for the Government" and "with the authorization or consent of the Government." Gov't Reply at 2–3.

### 4.   The Court's Resolution.

#### a.   The June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's National Science Foundation Claims, Pursuant To RCFC 12(b)(1), Is Denied.

Under the Tucker Act, the United States Court of Federal Claims has jurisdiction to adjudicate a claim if the statute, regulation, or constitutional provision that is the basis for that claim "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained," *United States v. Mitchell*, 463 U.S. 206, 217 (1983), and the plaintiff is "within the class of plaintiffs entitled to recover under the statute if the elements of [the] cause of action are established," *Greenlee County, Arizona v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007). "There is no further jurisdictional requirement that plaintiff make [] additional nonfrivolous allegation[s] that [he] is entitled to relief under the relevant money-mandating source." *Jan's Helicopter Serv., Inc. v. Federal Aviation Agency*, 525 F.3d 1299, 1307 (Fed. Cir. 2008). Instead, "the consequence of a ruling by the court . . . that plaintiff's case does not fit within the scope of the [money-mandating] source . . . is simply [that] plaintiff loses on the merits for failing to state a claim on which relief can be granted." *Fisher v. United States*, 402 F.3d 1167, 1175–76 (Fed. Cir. 2005).

Here, the February 12, 2016 Amended Complaint's NSF claims are based on section 1498(a), a statute that is money-mandating on its face. *See* 28 U.S.C. § 1498(a) ("Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, *the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.*") (emphasis added). Furthermore, Plaintiff is the owner of the United States patents asserted in this case and is therefore entitled to recover under section 1498(a). *See* 28 U.S.C. § 1498(a).

Accordingly, the court has jurisdiction to adjudicate the February 12, 2016 Amended Complaint's NSF claims. The Government's June 24, 2016 Motion To Dismiss, pursuant to 12(b)(1), is denied.

> **b.    The June 24, 2016 Motion To Dismiss The February 12, 2016 Amended Complaint's National Science Foundation Claims, Pursuant To RCFC 12(b)(6), Is Denied.**

The February 12, 2016 Amended Complaint's NSF claims allege sufficient facts to support a reasonable inference that the manufacture and use of the accused devices was "for the Government." *See Iqbal*, 556 U.S. at 678. The NSF claims allege that the Government awarded research grants to develop portable devices that can: (1) identify dangerous chemical, radiological, and bacterial agents; and (2) track the spread of disease.[7] Based on the alleged facts, it is plausible that the accused devices were used to further the military defense, national security, and public health interests of the United States: policies that the Government has a fundamental interest in advancing. Accordingly, the court can reasonably infer that the use of the NSF-funded devices was "for the Government." *See, e.g., Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's participation in a satellite program was "for the Government," because the program was vital to the military defense and security of the United States); *see also Madey*, 413 F. Supp. 2d at 607 (M.D.N.C. 2006) (explaining that a use is "for the Government" if it is in furtherance and fulfillment of a stated Government policy and for the Government's benefit).

The February 12, 2016 Amended Complaint's NSF claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of the Government." Authorization or consent can be implied from the circumstances—"e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." *Hughes Aircraft Co.*, 534 F.2d at 901. For example, in *TVI Energy Corp.*, the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device. *See TVI Energy Corp.*, 806 F.2d at 1060.

In this case, the relevant NSF grants anticipate that the awardees will develop and test the devices proposed in their applications. *See, e.g.,* NSF Award No. 1444240 ("Annual and Final

---

[7] The relevant NSF grants are being used to develop: "a portable smartphone attachment that can be used to perform sophisticated field testing to detect viruses and bacteria," 2/12/16 Am. Compl. ¶78; "[a device] that derives biological signals from your smartphone's accelerometer . . . [and] [t]his information is useful to base medical diagnoses in real-life conditions and to help track chronic health conditions and effects of therapeutic interventions," 2/12/16 Am. Compl. ¶80; "a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera and processing power to detect any kind of biological molecules or cells," 2/12/16 Am. Compl. ¶92; a handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaria, 2/12/16 Am. Compl. ¶102; "[a portable device for] real-time detection of explosives, toxicants, and radiation," 2/12/16 Am. Compl. ¶122; "highly sensitive rapid medical diagnostic tests," 2/12/16 Am. Compl. ¶126.

project reports, as required in the NSF Grant Conditions, should document all efforts and outcomes, whether or not they are successful."). Government funding of research that will lead to the development and testing of an accused device supports a reasonable inference that the Government impliedly sanctioned infringing activity.

## V.     CONCLUSION.

For the reasons discussed herein, the Government's June 24, 2016 Motion To Dismiss Certain Devices, pursuant to RCFC 12(b)(1) and 12(b)(6), is denied.

Plaintiff, however, is cautioned that the court's ruling today is based on the standard of review on sufficiency of the pleading alone and is not to be construed as a ruling on the substantive merits of the patent infringement claims alleged in the February 12, 2016 Amended Complaint. The court will convene a telephone status conference in the next few days to discuss a schedule to move this case towards adjudication.

**IT IS SO ORDERED.**

SUSAN G. BRADEN
Judge

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---



LARRY GOLDEN,
*Plaintiff-Appellant*



v.

APPLE INC., SAMSUNG ELECTRONICS USA, LG
ELECTRONICS USA, INC., QUALCOMM
INCORPORATED, MOTOROLA SOLUTIONS, INC.,
PANASONIC CORPORATION, AT&T INC.,
VERIZON CORPORATION SERVICE GROUP,
SPRINT CORPORATION, T-MOBILE USA, INC.,
FORD GLOBAL TECHNOLOGIES, LLC, FAIRWAY
FORD LINCOLN OF GREENVILLE, GENERAL
MOTORS COMPANY, KEVIN WHITAKER
CHEVROLET, FCA US LLC, BIG O DODGE
CHRYSLER JEEP RAM,
*Defendants*

---

2022-1229

---

Appeal from the United States District Court for the
District of South Carolina in No. 6:20-cv-04353-JD, Judge
Joseph Dawson, III.

-------------------------------------------------

**LARRY GOLDEN,**
*Plaintiff-Appellant*









v.

**GOOGLE LLC,**
*Defendant*

———————

2022-1267

———————

Appeal from the United States District Court for the
District of South Carolina in No. 6:21-cv-00244-JD, Judge
Joseph Dawson, III.

———————

Decided: September 8, 2022

———————

LARRY GOLDEN, Greenville, SC, pro se.

———————

Before DYK, TARANTO, and STOLL, *Circuit Judges.*

PER CURIAM

Larry Golden appeals two orders of the United States
District Court for the District of South Carolina ("district
court") dismissing his patent infringement claims against
various defendants. We *affirm* the dismissal in Case
No. 22-1229 but *vacate* the dismissal in Case No. 22-1267
and *remand* for further proceedings consistent with this
opinion.

BACKGROUND

Mr. Golden owns a family of patents concerning a sys-
tem for locking, unlocking, or disabling a lock upon the

detection of chemical, radiological, and biological hazards.[1] In 2019, he sued sixteen defendants in the district court, alleging patent infringement by their development and manufacturing of certain devices. The district court dismissed the suit without prejudice, and this court affirmed the dismissal "on the ground of frivolousness" because Mr. Golden's complaint "offer[ed] only vague generalities and block quotes of statutes, cases and treatises, but nowhere point[ed] us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant." *Golden v. Apple Inc.*, 819 F. App'x 930, 931 (Fed. Cir. 2020).

On January 5, 2021, in Case No. 22-1229, Mr. Golden again sued the same sixteen defendants from the 2019 case for patent infringement ("the Apple case"). He initially filed the same over-300-page complaint held to be frivolous in the 2019 case. After the magistrate judge imposed a 35 page limit on the complaint, Mr. Golden filed a shortened complaint complying with the restriction. On January 26, 2021, in Case No. 22-1267, Mr. Golden separately sued Google LLC for patent infringement ("the Google case"). The magistrate judge reviewed the complaints in both cases and recommended summary dismissal with prejudice without issuance of service of process or leave to amend and monetary sanctions for the filing of frivolous litigation.

In both cases, the district court adopted the magistrate judge's recommendations in part. In the Apple case, the district court dismissed the complaint as frivolous without the issuance of service of process but declined to dismiss with prejudice. Additionally, the district court lifted the page restriction for an amended complaint. In the Google case, the district court dismissed the complaint with

---

[1]    The patents at issue in these cases are U.S. Patent Nos. 7,385,497; 9,096,189; 9,589,439; 10,163,287 and Reissue Patent Nos. RE43,891 and RE43,990.

prejudice and without the issuance of service of process. Mr. Golden appeals the district court decisions in both cases. We have jurisdiction under 28 U.S.C. § 1295(a)(1). On appeal, Mr. Golden has filed briefs, while the defendants have not filed responsive briefs.

## DISCUSSION

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). In the patent context, this court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556). We review the district court's dismissal of the complaint de novo. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

In the Apple case, the district court dismissed the docketed complaint as frivolous after finding that Mr. Golden "failed to include factual allegations beyond the identities of the Defendants, reference to the alleged infringing devices, and the alleged infringed-upon patents." Dist. Ct. Op. at 4–5. We agree with the district court: the docketed complaint is nothing more than a list of patent claims and

accused products manufactured by each defendant for each asserted patent. Mr. Golden contends that his original complaint contained sufficient factual allegations to support his claims. However, he concedes that the rejected original complaint was identical to the one that this court deemed frivolous in the 2019 case. His effort to relitigate the sufficiency of the original complaint is precluded under the doctrine of res judicata. *See Arizona v. California*, 530 U.S. 392, 412 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though [a preclusion] defense has not been raised."). Mr. Golden does not argue that the docketed complaint contains factual allegations beyond those contained in his original complaint or that the allegations in the docketed complaint do anything beyond listing the alleged infringed-upon patent claims and the alleged infringing devices. This is plainly insufficient. We see no error in the district court's without prejudice dismissal of the Apple case.

In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far left column instead of Apple." Dist. Ct. Op. at 4. But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim

GOLDEN v. APPLE INC.

limitations to infringing product features, and it does so in a relatively straightforward manner.

We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous.

CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal in Case No. 22-1229, vacate the dismissal in Case No. 22-1267, and remand for further proceedings consistent with this opinion.

**CASE NO. 22-1229 AFFIRMED**

**CASE NO. 22-1267 VACATED AND REMANDED**

COSTS

No costs.

# In the United States Court of Federal Claims

No. 13-307C
(Filed: November 10, 2021)

* * * * * * * * * * * * * * * * * * *

LARRY GOLDEN,

                 *Plaintiff,*

v.

THE UNITED STATES,

                 *Defendant.*

|  |
|---|
| Patent infringement; 28 U.S.C. § 1498(a); RCFC Patent Rule 4; Preliminary infringement contentions; Dismissal. |

* * * * * * * * * * * * * * * * * * *

    *Larry Golden*, pro se.

    *Grant D. Johnson*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, and *Gary L. Hausken*, Director.

## OPINION

    Plaintiff, Larry Golden, owns a family of patents concerning a device for detecting chemical, radiological, and biological hazards. He alleges generally that the United States, through the Department of Homeland Security, has caused cell phone manufacturers to produce devices that infringe on one or more of his patents. Eight years on, however, the case has not proceeded past the pleadings stage; the most recent pleading being the sixth amended complaint. After allowing leave to file that complaint, we warned plaintiff that it would be his last, and we set a schedule to proceed to claim construction. The first step was to have been the filing of preliminary infringement contentions. Plaintiff's contentions, however, were "woefully deficient" and were struck by our order of July 29, 2021. *Golden v. United States*, 2021 WL 3238860, at *7 (Fed. Cl. July 29, 2021). We declined, however, to grant defendant's request that we dismiss the case and thus directed plaintiff to make another attempt at preliminary contentions. We cautioned, however, that it would be his final chance. *Id.*

Plaintiff timely submitted two batches of documents on August 19 and 23, 2021. Those were docketed, after an order clarifying their status for the clerk's office, on September 20, 2021. Defendant has since again moved to strike the contentions and to dismiss the complaint. Because we agree that the infringement contentions fail to meet the requirements of local patent rule 4 and improperly attempt to enlarge the scope of this case, we grant the motion to strike and to dismiss.

BACKGROUND

The Sixth Amended Complaint (ECF No. 195) puts forth a general theory that the Department of Homeland Security ("DHS") solicited proposals for the development of devices, such as plaintiff's, through its "Cell-All" initiative in 2007 and the following years. The focus of this program was cell phones. Plaintiff avers that he responded to the solicitation along with cell phone manufacturers such as Apple and Samsung. Mr. Golden alleges that DHS continues to fund development of these devices to this day. Through these efforts, according to plaintiff, the government has caused other manufacturers to develop, produce, and commercialize devices, such as cell phones, that infringe on plaintiff's patents.

Plaintiff describes his invention as a Communication, Monitoring, Detecting, and Controlling Device, known as a "CMDC." Sixth Am. Compl. ¶ 6. Each word corresponds to a feature of his invention. "Communication," such as cellular or WiFi; "monitoring," such as a screen for viewing alerts from the device; "detecting" via a "chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor"; and "communication" is found in the fact that the communication device is part of a system that can communicate with other devices. *Id.* Also central to his invention is the presence of a central processing unit ("CPU") for making these constituent elements function together, or as he describes it in the complaint, an "engine of logic, as with the brain." *Id.* The CMDC device also features a locking, unlocking and disabling function via sent or received signals. This device is claimed by the five patents still at issue: the '497, '752, '189, '439 and '287 patents.[1]

Plaintiff's earlier, defective infringement contentions accused 28

_____

[1] These refer to U.S. Patent Numbers 7,385,497; 8,106,752; 9,096,189; 9,589,439; and 10,163,287.

2

specific devices, 10 manufactured by Apple, nine by Samsung, and nine by LG. The documents submitted by plaintiff on August 19, 2021, again identify 10 Apple products and nine from Samsung. Voluminous claim charts for these products are included. The document received on August 23, 2021, however, states that 30 devices from Apple, 27 from Samsung, and 27 from LG are at issue. In addition to the allegations against LG, these contentions add smart watches and chipsets and CPUs used by Apple in a host of products it has offered and currently offers. The same is true for Samsung. Chipsets and CPUs used in LG products are also included. Plaintiff did not attach a claim chart that separately identifies how these additional devices are alleged to infringe nor any claim chart for any products used or offered by LG. The latter, specific contentions regarding LG, along with a claim chart, were received by the clerk's office on September 21, 2021, along with a "Notice of Missing Documents" in which plaintiff states that the docket is missing his contentions regarding LG. He points out that the appendix to defendant's motion to strike contains the contentions aimed at LG. The notice does not explain how or why those documents are missing nor does it seek leave to file them out of time. The notice and attached contentions are thus directed to be returned to plaintiff unfiled.[2]

Earlier this year, we struck plaintiff's first attempt at preliminary infringement contentions for two principal reasons. The first was that plaintiff's submittals, including lengthy charts, did not identify a specific component in the accused devices that was alleged to be a sensor. *Golden*, 2021 WL 3238860 at *4-6. It was insufficient that plaintiff's contentions alleged the general ability of the devices to be modified to operate as plaintiff's device does. *Id.* at 6.

The second basis for rejecting plaintiff's earlier attempt at infringement contentions was that they did not identify a locking feature as claimed by plaintiff's patents. *Id.* at 6-7. Plaintiff's citation to the doctrine of equivalents was unavailing because the charts offered did not assert with any detail how the accused devices performed substantially the same functions in substantially the same way. *Id.* at 7. Defendant again raises these issues regarding plaintiff's revised preliminary contentions. As explained

---

[2] We note, however, that the LG contentions were served on defendant and treated in the government's motion. Although we decline to add them to record *sua sponte*, the holdings below would apply to these contentions as well. Thus, even if we considered them, the outcome would not change.

below, plaintiff's corrected contentions fail for these same reasons.

Plaintiff responded to defendant's motion to strike and asked the court to grant summary judgment in his favor because of an alleged abuse of process on defendant's part for having repeated its same procedural arguments. Those motions are fully briefed.[3] Oral argument is unnecessary.

## DISCUSSION

The overarching issue, once again, is whether plaintiff's infringement contentions comply with the court's patent rules, specifically Patent Rule 4, which lists what must be present in preliminary infringement contentions. In pertinent part:

    (a) the claim in each product, process, or method of each patent at issue that is allegedly infringed by each opposing party;

    (b) for each asserted claim, each product, process, or method that allegedly infringes the identified claim. This identification must include the name and model number, if known, of the accused product, process, or method;

    (c) a chart identifying where each element of each asserted claim is found within each accused product, process, or method, including the name and model number, if known;

    (d) whether each element of each identified claim is alleged to be literally present or present under the doctrine of equivalents in the accused product, process, or method; and

---

[3] After the conclusion of briefing on the parties' motions, defendant filed a notice regarding the outcome of related proceedings that Mr. Golden brought in district court against the cell phone manufacturers. The complaint was dismissed as frivolous. *Golden v. Apple Inc.*, No. 6:20-cv-04353 (D. S.C. Nov. 3, 2021) (slip op. dismissing case). Mr. Golden attempted to lodge his objections regarding that decision in documents received by our clerk's office on November 4 and 8, 2021. Those documents were not docketed by the clerk's office because there is no provision in the court's rules allowing them to be filed. Accordingly, we direct the clerk's office to return them to plaintiff unfiled.

Rules of the United States Court of Federal Claims ("RCFC"), Appendix J, Patent Rule 4(a)-(d).

Preliminary infringement contentions serve, and must be specific enough, to put the opposing party and the court on notice of plaintiff's position as to "where each element of each infringed claim is found within the accused device." *Iris Corp. Berhad v. United States*, 84 Fed. Cl. 12, 16 (2008) (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1362-63 (Fed. Cir. 2006)). In a patent case, a specialized and technical area of law, the preliminary contentions supplement the notice pleading required of the complaint to focus the issues for discovery and trial. *Iris Corp. Berhad. v. United States*, 2019 WL 2317143, at *2 (Fed. Cl. May 8, 2019).

Defendant argues that Mr. Golden's corrected contentions are deficient because they again fail to specifically identify the hazardous material sensors in any of the accused products and again do not identify in any of the accused devices how the unlocking function is performed in response to the detection of a hazard. Defendant also argues that the late-included CPUs and chipsets are an improper expansion of the case and, in any event, have no corresponding claim chart to identify where in those devices the patent is infringed. We agree on each point and begin with the latter.

I. CPUs And Chipsets

Plaintiff's August 23 submission improperly attempts to expand the scope of the case to include a host of new devices, most which appear to be only components in other products. This appears in tune with plaintiff's argument that a CPU is the infringing component because it can be programmed to perform the functions or direct other components to perform the functions claimed by his patents. Putting the propriety of that aside for the moment, the inclusion of these new chips as independent infringing devices is an improper attempt to again enlarge and materially change the infringement pled in the final amended complaint. We warned that the pleading stage had come to an end. *See* Order of February 21, 2021 at 7 (ECF No. 215) ("Plaintiff may file no further amended complaints."). In any event, these contentions are not supported by a claim chart and thus violate RCFC Patent Rule 4(c). Accordingly, plaintiff's August 23 submission is struck for failure to conform to the court's rules and failure to follow a court order.

## II. Sensors

Defendant argues that plaintiff's corrected preliminary infringement contentions, like the first attempt, do not identify any sensing or detecting component in the accused devices. Instead, plaintiff's contentions merely point to the CPU, recite information from the patents' specifications regarding potential embodiments of his invention, or contain other irrelevant information.[4]

Plaintiff's response argues generally that preliminary infringement contentions need not provide every piece of evidence to support plaintiff's case since they are produced prior to discovery; a rule of reasonableness must be applied. Plaintiff then provides examples from his LG contentions to show how has met the specificity required of preliminary contentions. Plaintiff merely quotes *in haec verba* from his LG contentions for the sensing component of the first claim of the '497 patent. He then quotes from the specifications of all five patents regarding the use of the CPU in his invention. Although not explicitly argued, we understand this to be an argument that the ability of the CPU in the accused devices to instruct the phones to perform functions, such as running a sensor, is sufficient to infringe on his device, given the central importance of the CPU to both his CMDC and the accused phones by LG, Apple, and Samsung. He also discusses documents from Qualcomm, a mobile phone chip producer, apparently submitted to DHS in response to the Cell-All solicitation. Lastly, plaintiff reiterates that Claim 1 of the '497 patent is infringed by the accused products' CPUs, chipsets, and biometric locking disablers (fingerprint reading).[5]

Defendant is correct that the corrected contentions and claim charts are well short of the requirement of Patent Rule 4(c) in that they do not identify any sensing or detecting component. We will use the Apple claim chart as illustrative of the problem.

---

[4] Also included in plaintiff's claim charts corresponding to the sensor limitations is information regarding smart watches generally, the Cell-All initiative's aims, and an *Inter Partes Review* decision concerning a patent not at issue.

[5] The document goes on to discuss defendant's preliminary invalidity contentions submitted in response to plaintiff's earlier-struck infringement contentions.

A.   '497, '752, and '439 Patents' Sensor Limitation

Plaintiff's chart for Apple, for the '497 patent, begins with independent claim 1, which claims "a multi sensor detection and lock disabling system for monitoring products . . . comprising: . . . . a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case . . . ." Apple Claim Chart at 9 (quoting the '497 patent, claim 1).   In the column for the accused devices, plaintiff writes that the government and Apple infringe this detecting component under the doctrine of equivalents through the "NODE+" platform "developed with NASA for the DHS Cell-All project." *Id.*   The chart states that NODE+ is a small cylindrical device that "transmit[s] data from sensors to smartphones or other smart device." *Id.*   This then is used with "off-the-shelf sensors" to create an "interchangeable module" that could be "snapped onto either end of smartphone or other device." *Id.*   It is apparent that the NODE+ and the "off-the-shelf sensor" are both separate from and extraneous to the accused devices.   The same language is used by plaintiff for the sensor or detector limitation in his '752 and '439 patents. *Id.*   at 16 (Claim 10 of the '752 patent); 97 (Claim 13 of the '439 patent); 106 (Claim 14 of the '439 patent);173 (Claim 22 of the '439 patent); 187 (Claim 23 of the '439 patent). This language is further repeated for other products in the Apple charts.

General Systems Inc. and the NODE+ device are new to the suit. Thus, as defendant points out, they are an improper expansion of the case beyond the ambit of the final amended complaint.   They could therefore be ignored for this reason alone.   More fundamentally, however, they illustrate the painfully obvious problem with plaintiff's case: he has not, and at this point in the litigation we must presume cannot, credibly allege what component of the accused Apple, or Samsung for that matter, devices infringe literally, or is even equivalent to, hazard detectors or sensors claimed in his patents.[6]   NODE+ and the additional sensor needed to make it work are not components of the phones and smart watches accused by plaintiff. This is clarified further in plaintiff's reply brief where he explains that he has tried to demonstrate to defendant that "when the sensing and detection means is placed in, on, upon, or adjacent the cell phone, the integration forms a 'sensor'." Pl.'s Reply at 5.   He goes on to include pictures of examples, which show the additional sensors added or affixed to the phones.   They are

---

[6] The same language is used in plaintiff's contentions regarding Samsung, and for that matter, LG. *See, e.g.,* Samsung Claim Chart at 9, 16 *et seq.*

7

not native to the devices as manufactured by Apple or Samsung. Unable to find a sensing component in the accused devices, Mr. Golden did as he has done for many years now, simply brought in another party and device. Unexplained is how they relate either to the products ostensibly accused by the complaint or the overarching mystery present in all of plaintiff's pleadings—how the government is on the hook for the private parties' products. The citation to the NODE+ sensors of General Systems Inc. does not meet plaintiff's burden to "identify[] where each element of each asserted claim is found within each accused product." RCFC Patent Rule 4(c).

## B. The '287 Patent's Sensor Limitations

Like the three patents discussed above, the '287 patent contains three claims which teach that the CMDC device includes one or more sensors or detectors for hazardous materials. Claim 4 of the '287 states that the device is comprised of, among other things, "at least one or more detectors . . . of a chemical, biological, radiological, or explosive agents." Apple Claim Chart at 198 (quoting '287 patent, claim 4). Claims 5 and 6 likewise teach at least one hazard detector. *Id.* at 208, 218. The same is repeated for other Apple devices and the Samsung devices. The claim chart for this element of the invention identifies, ostensibly under the doctrine of equivalents, the CPUs of these Apple devices (phones and smart watches) as the sensors. Plaintiff explains that the CPU is connected to the "field devices" such as sensors to "provide[] the interface between the CPU and the information providers (inputs)" and then performs whatever function the phone has been programmed to perform in response to those inputs. *Id.* at 198, 208, 218. It is apparent from these charts and from plaintiff's response to the motion to strike that he asserts that the CPUs themselves satisfy the sensor limitation of his patents. We disagree.

Plaintiff's own chosen language belies his point. He states that the CPU receives inputs from the "field devices," which include any sensors, and then executes the commands stored in memory to respond to these inputs. His patents, however, claim a specific type of field device, *i.e.* hazardous material sensors, as an independent component of his invention. Thus, under Patent Rule 4, he must identify where in the Apple and Samsung devices such a sensor is present. Instead, plaintiff asserts that the phone's brain, its CPU, ought to count as the sensor. This, despite his own explanation in the claim charts that the CPU communicates with separate input devices (including sensors). Even under the doctrine of equivalents, the CPU cannot be both the thing that responds to the inputs—the brain—and the extremities

8

that deliver the inputs—in plaintiff's analogy, sensory nerves. Plaintiff's preliminary infringement contentions fail to identify a sensor or detector in the accused products as claimed by his patents.

## C. The '189 Patent

Like his other patents, plaintiff's '189 patent contains two claim limitations that include sensors for hazardous materials. These are found in independent claims 7 and 8. Apple Claim Chart at 68, 77. Plaintiff's claim charts make no attempt whatsoever to link these limitations to any component of the accused devices. The charts instead quote from an *Inter Partes Review* at the Patent Office of a different patent and from the '189 specifications regarding sensors. This does not pass muster under the rules as it wholly fails to link these limitations to the accused devices. For this reason, the corrected contentions must be struck.

## III. Locking Function

Defendant also argues that the claim charts fail to identify in the accused devices any locking mechanism or function as claimed by the five patents. This same problem betrayed plaintiff's first attempt at infringement contentions, and it does so again. Ignoring what was alleged in his claim charts, plaintiff responds that he has identified the CPUs of the accused products and their "fingerprint biometric lock disablers" which are together, in his opinion, the equivalent of the lock disabling systems claimed by his patents. Pl.'s Resp. and Cross-Mot. at 20. As discussed below, however, his claim charts do not identify any biometric fingerprint sensors or functions in the accused devices as the claimed locking features. He goes on to state that the locking mechanisms are described in his patents' specifications and thus there is no need for further specificity in the claims. It is unclear how that last point is responsive to defendant's argument, which has nothing to do with the lack of specificity in the patent itself, but rather asserts that Mr. Golden's claim charts are deficient because they do not identify the locking mechanisms in the accused devices.

## A. The '189 and '439 Patents

Claim 2 of the '189 patent and claim 14 of the '439 patent teach that the invention is comprised of, among other things, "monitoring equipment [that] is interconnected to a product equipped to received signals from or send signals to the lock disabling mechanism that is able to engage and

9

disengage or disable the lock disabling mechanism . . . ." Apple Claim Chart at 34, 110, 252, 328, 471, 547 (quoting the '189 and '439 patents). The corresponding box in the accused devices column states that the Apple products are "capable of sending signals to lock and unlock doors" and security systems in buildings and vehicles. *Id.* The same is true for the Samsung devices, and for that matter, the LG devices in plaintiff's charts.

This is again short of what is required by the rules. As we stated before, claiming that a product merely is capable of operating in a manner that infringes is insufficient notice in an infringement contention. *Golden*, 2021 WL 3238860 at *6 (citing *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001)). That a device could do something is not sufficient to identify what component performs the necessary function.[7] Beyond that, what is cited by plaintiff as exemplary of the infringement appears to be an altogether separate feature of smart devices, in essence, that they can be used to remotely lock and unlock other devices present in one's home or vehicle. The limitations claimed in the patents for a locking function claim a capability to lock the device itself or some of its subsystems, such as the sensors, not a device external to the CMDC. Plaintiff's corrected contentions fail to identify where in the accused devices a locking mechanism is present.

## B. '497 and '752 Patents

The '497 and '752 patents claim a mechanism for locking the CMDC in response to the detection of hazardous materials, found in claim 1 and claim 10 of those patents respectively. As we stated before, plaintiff's contentions must identify where or how in the accused devices this limitation is found. Plaintiff has again failed to do so.

For claim 1 of the '497 patent, plaintiff's contention chart accuses the

---

[7] To be fair, the patents also separately claim a locking and unlocking mechanism which responds to unauthorized attempts to access the device by locking it. For these limitations, the claim charts recite the patents' specifications and apparently quote an explanation from Apple regarding its Apple ID locking functions and, for Samsung, verbiage from a Samsung website regarding a similar security feature. *See, e.g.*, Apple Claim Chart at 33; Samsung Claim Chart at 10. Like the other locking feature in the claims, plaintiff has failed to point to anything specific in the accused devices which might literally or equivalently infringe on his design.

Apple products of having internal carbon monoxide sensors which then trigger light or sound alarms to alert the phone or watch user. Emergency services are automatically called if the alarm is not responded to. For Samsung products (and the LG products) a similar carbon monoxide warning feature is highlighted, but this time the sensor is in an external detector which communicates with the Samsung device via a downloaded application to provide a warning to the user. Both examples are a clear misfire as they do not purport to be a locking feature in response to a detected hazard, and, in the case of the Samsung (and LG) devices, both require communication with another, un-accused device. These are clear failures to identify where in the accused devices the locking feature in response to a detected hazard is present.

C. '287 Patent

Claims 4, 5, and 6 of the '287 patent each teach "at least one" locking mechanism that communicates with "at least one" CPU for locking or disabling the device. *E.g.*, Apple Claim Chart at 197, 206, 216 (quoting claims 4, 5, and 6 of the '287 patent). For this mechanism, the claim charts recite the same language regarding the capability of a CPU which plaintiff used for the detectors discussed above. *Id.* The same is true for the Samsung products. *E.g.*, Samsung Claim Chart at 197, 206, 216. An inspection of the LG chart reveals the same.

At best, this contention can be read to argue that the CPUs make the accused smart devices capable of locking. That is insufficient because the capability of a device to be programmed to perform similarly does not identify where or what in the device meets the patent's limitation. Plaintiff's patent clearly claims an independent component part of the CMDC that is a locking mechanism. Such a component is wholly missing from the claim chart. Plaintiff has had two attempts at identifying this feature in the accused devices. Having failed to do so, we assume that he cannot.

III. Other Deficiencies

The remaining limitations of the claim chart are almost entirely deficient as well. Although the two failures identified above are sufficient grounds to strike the new contentions, we agree with defendant that even a cursory examination of the claim charts for the other limitations reveals that they almost universally fail to meet the requirements of Patent Rule 4. Aside from the general claim of the patents that the CMDC includes a CPU, which

11

is unquestionably present in the devices accused, the rest of the limitations regarding sensors, viewing screens, warning lights, GPS connections, power sources, and communications components (Bluetooth, WiFi, and radio) are absent in the claim chart for each of the accused products. Instead, plaintiff's corrected claim charts merely provide a short explanation of the function of a CPU or a citation to the patent's specifications or to a decision of the Patent Office regarding another related patent.[8]

In a couple of other instances, plaintiff's charts refer to two prototype cell phones produced in 2011 for DHS, but neither of these phones is an accused product, nor were they made by Apple, Samsung, or LG. They cannot serve as the basis for a valid infringement contention for the accused products. In sum, plaintiff's corrected preliminary infringement contentions are irreparably deficient and must be struck.

## CONCLUSION

Mr. Golden has had two opportunities to conform his preliminary infringement contentions to the court's rules. These procedural requirements are not merely perfunctory. Patent Rule 4's specificity requirements serve an important function—to narrow and focus the issues and theories that must be pursued during the litigation. It is therefore not a triumph of form over function to dismiss the case for plaintiff's repeated failure to follow the rules in this regard.

Plaintiff has had eight years to come up with a plausible theory of infringement against the United States and the third parties whose products he alleges were made at the behest of the government. Mr. Golden has amended his complaint six times in response to the government's objections to the shortcomings in his pleadings. As we warned earlier, failure to produce a sufficiently detailed claim chart would cause the court to assume that it cannot be done. That has happened. Enough time and resources have been expended by the court and the Department of Justice dealing with these allegations. Because plaintiff has failed to conform his preliminary infringement contentions with Patent Rule 4 and has failed to follow a court order in that regard, the case must be dismissed. Accordingly, the following is ordered:

---

[8] Also included in his claim charts is generalized background regarding the Cell-All initiative, other unaccused devices, and general information about CPUs and smart devices.

1. The clerk's office is directed to return to plaintiff unfiled the materials received on September 21, 2021 (LG contentions) and the documents received on November 4 and November 8, 2021.

2. Defendant's motion to strike and to dismiss (ECF No. 240) is granted pursuant to Rule 41(b).

3. Plaintiff's cross-motion for summary judgment (ECF No. 241) is denied.

4. The Clerk of Court is directed to dismiss the complaint with prejudice and to enter judgment accordingly.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

Case: 24-2256    Document: 16    Page: 79    Filed: 11/25/2024



**UNITED STATES POSTAL SERVICE**®

**PRIORITY MAIL EXPRESS**®



EI 975 707 199 US

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)    PHONE **864 288-5605**

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**

☒ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)    PHONE **202 275-8000**

U.S. COURT OF APPEALS FOR THE FEDERAL
CASE No: 24-2256     CIRCUIT
717 MADISON PLACE, NW
WASHINGTON, SC
**ZIP + 4®** (U.S. ADDRESSES ONLY)

2 0 4 3 9 -

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

◄ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☒ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29662 | 11/23/24 | $ 32.00 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 11/22/24 | ☒ 3:00 PM | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 11:42 ☒ AM ☐ PM | | $ | |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | |

| Weight | ☐ Flat Rate | Acceptance Employee Initials | |
|---|---|---|---|
| lbs.   ozs. | | TL | $ 32.00 |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM ☐ PM | |

LABEL 11-B, NOVEMBER 2023     PSN 7690-02-000-9996